# APPENDIX A

COPY

FILED

**IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE**

TN DENTAL PROFESSIONALS, P.C., )
　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
　　　Plaintiff, 　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
v. 　　　　　　　　　　　　　　　　　 )　 Case No. _18-1384-I_
　　　　　　　　　　　　　　　　　　 )　 Chancellor _BONNYMAN_
ROBERT T. WINFREE, D.D.S. and 　　 )　 Jury Demand
OLIVIA WINFREE, 　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　 )
　　　Defendants. 　　　　　　　　　 )

**VERIFIED COMPLAINT FOR TEMPORARY
RESTRAINING ORDER, INJUNCTION AND DAMAGES**

　　　Plaintiff TN Dental Professionals, P.C. (the "Company") brings this Verified Complaint for Temporary Restraining Order, Injunction, and Damages (the "Complaint") against Defendants Robert T. Winfree, D.D.S. ("Dr. Winfree") and Olivia Winfree ("Mrs. Winfree") (sometimes collectively referred to herein as the "Winfrees") and states:

**SUMMARY**

　　　1.　　The Company operates dental practices with locations throughout middle Tennessee. Dr. Winfree is a former employee of the Company who now seeks to compete with the Company and interfere with its relationship with the Company's patients and vendors in violation of a written non-compete, non-interference, and non-disparagement agreement, and various common law obligations. The Company seeks a Restraining Order, temporary and permanent injunctive relief, and damages.

　　　2.　　The Company seeks to restrain and enjoin: (1) Dr. Winfree, directly, and Mrs. Winfree, indirectly, from further violating the terms of Dr. Winfree's non-compete, non-solicit,

4833-8220-8900.3

2

and non-disparagement agreement, and (2) Dr. Winfree and Mrs. Winfree from utilizing or

disclosing the Company's confidential and proprietary information and trade secrets, and from

interfering with the Company's relationships with its patients and vendors.  In addition to

preventing irreparable injury to it, the Company also seeks to recover all damages—to the extent

they are recoverable—it has suffered and will suffer as a result of the Winfrees's actions.  This is

the Company's first application for extraordinary relief.

## PARTIES

3.      The Company is a Tennessee professional corporation with its principle place of

business located at 2505 21st Avenue South, Suite 204, Nashville, Tennessee 37212.

4.      On information and belief, the Winfrees are residents of Wilson County,

Tennessee.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the parties and the subject matter of this action

pursuant to Tenn. Code Ann. §§ 20-2-223, 20-2-225, and 16-11-101, et seq.

6.      Venue is proper in this Court pursuant to Tenn. Code Ann. §§ 16-11-115, and 20-

4-101, *et seq.* and because of contractual agreements between the Company and Dr. Winfree with

respect to venue.

## FACTUAL BACKGROUND

### I.      Dr. Winfree Sells His Dental Practice.

7.      On December 16, 2015, CPF Dental, LLC[1] and Dr. Winfree entered into an Asset

Purchase Agreement whereby Dr. Winfree and the professional corporation he formed to own his

---

[1] CPF Dental, LLC d/b/a Marquee Dental Partners ("Marquee") is affiliated with the Company through a business services agreement, whereby Marquee provides non-clinical administrative/business services to the Company. Though Marquee is the named party in the APA, pursuant to its terms, Dr. Winfree agreed to transfer the dental practice and all clinical assets to the Company (and did so pursuant to a Professional Assets Bill of Sale), and New PC is a third party beneficiary under the APA.
4833-8220-8900.3

2

dental practice, Robert T. Winfree, D.D.S., P.C. ("Winfree PC"), located at 4243 Lebanon Pike, Hermitage, TN 37076 (the "Practice Location"), agreed to sell the non-clinical assets of Winfree PC to CPF Dental, LLC and the clinical assets of Winfree PC to TN Dental Professionals, P.C., for a combined purchase price of $1,675,000 (the "APA"). A true and exact copy of the APA and the Professional Assets Bill of Sale is attached hereto as Exhibit A. Prior to selling his dental practice, Dr. Winfree operated under the business name "Winfree & Denton Cosmetic and General Dentistry". The "Denton" being Dr. Gregory S. Denton, D.D.S.—another dentist in Wilson County, Tennessee. Following this acquisition, TN Dental Professionals, P.C. operated the newly acquired Practice Location (the "Practice") under the name "Winfree & Craig Cosmetic and General Dentistry".

8.      Contemporaneous with the closing of the APA (and as a condition thereto), Dr. Winfree executed an employment agreement with the Company whereby he agreed to work as a dentist at the Practice Location (the "Employment Agreement"). Dr. Winfree practiced in the same building and serviced the same patients that he did prior to selling his practice. However, and critical to this dispute, Dr. Winfree was an employee of the Company as a result of his sale, and the Practice was thereafter owned by TN Dental Professionals, P.C.—not Dr. Winfree or Winfree PC. A true and exact copy of the Employment Agreement is attached hereto as Exhibit B.

9.      As compensation for his services under the Employment Agreement, the Company paid Dr. Winfree an annual salary of $250,000. The Company also provided Dr. Winfree with the opportunity to achieve performance incentives.

II.     **The Restrictive Covenants in Dr. Winfree's Employment Agreement.**

10.     Under the terms of his Employment Agreement, and in exchange for the

Company's willingness to employ him and provide a lucrative salary, Dr. Winfree agreed to the

following restrictive covenants:

**Noncompetition; Non-Solicitation; Non-Interference; Non-Disparagement.**

. . .

[Dr. Winfree] agrees that during the Term and for a period of two years
following expiration or termination of this Agreement for any reason (the
"Restricted Period"), except pursuant to this Agreement on behalf and for the
benefit of [the Company], [Dr. Winfree] shall not, directly or indirectly, on his or
her own behalf or on behalf of any other person, organization or entity,
individually or collectively, in any fashion, form or manner, do or take any of the
following actions, nor attempt to do or take, assist any other person in doing or
taking or planning to do or take any such action:

(a)          (i) engage or participate or be involved in any capacity, or (ii)
own any shares or interest in, or manage, operate or control or contract with, or
be employed or engaged by or associated with, or serve as a director, officer,
manager, consultant, advisor, trustee or partner of, or provide services, advice,
financing or other aid or assistance to, or lend or permit its or his or her name to
be used in connection with, any company, business, enterprise, practice or other
Person (other than [the Company]) engaged or involved (or planning or taking
steps to become engaged or involved), in (A) the practice of dentistry or the
provision, performance or offer of any type of dental treatment, procedures or
services, in each case anywhere within a radius of ten (10) miles extending in all
directions from each Practice Site or other location at which [Dr. Winfree]
provides services hereunder for or on behalf of Employer during the Term  . . . ;
nor

. . .

(c)          Solicit, recruit, induce or endeavor to entice away any Person who
is or, at any time during the immediately preceding 24-month period was, a
patient of [the Company] to terminate or otherwise interfere with their patient
relationship with [the Company] or for the purpose of providing any dental
services, treatment or consultation; nor

(d)          Interfere with or disrupt in any way any business relationship or
contract between [the Company] and any customer, patient, potential customer or
patient, supplier, vendor, payor, consultant, employee, independent contractor or
other person having a business relationship with Employer; nor

(e)          Make or publish, orally, in writing or electronically, any
derogatory or disparaging statements or remarks regarding [the Company], any

4833-8220-8900.3

4

5

dental support organization engaged by [the Company] or their officers, directors, employees, operations or services; provided, however, that this clause is not intended to prevent Dentist from testifying truthfully in response to a valid subpoena or other compulsory legal process (the "Restrictive Covenants").

(Exhibit B, Section 12.)

11.    In addition to the Restrictive Covenants in the Employment Agreement, Dr. Winfree agreed:

> **Non-Disclosure.** During the Term and at any time thereafter, [Dr. Winfree] shall not, unless authorized by [the Company] for [its] benefit, directly or indirectly, on his or her own behalf or through any other person, misappropriate, use, divulge, reveal, disclose or communicate any trade secrets or other Confidential Information of [the Company] or any dental support organization engaged or contracted by [the Company]. The term "Confidential Information" means any trade secret or other information disclosed to or learned by [Dr. Winfree] in connection with his/her employment by [the Company], including, but not limited to, any information relating to [the Company's] patients, suppliers, business alliances, agreements, strategies, policies, procedures, pricing, software programs, contracts and financial records. All documents and records containing any trade secret or other Confidential Information of [the Company] in the possession of [Dr. Winfree] are the exclusive property of [Dr. Winfree] and shall be immediately returned to [the Company] when [Dr. Winfree's] employment with [the Company] ends. (the "Non-Disclosure")

(Id., Section 13.)

12.    Dr. Winfree acknowledged that a breach or threatened breach of any of the Restrictive Covenants or the Non-Disclosure entitled the Company to injunctive relief without any requirement to post a bond or prove actual damages. (Id., Section 15.) Dr. Winfree further acknowledged that these provisions were reasonable with respect to time, scope and geographic region. (Id.)

13.    Perhaps most importantly, Dr. Winfree acknowledged that the Restrictive Covenants and Non-Disclosure were a material inducement for the Company to enter into his Employment Agreement, and Dr. Winfree's breach of the same would rob the Company of its "benefit of the bargain." (Id.)

4833-8220-8900.3

III.    **The Company Decides Not to Renew Dr. Winfree's Employment Agreement.**

14.    Dr. Winfree's Employment Agreement ran for an initial three (3) year employment term, which expired on December 16, 2018. At the conclusion of this initial term, the Company had the option to renew Dr. Winfree's employment for successive one (1) year terms. Based upon the Practice Location being an outlier in performance and Dr. Winfree and his staff's refusal to meaningfully integrate into the Company, it chose not to exercise that option. Instead, the Company made the decision to give the Practice Location a fresh start and restructure it in its entirety.

15.    On October 2, 2018, the Company provided Dr. Winfree with notice that it would be terminating his Employment Agreement at the end of the initial three (3) year term. A copy of this notice is attached hereto as Exhibit C.

IV.    **The December 13, 2018 Meeting at the Practice.**

16.    On the afternoon of December 13, 2018 select employees of the Company and Marquee went to the Practice to oversee the conclusion of Dr. Winfree's employment with the Company and the conclusion of the non-clinical staff's employment with Marquee.    The Company needed the time between December 13, 2018 and January 1, 2019 to transition a new dentist and non-clinician team into the Practice, convert to a new practice management software, and install new cabinetry.

17.    During this December 13, 2018 visit, select employees of Marquee and the President of the Company, Dr. Keith Van Benthuysen informed the rest of the employees[2]— which included Dr. Winfree's wife and Practice Operations Leader, Defendant Olivia Winfree— that the Company had decided to reorganize (not close) the Practice Location and that the

---

[2] The non-clinical staff members of the Practice were employed by Marquee (the "Practice Location Staff"), whereas Dr. Winfree was employed by the Company.

4833-8220-8900.3

6

unfortunate but necessary result of that reorganization was that the current employees working at the Practice Location would be separated from their employment with Marquee and the Company.

18.     Each non-clinical staff member was told that she would (1) continue to be paid through the end of the year, (2) receive payment for all unused paid time off, (3) continue to receive health insurance through the end of the year, and (4) would be eligible for rehire at another practice location of the Company.

19.     At that time, the Company was unaware that Dr. Winfree had failed to inform the Practice Location Staff that his Employment Agreement had not been renewed.  In fact, Mrs. Winfree told the other Practice Employees that Dr. Winfree signed a new Agreement for an additional three-year term.  Dr. Winfree was present for this announcement and for the hours immediately thereafter.

20.     Immediately, the Practice Employees began to yell and cuss at the Marquee employees present at the Practice—threatening to harm the Company and disparage it to its patients and the public at-large.  Some Practice Location Staff were observed frantically texting. Other Practice Location Staff were observed shredding Company documents and destroying Company property.

21.     Upon receiving the news, Mrs. Winfree inaccurately reiterated to Practice Location Staff that the Company lied and had renewed Dr. Winfree's Employment Agreement— though she likely knew this was false because her husband had received his termination notice nearly three months prior.  Mrs. Winfree then began to walk around the practice whispering to other Practice Location Staff who would then walk to a different part of the Practice.  The Company could not hear what Mrs. Winfree was whispering, but upon information and belief, it

4833-8220-8900.3

believes she was instructing Practice Location Staff to destroy documents and gather Company patient information.

22.    Making matters worse, other Practice Location Staff took advantage of the chaos and packed up and removed confidential Company information. Upon information and belief, these stolen items included patient identifying information, patient contact information, patient medical charts, and information related to the Company's finances. However, Practice Location Staff were specifically observed packing up a rolodex, a thick binder full of papers, and endodontics-related patient correspondence.

23.    Later in the afternoon, the Winfrees's sons arrived at the Practice Location to help gather personal items. In doing so, one of the Winfree sons began inquiring into the Company's computer hard drives at the Practice Location and was heard stating "take the hard drives." The Company is in the process of determining whether any internal and/or external hard drives were stolen.

24.    After approximately two and a half hours, Dr. Winfree and all of the Practice Location Staff vacated the premises, but had previously announced their intention to meet at a nearby Chili's restaurant. Dr. Winfree accompanied these employees, including his wife, to the restaurant. Upon information and belief, it was at this time that the Winfrees and the Practice Location Staff formalized their plan to harm the Company by disparaging it on social media, in the news, and to the general public, poaching the Company's patients, and operating a competing dental practice only a handful of miles from the Practice Location—all in violation of Dr. Winfree's Restrictive Covenants and Non-Disparagement and in violation of the law.

V.    **The Winfrees Retaliate on Social Media.**

25.    Immediately after leaving the restaurant, the Winfrees began contacting patients

4833-8220-8900.3

of the Practice and misrepresenting the events of the previous hours. The very next morning,

individuals were taking to social media to spread the Winfrees's false version of the events.

One man posted the following in social media communities frequented by Company patients:

> To all Dr. Winfree & Craig dentistry patients:
>
> I just heard some horrible news.  Yesterday the company that was over their practice for the last two years came in with security and with no notice gave everyone five minutes to leave the premises.  EVERYONE who worked there lost their jobs instantly!

(Screenshots of these Facebook posts and the comments affixed thereto are attached as collective Exhibit D.)  Reacting to the misinformation spread by the Winfrees, individuals claiming to be patients of the Practice commented with outrage under the false belief that the Company had wrongfully and cruelly ousted the Winfrees from the Practice.  For example:



That is cruel and cold. No notice and right at Christmas. Seems pretty mean spirited.

Like · 6d                                                                                     1

Absolutely. I called and it rolls to the new companies answering service and they told me they'd be in the office Monday. Total lie! Very sad, but when one door closes God opens another.

Like · 6d                                                                                     3

and

Thank you for posting this.  I talked with Olivia today and am totally dumfounded how any person could even take part in this! Its just plain cruel! The Winfrees have been personal friends of mine for 30 years and both are among the most highly respected people in our community. Their love for family and our community is immeasurable and their entire staff is phenomal and irreplacable! Please pray for all of them. I am just devastated for them.

Like · 6d · Edited                                                                     10

(Id.)

4833-8220-8900.3

9

10

26.     Dr. Winfree's direct and/or indirect (via his wife) disparagement of the Company to patients of the Practice violates the Non-Disparagement provision in his Employment Agreement, and the Company has suffered and will continue to suffer irreparable harm if Dr. Winfree's conduct is not enjoined.

27.     Mrs. Winfree's direct and/or indirect disparagement of the Company to its patients without justification violates the law, and the Company has suffered and will continue to suffer irreparable harm if Mrs. Winfree's conduct is not enjoined.

28.     Upon information and belief, Dr. Winfree does not have a personal Facebook account.  Mrs. Winfree, however, has a very active social media presence—including on the posts referenced in Paragraph 25.  Specifically, Mrs. Winfree—and upon information and belief in collusion with her husband—began soliciting numerous Company patients and encouraged them to retrieve their dental records from the Company at the Practice:



and



I feel like there is something we patients could do. I was just there like 2 weeks ago. I spoke to Shirley yesterday for goodness sakes. It is soooo wrong.

Like · 6d

Olivia Winfree ▮▮▮▮▮▮▮▮ just ask for your records. We will reorganize.

Like · 6d

29.     Upon information and belief, the Company believes that these Facebook posts were created by individuals after speaking with one or both of the Winfrees.

30.     Dr. Winfree's direct and/or indirect solicitation (via his wife) of the Company's patients violates the Restrictive Covenants in his Employment Agreement, and the Company has suffered and will continue to suffer irreparable harm if Dr. Winfree's conduct is not enjoined.

31.     Mrs. Winfree's direct and/or indirect interference with the Company's relationships with its patients violates the law, and the Company has suffered and will continue to suffer irreparable harm if Mrs. Winfree's conduct is not enjoined.

## VI.     Dr. Winfree Commits Fraud.

32.     The Winfrees' attack on the Company did not stop with spreading lies on Facebook. Dr. Winfree began contacting laboratories and the United States Post Office in an effort to divert Company patients and confidential Company information to his home address.

33.     On Sunday December 16, 2018, Asa Blalock from Lloyd Dental Laboratory, Inc. emailed Fred Ward, CEO of Marquee ("Mr. Ward"), to let him know that Dr. Winfree had contacted Mr. Blalock and asked him to send Company lab cases to Dr. Winfree's home address. (A copy of the email from Asa Blalock dated December 16, 2018, is attached hereto as Exhibit E.) These test cases contained highly confidential and protected patient information and were the sole property of the Company (subject to rigorous safeguards, including receipt and storage

4833-8220-8900.3

of such information) and its patients. At the time he made his request, Dr. Winfree knew he had no right to receive or store them but told Lloyd Dental that he did.

34.     Upon information and belief, the Company believes that Dr. Winfree had likewise contacted Hodges Dental Lab, LLC and made a similar request for it to forward Company lab results to his home address. These test results contained protected patient information and were the sole property of the Company and its patients. At the time he made his request, Dr. Winfree knew he had no right to receive or store them but told Hodges Dental that he did.

35.     Making matters worse, in actions that constitute felony mail fraud, Dr. Winfree, directly and/or indirectly, contacted the United States Post Office and lied to it saying that the Practice had shut down and all of the Practice's mail—necessarily including protected patient health information—needed to be forwarded to his home address in violation of HIPAA and other laws. Dr. Winfree was successful in his deception, and the Company is unaware of the amount of its mail that has been fraudulently diverted into the Winfrees's hands.

36.     Dr. Winfree's direct and/or indirect diversion of the Company's patients and the Company's confidential information violates the Restrictive Covenants in his Employment Agreement, and the Company has suffered and will continue to suffer irreparable harm if Dr. Winfree's conduct is not enjoined.

VII.     **The Winfrees's Scheme Begins to Work.**

37.     By Monday December 17, 2018, the ramifications of the Winfrees's actions were beginning to manifest. Patients began presenting at the Practice by the dozens and demanding their dental records and withdrawing as patients of the Practice in accordance with the Winfrees's scheme.

38.     As the week progressed, more and more patients appeared at the Practice and

4833-8220-8900.3

requested to withdraw as patients of the Practice and requested copies of their records. Since that Monday, the Company has lost over 60 patients to other competing dental practices—likely to the Winfrees themselves.

39.     Upon information and belief, the Company believes that Dr. Winfree—along with his wife—is already operating a competing dental practice with his former dental partner Dr. Gregory S. Denton, D.D.S. ("Dr. Denton"), his former partner at Winfree & Denton (See ¶ 7 *supra*). The Company bases this belief on the facts that multiple Practice patients have requested that the Company send their records to Dr. Denton, and Dr. Denton's office has contacted the Practice and requested that the Company send patient records to it.

40.     Dr. Denton's office is located 6.3 miles away from the Practice.

41.     Dr. Winfree's direct and/or indirect competition (via diverting patients away from the Company) with the Company within ten (10) miles of the Practice violates the Restrictive Covenants in his Employment Agreement, and the Company has suffered and will continue to suffer irreparable harm if Dr. Winfree's conduct is not enjoined.

**VIII.   The Court Must Enjoin Dr. Winfree's Conduct Before It's Too Late.**

42.     Finally, and commanding the Company's and the Court's immediate attention, on the afternoon of December 20, 2018, a news reporter contacted Mr. Ward and requested comment on a story that it is considering running in the next 12 to 24 hours. That story involves the same issues that the Winfrees have been posting on Facebook, repeating to Company patients, and telling the public at-large. The Winfrees know that this story is false. If the Court does not prevent the Winfrees from further disparaging the Company, taking its patients, and stealing its property, the Company's reputation and trust of its patients and within the community will be irreparably and wrongfully destroyed.

4833-8220-8900.3

43.     The Practice will for all intents and purposes be destroyed—as the narrative in the general public will be that the Company victimized Dr. Winfree and his staff weeks before Christmas and without any notice. In all likelihood, current patients will leave, potential patients will seek treatment elsewhere, and the Company may be forced to shut the doors of a Practice Location purchased for $1,675,000.00 only three years ago. The Winfrees's conduct will not only effect the reputation of the Practice Location, but also the other dental practice locations owned and operated by the Company across Tennessee.   Without injunctive relief, the Company's damages will be catastrophic—and most certainly irreparable.

44.     Of course, the Winfrees—and now the Court—know exactly what happened. The Company provided Dr. Winfree with notice of its intent to terminate his Employment Agreement on October 2, 2018—an action the Company and Dr. Winfree explicitly agreed the Company could take.   Dr. Winfree had three months to tell his staff and prepare his exit from the Practice—leaving as a newly made millionaire. Dr. Winfree chose not to do that. Instead, he buried his head in the sand, and when the time came for him to leave, he and his wife played the role of victims supposedly taken by surprise and decided they were entitled to revenge. They are not. The Company requests that this Court grant the relief herein requested and enjoin the Winfrees before it is too late.

### COUNT ONE – INJUNCTIVE RELIEF AS TO DR. WINFREE

45.     The Company incorporates herein by reference all previous allegations of this Complaint as if the same were fully set forth in this paragraph.

46.     Dr. Winfree's Employment Agreement with the Company is a valid and enforceable contract supported by adequate consideration.

47.     Thereunder, Dr. Winfree promised to abide by the terms of the Restrictive

Covenants and the Non-Disparagement clause.

48.    Despite these promises, as set forth *supra*, Dr. Winfree has and is continuing to breach the Restrictive Covenants and Non-Disparagement clause.

49.    Dr. Winfree acknowledged and agreed that a breach or threatened breach of the same would entitle the Company to move for injunctive relief without posting bond. (Exhibit B, at Section 15.)

50.    For all of the reasons set forth in this Complaint, unless Dr. Winfree is restrained, temporarily enjoined and subsequently permanently enjoined from the foregoing conduct, the Company will be irreparably injured by its loss of confidential and proprietary information and trade secrets (i.e. Company patient information), the loss of patients, the loss of business reputation, other present economic losses which are currently unascertainable, and future economic loss which is presently incalculable.

51.    The Company has no adequate remedy at law for the immediate and irreparable harm it is suffering.

## COUNT TWO – INJUNCTIVE RELIEF AS TO MRS. WINFREE

52.    The Company incorporates herein by reference all previous allegations of this Complaint as if the same were fully set forth in this paragraph.

53.    Mrs. Winfree is lying to the Company's patients and the general public in an ill-advised and illegal smear campaign in an attempt to destroy the Practice and the Company.

54.    Mrs. Winfree's lies are a direct and immediate threat to the Company's reputation and business relationships—the most immediate of which is her efforts to spread her lies to a broader audience.

55.    For all of the reasons set forth in this Complaint, unless Mrs. Winfree is

4833-8220-8900.3

15

restrained, temporarily enjoined and subsequently permanently enjoined from the foregoing conduct, the Company will be irreparably injured by its loss of confidential and proprietary information and trade secrets (i.e. Company patient information), the loss of patients, the loss of business reputation, other present economic losses which are currently unascertainable, and future economic loss which is presently incalculable.

56.     The Company has no adequate remedy at law for the immediate and irreparable harm it is suffering.

## COUNT THREE – BREACH OF CONTRACT AS TO DR. WINFREE

57.     The Company incorporates herein by reference all previous allegations of this Complaint as if the same were fully set forth in this paragraph.

58.     Dr. Winfree's Employment Agreement with the Company is a valid and enforceable contract supported by adequate consideration.

59.     Thereunder, Dr. Winfree promised to abide by the terms of the Restrictive Covenants and the Non-Disparagement clause.

60.     Despite so promising, as set forth *supra*, Dr. Winfree has breached and/or continues to breach these obligations.

61.     As a result of these breaches, the Company has been damaged in an amount to be determined at trial. Dr. Winfree is liable for these damages and is subject to injunctive relief to prevent additional damages to the Company.

## COUNT FOUR – MISAPPROPRIATION OF TRADE SECRETS
## AS TO THE WINFREES

62.     The Company incorporates herein by reference all previous allegations of this Complaint as if the same were fully set forth in this paragraph.

63.     The Winfrees have misappropriated or have threatened to misappropriate the

4833-8220-8900.3

17

confidential and proprietary information and trade secrets of the Company, specifically patient-identifying information and patient medical records, and will inevitably use and disclose this information in violation of the Tennessee Uniform Trade Secrets Act, Tennessee Code Annotated Section 47-25-1701, et seq. or other applicable law.

64.     The Winfrees are liable for the damages resulting from their actions, including double damages, as provided for in the Tennessee Uniform Trade Secrets Act.

<u>COUNT FIVE – CIVIL CONSPIRACY AS TO THE WINFREES</u>

65.     The Company incorporates herein by reference all previous allegations of this Complaint as if the same were fully set forth in this paragraph.

66.     The Winfrees have engaged in, and are engaging in, a civil conspiracy to (1) wrongfully induce the Company's patients to terminate their relationships with the Company; (2) misappropriate the Company's confidential and proprietary information and trade secrets; and (3) utilize such misappropriated information to do the Company harm, take its patients, and destroy its reputation.

67.     The Winfrees were and are aware of each other's intent to engage in this civil conspiracy, and both have taken overt actions in furtherance of this conspiracy.

68.     The Winfrees are liable to the Company for all damages caused by any and all conduct in furtherance of this conspiracy.

<u>COUNT SIX – INTENTIONAL INTERFERENCE WITH
BUSINESS RELATIONS AS TO MRS. WINFREE</u>

69.     The Company incorporates herein by reference all previous allegations of this Complaint as if the same were fully set forth in this paragraph.

70.     The Company has business relationships with the Practice's patients of which Mrs. Winfree was aware.

4833-8220-8900.3

17

71.    Without justification, Mrs. Winfree spread lies and misinformation intended to induce those patients to terminate their relationships with the Company.

72.    Mrs. Winfree's intentional and malicious conduct proximately caused many of the Company's patients to terminate their relationships with the Company.

73.    Tennessee Code Annotated Section 47-50-109 provides:

Procurement of breach of contracts unlawful -- Damages. -- It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring suit for the breach and for such damages.

74.    Mrs. Winfree is liable for treble damages under the statute resulting from her actions.

75.    Mrs. Winfree is also liable for common law interference with business relationships and, because her actions were intentional and malicious, the Company is entitled not only to actual damages but also punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the Company respectfully prays for the following relief:

1.    That a jury of six or, alternatively, the smallest permissible number of jurors be empaneled;

2.    That a temporary restraining order issue enjoining Dr. Winfree from further violating the terms of his Restrictive Covenants and Non-Disparagement, and that the Court subsequently enter a temporary and then a permanent injunction issue enjoining the same;

3.    That a temporary restraining order issue enjoining Mrs. Winfree from further interfering with the Company's relationships with its patients and disparaging the Company's

4833-8220-8900.3

18

reputation, and that the Court subsequently enter a temporary and then a permanent injunction issue enjoining the same;

4.     That a temporary restraining order issue requiring the Winfrees to preserve all records of any kind, specifically including any and all computer records or data, including but not limited to, information and records related to the Company and its business, its employees, or its patients, the Winfrees's contact and/or solicitation of those employees and patients, or other records in any way related to any actions or conduct by the Winfrees which are the subject of this Complaint, and that the Court subsequently enter a temporary and then a permanent injunction issue enjoining the same;

5.     That the above prayed for restraining order and temporary injunction embodying the provisions prayed for above issue from the Court without bond;

6.     That upon final hearing of this cause, the Winfrees be ordered permanently to adhere to the above-described injunctions and other relief embodying the provisions prayed for, together with such further equitable relief as the Court finds just and proper;

7.     That the Winfrees be ordered to account for, disgorge and pay to the Company all of the monies they received or will receive as a result of their unlawful acts complained of in this Complaint, including the solicitation or service of the Company's patients;

8.     That Dr. Winfree be ordered to pay the Company its actual damages for any breach of contract, as shown by the proof;

9.     That the Winfrees be ordered to pay to the Company double damages for misappropriation of trade secrets;

10.    That the Winfrees be ordered to pay the Company treble damages for their interference with the Company's relationships with its patients;

4833-8220-8900.3

19

11.     That Mrs. Winfree be ordered to pay the Company punitive damages in an amount sufficient to deter such conduct in the future;

12.     That the Winfrees be ordered to pay the Company interest;

13.     That Dr. Winfree be ordered to pay the Company its attorneys' fees and expenses; and

14.     That the Company be awarded such other relief that this Court deems just and equitable.

WALLER LANSDEN DORTCH & DAVIS, LLP

By: _____

Aron Z. Karabel (BPR 031828)
John E. Haubenreich (BPR 29202)
Taylor J. Askew (BPR 33193)
511 Union Street, Suite 2700
Nashville, Tennessee 37219-8966
(615) 244-6380
aron.karabel@wallerlaw.com
john.haubenreich@wallerlaw.com
taylor.askew@wallerlaw.com

*Attorneys for Plaintiff,*
*TN Dental Professionals, P.C. d/b/a*
*Marquee Dental Partners*

4833-8220-8900.3

20

21

STATE OF _Colorado_

COUNTY OF _Denver_

## VERIFICATION

I, Fred Ward, being first duly sworn and under oath, state that I am the Chief Executive Officer of CPF Dental, LLC d/b/a Marquee Dental Partners, that I have read the foregoing Verified Complaint for Temporary Restraining Order, Injunction and Damages, that I have personal knowledge of the facts set forth in the Verified Complaint and that I personally know the facts to be true and correct except with respect to: (1) facts identified as being upon information and belief; and (2) the facts referenced in Paragraphs 19, 20, 22, 24, 34, 35.

_____
Fred Ward

SWORN TO AND SUBSCRIBED before me, this 21st day of December, 2018.

| SHERI KNOTT |
| Notary Public |
| State of Colorado |
| Notary ID # 19964004906 |
| My Commission Expires 02-14-2022 |

_____
NOTARY PUBLIC

My Commission Expires: 2-14-2022

4833-8270-8900.3                        21

## CERTIFICATE OF SERVICE

I certify that the foregoing document has been served on the following on December 21, 2018, as follows:

Robert T. Winfree, D.D.S.
1014 Mystic Streams
Mt. Juliet, Tennessee 37122

Olivia Winfree
1014 Mystic Streams
Mt. Juliet, Tennessee 37122

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is dated as of December 16, 2015, by and among CPF Dental, LLC, a Delaware limited liability company d/b/a Marquee Dental Partners ("Buyer"), Robert T. Winfree, D.D.S., P.C., a Tennessee professional corporation ("Seller"), and Robert T. Winfree, D.D.S., an individual residing in the State of Tennessee ("Owner").

### RECITALS:

A.      Seller owns and operates a dental practice (the "Practice") located at 4243 Lebanon Pike, Hermitage, Tennessee 37076 (the "Location"), and Owner owns and holds 100% of the issued and outstanding capital stock or other equity interests in Seller.

B.      Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the Purchased Assets (as defined below) on the terms and conditions set forth herein.

C.      Certain capitalized terms used in this Agreement without definition have the meaning ascribed to them in **Exhibit A** hereto (which is incorporated herein by reference).

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      **Purchase and Sale of Purchased Assets.**   In reliance upon the representations and warranties, and upon the terms and subject to the conditions, set forth herein:

(a)      **Purchase of Purchased Assets.**   Seller agrees to sell, transfer, convey, assign and deliver to Buyer, and Buyer agrees to purchase from Seller, at the Closing all of Seller's assets, properties, rights and interests, whether real, personal or mixed, tangible or intangible, and all of Seller's and Owner's respective rights, title and interest therein and thereto, other than and excluding the Excluded Assets (as defined below), free and clear of all Liens and Encumbrances (collectively, the "Purchased Assets"). The Purchased Assets include but are not limited to all of the following assets of Seller (other than the Excluded Assets):

(i)      All tangible personal property, including all equipment, furnishings, computers, furniture, fixtures, leasehold improvements, devices, instruments, inventory, supplies, drugs (other than controlled substances and other pharmaceuticals that Seller is prohibited from transferring or conveying to Buyer under applicable Laws) and other disposables, consumables and similar materials, including those in transit as of the Closing;

(ii)      All intangible personal property, including all goodwill, trade secrets, proprietary or confidential information, domain names, websites, web pages, social network profiles and pages (including for Facebook® and Twitter®), e-mail addresses, telephone numbers, software, trademarks, tradenames and other Intellectual Property (including the name "Winfree & Denton" and all variations and derivations thereof and the domain name www.winfreeanddenton.com); and all documentary evidence thereof, rights under warranties, indemnities or similar rights against third parties relating to the Purchased Assets,

(iii)      All accounts receivable and all notes receivable, negotiable instruments, chattel paper and other rights to receive payments from any Person, and all prepaid amounts, expenses, credits and security and other deposits; and all books, records, files, lists, manuals, advertising and promotional materials, and, to the extent lawfully assignable to Buyer, all licenses, permits, franchises and similar items; and

25

(iv)     All Contracts identified on **Exhibit B-1** hereto (the "Assigned Contracts"), the real property lease for the Location identified on the Office Lease Assignment Agreement (the "Assigned Office Lease") and the equipment lease identified on **Exhibit B-2** hereto (the "Assigned Equipment Lease" and, collectively with the Assigned Contracts and Assigned Office Lease, the "Assigned Contracts and Leases").

(b)     **Excluded Assets.**  The Purchased Assets will not include any of the following assets of the Seller (collectively, the "Excluded Assets"): (i) cash and cash equivalents as of immediately prior to the Closing; (ii) minute books and stock ledger; (iii) insurance policies and insurance premium refunds; (iv) retirement, pension and other employee benefit plans; (v) the Professional Assets; (vi) Seller's rights and benefits under this Agreement; (vii) Seller's automobiles; (viii) Seller's personal plaques; and (ix) the assets, if any, specifically identified on **Exhibit C** hereto.

(c)     **Bill of Sale.**  At the Closing, Seller shall convey to Buyer good and marketable title to the Purchased Assets, evidenced by delivery of a general bill of sale and assignment, executed by Seller, in substantially the form and substance of **Exhibit D** hereto (the "Bill of Sale"), and such other recordable instruments of assignment, transfer and conveyance as Buyer may request.

(d)     **Assumed Liabilities.**  At the Closing, Seller shall assign to Buyer, and Buyer shall only assume and become responsible for, the future payment and performance of obligations of Seller (i) arising after the Closing under the Assigned Contracts and Leases (excluding any uncured defaults for periods prior to the Closing and unpaid amounts that arose prior to the Closing) (the "Assumed Post-Closing Liabilities") and (ii) for certain trade payables and accrued but unpaid payroll obligations of the Company to the extent set forth in **Exhibit E-1** hereto and reflected as a current liability in the purchase price adjustment pursuant to Section 3 below (the "Assumed Pre-Closing Liabilities" and, collectively with the Assumed Post-Closing Liabilities, the "Assumed Liabilities"), which shall be evidenced by the execution and delivery by Seller and Buyer at the Closing of an assignment and assumption agreement, executed by such Parties, in substantially the form and substance of **Exhibit E-2** hereto (the "Assignment and Assumption Agreement").  Buyer does not and shall not assume or undertake to pay, satisfy, discharge or perform (and shall not be deemed to have assumed or so undertaken) any obligation, expense, Tax, Indebtedness or other Liability of Seller, including any defaults or breaches that occur or arise prior to the Closing and any unpaid or other amounts owed, accrued or owing thereunder that arose prior to the Closing, and for the avoidance of doubt excluding any Liability or obligation for payroll, wages, salaries, bonuses, paid-time-off, severance obligations or other compensation earned, incurred or accrued at or prior to the Closing or any related social security, unemployment, Medicare and other payroll taxes (whether or not pending, threatened, contingent, known or unknown) (collectively, the "Excluded Liabilities"), other than the Assumed Liabilities, and all of the Excluded Liabilities shall be retained by and be the responsibility of Seller.

(e)     **Transfer of Professional Assets to New PC.**  In addition, at the Closing, for an aggregate purchase price of One Thousand Dollars ($1,000.00) and other valuable consideration, Seller will  transfer, assign, convey and deliver to TN Dental Professionals, P.C., a Tennessee professional corporation (the "New PC"), and the New PC will accept and assume, all of the Professional Assets and Seller's and Owner's rights, title and interest therein and thereto, and Seller shall convey to the New PC good and marketable title to the Professional Assets, free and clear of any Liens and Encumbrances, all pursuant to a Professional Assets Bill of Sale and Assignment  Agreement in substantially the form and substance of **Exhibit F** hereto (the "Professional Assets Bill of Sale and Assignment"), and such other recordable instruments of assignment, transfer and conveyance as New PC may request, between Seller and New PC to be entered into by the parties concurrently with the execution and delivery of this Agreement. At the Closing, the New PC will assume the future payment and performance of obligations of Seller arising after the Closing under the Professional Assets (excluding any defaults or breaches that occur or arise prior to the Closing and any unpaid or other amounts owed, accrued or owing thereunder that arose at or prior to the Closing).

4848-3594-1674 9

12162015

2

2.     **Purchase Price.** The total consideration for the purchase and sale of all of the Purchased Assets, and the other covenants, agreements, conveyances and assignments set forth herein, shall be the aggregate sum of One Million, Six Hundred Seventy-Five Thousand Dollars ($1,675,000) (the "Purchase Price"), which shall be subject to the Working Capital Adjustment and the terms and conditions for payment of the Earn-out Payments as provided in Section 3 below, and payable as follows:

(a)     To Pinnacle National Bank, as escrow agent (the "Escrow Agent"), the sum of One Hundred Fifty Thousand, Seven Hundred Fifty Dollars ($150,750) (the "Escrow Amount") to be held in escrow and administered by the Escrow Agent in accordance with and subject to the terms and conditions of an escrow agreement among Buyer, Owner and the Escrow Agent, executed by such parties, in substantially the form and substance of **Exhibit G** hereto (the "Escrow Agreement");

(b)     To the applicable lender(s) or lessor(s), an aggregate amount equal to all outstanding Indebtedness of Seller as of immediately prior to the Closing (the "Closing Indebtedness");

(c)     To the appropriate Persons, an aggregate amount equal to the fees and expenses of any brokers, investment bankers, attorneys, accountants, financial advisors and other advisors incurred by Seller or Owner, and any bonuses payable by Seller or Owner, in connection with this Agreement or the Closing or transactions contemplated herein, in each case that are unpaid immediately prior to the Closing (collectively, the "Transaction Expenses");

(d)     To Owner, an aggregate amount (the "Closing Payment") equal to: (i) One Million, Five Hundred Seven Thousand, Five Hundred Dollars ($1,507,500.00); *minus* (iii) the Escrow Amount; *minus* (iv) the Closing Indebtedness; and *minus* (v) the Transaction Expenses; and

(e)     To Owner, at such times as provided in Section 3(b), with respect to each Earn-Out Calculation Period the sum of Eighty-Three Thousand, Seven Hundred Fifty Dollars ($83,750.00) (each, an "Earn-out Payment"), if and only if the Adjusted EBITDA for such Earn-Out Calculation Period exceeds Four Hundred Nine Thousand Dollars ($409,000.00).

(f)     The Purchase Price shall be allocated among the Purchased Assets for income Tax purposes as set forth on **Exhibit H** hereto. The Parties agree to report such allocation on IRS Form 8594 for federal income tax purposes in a manner consistent with such **Exhibit H**. Such allocation shall serve no evidentiary purpose in connection with any claim relating to a breach or alleged breach of the restrictive covenants set forth in Section 8.

3.     **Purchase Price Adjustment.**

(a)     **Working Capital Adjustment.**

(i)     First Working Capital Calculation. Within 120 days after the Closing Date, Buyer shall determine the amount of the First Working Capital Adjustment, and provide the Owner a written statement setting forth the determination of Buyer (the "First Closing Statement"). Owner may notify Buyer of any good faith objections to the First Closing Statement as set forth in Section 3(c) below. If Owner does not provide Buyer with a Notice of Objection to the First Closing Statement within the time period required under Section 3(c) below, then the First Closing Statement shall become the final, conclusive and binding calculation of the amount of the Working Capital Adjustment and Closing Payment reflected therein (the "Final First Closing Statement"). If Buyer does receive a Notice of Objection to the First Closing Statement from Owner within the time period required under Section 3(c) below, any items not specifically objected to in the Notice of Objection shall be deemed final, binding and conclusive upon the Parties. Within five Business Days after final determination of the Final First Closing Statement (whether pursuant to Section 3(a)(i) or 3(d)), if the First Working Capital Adjustment is a positive number, then Buyer shall pay the amount of the First Working Capital Adjustment to the Owner by wire transfer of immediately available funds. If the First Working Capital Adjustment is a

4848-3594-1674.9

3

12162015

negative number, then it shall be addressed in the Second Working Capital Calculation as provided below.

(ii)     Second Working Capital Calculation.  Within 180 days after the Closing Date, Buyer shall determine the amount of the Second Working Capital Adjustment, and provide the Owner a written statement setting forth the determination of Buyer (the "Second Closing Statement"). Owner may notify Buyer of any good faith objections to the Second Closing Statement as set forth in Section 3(c) below.  If Owner does not provide Buyer with a Notice of Objection to the Second Closing Statement within the time period required under Section 3(c) below, then the Second Closing Statement shall become the final, conclusive and binding calculation of the amount of the Working Capital Adjustment and Closing Payment reflected therein (the "Final Second Closing Statement").  If Buyer does receive a Notice of Objection to the Second Closing Statement from Owner within the time period required under Section 3(c) below, any items not specifically objected to in the Notice of Objection shall be deemed final, binding and conclusive upon the Parties.   Within five Business Days after final determination of the Final Second Closing Statement (whether pursuant to Section 3(a)(ii) or 3(d)), if (i) the Second Working Capital Adjustment is a positive number, then Buyer shall pay the amount of the Second Working Capital Adjustment to the Owner by wire transfer of immediately available funds, or (ii) if the Second Working Capital Adjustment is a negative number, then the Owner shall pay the absolute value of the Second Working Capital Adjustment to Buyer by wire transfer of immediately available funds.

(b)     **Earn-out**.

(i)     Earn-out Calculation.  Following each Earn-Out Calculation Period, on or before the date (each, an "Earn-out Calculation Delivery Date") which is the earlier of (i) five days after the completion of the audit of Buyer's annual financial statements for the immediately preceding year or (ii) ninety (90) days after the last day of such Earn-Out Calculation Period, Buyer shall prepare and deliver to Seller a written statement (in each case, an "Earn-out Calculation Statement") setting forth in reasonable detail its determination of Adjusted EBITDA for the applicable Earn-Out Calculation Period and its calculation of the resulting Earn-out Payment (in each case, an "Earn-out Calculation").  If Owner does not provide Buyer with a Notice of Objection to the Earn-out Calculation Statement within the time period required under Section 3(c) below, then such Earn-out Calculation Statement shall become the final, conclusive and binding calculation of the amount of the Earn-out Payment reflected therein.  If Buyer does receive a Notice of Objection to the Earn-out Calculation Statement from Owner within the time period required under Section 3(c) below, any items not specifically objected to in the Notice of Objection shall be deemed final, binding and conclusive upon the Parties.

(ii)     Purchase Price Adjustment.  Within five Business Days after final determination of any Earn-out Calculation Statement (whether pursuant to Section 3(b)(i) or 3(d)), Buyer shall pay the applicable Earn-out Payment, if any, to Owner by wire transfer of immediately available funds.

(iii)     Independence of Earn-out Payments.  Buyer's obligation to pay each of the Earn-out Payments to Owner in accordance herewith is an independent obligation of Buyer and is not otherwise conditioned or contingent upon the satisfaction of any conditions precedent to any preceding or subsequent Earn-out Payment and the obligation to pay an Earn-out Payment to Owner shall not obligate Buyer to pay any preceding or subsequent Earn-out Payment. For the avoidance of doubt and by way of example, if the conditions precedent to the payment of the Earn-out Payment for the first Earn-Out Calculation Period are not satisfied, but the conditions precedent to the payment of the Earn-out Payment for the second Earn-Out Calculation Period are satisfied, then Buyer would be obligated to pay such Earn-out Payment for the second Earn-Out Calculation Period for which the corresponding conditions precedent have been satisfied, and not the Earn-out Payment for the first Earn-Out Calculation Period.

(iv)     Post-closing Operations. Subject to the terms of this Agreement and the Ancillary Agreements, Buyer shall have sole discretion with regard to all matters relating to the operation of its business; provided, that Buyer shall not, directly or indirectly, take any actions in bad faith that would have the purpose of avoiding or reducing any of the Earn-out Payments hereunder. Notwithstanding the foregoing, Buyer has no obligation to operate its Business in order to achieve any Earn-out Payment or to maximize the amount of any Earn-out Payment.

(v)     Right of Set-off. Buyer shall have the right to withhold and set off against any amount otherwise due as an Earn-out Payment the amount of any Losses to which any Buyer Indemnified Party may be entitled under Section 7 of this Agreement or any other Ancillary Agreement.

(vi)     No Security. The parties hereto understand and agree that (A) the contingent rights to receive any Earn-out Payment shall not be represented by any form of certificate or other instrument, are not transferable, except by operation of Laws relating to descent and distribution, divorce and community property, and do not constitute an equity or ownership interest in Buyer or New PC, (B) neither Seller nor Owner shall have any rights as a securityholder of Buyer or New PC as a result of Owner's contingent right to receive any Earn-out Payment hereunder and (C) no interest is payable with respect to any Earn-out Payment.

(c)     **Objection Procedures.** If Owner disagrees in good faith with Buyer's determination of any of the items on the Closing Statement or the Earn-out Calculation Statement, Owner shall notify Buyer in writing prior to 5:00 p.m. Central Time on the day that is 30 days immediately following the date on which the Owner is given the Closing Statement or the Earn-out Calculation Statement, as applicable, to which Owner objects, including in reasonable detail the Owner's basis for the disagreement and the Owner's determination of the amount or amounts in dispute ("Notice of Objection").

(d)     **Dispute Resolution.** Following Buyer's receipt of any Notice of Objection (if applicable), Buyer and Owner shall negotiate in good faith to attempt to resolve such dispute for a period of 60 days. If Buyer and Owner fail to agree within 60 days after Owner's delivery, if any, to Buyer of a Notice of Objection, then Buyer and Owner shall jointly engage and submit such disputed determination to the Nashville, Tennessee area office of BKD, LLP or, if such firm is unable or unwilling to be so engaged, such other accounting firm as the parties shall mutually agree (such applicable firm, the "Accounting Firm") for computation or verification in accordance with the provisions of this Agreement. The Accounting Firm shall review the items in dispute and shall, within 60 days following their engagement (or within the shortest time frame as the Accounting Firm shall agree), decide the proper amounts of such disputed items (which decision shall also include a calculation of the amounts on the Final Closing Statement). The scope of the Accounting Firm's review shall be limited solely to the resolution of the then unresolved objections raised by the Owner in the Notice of Objection. Submission of the disputed matter to the Accounting Firm shall be the exclusive remedy for resolving disputes related to the determination of the Final Closing Statement or any Earn-out Calculation Statement. The Accounting Firm's determination shall be final and binding upon the Parties and the Owner. The fees and expenses of the Accounting Firm shall be allocated between and borne by Buyer, on the one hand, and the Owner, on the other, equal to the proportion of the dollar value of the disputed amounts determined in favor of the other Party by the Accounting Firm.

4.     **Closing.**

(a)     **Closing Date and Place.** The closing of the transactions contemplated hereby (the "Closing") will take place remotely by electronic mail, facsimile or other electronic exchange of documents, among and between the Parties and their respective counsel, at the offices of Waller Lansden Dortch & Davis, LLP in Nashville, Tennessee, simultaneously with the execution and delivery of this Agreement by each of the Parties hereto or at such other time and place as the Parties may agree in writing (the "Closing Date"). The Parties agree that should the Closing occur, the effective time and date

4848-3594-1674.9

5

12162015

29

of the transactions shall be 12:00:01 a.m. Central Time on the Closing Date. All deliveries, payments and other transactions and documents relating to the Closing shall not be effective unless and until all are effective (or waived in writing by the applicable Party), and shall be deemed to be consummated simultaneously.

(b) **Events to Occur at the Closing.** In addition to the actions to be taken pursuant to Sections 1 through 3, at or prior to the Closing:

(i) Repayment of Debt and Payoff Letters. Seller shall repay and satisfy (or cause to be repaid and satisfied) in full all outstanding Indebtedness of or guaranteed by Seller, if any, or secured by or encumbering any of the Purchased Assets or Professional Assets, and Seller will cause all security interests and other Liens and Encumbrances encumbering any of the Purchased Assets or Professional Assets to be terminated and UCC-3 releases or termination statements or other lien discharging documents to be properly recorded or to be promptly recorded to the satisfaction of Buyer and its legal counsel. Prior to Closing Date, Seller shall deliver to Buyer payoff letters and payment instructions, in form and substance satisfactory to Buyer, from each of the applicable lenders or lessors in respect of such Indebtedness.

(ii) Transaction Expenses. Seller shall repay and satisfy (or cause to be paid or satisfied) in full all Transaction Expenses. Prior to the Closing Date, Seller shall deliver to Buyer payment amounts and instructions in respect of the Transaction Expenses.

(iii) Satisfaction of Pre-Closing Payroll. At or prior to the Closing, Seller shall satisfy and pay in full all of its payroll, wages, salaries, bonuses, paid-time-off, severance obligations and other compensation earned, incurred or accrued prior to the Closing, and all related social security, unemployment, Medicare and other payroll taxes.

(iv) Deliveries by Seller. Seller and Owner shall deliver the following documents to Buyer (collectively, the "Seller Closing Deliverables"):

(A) Seller Officer Certificate. A certificate or certificates dated as of the Closing Date and duly executed by Owner, substantially in the form and substance of **Exhibit I** hereto;

(B) Non-Foreign Person Affidavit. A non-foreign person affidavit, substantially in the form and substance of **Exhibit J** hereto, duly executed by Owner and an authorized officer of Seller;

(C) Bill of Sale and Assignment and Assumption Agreement. Each of the Bill of Sale and Assignment and Assumption Agreement, in each case duly executed by Owner and an authorized officer of Seller;

(D) Escrow Agreement. The Escrow Agreement, duly executed by Owner and an authorized officer of Seller and duly executed on behalf of the Escrow Agent;

(E) Payoff Letters. Customary payoff letters or similar documentation with respect to all Closing Indebtedness;

(F) Employment Agreements. An employment agreement between Owner and New PC, substantially in the form and substance of **Exhibit K** hereto (the "Winfree Employment Agreement"), duly executed by Owner, and an employment agreement between Gregory S. Denton, D.D.S. and New PC, substantially in the form and substance of **Exhibit L** hereto (the "Denton Employment Agreement");

30

(G)     Consents to Assignment. Written consent to assignment, in form and substance satisfactory to Buyer and duly executed by the applicable counterparty(ies), to the assignment to New PC of (1) each of the Dentist Employment Agreements, (2) the Assigned Office Lease, substantially in the form and substance of **Exhibit M** hereto (the "Office Lease Assignment Agreement"), and (3) to the extent required under the terms and conditions thereof in connection with the transactions contemplated by this Agreement, to the assignment to Buyer of each of the Assigned Contracts and the assignment to New PC of any other Contracts included in the Professional Assets;

(H)     Transition Services Agreement. A transition services agreement among Seller, Buyer and New PC, pursuant to which New PC would provide certain personnel to Seller and Buyer would provide certain business services and other personnel to Seller during a credentialing and enrollment transition period following the Closing, substantially in the form and substance of **Exhibit N** hereto (the "Transition Services Agreement"), and a related business associate agreement among such Parties, duly executed by Owner and an authorized officer of Seller;

(I)     Other Documents. Such other documents as may be reasonably necessary to consummate the transactions contemplated by this Agreement as reasonably requested by Buyer, its counsel or New PC.

(v)     Deliveries by Buyer. At the Closing, Buyer shall have delivered the following documents to Owner (collectively, the "Buyer Closing Deliverables"):

(A)     Officer's Certificate. Certificate dated as of the Closing Date and duly executed by an authorized officer of Buyer, substantially in the form and substance of **Exhibit O** hereto ("Buyer Certificate");

(B)     Assignment and Assumption Agreement. The Assignment and Assumption Agreement, duly executed by an authorized officer of Buyer;

(C)     Escrow Agreement. The Escrow Agreement, duly executed by an authorized officer of Buyer, and executed on behalf of the Escrow Agent;

(D)     Employment Agreements. The Employment Agreements, duly executed on behalf of New PC; and

(E)     Transition Services Agreement. The Transition Services Agreement, duly executed on behalf of Buyer and New PC.

(vi)     Employment Transition. As of the Closing, the employment relationship between Seller and all of its employees (including Owner) and their active participation in any of Seller's benefit plans shall cease, and Seller and Owner shall use their reasonable best efforts to cause all of such employees to become employees of Purchaser or New PC as applicable. Seller shall retain and be responsible for paying all of such employees for all wages, bonuses, paid-time-off and other compensation and benefits accrued or earned through the Closing, and all related taxes, contributions and other Liabilities, except for the Assumed Pre-Closing Liabilities. Purchaser or New PC, as applicable, agree to pay the amounts set forth in **Exhibit P** attached hereto (the "Buyer Portion of Christmas Bonuses") to such employees or independent contractors of Purchaser or New PC as set forth therein. For the avoidance of doubt, nothing in this Agreement shall be deemed to (A) limit the right of Buyer or New PC to terminate the employment of any Person at any time, or to withhold any offer of employment to any Person, in their respective sole discretion (other than as expressly set forth under the Employment Agreements), (B) create or grant any third-party beneficiary, employment or other rights to any Person or (C) constitute the establishment or adoption of, or amendment to, any employee benefit plan, or provide any third party any claim or cause of action in respect of any provision of this Agreement as it relates to any employee benefit plan or otherwise.

4848-3594-1674.9

7

12162015

31

(c)     **Bank Accounts**.  Upon request by Buyer, Seller shall execute and deliver all signature cards and other documentation, and cooperate with Buyer, to effectuate all changes in the bank accounts of Seller to allow Buyer to sweep the bank accounts of Seller, as reasonably requested by Buyer, during the term of the Transition Services Agreement.

(d)     **Use of Name**.  Seller shall not include the words or letter combinations "Winfree" or "Denton" or any variant thereof as a trade name, fictitious name or otherwise in the conduct of any trade or business for a period of five (5) years following the Closing (except as contemplated in the Transition Services Agreement, as defined below).  Notwithstanding the foregoing, except as expressly permitted by Buyer, Seller shall no longer use or include the words or letter combinations "Winfree & Denton" nor shall Seller or Owner use such name or combination thereof as a trade name, fictitious name or otherwise in the conduct of any trade or business following the Closing (except as contemplated in the Transition Services Agreement, as defined below).

(e)     **Prorations**.  The Parties shall prorate as of the Closing Date, including for purposes of the Working Capital Adjustment, the responsibility for payment of lease payments, property or ad valorem taxes on any of the Purchased Assets or Professional Assets, and the expense of any water, sewer, telephone, electricity, gas, Internet, cable or other utilities any other expenses which are normally prorated upon the sale of assets of a going concern with respect to the Business and the Practice.

(f)     **Misdirected Payments**.  If, following the Closing, any Payor, customer, patient, vendor, supplier or other third party misdirects goods or payments to Seller or Owner in respect of any Purchased Assets or Professional Assets, then Seller and Owner shall promptly notify Buyer and forward such misdirected goods or payments to Buyer.

(g)     **Further Acts and Assurances**.  Seller and Owner shall, upon request of Buyer from time to time upon and following the Closing, take any and all steps necessary to place Buyer and New PC in possession and operating control of the Purchased Assets and the Professional Assets, respectively, and will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be required for transferring and confirming to Buyer or New PC or their respective successors or assigns, as applicable, or for reducing to possession, any or all of the Purchased Assets and Professional Assets, respectively.  Seller and Owner also shall cooperate with Buyer, New PC and their respective Affiliates and representatives after the Closing in furnishing information, evidence, testimony and other assistance in connection with any Action, proceeding, investigation or dispute of any nature with respect to matters or Taxes pertaining to periods prior to the Closing in respect of the Practice, the Business, the Purchased Assets or Professional Assets.

(h)     **Work In Progress**.  For any dental crown preparation services that have been rendered prior to the Closing Date for which only the seating of the dental crown shall be completed following the Closing Date, the following shall apply: Upon receipt of payment for the dental crown, eighty percent (80%) of the fee for the dental crown shall be attributed to Seller's Pre-Closing Accounts Receivable, and twenty percent (20%) of the fee for the dental crown shall be attributed to the Buyer's Post-Closing Accounts Receivable.

5.     **Representations and Warranties of Seller and Owner**.  As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller and Owner, jointly and severally, represent and warrant to Buyer as follows, except as described in reasonable detail in the corresponding section or subsection of the Disclosure Schedule attached hereto as **Exhibit Q** (the "Disclosure Schedule").

(a)     **Organization; Qualification**.  Owner is a natural Person who resides in the State of Tennessee and is, and at all times during the period in which he has held any ownership interests in Seller has been, duly licensed to practice dentistry without restriction in the State of Tennessee.  Seller is

4848-3594-1674.9

8

a professional service corporation, duly organized, validly existing and in good standing under the laws of the State of Tennessee, and has full power and authority to carry on the Business as currently conducted and to own and lease the rights, properties and assets that it currently owns or leases, including the Purchased Assets and Professional Assets. Owner owns and holds, beneficially and of record, all of the issued and outstanding shares of capital stock or other equity or ownership interests in Seller, free and clear of any and all Liens, encumbrances, preemptive rights and other limitations or restrictions, and there are no outstanding, authorized or reserved options, warrants, convertible securities, agreements or rights to purchase any capital stock or other equity or ownership interests in Seller. Seller does not do business in any jurisdiction other than the State of Tennessee and is not required to be qualified to do business as a foreign corporation or limited liability company in any jurisdiction. Seller has provided Buyer with true, correct and complete copies of Seller's formation, organizational and governing documents, and minutes of meetings of Seller's board of directors and shareholders or actions by written consent, and stock ledger. Seller does not own or hold any shares of capital stock, membership interests or other equity or ownership interests in any other Person, and the Practice is operated solely through Seller and no other Person.

(b)     **Authority and Validity**. Each of Seller and Owner has full power, authority and legal capacity to execute, deliver and perform their obligations under this Agreement and under each of the other Contracts and documents to be executed and delivered by such Party. This Agreement and the Ancillary Agreements and other documents to be executed and delivered by Seller or Owner in connection herewith have been duly authorized, executed and delivered by each of Seller and Owner and, to the extent required, its board of directors, managers, shareholders, members or trustees, as applicable, and do not require any further authorization or consent, and are the legal, valid and binding obligations of each of Seller and Owner, enforceable against such Party in accordance with their respective terms.

(c)     **No Conflicts or Required Consents**. **Section 5(c)** of the Disclosure Schedules sets forth each consent, approval or waiver required under the terms and conditions of the Assigned Contracts and Leases, and any other Contracts or leases of Seller in connection with the transactions contemplated by this Agreement. The execution, delivery and performance by Seller and Owner of this Agreement and the Ancillary Agreements and other documents to be executed and delivered by such Party in connection herewith, and the consummation by Seller and Owner of the transactions contemplated hereby and thereby, do not and will not: (i) require the consent of or notice to any Governmental Authority; (ii) conflict with or result in a violation of any Law, order or injunction of any court or Governmental Authority to which Seller or Owner is subject or bound; (iii) conflict with or result in a violation of any of the terms of the Seller's or Owner's respective articles of incorporation, bylaws or other formation, organizational or governing documents, or any amendments thereto; nor (iv) violate, conflict with, result in a breach of or default under (with or without notice or lapse of time or both), require notice, filing, consent or other action under, or accelerate or permit the termination or acceleration of any performance required by the terms of any Contract, lease, license or permit to which Seller or Owner is a party or by which Seller or Owner is bound, nor result in the creation of any Lien or Encumbrance upon any of the assets of Seller or Owner.

(d)     **Financial Statements; No Undisclosed Liabilities**. Seller has provided Buyer with true, correct and complete copies of the unaudited balance sheet, income statement and other financial statements of Seller as of and for the 12 months ended December 31, 2012, 2013 and 2014, and as and for the eight months ended August 30, 2015 (collectively, the "Financial Statements"), each of which presents fairly the assets, liabilities and financial condition of Seller as of such dates and the results of operations and cash flows of Seller for such periods, in each case on a cash basis, and are consistent with the books and records of Seller and represent only actual, bona fide transactions. Attached as **Section 5(d)-1** of the Disclosure Schedules is a true, correct and complete copy of the Financial Statements. The Financial Statements do not reflect the assets, liabilities or operations of any other Person other than Seller. Seller has no Liabilities of any nature except as disclosed in **Section 5(d)-2** of the Disclosure Schedules or that were incurred since August 30, 2015 in the ordinary course of business consistent with past practice and that are not material individually or in the aggregate.

4848-3594-1674.9

9

12162015

33

(e)     **Absence of Recent Changes**.  Since December 31, 2014, Seller and the Practice have operated only in the ordinary course of business consistent with past practice, and, except as disclosed in **Section 5(e)** of the Disclosure Schedules, Seller has not:

(i)     Suffered any event or condition that has had, or is reasonably likely to have, a material adverse effect on Seller or the Practice or their financial condition, assets, Liabilities, business, operations or prospects, or the ability of Seller or Owner to perform any of their obligations under this Agreement or the Ancillary Agreements;

(ii)     Sold, disposed of or otherwise transferred any of its rights or assets, other than inventory in the ordinary course of business consistent with past practice, or suffered any material damage, loss, destruction or eminent domain taking of any assets, or made aggregate capital expenditures or commitments in excess of $2,500.00;

(iii)     Increased any salaries, wages or benefits or made any arrangement or entered into any Contract for the payment of any bonus, special compensation or severance to any employee, independent contractor or consultant, other than immaterial amounts in the ordinary course of business consistent with past practice, or hired, committed to hire or terminated any employee, independent contractor or consultant, or received notice that any employee, independent contractor or consultant has resigned or threatened to resign; or entered into or amended any employment, independent contractor, consulting, severance or similar agreement;

(iv)     Terminated or amended any material Contract, Permit or other instrument or business arrangement or suffered any loss or termination, or, to the Knowledge of Seller, threatened loss or termination, of any material Contract, Permit, instrument or business arrangement, entered into any commitments or transactions involving aggregate value in excess of $2,500.00, or opened, terminated or closed any office location or line of business;

(v)     Delayed or postponed the payment of trade payables, accounts payable, payroll, wages, benefits, Taxes and other obligations, or accelerated the collection or payment of accounts receivable, except in the ordinary course of business consistent with past practice; or

(vi)     Agreed to take any action described in this Section 5(e).

(f)     **Litigation and Claims**.  Except as disclosed in **Section 5(f)** of the Disclosure Schedules, there is, and has been, no Action pending or, to the Knowledge of Seller, threatened against Seller or any Affiliate, shareholder, director, officer, employee or independent contractor thereof in their capacities as such or relating to Seller, at law or in equity before any court, arbitration tribunal or Governmental Authority, and there is no reasonable basis therefor. There are no judgments against or orders or consent decrees binding on Seller or on any Affiliate, shareholder, director, officer, employee or independent contractor of Seller in their capacity as such or relating to Seller.

(g)     **Compliance with Laws; Permits**.

(i)     Seller is, and has been, in compliance in all material respects with all applicable Laws, orders and decrees, including all Healthcare Laws, and Seller and Owner have not received or been served with any search warrant, subpoena, civil investigative demand, contact letter or other notice alleging any violation of any Law by Seller or Owner. Seller and Owner are not subject to any fine, penalty, Liability or disability as a result of a failure to comply with any requirement of any applicable Law, order, injunction or decree, or any other requirement of any Governmental Authority or court, and Seller and Owner have not received any notice of such noncompliance.

(ii)   Neither Owner or Seller nor any of its directors, officers, agents, employees, independent contractors, shareholders or Affiliates or any other Persons acting on its behalf have, in their capacity with or on behalf of Seller: (A) used or committed to use any corporate or other funds for unlawful contributions, payments, gifts or entertainment, or made or committed to make any unlawful expenditures relating to political activity to government officials or others or established or maintained any unlawful or unrecorded funds; (B) accepted or received any unlawful contributions, payments, expenditures or gifts; or (C) established or maintained any fund or asset that has not been recorded in the books and records of Seller.

(iii)   Seller has in effect all federal, state and local permits, certificates, licenses, registrations, accreditations, approvals and other authorizations ("Permits") necessary in the conduct and operation of their respective business and operations as currently conducted or the assets used therein, or to obtain payment for services provided by or on behalf of Seller. All of the Permits are in full force and effect, Seller is not in material breach or violation of, or default under, any such Permit. No basis exists which, with or without notice or lapse of time or both, would constitute any such breach, violation or default or grounds for a violation, order or deficiency, and no proceeding is pending or, to the Knowledge of Seller, threatened to revoke, refuse to renew, suspend or modify any such Permit or accreditation.   **Section 5(g)** of the Disclosure Schedule hereto sets forth a true, correct and complete list of all of such Permits. Seller has not engaged in mobile dentistry or on-site dentistry, owned or operated any dental or other laboratory, sponsored or made available to patients any discount dental plan, nor engaged in the business of insurance.

(h)   **Healthcare Matters**.

(i)   Neither Seller nor Owner, nor any of Seller's independent contractors, employees or agents, is or has been (A) party to any contract, lease, joint venture or other arrangement with any health care provider or immediate family member thereof, or other Person who is in a position to make or influence referrals to or otherwise generate business for Seller, except in compliance in all material respects with applicable Laws; (B) excluded, suspended or debarred from participation in any Government Program, or any federal or state governmental procurement or non-procurement program, nor is any such debarment, disqualification, suspension or exclusion pending or, to the Knowledge of Seller, threatened; (C) party to a Corporate Integrity Agreement or similar agreement with any Governmental Authority, or has any ongoing reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; or (D) a defendant in any *qui tam*, False Claims Act or similar Action, nor made any voluntary disclosure to any Governmental Authority.

(ii)   Seller has not participated in, contracted with or received reimbursement or payments from Medicare, any state or federal Medicaid program, Children's Health Insurance Program or other Governmental Program. All claims and billings submitted by or on behalf of Seller have been true, correct and complete and are and have been in compliance in all material respects with all applicable Laws and Contracts, manuals, policies and billing guidelines, and (except for immaterial amounts billed and refunded in the ordinary course of business) Seller has not billed or received any payment in excess of amounts permitted thereby nor made or caused to be made a false statement, claim or representation of a fact in any application for any benefit or payment from any patient or Payor. Seller has paid or caused to be paid all known and undisputed refunds or overpayments which have become due to any patient or third party, and neither Seller nor Owner has received any notice of any material overpayment, false claim, improper billing or recoupment from any patient or payor. Seller has provided Buyer with true, correct and complete copies of all audit, corrective action plan or inspection reports or overpayment demands received by Seller from any Payor and all written responses thereto.

(iii)   Seller and its operations are and have been in compliance in all material respects with HIPAA and all other applicable federal and state laws and regulations governing the use, security or disclosure of patient, health or protected information.   Seller has taken commercially reasonable steps, consistent with industry standards and applicable Laws, such that the information is

4848-3594-1674 9

11

protected against unauthorized access, use, modification, disclosure or other misuse. Neither Seller nor Owner has received any notice from the Office for Civil Rights for the U.S. Department of Health and Human Services or any other Governmental Authority or Person of any allegation regarding its failure to comply with HIPAA or any other state law or regulation applicable to the protection of patient, health or protected information, nor made any notification of such a breach or failure to any Person, the media or the Secretary of the U.S. Department of Health and Human Services pursuant to HIPAA or applicable state Laws. Seller has undertaken surveys, audits, inventories, reviews, analyses and/or assessments to the extent required by HIPAA and remediated any deficiencies identified thereby, and have provided training with respect to compliance with HIPAA to their "workforce" and entered into a business associate agreement in accordance with HIPAA with each third party acting as a "business associate" or "subcontractor" thereto (as such terms are defined in HIPAA).

(iv)    Set forth in **Section 5(h)(iv)** of the Disclosure Schedule hereto is a true, complete and correct list of each dentist, orthodontist, endodontist, oral surgeon, pediatric dentist, dental hygienist, dental assistant and other licensed personnel (including Owner) employed or contracted by or otherwise providing dental or healthcare services on behalf of Seller (each, a "<u>Provider</u>"), including each such Person's position and, if applicable, specialty, period of service with Seller, and whether such Person is part-time or full-time, an employee or independent contractor, or on a leave of absence and the type of leave. Each Provider is and, throughout the period of such employment, engagement or contract has been: (A) duly licensed and/or duly registered or certificated to practice his or her profession (or provide the applicable services to or on behalf of Seller) in the State of Tennessee and each other state in which he or she practices such profession; (B) performed such services in accordance with the scope of practice and supervision requirements set forth in applicable Laws, rules, regulations and guidelines; and (C) validly registered (to the extent required) with the United States Drug Enforcement Administration under the federal Controlled Substances Act and any other applicable Laws. There is no Action pending or, to the Knowledge of Seller, threatened with respect to denial or revocation of licensure, registration or certification of Seller or Providers, and no event has occurred, and no fact, circumstance or condition exists, that has resulted or reasonably may result in the denial, loss, restriction, revocation, suspension or rescission of any such professional license, registration or certification. Neither Seller nor any Provider is or has been subject to a disciplinary proceeding, corrective action plan, inquiry, monitoring or investigation by or involving any professional board, agency, society, association or Governmental Authority charged with regulating the professional activities of such Person or any other Law, and no such Action or proceeding is pending or threatened. All disciplinary actions, imposition of restrictions or conditions, revocation or non-renewal of rights and privileges for reasons requiring reporting to local, state, federal or quasi-public authorities that are required of each of Seller and the Providers have been effected as required.

(i)    **Contracts.** **Section 5(i)** of the Disclosure Schedule hereto sets forth a true, complete and correct list of each written or oral Material Contract to which Seller is a party or by which it is bound. Except as set forth in **Section 5(i)** of the Disclosure Schedule, Seller has delivered to Buyer a true, correct and complete copy of each of the Material Contracts and such others as have been requested by Buyer. Each of the Material Contracts are valid and in full force and effect and are enforceable by or against Seller in accordance with their terms except as may be limited by bankruptcy, insolvency, or other Laws affecting creditors' rights generally, or as may be modified by a court of equity, and there is not (i) any existing or claimed default or breach by Seller or event that, with the notice or lapse of time or both, would constitute a default or breach by Seller or (ii) to the Knowledge of Seller, any existing or claimed default or breach by any other party or event which, with notice or lapse of time or both, would constitute a default or breach by any such party. There is no actual or, to the Knowledge of Seller, threatened, termination, cancellation or limitation of the Material Contracts. To the Knowledge of Seller, there is no pending or threatened bankruptcy, insolvency or similar proceeding with respect to any other party to any of the Material Contracts. Except as set forth on **Section 5(i)** of the Disclosure Schedule hereto, none of the Material Contracts requires consents by any third party in connection with the transactions contemplated hereby.

(j)     **Assets**. Seller has sole and exclusive, good and marketable title to (or, in the case of property held under a lease or other contractual obligation, a sole and exclusive, enforceable leasehold interest in, or right to use) all of its assets, free and clear of all Liens and Encumbrances. All of Seller's rights and tangible assets, whether owned or leased, are in the possession and control of Seller and are located at the premises currently used for the operation of the Practice. The Purchased Assets include all tangible and intangible property necessary for or used or useful in the operation of the Practice (other than the Excluded Assets). **Section 5(j)** of the Disclosure Schedule hereto sets forth a true, correct and complete list of all items of tangible personal property of or used or held for use in Seller's operations. All tangible Purchased Assets are in good repair and operating condition, reasonable wear and tear excepted. The inventories of Seller are of a good and merchantable quality usable and saleable in the ordinary course of business, are in a quantity reasonable for the operations of the businesses of Seller as currently conducted and are not obsolete, damaged, defective or slow moving. The accounts receivable of Seller, whether or not reflected in the Financial Statements, represent bona fide transactions made in the ordinary course of business, have not been assigned or pledged to any other Person, are not subject to any dispute, contest, refusal to pay or right of set-off, and are collectible in accordance with their terms. **Section 5(j)** of the Disclosure Schedule hereto also sets forth a true, correct and complete aging schedule of the accounts receivable of Seller as of November 30, 2015.

(k)     **Real Property.** Except as disclosed on **Section 5(k)** of the Disclosure Schedule hereto, Seller does not own and has not owned any real property. The Assigned Office Lease represents all of the leases, subleases, licenses or other Contracts with respect to which real property is leased, subleased, licensed, occupied or used by Seller, and Seller has provided Buyer with a true, correct and complete copy thereof, including all amendments, exhibits and schedules thereto. The Location is the only location at which the Practice is being conducted or that is necessary for the conduct and operation of the Practice, and is the only real property being leased or occupied by Seller. The Location is adequate for the purposes for which it is currently used by Seller, in good repair and operating condition (subject to normal wear and tear) and not in need of maintenance or repairs other than in the ordinary course of business. Seller's occupancy and use of the Location is in accordance with all applicable certificates of occupancy, Permits and zoning and other Laws. All utility systems serving the Location are adequate for the operation of the Business and the Practice and the Location has adequate access for ingress from and egress to a public way. There are no facts or conditions affecting the Location that could reasonably be expected to, individually or in the aggregate, interfere in any material respect with the use, occupancy or operation thereof as currently used, occupied or operated. Seller has a good and valid leasehold interest in the Location, free of all Liens and Encumbrances. The Assigned Office Lease is in full force and effect, and no event has occurred which (whether with or without notice, lapse of time or both) would constitute a default thereunder by Seller, and Seller has not received any notice of any default, termination, eviction or assessment thereunder by any parties thereto. The Location is not subleased from another Person, and Seller has not subleased, licensed or otherwise granted to any Person the right to use or occupy the Location or any portion thereof and there is no Person (other than Seller) in possession of any of the Location. During the past 12 months, Seller has not received any notice of any increase in the amount of rent payable under the Assigned Office Lease.

(l)     **Employees.** **Section 5(l)** of the Disclosure Schedule hereto sets forth a true, complete and correct list of each employee, independent contractor and consultant of Seller, including any leased or co-employed individuals, and each such Person's job title, salary or wage rates, bonus and benefit information, accrued paid-time-off and period of service, and whether such Person is part-time or full-time, an employee or independent contractor or leased or co-employed employees, or on a leave of absence and the type of leave. Except as disclosed in **Section 5(l)** of the Disclosure Schedule hereto, all of such persons are terminable at will. Seller has not received any notice that any of such employees, independent contractors or consultants plans or intends to terminate such Person's employment or engagement with Seller. Seller is and has been in compliance with all applicable Laws relating to employment and employment practices, terms and conditions of employment, wages and hours, occupational safety and health, discrimination, civil rights, whistleblower statutes, workers' compensation, collection and payment of withholding and/or social security taxes, payroll taxes and any

4848-3594-1674.9

13

12162015

similar Tax, and the Fair Labor Standards Act or any other applicable Laws dealing with minimum wages, maximum hours or overtime for such employees. Seller has properly classified individuals providing services to Seller as independent contractors or employees, as the case may be. There are and have been no charges, audits, investigations, proceedings or complaints concerning any of Seller's employment practices pending or, to the Knowledge of Seller, threatened before any Governmental Authority. There are no claims by any employee, leased employee or former employee (or their dependents or spouses) pending or, to the Knowledge of Seller, threatened against Seller for costs, expenses or other Liabilities under any workers' compensation Laws, requirements or programs and no claims, injuries, fact, event or condition exists that could give rise to such a claim. No labor dispute, strike, stoppage or complaint exists or, to the Knowledge of Seller, is threatened against Seller, none of Seller's employees is represented by a labor union, Seller is not party to or negotiating any collective bargaining agreement and no union organizing activities are taking place.

(m)     **Employee Benefits.** **Section 5(m)** of the Disclosure Schedule hereto sets forth a true, complete and correct list of all retirement plans, pension plans, health, disability and life insurance plans, and other employee benefit plans or welfare plans that are or during the past five years have been maintained or contributed to by Seller, or with respect to which Seller has any Liability or obligations to any current or former officer, employee or service provider of Seller (the "Benefit Plans"). Seller has delivered to Buyer true, correct and complete copies of all Benefit Plan documents and amendments thereto. Each Benefit Plan has been operated in compliance in all material respects with all applicable Laws, and all contributions to, and payments from, each Benefit Plan have been timely made under the requirements of all applicable Laws and the terms of the Benefit Plan. All required reports, tax returns, documents and plan descriptions of the Benefit Plans have been timely filed with the appropriate Governmental Authority and if required by applicable Law, provided to participants in the Benefit Plans. Each Benefit Plan intended to be qualified under Section 401(a) of the Code has a current favorable determination letter (or, in the case of a prototype plan, a favorable opinion or notification letter), and no event has occurred which would reasonably be expected to cause any Benefit Plan to become disqualified for purposes of Section 401(a) of the Code. There are no pending or, to the Knowledge of Seller, threatened claims, lawsuits or Actions relating to any Benefit Plan. The consummation of any of the transactions contemplated by this Agreement will not accelerate the time of vesting or payment, or increase the amount, of compensation to any employee or former employee of Seller, nor trigger any payments under any of the Benefit Plans. No Benefit Plans provide for, and no written or oral Contracts have been entered into with any employee or former employee of Seller promising or guaranteeing, any employer payment or funding for the continuation of any insurance coverage following Closing.

(n)     **Taxes.** Seller has filed all Tax Returns required to be filed by it within the time and in the manner required or provided by applicable Law, and each such Tax Return was true, correct and complete, prepared in compliance with all applicable Laws and accurately reflected the Tax Liabilities of Seller. Seller has provided to Buyer true, correct and complete copies of all Tax Returns, examination reports and statements of deficiencies filed by, assessed against or agreed to by Seller since December 31, 2010. Seller has timely paid in full all Taxes (whether or not shown on a Tax Return), penalties, interest and any other statutory additions that have become due or payable, and there are no Tax Liens and Encumbrances encumbering any of the assets or other properties of Seller. There is no pending or, to the Knowledge of Seller, threatened audit, examination, investigation, deficiency assessment, refund litigation, appeal, claim or other administrative or judicial Action relating to any Tax Return filed by Seller or any Tax for which Seller is or may be expected to be liable. There is no dispute, deficiency or claim concerning any Tax Liability of Seller asserted, claimed or raised by any Governmental Authority, and Seller is not contesting any Tax Liability alleged to be owed by it. Seller has not received notice that any Governmental Authority has proposed, asserted or assessed any adjustment that would reasonably be expected to result in an additional Tax for which Seller is or would reasonably be expected to be liable that has not been settled and paid. Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency. All Taxes required to be withheld by or on behalf of Seller in connection with amounts paid or owing to any

employee, independent contractor, creditor or other Person have been withheld and duly and timely paid to the proper Governmental Authorities, in accordance with applicable Laws.

(o)     **Insurance**. Seller maintains, and has maintained, in full force and effect general and professional liability insurance coverage and various policies and forms of insurance that are, in each case, of the type and in the amounts adequate, commercially reasonable and customary for the Practice. **Section 5(o)** of the Disclosure Schedule hereto sets forth a true, correct and complete list of all insurance policies currently maintained by Seller and a list of all claims made by Seller under any policy of insurance during the past three years. Seller has delivered to Buyer true, correct and complete copies of all such policies together with all riders and amendments thereto. Such policies are in full force and effect and all premiums due thereon have been paid, and Seller is not in default under any such insurance policy or failed to file any notice or present any claim thereunder in a due and timely fashion. Seller has not received any notice of cancellation, modification or termination of any such policy, or any notice denying or disputing any coverage or claim made under any policies.

(p)     **Intellectual Property.** Seller owns the entire right, title and interest in and to, free and clear of Liens and Encumbrances, or have a valid license or right to use, all trade names, trademarks, service marks, logos, copyrights, patents, patent applications, domain names and other Intellectual Property used or held for use in the operation of their respective businesses as currently conducted. **Section 5(p)** of the Disclosure Schedule hereto sets forth a true, correct and complete list of all Intellectual Property registered, or for which application has been filed for registration, with the United States Copyright Office or Patent and Trademark Office or other Governmental Authority. **Section 5(p)** of the Disclosure Schedule hereto further sets forth a true, correct and complete list of all Intellectual Property: (i) owned or developed by Seller; or (ii) licensed to Seller or otherwise owned by any third party and used in the businesses of Seller. The operations of Seller's businesses are not and have not been infringing, misappropriating or otherwise violating the Intellectual Property of any other Person, and, to the Knowledge of Seller, no other Person is infringing, misappropriating or otherwise violating any intellectual property owned by or licensed to Seller. There are and have been no claims or Actions pending or, to the Knowledge of Seller, threatened against Seller or Owner contesting the validity, use, ownership or enforceability of any of the intellectual property owned by Seller or used in their businesses, and no notices have been received by Seller that the operations of Seller are infringing, misappropriating or otherwise violating the intellectual property of any other Person.

(q)     **Environmental Matters**. The operations, assets and properties of Seller are, and have been, in compliance in all material respects with all Environmental Laws and Seller has not treated, stored, managed, disposed of, transported, handled, released or used any Hazardous Materials, except in the ordinary course of business and in compliance with all Environmental Laws. There are no Actions pending or, to the Knowledge of Seller, threatened against Seller relating to any Environmental Law. There are no underground storage tanks located at the Location, and there is no asbestos-containing material or polychlorinated biphenyls ("PCBs") or PCB-containing items contained in or forming part of the Location. Seller is and has been in compliance in all material respects with all Laws applicable to the generation, transportation, treatment, storage, disposal and other handling of medical waste.

(r)     **Affiliate Transactions**. Except as disclosed on **Section 5(r)** of the Disclosure Schedule hereto, Seller is not party to any Contract, loan, account receivable, accounts payable or other business arrangement with Owner or any director, officer, manager, employee or independent contractor of Seller (nor any Affiliate or immediate family member of Owner or any of the foregoing).

(s)     **Bank Accounts**. Set forth in **Section 5(s)** of the Disclosure Schedule hereto is a true, correct and complete list of each of the bank accounts of Seller and the authorized signatories thereon.

(t)     **Brokers**. None of Owner, Seller, or any Affiliate, representative or agent thereof, has employed or engaged any broker, finder or investment banker or incurred any Liability for

4848-3594-1674.9

15

12162015

39

any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with this Agreement or the transactions contemplated hereby.

(u)      **Disclosure**. Seller and Owner have not withheld from Buyer any material facts or information relating to Seller, Owner or the Practice, Business or their assets, liabilities and operations. No representation or warranty made by Owner or Seller in this Agreement or in any statement, certificate or instrument to be furnished to Buyer pursuant to this Agreement or other Contracts or documents delivered in connection herewith contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make these statements contained herein and therein not misleading.

6.      **Representations and Warranties of Buyer.** As an inducement to Seller and Owner to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer represents and warrants to Seller and Owner as follows:

(a)      **Organization**. Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)      **Authority and Validity**. Buyer has full power, authority and legal capacity to execute, deliver and perform its obligations under this Agreement and under each of the other Ancillary Agreements and documents to be executed and delivered by Buyer. This Agreement and the Ancillary Agreements and other documents to be executed and delivered by Buyer in connection herewith have been duly authorized, executed and delivered by Buyer and do not require any further authorization or consent, and are the legal, valid and binding obligations of Buyer, enforceable against it in accordance with their respective terms.

(c)      **No Conflicts or Required Consents**. The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements and other documents to be executed and delivered by Buyer in connection herewith, and the consummation by Buyer of the transactions contemplated hereby and thereby, do not and will not: (i)  require the consent of or notice to any Governmental Authority; (ii) conflict with or result in a violation of any Law, order or injunction of any court or Governmental Authority to which Buyer is subject or bound; (iii) conflict with or result in a violation of any of the terms of Buyer's certificate of formation, limited liability company agreement or other formation or governing documents, or any amendments thereto; nor (iv) violate, conflict with, result in a breach of or default under (with or without notice or lapse of time or both), require notice, filing, consent or other action under, or accelerate or permit the termination or acceleration of any performance required by the terms of any Contract, lease, license or permit to which Buyer is a party or by which Buyer is bound.

(d)      **Brokers**. Buyer has not employed or engaged any broker, finder or investment banker or incurred any Liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with this Agreement or the transactions contemplated hereby.

(e)      **Claims**. As of the Closing, there are no Actions pending against Buyer or New PC Seller, at law or in equity before any court, arbitration tribunal or Governmental Authority that seek to challenge, enjoin or otherwise restrain Buyer's consummation of the transactions contemplated in this Agreement.

(f)      **Representations**. No representation or warranty made by Buyer in this Agreement, and no statement, certificate or instrument to be furnished to Buyer pursuant to this Agreement contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make these statements contained herein and therein not misleading.

7.     **Indemnification.**

(a)     **Indemnification by Seller and Owner.**  Subject to the terms set forth in this Section 7, Seller and Owner, jointly and severally, shall indemnify, defend, hold harmless, reimburse and pay Buyer, New PC and their respective Affiliates, owners, directors, officers, successors and assigns (each, a "Buyer Indemnified Person"), from and against any and all Losses suffered or incurred by any such Buyer Indemnified Person by reason of, arising out of or relating to, or based upon any of the following:

(i)     Any breach of or inaccuracy in any representation or warranty of Seller or Owner contained in this Agreement or any Ancillary Agreement or other document delivered in connection herewith to which Seller or Owner is or was a party, or any certificate, document or instrument delivered by Seller or Owner in connection herewith;

(ii)     The breach of any covenant or agreement of Seller or Owner contained in and made in connection with this Agreement;

(iii)     Any Transaction Expenses or Indebtedness of Seller or Owner, any Taxes of or with respect to Seller or its assets arising out of or relating to any period or periods prior to the Closing Date or ending on the Closing Date, or the Excluded Liabilities, Excluded Assets or operations of Seller prior to the Closing; and/or

(iv)     The matters, if any, described on **Exhibit Q** hereto.

(b)     **Indemnification by Buyer.**  Subject to the terms set forth in this Section 7, Buyer shall indemnify, defend, hold harmless, reimburse and pay Seller and Owner from and against any and all Losses suffered or incurred by Seller and Owner by reason of, arising out of or relating to, or based upon any of the following:

(i)     Any breach of or inaccuracy in any representation or warranty of Buyer contained in this Agreement or any Ancillary Agreement or other document delivered in connection herewith to which Buyer is a party or any certificate, document or instrument delivered by Buyer in connection herewith; or

(ii)     The breach of any covenant or agreement of Buyer contained in and made in connection with this Agreement.

(c)     **Survival.**  Subject to the limitations and other provisions of this Agreement, the representations and warranties set forth in this Agreement shall survive the Closing and shall remain in full force and effect for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus a period of 60 days; provided, that (i) the representations and warranties in Sections 5(a) (Organization; Qualification), 5(b) (Authority and Validity), 5(c) (No Conflicts or Required Consents), 5(j) (Assets), 5(q) (Affiliate Transactions) and 5(t) (Brokers), and in Sections 6(a) (Organization), 6(b) (Authority and Validity), 6(c) (No Conflicts or Required Consents) and 6(d) (Brokers) and (ii) this Section 7 (Indemnification) shall survive indefinitely. All covenants and agreements of the Parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims asserted by notice from the Party to be indemnified to the indemnifying Party prior to the expiration of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

(d)     **Determination of Indemnification Amount.**  All indemnification payments under this Agreement will be treated as adjustments to the Purchase Price. The right of any Buyer Indemnified Person to indemnification pursuant to this Section 7 will not be affected or limited by any investigation conducted for or on behalf of any Party, or knowledge acquired (or capable of being

4848-3594-1674.9

17

12162015

acquired) at any time by any Party or any Party's representatives, whether before or after the execution and delivery of this Agreement or the Closing, with respect to the accuracy of any representation or warranty, or performance of or compliance with any covenant or agreement. If a Buyer Indemnified Person has a right to indemnification under this Section 8, then Buyer may recover such amounts, claimed amounts or Losses from the Escrow Amount and shall be entitled to offset the amount of such recovery against any amounts otherwise payable by Buyer or its Affiliates to Seller or Owner under this Agreement and Ancillary Agreement or other Contract then in effect between Buyer or its Affiliates and Seller or Owner. The Escrow Amount shall not be the sole or exclusive relief afforded under this Agreement or otherwise to a Buyer Indemnified Person for Losses.

(f)     **Third Party Claims**. If a third party asserts a claim or brings an Action (a "Third-Party Claim") against any Person entitled to indemnification under this Section 7 (an "Indemnified Party") that may give rise to a claim by the Indemnified Party for indemnification under this Section 7 by a Party or Parties hereto (each, the "Indemnifying Party"), then the Indemnified Party will give written notice of such Third Party Claim to each Indemnifying Party promptly upon obtaining knowledge thereof; provided, however, that no delay or failure in delivering such notice shall relieve any Indemnifying Party from any indemnification obligation under this Agreement unless, and then only to the extent that, such Indemnifying Party is actually and materially prejudiced thereby. The Indemnified Party may elect to contest, defend against, consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim in any manner that the Indemnified Party reasonably deems appropriate and the Indemnifying Party(ies) will reimburse the Indemnified Party promptly and periodically for all costs and expenses (including attorneys' fees and expenses) of such contest, defense or settlement and will remain responsible for any Losses that the Indemnified Party suffers resulting from or relating to the Third-Party Claim as provided in this Section 7; provided, however, that the Indemnifying Party will have the right to contest and defend against the Third-Party Claim at the Indemnifying Party's sole cost and expense and with legal counsel of its or his or her choice (and reasonably satisfactory to the Indemnified Party), if (i) the Indemnifying Party notifies the Indemnified Party, in writing within 10 days after receiving notice of the Third-Party Claim, that the Indemnifying Party will indemnify the Indemnified Party from and against all Losses that the Indemnified Party suffers or incurs by reason of, arising out of or relating to, or based upon the Third-Party Claim, (ii) the Third-Party Claim involves only money damages and does not seek an injunction or other equitable relief, and does not involve any criminal proceeding or claim by any Governmental Authority, Government Program or other Payor, (iii) no conflict of interest exists between the Indemnifying Party(ies) and the Indemnified Party, and (iv) the Indemnifying Party conducts the defense of the Third-Party Claim actively and diligently. If any such condition ceases to be satisfied, then the Indemnified Party may again elect to contest, defend against, consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim, and the Indemnifying Party(ies) will reimburse the Indemnified Party and be responsible as provided above. If the Indemnifying Party so elects to contest or defend against a Third-Party Claim in accordance with this Section 7(f), then the Indemnified Party may, at its cost and expense, retain separate co-counsel of its choice and otherwise participate in such contest or defense of the Third-Party Claim, and the Indemnifying Party will not consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim without the Indemnified Party's prior written consent (not to be unreasonably withheld or delayed).

(g)     **Exclusive Remedy**. After the Closing, indemnification pursuant to this Section 7 and the other remedies provided for in this Agreement shall be the exclusive remedies of the Parties with respect to any inaccuracy in or breach of any representations and warranties in this Agreement or breach of or failure to comply with any covenant or obligation under this Agreement, other than with respect to any claim of fraud, willful misconduct or intentional misrepresentation and except for the remedies of specific performance or injunctive or other equitable relief.

8.    **Restrictive Covenants.**

(a)    **Acknowledgements.**  Seller and Owner each acknowledges and agrees that: (i) the covenants and agreements contained in this Section 8 are reasonably necessary to protect Buyer's interests in light of the substantial harm that Buyer might suffer should Seller or Owner breach any of the covenants or agreements, (ii) the period and geographical area of restrictions, and the activities prohibited, under this Section, are fair, reasonable and necessary to protect Buyer and its legitimate business interests, including the goodwill, trade secrets and confidential information being acquired hereunder, and (iii) by reason of Seller's and Owner's abilities and experience, these covenants and agreements will not prevent them from obtaining suitable employment or earning a livelihood in Owner's profession.

(b)    **Non-Competition; Non-Solicitation; Non-Interference; Non-Disparagement.**  In order that Buyer shall receive and be able to maintain the benefit of the goodwill, trade secrets and confidential information being acquired directly or indirectly by Buyer or New PC hereunder, and in order to protect the legitimate business interests of Buyer and New PC, each of Seller and Owner hereby covenants and agrees with Buyer and New PC that commencing upon the Closing and thereafter for a five year period immediately following the Closing (the "Restricted Period"), Seller and Owner shall not, directly or indirectly, for its or his or her own behalf, or for or through any other Person:

(i)    Own any shares or interest in, manage, operate, control, finance or participate in, contract with, or be employed or engaged by or associated with, serve as a director, officer, manager, consultant, trustee or partner of or provide services, advice or other aid or assistance to, nor lend or permit their name to be used in connection with, any company, business, enterprise, practice or other Person (other than Buyer or New PC) engaged or involved (or planning to become engaged or involved), or otherwise engage or participate in (A) the practice of dentistry or providing, performing or offering to provide or perform any type of dental, implant or orthodontic treatment, procedures and services, and related activities, anywhere within a radius of 75 miles extending in all directions from the Location, or (B) any dental support organization or providing, performing or offering to provide or perform any business, management, administrative or support services to or for any dental, implant or orthodontic practice, anywhere within the State of Tennessee or a radius of 75 miles extending in all directions from the Location (in each case other than such Seller's passive ownership of less than 2% of any class of securities of an entity whose securities are listed on a national or regional securities exchange or stock market), nor attempt to do or take, assist any other Person in doing or taking or permit any Affiliate to do or take any such action; nor

(ii)    Solicit, recruit, induce or endeavor to entice away any employee or independent contractor of Buyer, its Affiliates or New PC to terminate his or her employment or engagement with Buyer, its Affiliates or New PC or to become employed or engaged by any other Person (other than general classified or "help wanted" advertisements and/or general solicitations to the public at large that are not targeted at any employees or independent contractors of Buyer), nor hire, employ or engage any Person who is or was an employee or independent contractor of Buyer, its Affiliates or New PC at any time during the immediately preceding 24-month period, nor attempt to do or take, assist any other Person in doing or taking or permit any Affiliate to do or take any such action; nor

(iii)    Solicit business from or perform services for, or solicit, recruit, induce or endeavor to entice away or to cease or reduce doing business with Buyer, its Affiliates or New PC, any customer, supplier, vendor, patient or other Person having a business relationship with Buyer, its Affiliates or New PC, nor attempt to do or take, assist any other Person in doing or taking or permit any Affiliate to do or take any such action; nor

(iv)    Interfere with or disrupt in any way any business relationship or Contract between Buyer, its Affiliates or New PC and any customer, patient, potential customer or patient, supplier, vendor, Payor, consultant, employee, independent contractor or other Person having a business

4848-3594-1674.9

12162015

relationship with Buyer, its Affiliates or New PC, nor make or publish, orally or in writing or electronically, any derogatory or disparaging statements regarding Buyer, its Affiliates or New PC, nor attempt to do or take, assist any other Person in doing or taking or permit any Affiliate to do or take any such action; provided, however, that this clause is not intended to prevent Owner from testifying truthfully in response to a valid subpoena or other compulsory legal process.

        (c)    **Non-Disclosure**. From and after the Closing Date, Seller and Owner each shall not, directly or indirectly, on its or his or her own behalf or through any other Person, use, disclose or communicate to any other Person any trade secrets or confidential information of or regarding Buyer, its Affiliates or New PC (including those included within the Purchased Assets or Professional Assets), whether or not such was created or arose before or after the Closing, and whether or not such is in written or physical form or is retained in the memory of Seller or Owner, unless and to the extent that the confidential information is or becomes generally known to and available for use by the public other than due to or as a result of a breach by or other fault, directly or indirectly, of Seller or Owner or their representatives or agents or a breach by or other fault of any other Person bound by a duty of confidentiality to Buyer or New PC. In addition, Seller and Owner shall not, directly or indirectly, for itself or his or her self or for, though or in association with any other Person (other than on behalf of Buyer, New PC or their respective Affiliates), use or practice or operate under the name "Winfree & Denton" or "Winfree" or "Denton" or any variations and derivations thereof.

        (d)    **Remedies**. In the event of an actual or threatened breach by Seller or Owner of any provision of this Agreement, each of Buyer and/or New PC shall be entitled to injunctive or other appropriate equitable relief, enjoining, restraining and prohibiting Seller and/or Owner, as applicable, from violating this Agreement; provided, however, that nothing stated herein shall be construed as prohibiting or limiting Buyer and/or New PC from pursuing such other remedies as may be available to it in law or at equity, including the recovery of damages. Seller and Owner each hereby waives any requirement on the part of Buyer and/or New PC of proving actual damages or securing or posting any bond in connection with obtaining such injunctive or other equitable relief. Seller and Owner each agrees that it or he shall not challenge the reasonableness of the time, scope and geographic coverage of any of the provisions of this Section 8 in any Action, regardless of who initiates such Action. If Seller or Owner breaches any of the provisions contained in this Section 8, the Restricted Period shall be extended by a period of time equal to the period of time during which such Person breaches this Section.

        (e)    **Severability**. If any provisions of this Section 8 shall be held or determined to be invalid or unenforceable, either in whole or in part, then: (i) the validity and enforceability of all other provisions shall be unaffected, (ii) the provision(s) held or determined to be wholly or partly invalid or unenforceable shall be deemed amended to delete or modify, as necessary, the offending provisions and to alter the balance of such provisions in order to render the same valid and enforceable to the fullest extent permissible, and the provisions of this Section shall be deemed to be valid and enforceable to the extent of any lesser geographic area or for any lesser duration permitted by law if the area and duration set forth herein is deemed to be too broad by a court or other government body, (iii) the court or other government body is authorized to amend and to reform the provision(s) to the minimum extent necessary to render it valid and enforceable to the fullest extent permissible and a provision having a similar economic effect shall be substituted, and (iv) if the ruling and/or the controlling principle of law or equity leading to the ruling is subsequently overruled, modified or amended by legislative, judicial or administrative action, then the provision(s) in question as originally set forth in this Section shall be deemed valid and enforceable to the maximum extent permitted by the new controlling principle of law or equity.

        9.    **Miscellaneous.**

        (a)    **Notices**. All notices and other communications under this Agreement shall be in writing and shall be delivered in person, by nationally recognized overnight delivery service (charges prepaid), or by registered or certified U.S. mail (return receipt requested, postage prepaid), in each case addressed as

4848-3594-1674.9

12162015

follows, and shall be deemed given when (i) delivered in person, (ii) on the earlier of receipt or one Business Day after dispatch by FedEx, UPS or other nationally recognized overnight delivery service, or (iii) on the earlier of receipt or three Business Days after dispatch by U.S. registered or certified mail: (x) if to Seller or Owner: Dr. Robert T. Winfree, D.D.S., 1014 Mystic Streams, Mt. Juliet, Tennessee 37122, with a copy to Oberman Law Firm, 147 Lee Byrd Road, Loganville, Georgia 30052, Attention: Stuart J. Oberman, Esq. and Lauren A. Mansour, Esq.; and (y) if to Buyer, CPF Dental, LLC, 2505 21st Avenue S., Suite 204, Nashville, TN 37212, Attention: James Usdan, with a copy to Chicago Pacific Founders, 400 N. Michigan Ave., Suite 560, Chicago, Illinois 60611, Attention: Jon Maschmeyer, and to Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219, Attention: Donald R. Moody, Esq.  Any party hereto may change its address specified for notices herein by designating a new address by notice in accordance with this Section 9(a).

        **(b)**     **Expenses**.  Except as otherwise provided herein, each of the Parties shall bear and pay all costs and expenses incurred by it or him (or on such Party's behalf) in connection with the negotiation, preparation, execution and performance of this Agreement and the other agreements and documents contemplated herein and the consummation of the transactions contemplated herein and therein.

        **(c)**     **Amendments and Waivers**.  No amendment or waiver of any provision of this Agreement will be valid and binding unless it is in writing and signed, in the case of an amendment, by each of the Parties, or in the case of a waiver, by the Party against whom the waiver is to be effective.  No waiver by any Party of any breach or violation of, default under or inaccuracy in any representation, warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation, default of, or inaccuracy in, any such representation, warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence. No delay or omission on the part of any Party in exercising any right, power or remedy under this Agreement will operate as a waiver thereof.

        **(d)**     **Succession and Assignment; No Third-Party Beneficiaries**.  This Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, and each of which such successors and permitted assigns will be deemed to be a Party hereto for all purposes hereof.  No Party may assign, delegate or otherwise transfer either this Agreement or any of his or her or its rights, interests, or obligations hereunder without the prior written consent of the other Parties; provided, however, that each of Buyer and New PC may assign any or all of its rights and interests or obligations hereunder to one or more of its Affiliates, or any acquiror of all or substantially all of its assets or any successor entity resulting from a merger or consolidation of or with such Party; or collaterally assign its rights and benefits hereunder to any lender, for security purposes or as collateral. This Agreement is for the sole benefit of the Parties hereto and their successors and permitted assignees and nothing herein expressed or implied will give or be construed to give any Person, other than the Parties hereto and such successors and assignees and New PC, any legal or equitable rights hereunder, including any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

        **(e)**     **Entire Agreement**.  This Agreement and the Exhibits, Schedules, certificates and other documents delivered pursuant hereto or incorporated herein by reference, contain and constitute the entire agreement among the Parties and supersede and cancel any prior agreements, representations, warranties, or communications, whether oral or written, among the Parties relating to the transactions contemplated by this Agreement.

        **(f)**     **Severability**.  Any term or provision hereof that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  In the event that any provision hereof would, under applicable Law, be invalid or unenforceable in any respect, each Party hereto intends that such provision will be construed

4848-3594-1674.9

12162015

by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable Law and to otherwise give effect to the intent of the Parties.

(g) **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The exchange by the Parties of copies of this Agreement and executed signature pages hereto by facsimile or other electronic transmission shall constitute effective execution and delivery of the Agreement and may be used in lieu of the original thereof for all purposes. In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart executed by the Party against whom enforcement of this Agreement is sought.

(h) **Schedules**. Nothing in any schedule attached to this Agreement is to be adequate to modify, qualify or disclose an exception to a representation or warranty made in this Agreement unless such schedule identifies the modification, qualification or exception with particularity and describes the relevant facts in reasonable detail. The mere listing (or inclusion of a copy) of a document or other item is not to be adequate to disclose an exception to a representation or warranty made in this Agreement, unless the representation or warranty has to do with the existence of the document or other item itself. No modifications, qualifications or exceptions to any representations or warranties disclosed on one schedule is to constitute a modification, qualification or exception to any other representations or warranties made in this Agreement unless the modification, qualification or exception is also disclosed on each other applicable schedule or a specific cross reference to a disclosure on another schedule is made.

(i) **Governing Law; Venue; Legal Expenses; Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the Laws of the State of Tennessee, without giving effect to any choice or conflict of Laws provision or rule that would cause the application of the Laws of any other jurisdiction. To the fullest extent permitted by applicable Law, each Party hereto agrees: (i) that any claim, action or proceeding by such Party seeking any relief arising out of, or in connection with, this Agreement or the transactions contemplated hereby shall be brought only in a state or Federal court located in Davidson County, Tennessee and not in any other State or Federal court; (ii) to submit to the exclusive jurisdiction of such courts and waives and agrees not to assert any objection that the laying of such venue has been brought in an inconvenient forum; and (iii) that a judgment in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law. If a Party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial or arbitral proceedings, the prevailing Party in such proceeding will be entitled to recover such legal expenses (including reasonable attorneys' fees, costs and disbursements at all court levels), in addition to any other relief to which such Party shall be entitled. EACH OF THE PARTIES KNOWINGLY AND VOLUNTARILY WAIVES THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(j) **Remedies; Specific Performance**. The rights, remedies, powers and privileges of the Parties provided in this Agreement are cumulative and not exclusive and are in addition to any and all rights, remedies, powers and privileges granted by applicable Law to the Parties. Seller and Owner acknowledge and agree that Buyer and New PC would be damaged irreparably in the event any of the provisions of this Agreement is not performed in accordance with its specific terms or otherwise is breached or violated, and, accordingly, Seller and Owner agree that, without having to post bond or other security or prove actual damages, Buyer and/or New PC are entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions of this Agreement in any claim or action in addition to any other remedy to which Buyer or New PC, respectively, are entitled, at law or in equity. Seller and Owner further agree that, in the event of any action for an injunction or specific performance in respect of any such threatened or actual breach or violation, Seller and Owner shall not assert that a remedy at law would be adequate.

(k)     **Headings; Interpretation**. The sections and other headings in this Agreement are solely for reference, and will not affect the meaning or interpretation hereof. References to "including" and words of similar import shall mean "including, without limitation," and any list of items that may follow such word shall not be deemed to represent a complete list of, or be limited to, the contents of the referent of the subject. References to (i) this Agreement are references to this Agreement and the Schedules and Exhibits hereto, (ii) the words "herein," "hereof" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular Section or other subdivision, (iii) any Section are to a section of this Agreement unless otherwise provided, (iv) a Party shall include references to its respective successors and permitted assigns, and (v) any document are to that document as of the date hereof and as amended, consolidated, supplemented, novated or replaced by the parties thereto from time to time. The singular shall include the plural, the plural shall include the singular, and all nouns, pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, as the identity of the Person or Persons may require, and the term "or" shall mean "and/or". The Parties have participated jointly in the negotiation and drafting of this Agreement, and in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The parties intend that each representation, warranty, covenant and agreement contained herein will have independent significance. If any party hereto has breached or violated, or if there is an inaccuracy in, any representation, warranty, covenant or agreement contained herein in any respect, the fact that there exists another representation, warranty, covenant or agreement relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached or violated, or in respect of which there is not an inaccuracy, will not detract from or mitigate the fact that the party has breached or violated, or there is an inaccuracy in, the first representation, warranty, covenant or agreement.

(l)     **Risk of Loss.** The risk of loss or damage to the Purchased Assets or Professional Assets by fire, other casualty or condemnation prior to the Closing is retained by Seller.

(m)     **No Requirement to Refer**. Nothing in this Agreement is to be construed to induce, encourage, solicit or reimburse the referral of any patients or business, or to limit the freedom of any patient to choose the practice, dentist or other provider from whom such patient will receive dental or healthcare services. The Parties acknowledge that there is no requirement under this Agreement that any Seller refer patients or business to any Person and no payment under this Agreement is in return for the referral of any patients or business.

*[Remainder of page intentionally left blank.  Signatures on following page]*

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed on its behalf as of the day and year first above written.

CPF DENTAL, LLC

By: _James M. Usdan_
James Usdan
Chief Executive Officer

ROBERT T. WINFREE, D.D.S., P.C.

By:_____
Robert T. Winfree, D.D.S.
President

OWNER

_____
Robert T. Winfree, D.D.S.

*Signature Page to Purchase Agreement*

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed on its behalf as of the day and year first above written.

CPF DENTAL, LLC

By:_____
     James Usdan
     Chief Executive Officer

ROBERT T. WINFREE, D.D.S., P.C.

By: _____
     Robert T. Winfree, D.D.S.
     President

OWNER

_____
Robert T. Winfree, D.D.S.

*Signature Page to Purchase Agreement*

49

## EXHIBIT F

**BILL OF SALE AND ASSIGNMENT**
**(PROFESSIONAL ASSETS)**

See attached.

4825-3305-3227.6

## GENERAL BILL OF SALE AND ASSIGNMENT
### (PROFESSIONAL ASSETS)

**THIS GENERAL BILL OF SALE AND ASSIGNMENT** ("Bill of Sale") is dated as of December 16, 2015, by and among TN Dental Professionals, P.C., a Tennessee professional service corporation ("New PC"), Robert T. Winfree, D.D.S., P.C., a Tennessee professional corporation ("Seller") and Robert T. Winfree, D.D.S., an individual residing in the State of Tennessee ("Owner").

### RECITALS:

A.      Seller, Owner and CPF Dental, LLC are parties to that certain Asset Purchase Agreement, dated as of December 16, 2015 (the "Purchase Agreement"), pursuant to which Seller and Owner agreed to sell, transfer, convey and deliver to New PC or its designee all of Seller's and Owner's right, title and interest in and to the Professional Assets.

**NOW, THEREFORE,** for and in consideration of the premises, agreements and covenants hereinafter set forth, and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and confessed, the parties, intending to be legally bound, hereby agree as follows:

1.      **Definitions**. Capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the Purchase Agreement.

2.      **Assignment**. Each of Seller and Owner does hereby irrevocably and unconditionally sell, assign, transfer, convey and deliver to New PC, its successors and assigns forever, all of the Professional Assets and all of Seller's and Owner's right, title and interest in and to the Professional Assets, free and clear of any and all Liens and Encumbrances, to have and to hold the same and each and all thereof unto the New PC, its successors and assigns forever, to its and their own use and benefit forever.

3.      **Further Assurances**. Each of Seller and Owner hereby agrees to take such additional actions and to execute, acknowledge and deliver any and all other acts, deeds, assignments, powers of attorney, instruments or other documents as may reasonably be required to effect the intent and purposes of this Bill of Sale and the transactions contemplated hereby and/or by the Purchase Agreement.

4.      **Power of Attorney**. Each of Seller and Owner hereby constitutes and appoints New PC their true and lawful attorney, with full power of substitution, in the name of Seller and Owner or otherwise, and on behalf and for the benefit of New PC, to demand and receive from time to time any and all of the Professional Assets; to institute and prosecute, from time to time, in the name of Seller and Owner or otherwise, any and all actions, suits and proceedings which New PC deems proper to assert or enforce any claim, title, right, debt, note or actions, suits or proceedings in respect to the Professional Assets; and to execute such other documents and take such other action as may be necessary from time to time to carry out this Bill of Sale. Seller and Owner hereby declare that the foregoing powers are coupled with an interest and shall be irrevocable.

5.      **Amendment and Modification; Waiver**. This Bill of Sale may be amended, modified and supplemented only by a written instrument authorized and executed by New PC, Seller and Owner. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the party so waiving. The waiver by either party hereto of a breach of any provision of this Bill of Sale shall not operate or be construed as a waiver of any other or subsequent breach.

6.      **No Third-Party Beneficiaries**. This Bill of Sale is for the sole and exclusive benefit of the parties hereto and their respective successors and permitted assigns and nothing herein is intended or shall be construed to confer upon any person other than the parties hereto and their respective successors and

4825-3305-3227.6

permitted assigns any rights, remedies or claims under, or by any reason of, this Bill of Sale or any term, covenant or condition hereof.

7.      **Governing Law; Venue; Legal Expenses; Waiver of Jury Trial**. This Bill of Sale shall be governed by and construed in accordance with the Laws of the State of Tennessee, without giving effect to any choice or conflict of Laws provision or rule that would cause the application of the Laws of any other jurisdiction. To the fullest extent permitted by applicable Law, each Party hereto agrees: (i) that any claim, action or proceeding by such Party seeking any relief arising out of, or in connection with, this Agreement or the transactions contemplated hereby shall be brought only in a state or Federal court located in Davidson County, Tennessee and not in any other State or Federal court; (ii) to submit to the exclusive jurisdiction of such courts and waives and agrees not to assert any objection that the laying of such venue has been brought in an inconvenient forum; and (iii) that a judgment in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law. If a Party elects to incur legal expenses to enforce or interpret any provision of this Bill of Sale by judicial or arbitral proceedings, the prevailing Party in such proceeding will be entitled to recover such legal expenses (including reasonable attorneys' fees, costs and disbursements at all court levels), in addition to any other relief to which such Party shall be entitled. EACH OF THE PARTIES KNOWINGLY AND VOLUNTARILY WAIVES THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, OR RELATING TO THIS BILL OF SALE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

8.      **Severability**. In the event any provision of this Bill of Sale is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Bill of Sale, which shall be and remain in full force and effect, enforceable in accordance with its terms.

9.      **Divisions and Headings**. The division of this Bill of Sale into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Bill of Sale. The parties have participated jointly in the negotiation and drafting of this Bill of Sale, and in the event an ambiguity or question of intent or interpretation arises, this Bill of Sale will be construed as if drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Bill of Sale.

10.     **Counterparts**. This Bill of Sale may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Bill of Sale and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Bill of Sale and of signature pages by facsimile transmission or Portable Document Format (PDF) shall constitute effective execution and delivery of this Bill of Sale as to the parties and may be used in lieu of the original Bill of Sale for all purposes. Signatures of the parties transmitted by facsimile and PDF shall be deemed to be their original signatures for any purposes whatsoever.

[Remainder of Page Intentionally Left Blank. Signature page follows.]

4825-3305-3227.6

2

**IN WITNESS WHEREOF,** the parties have caused this Bill of Sale to be executed by such party or its authorized officer, all as of the date and year first above written.

ROBERT T. WINFREE, D.D.S., P.C.

By: _Robert T. Winfree_ PRS
Robert T. Winfree, D.D.S.
President

OWNER

_Robert T. Winfree_ PPS
Robert T. Winfree, D.D.S.

*SIGNATURE PAGE TO BILL OF SALE AND ASSIGNMENT*
*(PROFESSIONAL ASSETS)*

# EXHIBIT B

## EXHIBIT K

### FORM OF WINFREE EMPLOYMENT AGREEMENT

See attached.

4825-3305-3227.6

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** ("Agreement"), dated as of December 16, 2015 (the "Effective Date"), by and between TN Dental Professionals, P.C., a Tennessee professional corporation ("Employer"), and Robert T. Winfree, D.D.S., an individual residing in the State of Tennessee ("Dentist").

### RECITALS:

A.    Employer owns and operates a dental practice providing dental services at one or more in locations in the State of Tennessee (the "Practice").

B.    Dentist is a dentist duly licensed to practice dentistry in the State of Tennessee.

C.    Employer desires to employ Dentist, and Dentist is willing to accept employment with Employer, each on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    **Employment.**    Employer agrees to employ Dentist, and Dentist hereby accepts employment with Employer, to provide professional dental services on a full-time basis, at the location(s) and during the times and days of the week identified in Exhibit A attached hereto and incorporated herein by reference, and at such other location(s) and during such other times as may be agreed upon in writing or an e-mail by the parties from time to time (such locations, collectively, the "Practice Sites"). Dentist shall perform his or her duties and responsibilities hereunder diligently, faithfully and in a high quality manner, using his or her best efforts and skill for the interest and benefit of Employer.

2.    **Covenants of Dentist.** Dentist covenants and agrees as follows:

(a)    Dentist shall devote all of his or her professional time and effort to Employer except for such volunteer and charitable services rendered by Dentist for which no compensation is received and which does not interfere with Dentist's obligations hereunder, in each case subject to the terms of the Asset Purchase Agreement of even date herewith (the "Purchase Agreement") among Dentist, Robert T. Winfree, D.D.S., P.C. and CPF Dental, LLC (the "DSO"), to the extent they do not interfere with Dentist's obligations hereunder. Dentist shall not, during the Term, enter into any other arrangements to offer or provide professional dental or related services to patients nor acquire an ownership interest, directly or indirectly, in any entity providing such services.

(b)    Dentist shall procure and maintain at his or her own cost and expense professional claims made liability insurance covering Dentist and Employer with limits of coverage not less than $1,000,000.00 for each incident and no less than $3,000,000.00 for all incidents in the aggregate. The policy shall name Employer and any dental support organization engaged by Employer as additional insureds and Dentist shall provide Employer evidence of such designation upon the request of Employer. The terms and provisions of such professional liability insurance policy shall conform to reasonable requirements established and communicated in writing by Employer to Dentist.    Employer shall reimburse Dentist, up to $1,500.00 total, on an annual basis for premiums paid by Dentist with respect to the professional liability insurance procured and maintained by Dentist pursuant to this Section 2(b).

(c)    If Dentist's license to practice dentistry in the State of Tennessee, registration to prescribe certain drugs, medications or pharmaceuticals, and/or professional liability insurance coverage is cancelled, suspended, revoked, restricted or terminated, Dentist shall immediately notify Employer of such cancellation, suspension, revocation, restriction or termination. Dentist shall immediately

4829-2766-4170.11
12162015

56

discontinue treatment of patients until such license and/or malpractice insurance is reinstated or replaced and Employer consents to such treatment.

(d)     Dentist shall provide professional services to patients in a manner consistent the then current standards of care in the State of Tennessee. In addition, Dentist shall abide by all rules, regulations and policies of Employer, and comply with all federal, state and local laws, rules and regulations applicable to and governing professional dental services; all rules, regulations and policies of accrediting bodies or agencies having jurisdiction over the practice of dentistry; and all rules, procedures and policies of third party payors providing reimbursement to Employer for professional dental services. Dentist shall notify Employer, promptly upon obtaining knowledge thereof, of any violation by Dentist of any such laws, rules, regulations, procedures or policies and fully cooperate with Employer in its investigation thereof.

(e)     Dentist shall promptly provide any materials, documentation and information reasonably requested by Employer's credentialing personnel. Dentist grants Employer the power and authority to include Dentist as a provider in contracts with third party insurance, capitation, direct reimbursement plans, or any other third party payor plan or program.

(f)     Dentist shall use all personnel, space, equipment, supplies and other items provided or arranged for by Employer solely for the purpose of providing professional dental services hereunder.

(g)     In providing services under this Agreement, Dentist shall not discriminate on the basis of race, color, sex, age, religion, national origin, handicap, disability or payment source, or on any other basis prohibited by applicable law.

(h)     Dentist agrees that Employer may use Dentist's name, likeness and biographical information, including but not limited to print, photo or video footage of Dentist, for marketing of the Practice. Dentist agrees to engage in marketing and promotion of Employer's business as requested by Employer.

(i)     Dentist agrees, acknowledges and understands that Employer has the right to conduct a pre-employment and/or continued employment background or reference investigations of Dentist.

3.     **Representations and Warranties**.    Dentist represents and warrants to Employer as follows:

(a)     Dentist possesses, and shall maintain throughout the Term, a valid and unrestricted license to practice dentistry in the State of Tennessee and registration to prescribe certain drugs, medications or pharmaceuticals, in accordance with all applicable state and federal laws, rules and regulations.

(b)     Except as expressly disclosed by Dentist in writing to Employer prior to the date hereof, (i) Dentist has never been disciplined, sanctioned or disciplined by any governmental authority, licensing board or state or local dental society or specialty board, professional, managed care or peer review organization, accrediting body or provider network in any jurisdiction; (ii) Dentist's license to practice dentistry or to prescribe controlled substances in any jurisdiction has never been restricted, limited, suspended or revoked; and (iii) Dentist has never been the subject of any investigation or proceeding relating to an allegation that Dentist filed or cause to be filed any false claims, violated any anti-kickback laws or committed any fraud, or suspended, excluded or debarred from participation in Medicare, Medicaid or any other governmental health care program. Dentist shall notify Employer,

4829-2766-4170.11
12162015

2

57

immediately after obtaining knowledge thereof, of any inquiry, investigation, action, suit, claim, sanction or other proceeding, threatened or pending, that relates to dental care provided by Dentist, and fully cooperate with Employer's efforts to investigate, respond and defend any such proceeding.

(c)     Except as expressly disclosed by Dentist in writing to Employer prior to the date hereof, (i) there has never been entered against Dentist a final judgment in a malpractice action; (ii) no action, based on an allegation of malpractice by Dentist, has ever been settled by payment to the plaintiff; and (iii) there have been no claims threatened or pending against Dentist for professional malpractice occurring within five years prior to the date hereof.

(d)     Dentist is not under any covenant, contract or other obligation of any nature to any person that would prevent, limit or impair in any way Dentist's performance of his or her duties and responsibilities under this Agreement, and hereby represents and warrants that (i) the execution, delivery and performance of this Agreement by Dentist does not and will not conflict with, breach, violate or cause a default under any agreement, contract or instrument to which Dentist is a party or any judgment, order or decree to which Dentist is subject; (ii) Dentist is not a party to or bound by any employment agreement, consulting agreement, non-compete agreement, confidentiality agreement or similar agreement with any other person or entity that is inconsistent with the provisions of this Agreement; and (iii) upon the execution and delivery of this Agreement by Employer and Dentist, this Agreement will be a valid and binding obligation of Dentist.

4.     **Term**.  The initial term of this Agreement shall begin on the Effective Date specified herein and, unless earlier terminated pursuant to Section 9 below, shall continue until the three year anniversary of the Effective Date ("Initial Term").  This Agreement shall thereafter be renewed for successive one year periods (each a "Renewal Term"), unless earlier terminated pursuant to Section 8 below.  As used herein, the "Term" means the period during which Dentist is employed by Employer under this Agreement.

5.     **Compensation**.  Dentist shall be paid the compensation specified in Exhibit B, attached hereto and incorporated herein by reference. The parties acknowledge and agree that such compensation reflects fair market value for the services to be rendered. In addition, for each new dentist that Dentist identifies and introduces to Employer, with whom Employer has not previously engaged in substantive discussions regarding engagement or employment and whom Employer subsequently engages or employs to provide dental services during the Term, Dentist shall be paid (a) an initial fee of One Thousand, Five Hundred Dollars ($1,500.00) at the end of the first six months of such new dentist's engagement or employment with Employer and (b) an additional fee of One Thousand, Five Hundred Dollars ($1,500.00) at the end of the first twelve months of such new dentist's engagement or employment with Employer. Subject to the terms and conditions as set forth in this Agreement, in the event of termination of this Agreement by either party and for any reason, the Dentist shall be entitled to all Compensation earned by Dentist up to the date of termination, which shall be paid at Employer's next scheduled pay period after termination.

6.     **Outside Activities and Income**.  Dentist may engage in teaching, lecturing or research at any school, university or other institution of learning as long as such activity has been first approved in writing by Employer (such approval not to be unreasonably withheld unless Employer determines in good faith that such activity may interfere with Dentist's obligations hereunder). Notwithstanding the foregoing, Dentist shall cease any such engagement or activity as soon as reasonably practicable upon any good faith determination by Employer that such engagement or activity has interfered or may interfere with Dentist's obligations hereunder. Personal income of Dentist earned in any of the foregoing pursuits set forth in this Section 6 shall belong to Dentist individually and will not be deemed compensation by the Employer. All applicable federal, state and local taxes on any income earned by the Dentist from any school, university or other institution of learning shall be the sole responsibility of the Dentist.

4829-2766-4170.11
12162015

3

7.    **Employer's Obligations and Authority**

(a)    **Facility, Equipment and Supplies**.  Employer shall provide Dentist reasonable access to the Employer's facility, equipment, instruments and supplies that are reasonably necessary for the performance of Dentist's duties, as determined by Employer, provided that Employer shall not be required to provide any such items if they are not reasonably or normally used in the Employer's practice.

(b)    **Personnel.**    Employer    shall    provide    additional    personnel,    including administrative/clerical personnel, chair side assistant(s) and dental hygienists, as necessary and available that are reasonably necessary for the performance of Dentist's duties, as determined by Employer.

(c)    **Benefits**.  In addition to holidays on which the Practice Sites are closed, Dentist shall be entitled to time off for non-paid vacation, personal leave and/or continuing education, up to the following number of days each year: (i) three consecutive working days after the last Monday of May (Memorial Day), (ii) three consecutive working days during the week of that includes July 4 (Independence Day) and (iii) six consecutive working days in any two-week period that includes December 25 (Christmas) (provided that Dentist shall provide Employer with reasonable notice of the specific two-week period that Dentist desires to take off).  Dentist may request additional time off with at least four (4) weeks prior written notice to Employer (or, if such request is for emergency reasons, with reasonable notice), provided that any such additional time off shall be subject to Employer's sole determination of the needs of the Practice, and any such additional days that Employer permits Dentist to take off shall be made up by Dentist at additional working days and times to be mutually agreed upon.  Any such additional permitted leave may not be carried over to any subsequent period.  Dentist shall be entitled to participate in Employer's benefit plans on the same basis as other dentist employees of Employer, subject to (i) the provisions of the relevant contracts, policies or plans providing such benefits, and (ii) the right of Employer to amend, modify or terminate any such benefit plans.

(d)    **Additional Employer Obligations.**  Employer agrees to provide, (a) scheduling of appointments; (b) processing of patient records and maintenance of patient financial records; (c) billing and collection of payment services; and (d) other reasonable and normal administrative duties related to patient care.

8.    **Fees and Power of Attorney**.  Employer shall have the exclusive authority to (a) determine the fees or charges, or a procedure for establishing the fees or charges, for services provided by Dentist hereunder; and (b) determine whether and upon what terms Dentist and Company shall participate in any managed care, third party payer or other plan, program or contract with respect to such services. All fees, charges, compensation and other sums billed to, received from, or due from patients or third parties with respect to Dentist's services under this Agreement belong exclusively to Employer. Dentist shall open all mail addressed to Dentist as soon as reasonably practicable following the delivery thereof to Dentist to determine if any such correspondence contains payments by third party payors or patients for services rendered by Dentist under this Agreement and shall deliver such payment to Employer on the same day received.  Dentist shall account to Employer for all such sums as Employer may reasonably request.  Employer and its designees shall have the sole right to bill and collect, or cause to be billed and collected, such fees, charges, compensation and other sums.  This Agreement does not confer upon Dentist any interest in or claim upon any such fees, charges, compensation or sums.  Dentist hereby appoints Employer as his/her attorney-in-fact to: (i) execute, deliver and endorse, all checks, claim forms, payment applications and other documents which Employer regards as necessary or appropriate to collect all sums due for services rendered by Dentist; and (ii) execute and deliver any other documents, applications or forms required by Employer or its service providers, provider networks, managed care organizations or third party payors in relation to billing or payment for Dentist's services under this Agreement.

4829-2766-4170.11
12162015

4

9. **Patient Re-Treatment**. For the first twelve-months during the Term, Employer may permit Dentist to re-treat or re-do any services previously rendered by Dentist on patients at the Practice Site (including any corrective or replacement of services), at Buyer's option. Any such services provided by Dentist shall be with no compensation due for such services from Employer. At Dentist's request, an employee or independent contractor of Employer other than Dentist may provide such services on such patients, subject to Dentist's agreement to reimburse Employer for the cost of any such services (including the cost of compensating such other employee or independent contractor for providing such services). For the avoidance of doubt, Employer is not assuming any blanket responsibility or liability for any such corrective or replacement of services.

10. **Patient Records**. Dentist shall prepare and maintain or cause to be maintained complete, accurate and appropriate records relating to all services rendered by Dentist under this Agreement, in accordance with applicable law and Employer policies and procedures. Dentist shall submit timely and accurate information to Employer for billing purposes in a format prescribed by Employer. All charts, x-rays, molds, reports, billing records and other patient records pertaining to the services and the patients treated by Dentist, as well as all office, business, financial and appointment records and patient lists relating to the services provided pursuant to this Agreement are and shall remain at all times, the property of Employer. Dentist hereby agrees that Dentist shall not remove such records from any Practice Sites or from any other location where such records are kept. While providing services at the Practice Sites during the Term, Dentist acknowledges and agrees to serve as a custodian of the patient records and protect the same as required under applicable law. Upon the request of Employer following the termination of this Agreement for any reason, Dentist agrees to execute a letter approved by Employer that Employer may send, at Employer's sole cost and expense, to all of Dentist's patients of record at the Practice Site, announcing the end of Dentist's engagement with Employer and encouraging such patients to continue to seek their future dental treatment from the professionals employed or engaged by Employer. Employer shall provide Dentist with access to the patient records of patients treated by Dentist for the purpose of treatment of such patients and billing by the Employer for such services and directly in furtherance of Dentist's performance of his duties hereunder. After termination of this Agreement, upon reasonable request and subject to compliance with HIPAA and other applicable laws and confidentiality requirements, Employer shall provide Dentist with limited access to patient records of patients treated by Dentist on behalf of Employer during the term of this Agreement, solely for the purpose of Dentist's defense of any malpractice claim or any formal grievance or complaint filed with or brought by the Tennessee Board of Dentistry, any patient lawsuits, discovery obligations to the extent required by law, court orders, and insurer requests in connection with insurance investigations or defenses of malpractice claims in connection with services provided by Dentist during the term of the Agreement, in each case during the normal business hours of the Employer, at the Practice Sites, in a manner that does not disturb the normal operation of the dental practice and upon reasonable advance notice. The costs of any reproduction shall be paid for solely by Dentist. Under no circumstances shall Dentist remove or copy any patient list, clinical or financial record without the express written consent of Employer.

11. **Termination.**

(a) Employer may terminate this Agreement and Dentist's employment hereunder with or without cause at any time by providing at least 90 days prior written notice to Dentist.

(b) Dentist may terminate this Agreement and Dentist's employment hereunder with or without cause at any time by providing at least 90 days prior written notice to the Employer. Employer may request Dentist not to perform any other service during all or any portion of such 90-day notice period, and if Employer so requests, Employer shall have no obligation to pay Dentist any compensation or provide any benefits (except to the extent required by applicable law) with respect to such notice period or portion thereof during which Dentist does not provide services hereunder.

(c)       Employer may terminate this Agreement at any time upon the occurrence of any of the following events (each of which shall constitute "Cause"):

(i)       Dentist's breach or failure to comply with any of the covenants, agreements or requirements set forth in Sections 10 or 11 of this Agreement,

(ii)      Dentist's material breach by Dentist of any other provision of this Agreement that (if capable of being cured) is not cured within 15 days following written notice of the breach from Employer;

(iii)     The revocation, suspension, termination, cancellation, restriction, lapse, placement on probationary status or taking of other disciplinary action or sanction with regard to Dentist's license to practice dentistry in the State of Tennessee or state or federal controlled substances registration;

(iv)     The exclusion, debarment or suspension of Dentist's participation in the Medicare or Medicaid programs or any other governmental health care program;

(v)      Dentist's indictment for, conviction or commission of or plea of guilty or no contest to any crime punishable as a felony or involving moral turpitude or fraud;

(vi)     Loss, cancellation or non-renewal of Dentist's professional liability insurance coverage or Dentist's uninsurability thereunder at standard rates;

(vii)    Dentist's use of alcohol or a controlled substance, which materially impairs the ability of Dentist to effectively perform his or her duties and obligations under this Agreement or which violates any of Employer's policies with respect to the use of alcohol or controlled substances; or

(viii)   Dentist's neglect of duty, personal misconduct, disruptive behavior or failure to provide adequate patient care, or a determination by Employer in good faith that patient health, safety or welfare may be jeopardized by continued employment of Dentist.

(d)      This Agreement shall terminate immediately in the event of Dentist's death.

(e)      Following the termination of this Agreement, Dentist shall be entitled to and shall be promptly paid by Employer compensation owed pursuant to Section 5 above that has been earned or accrued but unpaid as of the termination date.

(f)      Dentist acknowledges that Dentist is responsible for all dental services performed by Dentist during the Term as defined herein, and shall complete or redo, as reasonably necessary, all dental services Dentist provides during the Term as defined herein (unless Employer determines that another dentist shall perform such services). Accordingly, Dentist agrees that, if notice of termination of this Agreement is given by Employer or Dentist, Dentist shall use Dentist's best efforts to complete any ongoing dental services prior to such termination. Following Dentist's termination, and for the twelve (12) month period following the date that the Dentist discontinues practicing on the Employer's premises, the Dentist shall assist the Employer with any re-treatment of services previously rendered by the Dentist on patients of the Employer. However, the Employer is not assuming any blanket responsibility or liability for such corrective or replacement of services. Should any of the Dentist's patients treated by Dentist during the Term on behalf of Employer require such corrective services or replacement with respect to such treatment provided by Dentist during the Term, and to the extent consented by the patient, the Employer may provide such corrective services or request Dentist to provide such services or replacements. Should the Employer request compensation or reimbursement from the Dentist for such

4829-2766-4170.11
12162015

6

corrective services or replacements (whether such services or replacements are provided by Employer or Dentist), then the following shall apply:

Dentist Provides Re-treatment: The Dentist shall first be given the option by notice of examining the patient needing re-treatment and providing the necessary service in the Employer's office, provided that the Dentist is licensed to practice dentistry in the State of Tennessee at that time, and has professional malpractice insurance coverage. The foregoing notice may be delivered in person, by email or by telephone and shall be deemed given on such date of delivery, or otherwise by any notice procedure permitted under Section 16(f). Dentist may elect to exercise such option by informing Employer of such within three (3) business days after Employer's delivery of such notice, the Dentist shall pay the Employer for all direct expenses associated with the service(s) at the time such service(s) are rendered, which shall be limited to all supply and lab costs, as well as any personnel costs. Should the patient have third party coverage for any needed re-treatment, then the fee received shall be divided equally between the Employer and Dentist and shall be in lieu of the Dentist paying the Employer for any direct costs as previously described. Dentist shall provide such services promptly and in accordance with applicable law and standard of care and, unless the patient requests a different time for performance of such services, by no later than twelve (12) business days after electing to exercise his option.

Employer Provides Re-treatment: Dentist shall be deemed to be unable or unwilling to provide the necessary service if he does not inform Employer within three (3) business days after Employer's delivery of notice in accordance with the immediately foregoing paragraph. Should the Dentist be unable or unwilling to provide the necessary service, then Employer may provide the re-treatment services for fifty percent (50%) of the Employer's normal fee at the time such service is rendered. This fee shall then be paid to the Employer by the Dentist within thirty (30) days of receiving written notice from the Employer that such services have been completed. Should the patient have third party coverage for any needed re-treatment, then the Employer shall accept the third party carrier's fee in lieu of payment from the Dentist.

On all patients of the Dentist being re-treated by the Employer (where compensation for such services is being requested by the Employer from the Dentist), upon reasonable request and subject to compliance with HIPAA and other applicable laws and confidentiality requirements, the Employer agrees to provide the Dentist with limited access to (a) applicable radiographs of the tooth or teeth, (b) progress notes of proposed treatment fees, and (c) copies of all applicable ledger cards or computerized billing statements, in each case during the normal business hours of the Employer, at the Practice Sites, in a manner that does not disturb the normal operation of the dental practice and upon reasonable advance notice. In each case, the costs of reproduction shall be paid for solely by Dentist. Under no circumstances shall Dentist remove or copy any patient list, clinical or financial record without the express written consent of Employer.

(g)     Upon termination of Dentist's employment hereunder for any reason, Dentist shall deliver promptly to Employer all computers, keys, telephones, other electronic devices, card keys, credit cards, files, correspondence, memoranda, notes, records, drawings, sketches, plans, lists or documents or property of Employer or any dental support organization engaged by Employer that are in Dentist's possession, custody or control.

(h)     Dentist shall, upon the termination of this Agreement for any reason, also procure and maintain at his/her own cost and expense an extended reporting endorsement (a/k/a "tail policy") covering Dentist and Employer for Dentist's professional acts and omissions during the Term in the same coverage amounts as set forth in Section 2(b) above. Dentist shall provide Employer evidence of such coverage within 15 days of the effective date of termination of this Agreement. If Dentist fails to do so, Employer shall have the right to procure such policy on Dentist's behalf and deduct the cost of the policy from any amounts that remain due and owing to Dentist from Employer. If the cost of the policy exceeds

4829-2766-4170.11
12162015

7

the amounts that Employer owes to Dentist following termination, Dentist shall pay Employer the difference immediately.

(i)      Notwithstanding any provision contained herein to the contrary, Employer's termination of this Agreement and Dentist's employment hereunder, with or without cause, shall not have any effect on the payment of any portion of the Purchase Price (including the Earn-out Payments) pursuant to that certain Asset Purchase Agreement by and among Robert T. Winfree, D.D.S., P.C., Dentist and CPF Dental, LLC.

12.      **Noncompetition; Non-Solicitation; Non-Interference; Non-Disparagement**.  Dentist acknowledges that, in the course of his or her employment with Employer, Dentist has and will become familiar with the Trade Secrets and Confidential Information (each as defined Section 12) and that the restrictions in this Section 12 are necessary to protect the legitimate business interests of Employer, and that the covenants in this Section 12 and Section 13 are reasonable with respect to duration, geographical area and proscription and will not prevent Dentist from practicing his or her profession or earning a living.  Therefore, Dentist agrees that during the Term and for a period of two years following expiration or termination of this Agreement for any reason (the "Restricted Period"), except pursuant to this Agreement on behalf and for the benefit of Employer, Dentist shall not, directly or indirectly, on his or her own behalf or on behalf of any other person, organization or entity, individually or collectively, in any fashion, form or manner, do or take any of the following actions, nor attempt to do or take, assist any other person in doing or taking or planning to do or take any such action:

(a)      (i) engage or participate or be involved in any capacity, or (ii) own any shares or interest in, or manage, operate or control or contract with, or be employed or engaged by or associated with, or serve as a director, officer, manager, consultant, advisor, trustee or partner of, or provide services, advice, financing or other aid or assistance to, or lend or permit its or his or her name to be used in connection with, any company, business, enterprise, practice or other Person (other than Employer) engaged or involved (or planning or taking steps to become engaged or involved), in (A) the practice of dentistry or the provision, performance or offer of any type of dental treatment, procedures or services, in each case anywhere within a radius of ten (10) miles extending in all directions from each Practice Site or other location at which Dentist provides services hereunder for or on behalf of Employer during the Term, or (B) any dental support organization or the provision, performance or offer of any business, management, administrative, marketing or support services to or for any dentist, dental practice or dental entity, in each case anywhere within the State of Tennessee (other than such Dentist's passive ownership of less than 2% of any class of securities of an entity whose securities are listed on a national or regional securities exchange or stock market); nor

(b)      Solicit, recruit, induce or endeavor to entice away any employee or independent contractor of Employer or any dental support organization engaged by Employer to terminate his or her or its employment or engagement with Employer or any dental support organization engaged by Employer or to become employed or engaged by any other Person (other than general classified or "help wanted" advertisements and/or general solicitations to the public at large that are not targeted at any employees or independent contractors of Employer or any dental support organization engaged by Employer), nor hire, employ or engage any Person who is or was an employee or independent contractor of Employer or any dental support organization engaged by Employer at any time during the immediately preceding 24-month period; nor

(c)      Solicit, recruit, induce or endeavor to entice away any Person who is or, at any time during the immediately preceding 24-month period was, a patient of Employer to terminate or otherwise interfere with their patient relationship with Employer or for the purpose of providing any dental services, treatment or consultation; nor

4829-2766-4170.11
12162015

(d)     Interfere with or disrupt in any way any business relationship or contract between Employer and any customer, patient, potential customer or patient, supplier, vendor, payor, consultant, employee, independent contractor or other person having a business relationship with Employer; nor

(e)     Make or publish, orally, in writing or electronically, any derogatory or disparaging statements or remarks regarding Employer, any dental support organization engaged by Employer or their officers, directors, employees, operations or services; provided, however, that this clause is not intended to prevent Dentist from testifying truthfully in response to a valid subpoena or other compulsory legal process.

13.     **Non-Disclosure**. During the Term and at any time thereafter, Dentist shall not, unless authorized by Employer for Employer's benefit, directly or indirectly, on his or her own behalf or through any other person, misappropriate, use, divulge, reveal, disclose or communicate any trade secrets or other Confidential Information of Employer or any dental support organization engaged or contracted by Employer. The term "Confidential Information" means any trade secret or other information disclosed to or learned by Dentist in connection with his/her employment by Employer, including, but not limited to, any information relating to Employer's patients, suppliers, business alliances, agreements, strategies, policies, procedures, pricing, software programs, contracts and financial records. All documents and records containing any trade secret or other Confidential Information of Employer in the possession of Dentist are the exclusive property of Employer and shall be immediately returned to Employer when Dentist's employment with Employer ends.

14.     **Survival**. The provisions of Sections 8, 10 11(f), 11(g), 11(h), 11(i) and 12 through 16 of this Agreement, and any right or obligation of the parties in this Agreement which, by its nature, should survive termination or expiration of this Agreement, shall survive the termination or expiration of this Agreement and Dentist's employment. Dentist agrees that he or she will cooperate with Employer and its affiliates and any dental support organization engaged by Employer in the defense of any claims that may be made against Employer or its affiliates or any dental support organization engaged by Employer to the extent that such claims may relate to services performed by Dentist on behalf of Employer or otherwise with respect to his or her employment by Employer.

15.     **Enforcement**. In the event of a breach or threatened breach of any term, provision or condition of this Agreement by Dentist, Employer shall be accorded the broadest protection allowed by law to enforce this Agreement, including, but not limited to, injunctive relief without any requirement to post a bond or prove actual damages, and/or monetary damages and any other legal or equitable remedies or relief. The Restricted Period shall be extended by a period of time equal to the period of time during which Dentist breaches Section 10. Sections 10 and 11 of this Agreement are independent of the other provisions of this Agreement and the existence of any claim or cause of action of Dentist against Employer shall not be a defense to Employer's enforcement thereof. To the extent that Sections 10 and 11 may be deemed unenforceable because of their scope in terms of geographical area or duration of time, a court of competent jurisdiction may modify or reduce their scope to the minimum extent necessary to enforce them. Dentist further acknowledges and agrees that (a) the covenants and agreements set forth in Sections 10 and 11 were a material inducement to Employer to enter into this Agreement and to perform its obligations hereunder and that Employer would not have the benefit of its bargain set forth in this Agreement if Dentist breached the provisions of Sections 10 or 11; and (b) all restrictions contained in Sections 10 and 11 are reasonable and valid and all defenses to the strict enforcement of Sections 10 or 11 are hereby waived.

16.     **Miscellaneous.**

(a)     **Governing Law; Venue; Legal Expenses; Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of

4829-2766-4170.11
12162015

9

Tennessee, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Subject to Section 16(b), to the fullest extent permitted by applicable law, each party hereto agrees: (i) that any claim, action or proceeding by such party seeking any relief arising out of, or in connection with, this Agreement or the transactions contemplated hereby shall be brought only in a state or Federal court located in Davidson County, Tennessee and not in any other State or Federal court; (ii) to submit to the exclusive jurisdiction of such courts and waives and agrees not to assert any objection that the laying of such venue has been brought in an inconvenient forum; and (iii) that a judgment in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law. If a party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial or arbitral proceedings, the prevailing party in such proceeding will be entitled to recover such legal expenses (including reasonable attorneys' fees, costs and disbursements at all court levels), in addition to any other relief to which such party shall be entitled. EACH OF THE PARTIES KNOWINGLY AND VOLUNTARILY WAIVES THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(b)    **Dispute Resolution**. Any controversy, dispute or claim arising out of or relating to this Agreement or the breach hereof, including whether the controversy, dispute or claim is arbitrable (each, a "Dispute"), will be resolved in accordance with the following. Upon the written demand of either party hereto, the Dispute will be submitted to mediation administered by the American Arbitration Association ("AAA") or its successor under its employment mediation rules and procedures. The mediation will be conducted by a single mediator selected and appointed in accordance with such rules. If the Dispute is not resolved in the course of such mediation, then upon the written demand of either party, such Dispute will be submitted to and finally resolved by binding arbitration administered by the AAA or its successor in accordance with its employment arbitration rules and procedures. The arbitration will be conducted before a panel of three arbitrators selected and appointed in accordance with such rules. The same Person may not serve both as the mediator and an arbitrator. Each party may be represented by one or more attorneys or other selected representative(s). Each party will bear and pay equally the fees and expenses of AAA and the mediator associated with the mediation, and each party will bear its own attorneys' fees, costs and other expenses in connection with the mediation. Subject to Section 16(a), each party will bear and pay equally the fees and expenses of AAA and the arbitrators associated with the arbitration, and each party will bear its own attorneys' fees, costs and other expenses in connection with the arbitration. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The mediation and arbitration will be conducted in Nashville, Tennessee. This subsection will not restrict the Company's right to institute any proceeding to obtain injunctive relief without resorting to mediation or arbitration, including the remedies referenced in Section 15. The arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.) and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(c)    **Severability**. The invalidity or partial invalidity of any portion of this Agreement will not affect the validity of any other provision. In the event that any provision of this Agreement is held to be invalid, the remaining provisions shall be deemed to be in full force and effect as if they had been executed by both parties subsequent to the expungement or judicial modification of the invalid provision.

(d)    **Entire Agreement; Amendment**. This Agreement and the Exhibits hereto set forth and establishes the entire understanding between Employer and Dentist relating to the employment of Dentist by Employer. Any prior discussions or representations by or between the parties are merged into and rendered null and void by this Agreement. No amendment or modification of this Agreement shall be valid or effective unless it is in writing and properly executed by all parties hereto.

4829-2766-4170.11
12162015

10

(e)     **Waiver**.  Any waiver of any term and condition hereof must be in writing and signed by the party against whom it is sought to be asserted.  No consent or waiver, expressed or implied, by any party to any breach or default by the other in the performance by the other of their obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default of this Agreement.  Failure of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver of that party's rights hereunder.

(f)     **Notices**.  All notices and other communications under this Agreement shall be in writing and shall be delivered in person, by nationally recognized overnight delivery service (charges prepaid), or by registered or certified U.S. mail (return receipt requested, postage prepaid), in each case addressed as follows, and shall be deemed given when (i) delivered in person, (ii) on the earlier of receipt or one business day after dispatch by FedEx, UPS or other nationally recognized overnight delivery service, or (iii) on the earlier of receipt or three business days after dispatch by U.S. registered or certified mail: (x) if to Dentist: Robert T. Winfree, D.D.S., 1014 Mystic Streams, Mt. Juliet, Tennessee 37122; and (y) if to Employer, TN Dental Professionals, P.C., c/o 2505 21st Avenue S., Suite 204, Nashville, TN 37212, with a copy to CPF Dental, LLC, 2505 21st Avenue S., Suite 204, Nashville, TN 37212, Attention: James Usdan.  Any party hereto may change its address specified for notices herein by designating a new address by notice in accordance with this Section 14(e).

(g)     **Counterparts; Construction.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  The parties may deliver executed signature pages to this Agreement by facsimile, e-mail or other electronic transmission.  The headings of sections herein are inserted for convenience of reference only and shall be ignored in the construction or interpretation hereof.  The parties have participated jointly in the negotiation and drafting of this Agreement and this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions of this Agreement.

(h)     **Dentist's Understanding**.  Dentist acknowledges that he or she has reviewed this Agreement to his or her satisfaction and has had an opportunity to consult with an attorney before signing it.

(i)     **Assignment and Binding Effect**.  Employer shall have the right to assign its rights and obligations under this Agreement, provided that such assignment shall be made to an entity authorized to employ dentists under applicable law. The rights and benefits of Dentist under this Agreement are personal to Dentist and no such right or benefit shall be subject to voluntary or involuntary alienation, assignment or transfer without the prior written consent of Employer. This Agreement shall be binding on Employer and Dentist as well as their heirs, permitted assigns, executors, personal representatives and successors in interest.

(j)     **Patient Referrals**.  The parties agree that no part of this Agreement shall be construed to induce or encourage, directly or indirectly, the referral of patients or the purchase of health care services or supplies.  The parties acknowledge that there is no requirement under this Agreement or any other agreement between the parties that either party refer any patients to any health care provider or purchase any health care goods or services from any source.  No payment made under this Agreement shall be in return for such referral or purchase.

[Remainder of page intentionally blank. Signatures appear on following page.]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

**EMPLOYER:**

**TN DENTAL PROFESSIONALS, P.C.**

By: _____

Name:  Steven Hecklin, D.M.D.

Title:  President

**DENTIST:**

_____

Robert T. Winfree, D.D.S.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**EMPLOYER:**

**TN DENTAL PROFESSIONALS, P.C.**

By:_____
Name:  Steven Hecklin, D.M.D.
Title:  President

**DENTIST:**

Robert T. Winfree, D.D.S.

## EXHIBIT A

## PRACTICE SITES AND TIMES

Practice Site(s):

- 4243 Lebanon Pike, Hermitage, Tennessee 37076

Times and Days of Week:

- 8:30 a.m.- 5:00 p.m. (Central Time) each Monday and Tuesday

- 8:30 a.m. - 12:00 p.m. (Central Time) each Wednesday

## EXHIBIT B

### COMPENSATION

      1.    **Compensation**. As compensation for all services rendered by Dentist, Employer shall pay Dentist an annual salary of Two Hundred Fifty Thousand Dollars ($250,000.00).

      2.    **Payment**. The Compensation shall be paid to Dentist pursuant to Employer's normal payroll practices as the same may be modified from time to time by Employer.

      3.    **Withholding**. Employer may withhold and deduct any amounts required or permitted to be withheld or deducted by applicable law or benefit plan, such as payroll taxes, FICA, garnishments, amounts owed to Employer, from Dentist's compensation and/or final pay in accordance with Employer's normal payroll practices and internal books and records.

# EXHIBIT C

## TN DENTAL PROFESSIONALS, P.C.

October 2, 2018

**VIA HAND DELIVERY**

Robert T. Winfree, D.D.S.
1014 Mystic Streams
Mt. Juliet, Tennessee 37122

      Re:    Termination of Provider Agreement

Dr. Winfree,

      This letter constitutes notice by TN Dental Professionals, P.C. ("Employer") to you of its decision to terminate, without cause, your Employment Agreement, dated December 16, 2015 (as it may have been amended, the "Agreement"), and your employment by Employer. A copy of the Agreement is attached hereto as Attachment 1. In the alternative, should you agree with Employer's determination that it would be best for the parties to part ways, Employer would be amendable to your voluntary resignation.

      The effective date of your separation will be December 31, 2018, which is ninety (90) days after the date of this written notice of termination, pursuant to Section 11 of the Agreement.

      We want to remind you of your existing and continuing obligations under the Agreement, including the restrictive covenants in Section 12 of the Agreement.

      Thank you for your service. We wish you the best in your future endeavors.

                Sincerely,

                TN Dental Professionals, P.C.

                Dr. Keith Van Benthuysen, President

4827-9039-6277 2

# EXHIBIT D

**Hip Mt Juliet**
December 14 at 11:04 AM · 🌐

To all Dr. Winfree & Craig dentistry patients:

I just heard some horrible news. Yesterday the company that was over their practice for the last two years came in with security and with no notice gave everyone five minutes to leave the premises. EVERYONE who worked there lost their jobs instantly! Many of them were my longtime friends. Personally,, they have treated me like family for almost 20 years through emergencies and sound dental advice. I'm going to continue to use them wherever they move to. Please pray for all their staff and that they land on their feet and god walks them through this tough time! Truly a horrible situation.

Please tell your friends as they were recommended to me from a friend years ago!

 48

34 Comments  8 Shares

👍 Like                    ➤ Share

That is cruel and cold. No notice and right at Christmas. Seems pretty mean spirited.

Like · 6d                                        👍 1

 Absolutely. I called and it rolls to the new companies answering service and they told me they'd be in the office Monday. Total lie! Very sad, but when one door closes God opens another.

Like · 6d                                        👍 3

**► Hip Donelson**

December 14 at 11:04 AM · 🌐

To all Dr. Winfree & Craig dentistry patients:

I just heard some horrible news. Yesterday the company that was over their practice for the last two years came in with security and with no notice gave everyone five minutes to leave the premises. EVERYONE who worked there lost their jobs instantly! Many of them were my longtime friends. Personally,, they have treated me like family for almost 20 years through emergencies and sound dental advice. I'm going to continue to use them wherever they move to. Please pray for all their staff and that they land on their feet and god walks them through this tough time! Truly a horrible situation.

Please tell your friends as they were recommended to me from a friend years ago!

 59

31 Comments  5 Shares



Thank you for posting this talked with Olivia today and am totally dumfounded how any person could even take part in this! Its just plain cruel! The Winfrees have been personal friends of mine for 30 years and both are among the most highly respected people in our community. Their love for family and our community is immeasurable and their entire staff is phenomal and irreplacable! Please pray for all of them. I am just devastated for them.

Like · 6d · Edited                                        10

 Oh my gosh! I was scheduled to go
Tuesday next week! That's crazy!

Like · 6d  1

 **Olivia Winfree** ██████ you can call me 615-476-3303.
Thank you, Olivia.

Like · 6d · Edited

██████████ **Olivia Winfree** my kids have appts wed.

Like · 6d

**Olivia Winfree** █████████ you can call me at
6154763303 .

Like · 6d · Edited 👍 1

I feel like there is something we patients could do. I was just there like 2 weeks ago. I spoke to Shirley yesterday for goodness sakes. It is soooo wrong.

Like · 6d

**Olivia Winfree** ▬▬▬▬▬▬ just ask for your records. We will reorganize.

Like · 6d

# EXHIBIT E

**From:** Asa Blalock <dentalasa@gmail.com>
**Sent:** Sunday, December 16, 2018 12:13 PM
**To:** Fred Ward <fred.ward@marqueedentalpartners.com>
**Subject:** Winfree

Mr Fred ,Dr Winfree is trying to get me to send word thats in lab to his home ? i cant really do that.ivtook work in from Marquee and i have to return it to u guys . and i will.just want u to know who i am loyal to .

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| TN DENTAL PROFESSIONALS, P.C. and<br>CPF DENTAL, LLC d/b/a MARQUEE<br>DENTAL PARTNERS,<br><br>    Plaintiffs,<br><br>v.<br><br>ROBERT T. WINFREE, D.D.S. and<br>OLIVIA WINFREE,<br><br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 181384-I<br>)  Chancellor Martin<br>)  Jury Demand<br>)<br>)<br>)<br>) |

## AMENDED COMPLAINT

Plaintiffs TN Dental Professionals, P.C. ("TN Dental") and CPF Dental, LLC d/b/a

Marquee Dental Partners ("Marquee") bring this Amended Complaint for injunctive relief and

damages against Defendants Robert T. Winfree, D.D.S. and Olivia Winfree and state:

## SUMMARY

1.     In December of 2015, Dr. Winfree sold his dental practice to Marquee for

$1,675,000 and signed a three-year employment agreement with TN Dental for $250,000 per

year, terminable with or without cause. Both the Asset Purchase Agreement and Employment

Agreement he signed contained non-solicitation and non-competition provisions. In late 2018,

TN Dental chose to terminate its employment relationship with Dr. Winfree.

2.     Within minutes of leaving the practice location, Dr. Winfree and Olivia Winfree

launched a pernicious and broad-scale campaign to poach TN Dental's patients, disparage

Plaintiffs, and attempt to destroy Plaintiffs' business.

3.     Plaintiffs seek permanent injunctions restraining and enjoining Defendants: (1)

from further violating the non-solicitation, non-disparagement, and non-compete terms in the

APA and Employment Agreement; (2) from utilizing or disclosing the Plaintiffs' confidential and proprietary information and trade secrets; and (3) from interfering with the TN Dental's relationships with its patients and vendors. In addition to preventing further irreparable injury to it, Plaintiffs also seek to recover both compensatory and punitive damages related to the Winfrees' actions.

## PARTIES

4.     TN Dental Professionals, P.C. is a Tennessee professional corporation with its principal place of business located at 2505 21st Avenue South, Suite 204, Nashville, Tennessee 37212.

5.     CPF Dental, LLC is a Delaware limited liability company doing business as Marquee Dental Partners with its principal place of business located at 2505 21st Avenue South, Suite 204, Nashville, Tennessee 37212.

6.     The Winfrees are residents of Wilson County, Tennessee residing at 1014 Mystic Streams Dr., Mt. Juliet, TN 37122.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the parties and the subject matter of this action pursuant to Tenn. Code Ann. §§ 20-2-223, 20-2-225, and 16-11-101, *et seq.*

8.     Venue is proper in this Court pursuant to Tenn. Code Ann. §§ 16-11-115, and 20-4-101, *et seq.* and because of contractual agreements between Plaintiffs and Dr. Winfree with respect to venue.

## FACTUAL BACKGROUND

### I.     Dr. Winfree Sells His Dental Practice.

9.      On December 16, 2015, Marquee[1] and Dr. Winfree entered into an Asset Purchase Agreement whereby Dr. Winfree and the professional corporation he formed to own his dental practice, Robert T. Winfree, D.D.S., P.C. (the "Winfree P.C."), located at 4243 Lebanon Pike, Hermitage, TN 37076 (the "Practice Location"), agreed to sell the non-clinical assets of Winfree PC to CPF Dental, LLC and the clinical assets of Winfree PC to TN Dental Professionals, P.C., for a combined purchase price of $1,675,000 (the "APA"). A true and exact copy of the APA and the Professional Assets Bill of Sale is attached hereto as Exhibit A. Prior to selling his dental practice, Dr. Winfree operated under the business name "Winfree & Denton Cosmetic and General Dentistry." Following this acquisition, TN Dental Professionals, P.C. operated the newly acquired Practice Location (the "Practice") under the name "Winfree & Craig Cosmetic and General Dentistry."

10.     Contemporaneous with the closing of the APA (and as a condition thereto), Dr. Winfree executed an employment agreement with TN Dental whereby he agreed to work as a dentist at the Practice Location (the "Employment Agreement"). Dr. Winfree practiced in the same building and serviced the same patients that he did prior to selling his practice. However, and critical to this dispute, Dr. Winfree was an employee of TN Dental as a result of his sale, and the Practice was thereafter owned by TN Dental Professionals, P.C.—not Dr. Winfree or Winfree PC. A true and exact copy of the Employment Agreement is attached hereto as Exhibit B.

---

[1] Marquee is affiliated with TN Dental through a business services agreement, whereby Marquee provides non-clinical administrative/business services to TN Dental. Though Marquee is the named party in the APA, pursuant to its terms, Dr. Winfree agreed to transfer the dental practice and all clinical assets to TN Dental (and did so pursuant to a Professional Assets Bill of Sale), and TN Dental is a third party beneficiary under the APA.

11.     As compensation for his services under the Employment Agreement, TN Dental paid Dr. Winfree an annual salary of $250,000. Marquee also provided Dr. Winfree with the opportunity to achieve performance incentives.

12.     Olivia Winfree was also hired as an employee of Marquee, earning an annual salary of $80,000.

## II.     The Restrictive Covenants in the APA and the Employment Agreement.

13.     Under the terms of the APA and his Employment Agreement, and in exchange for Marquee's purchase of his practice/customer goodwill and TN Dental's willingness to employ him and provide a lucrative salary, Dr. Winfree agreed to non-competition, non-solicitation, non-interference, and non-disparagement covenants. These are found in Section 8 of the APA (Exhibit A) and Section 12 of the Employment Agreement (Exhibit B). These covenants restrict the ability of Dr. Winfree—or anyone on his behalf—to, among other things, solicit or attempt to solicit former patients, disparage Plaintiffs or their employees, and otherwise harm Plaintiffs' businesses post-termination.

14.     The APA and the Employment Agreement also contain non-compete provisions. Pursuant to the APA, Dr. Winfree is prohibited from, among other things, providing dental services within 75 miles of the Practice Location. (Ex. A at ¶ 8.) Pursuant to the Employment Agreement, Dr. Winfree is prohibited from providing dental services within 10 miles of the Practice Location. (Ex. B at ¶ 12.)

15.     In addition to these restrictive covenants, Dr. Winfree also agreed to various non-disclosure obligations related to confidential information and trade secrets of Marquee and TN Dental. These are found in Section 8 of the APA and Section 13 of the Employment Agreement.

16.     Dr. Winfree acknowledged that a breach or threatened breach of any of the restrictive covenants or the non-disclosure obligations entitled Plaintiffs to injunctive relief without any requirement to post a bond or prove actual damages. (Ex. A at ¶ 8(d); Ex. B at ¶ 15.) Dr. Winfree further acknowledged that these provisions were reasonable with respect to time, scope and geographic region. (*Id.*)

17.     Perhaps most importantly, Dr. Winfree acknowledged that the restrictive covenants and non-disclosure obligation in the Employment Agreement were a material inducement for TN Dental to enter into his Employment Agreement, and Dr. Winfree's breach of the same would rob TN Dental of its "benefit of the bargain."  (Ex. B at ¶ 15.)

**III.     Additional Promises, Representations, and Warranties.**

18.     In the APA, Dr. Winfree represented:

- That he had provided "true, correct and complete copies of the unaudited balance sheet, income statement and other financial statements of Seller as of and for the 12 months ended December 31, 2012, 2013 and 2014, and as and for the eight months ended August 30, 2015 (collectively, the 'Financial Statements'), each of which presents fairly the assets, liabilities and financial condition of Seller as of such dates and the results of operations and cash flows of Seller for such periods, in each case on a cash basis, and are consistent with the books and records of Seller and represent only actual, bona fide transactions." (Ex. A at ¶ 5(d).)

- That he was, and had been, "in compliance in all material respects with all applicable Laws, orders and decrees, including all Healthcare Laws . . . ." (*Id.* at ¶ 5(g)(i).)

- That neither he nor anyone acting on his behalf had "established or maintained any fund or asset that has not been recorded in the books and records of Seller." (*Id.* at ¶ 5(g)(ii).)

- That he had not "been subject to a disciplinary proceeding, corrective action plan, inquiry, monitoring or investigation by or involving any professional board, agency, society, association or Governmental Authority charged with regulating the professional activities of such Person or any other Law . . . ." (*Id.* at ¶5(h)(iv).); and

- That he had not "withheld from Buyer any material facts or information relating to Seller, Owner or the Practice, Business or their assets, liabilities and operations" and that "[n]o representation or warranty made by Owner or Seller in this Agreement or in any statement, certificate or instrument to be furnished to Buyer pursuant to this Agreement or other Contracts or documents delivered in connection herewith contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make these statements contained herein and therein not misleading." (*Id.* at ¶ 5(u).)

19.    In the Employment Agreement, Dr. Winfree agreed to:

- "Devote all of his . . . professional time and effort to" TN Dental (Ex. B at ¶ 2(a)); and

- "[U]se all personnel, space, equipment, supplies and other items provided or arranged for by Employer solely for the purpose of providing professional dental services" pursuant to the Employment Agreement (Ex. B at ¶ 2(f)).

**IV.     The Winfrees Breach Contractual, Fiduciary, and Ethical Obligations to Plaintiffs**

20.     Unbeknownst to Plaintiffs, Dr. Winfree was in breach of many of the above representations and warranties from the moment the APA and Employment Agreement were signed.

21.     As has come to light after Plaintiffs terminated their relationships with Dr. and Mrs. Winfree, Dr. Winfree intentionally made a number of serious and material misrepresentations about the financial worth of the Practice and provided records that were riddled with inaccuracies, errors, misinformation, and deliberate misrepresentations, all in violation of the APA.

22.     Moreover, while an employee with TN Dental, and with the help of Olivia Winfree, Dr. Winfree, among other things, saw patients at the Practice Location, failing to document treatment in the medical records and accepting cash payments in order to deprive TN Dental of revenue, in violation of the Employment Agreement and the APA.

23.     Plaintiffs are still uncovering evidence of the Winfrees' fraudulent and unethical conduct as this case progresses.

**V.     TN Dental Decides to Terminate the Employment Agreement.**

24.     Dr. Winfree's Employment Agreement ran for an initial three-year employment term, which expired on December 16, 2018. At the conclusion of this initial term, the Agreement was set to renew for successive one-year periods unless terminated pursuant to the provisions of the Agreement.

25.     The "Termination" provision of the Employment Agreement with respect to TN Dental's termination rights reads as follows: "Employer may terminate this Agreement and

Dentist's employment hereunder with or without cause at any time by providing at least 90 days prior written notice to Dentist." (Ex. B, ¶ 11.)

26.     On October 2, 2018, TN Dental provided Dr. Winfree with notice that it would be terminating his Employment Agreement without cause pursuant to the Termination provision in the Employment Agreement. A copy of this notice is attached hereto as Exhibit C.

27.     To ensure that Dr. Winfree would have the full benefit of the 90 days notice of the termination of the Employment Agreement, TN Dental arranged for him to be paid his salary through December 31, 2018 (i.e., 90 days from October 2, 2018).

**VI.     The December 13, 2018 Meeting at the Practice.**

28.     Believing that it was the plan for Dr. Winfree to close the office for the last two weeks of December (and knowing that the office was not open on Fridays), on the afternoon of Thursday December 13, 2018, select employees of TN Dental and Marquee went to the Practice to oversee the conclusion of Dr. Winfree's employment with TN Dental. The decision had also been made to terminate the other staff at the Practice along with the conclusion of Dr. Winfree's employment, based on TN Dental and Marquee's experience in the industry, with the opportunity for many of the staff to re-apply. To provide a cushion, however, TN Dental and Marquee also paid the staff through the end of the year as well. TN Dental and Marquee intended to use the downtime between December 14, 2018 and January 1, 2019 to transition a new dentist and non-clinician team into the Practice, convert to a new practice management software, and install new cabinetry.

29.     During this December 13, 2018 visit, select employees of Marquee and the President of TN Dental, Dr. Keith Van Benthuysen, informed the rest of the employees[2]—which

---

[2] The non-clinical staff members of the Practice were employed by Marquee (the "Practice Location Staff"), whereas Dr. Winfree was employed by TN Dental.

4811-9619-0102.2-9619-0102.2

included Dr. Winfree's wife and Practice Operations Leader, Defendant Olivia Winfree—that Plaintiffs had decided to reorganize (not close) the Practice Location and that the unfortunate but necessary result of that reorganization was that the current employees working at the Practice Location would be separated from their employment with Marquee and TN Dental.

30.     Each non-clinical staff member was told that she would (1) continue to be paid through the end of the year, (2) receive payment for all unused paid time off, (3) continue to receive health insurance through the end of the year, and (4) would be eligible for rehire at another practice location staffed by Marquee.

31.     At that time, Plaintiffs were unaware that Dr. Winfree had failed to inform the Practice Location Staff that he had been given notice of the termination of his Employment Agreement. In fact, Mrs. Winfree had told the other Practice employees that Dr. Winfree signed a new agreement for an additional three-year term. Dr. Winfree was present for this announcement and for the hours immediately thereafter.

32.     Immediately, the Practice employees began to yell and curse at the TN Dental and Marquee representatives present—threatening to harm TN Dental and Marquee and disparage them to TN Dental's patients and the public at-large. Some employees were observed frantically texting. Other employees were observed shredding documents and destroying property.

33.     Upon receiving the news, Mrs. Winfree inaccurately reiterated to Practice employees that TN Dental lied and had renewed Dr. Winfree's Employment Agreement—though she knew this was false because her husband had received his termination notice nearly three months prior. Mrs. Winfree then began to walk around the practice whispering to other Practice employees who would then walk to a different part of the Practice. No representative of either Plaintiff could hear what Mrs. Winfree was whispering, but upon information and belief,

Plaintiffs believe she was instructing Practice employees to destroy documents and gather patient information.

34.     Making matters worse, other Practice employees took advantage of the chaos and packed up and removed confidential information. Upon information and belief, these stolen items included patient identifying information, patient contact information, patient medical charts, and information related to the TN Dental's finances. However, Practice employees were specifically observed packing up a rolodex, a thick binder full of papers, and endodontics-related patient correspondence.

35.     Later in the afternoon, the Winfrees' sons arrived at the Practice Location to help gather personal items. In doing so, one of the Winfree sons began inquiring into the Plaintiffs' computer hard drives at the Practice Location and was heard stating, "Take the hard drives." Plaintiffs still have not determined whether any internal and/or external hard drives were stolen.

**VII.     The Winfrees Set Their Plan in Motion.**

36.     After approximately two and a half hours, Dr. Winfree and all of the Practice employees vacated the premises. The separation was short, however, because the Winfrees and a number of Practice employees had previously agreed to meet at a nearby Chili's restaurant. Dr. Winfree accompanied these employees, including his wife, to the restaurant. At the restaurant, Winfrees and the Practice employees formalized their plan to harm Plaintiffs by disparaging them on social media, in the news, and to the general public; poach TN Dental's patients; and open a competing dental practice only a handful of miles from the Practice Location.

37.     Immediately after leaving the restaurant, the Winfrees—and others acting on their behalf—began frantically contacting patients of the Practice, misrepresenting the events of the previous hours, telling them to retrieve their records from the Practice, and soliciting them away

from the Practice. As a result, numerous people (including Olivia Winfree and other former TN Dental and Marquee employees) took to social media to spread the Winfrees' false version of the events. This was a campaign orchestrated by Defendants, as contemporaneous text messages, Facebook posts, Facebook messages, phone records, and other witness accounts later revealed.

38.     This meeting was followed up in the ensuing weeks by two other meetings at which this plan was discussed, one being a lunch at Restoration Hardware on or about December 18, 2018 (which Dr. Winfree paid for) and another being a Christmas party hosted by the Winfrees at Cedar Creek Yacht Club on December 20, 2018.

39.     Just as importantly, these meetings were both preceded and followed by a slew of text messages, Facebook messages, and phone calls in and among the Winfrees and former employees of TN Dental and Marquee, all with the coordinated plan to undermine Plaintiffs and poach TN Dental's patients.

40.     Dr. Winfree's disparagement of Plaintiffs to patients of the Practice and others violated and continues to violate the Non-Disparagement provisions in the APA and his Employment Agreement, and Plaintiffs have suffered and will continue to suffer irreparable harm if Dr. Winfree's conduct is not enjoined.

41.     Mrs. Winfree's disparagement of Plaintiffs to patients of the Practice and others is without justification and violates the law. Plaintiffs have suffered and will continue to suffer irreparable harm if Mrs. Winfree's conduct is not enjoined.

42.     Dr. Winfree's solicitation of the TN Dental's patients violated and continues to violate the restrictive covenants in the APA and his Employment Agreement, and Plaintiffs have suffered and will continue to suffer irreparable harm if Dr. Winfree's conduct is not enjoined.

43.     Mrs. Winfree's interference with TN Dental's relationships with its patients

violates the law, and TN Dental has suffered and will continue to suffer irreparable harm if Mrs. Winfree's conduct is not enjoined.

### VIII.   Dr. Winfree Commits Fraud.

44.     The Winfrees' attack on Plaintiffs did not stop with spreading lies in person, on the phone, via text message, and both publicly and privately on Facebook. Dr. Winfree began contacting laboratories and the United States Post Office in an effort to divert TN Dental patients and confidential information to his home address.

45.     On Sunday December 16, 2018, Asa Blalock from Lloyd Dental Laboratory, Inc. emailed Fred Ward, CEO of Marquee ("Mr. Ward"), to let him know that Dr. Winfree had contacted Mr. Blalock and asked him to send TN Dental lab cases to Dr. Winfree's home address. These test cases contained highly confidential and protected patient information and were the sole property of the TN Dental (subject to rigorous safeguards, including receipt and storage of such information) and its patients. At the time he made his request, Dr. Winfree knew he had no right to receive or store them but told Lloyd Dental that he did.

46.     Upon information and belief, Plaintiffs believe that Dr. Winfree had likewise contacted Hodges Dental Lab, LLC and made a similar request for it to forward TN Dental lab results to his home address. These test results contained protected patient information and were the sole property of TN Dental and its patients. At the time he made his request, Dr. Winfree knew he had no right to receive or store them but told Hodges Dental that he did.

47.     Making matters worse, in actions that constitute felony mail fraud, Dr. Winfree, directly and/or indirectly, contacted the United States Post Office and lied to it saying that the Practice had shut down and all of the Practice's mail—necessarily including protected patient health information—needed to be forwarded to his home address, in violation of HIPAA and

other laws. Dr. Winfree was successful in his deception, and TN Dental is unaware of the amount of its mail that has been fraudulently diverted into the Winfrees's hands.

48.     Dr. Winfree's direct and/or indirect diversion of the TN Dental's patients and the Plaintiffs' confidential information violates the Restrictive Covenants in the APA and the Employment Agreement, and Plaintiffs have suffered and will continue to suffer irreparable harm if Dr. Winfree's conduct is not enjoined.

**IX.     The Winfrees's Scheme Succeeds in Crippling TN Dental and Robbing Plaintiffs of Any Benefit of Their Bargain with Dr. Winfree.**

49.     By Monday December 17, 2018, the ramifications of the Winfrees's actions were beginning to manifest. Patients began presenting at the Practice by the dozens and demanding their dental records and withdrawing as patients of the Practice in accordance with the Winfrees' scheme.

50.     As the week progressed, more and more patients appeared at the Practice and requested to withdraw as patients of the Practice and requested copies of their records. Since that Monday, TN Dental has lost several hundred patients to other competing dental practices—and likely to Dr. Winfree himself, as he has admitted.

51.     In the weeks and months following December 13, 2018, the Winfrees continued to solicit patients through a variety of means (e.g., Facebook messages, phone conversations, text messages, in-person conversations) and have continued to disparage Plaintiffs to virtually anyone who will listen. As a result, TN Dental continues to hemorrhage patients and its revenues have declined precipitously.

**X.     The Court Must Permanently Enjoin the Dr. Winfree's Conduct.**

52.     The Winfrees have repeatedly failed to desist in harming Plaintiffs, despite understanding and acknowledging that their behavior is wrong and in violation of Dr. Winfree's

4811-9619-0102.2-9619-0102.2

agreements with Plaintiffs and the law more generally. The only thing holding Defendants back from finishing the job they started in destroying TN Dental is the Court's action. Absent a permanent injunction, and the means to enforce it, TN Dental will for all intents and purposes be destroyed. In all likelihood, the remaining patients will leave, potential patients will seek treatment elsewhere, and Plaintiffs may be forced to shut the doors of a Practice Location purchased for $1,675,000.00 only three years ago. The Winfrees' conduct will not only affect the reputation of the Practice Location, but also the other dental practice locations which Marquee manages across Tennessee. Without injunctive relief, Plaintiffs' damages will be catastrophic—and most certainly irreparable.

**COUNT ONE**
**INJUNCTIVE RELIEF AS TO DR. WINFREE**

53.     Plaintiffs incorporate herein by reference all previous allegations of this Complaint as if the same were fully set forth in this paragraph.

54.     Dr. Winfree's Employment Agreement with TN Dental is a valid and enforceable contract supported by adequate consideration. The APA is also a valid and enforceable contract supported by adequate consideration.

55.     Pursuant to these agreements, Dr. Winfree promised to abide by the terms of the restrictive covenants and the non-disparagement clauses, as more fully detailed herein.

56.     Despite these promises, as set forth *supra*, Dr. Winfree has and is continuing to breach the restrictive covenants and non-disparagement clause.

57.     Dr. Winfree acknowledged and agreed that a breach or threatened breach of the same would entitle Plaintiffs to move for injunctive relief without posting bond. (Ex. A at ¶ 8(d); Ex. B, at ¶ 15.)

58.     For all of the reasons set forth in this Amended Complaint, unless Dr. Winfree is

restrained, temporarily enjoined, and subsequently permanently enjoined from the foregoing conduct, Plaintiffs will be irreparably injured by their loss of confidential and proprietary information and trade secrets, the loss of patients, the loss of business reputation, other present economic losses which are currently unascertainable, and future economic losses which are presently incalculable.

59.     Plaintiffs have no adequate remedy at law for the immediate and irreparable harm they are suffering.

## COUNT TWO
## INJUNCTIVE RELIEF AS TO MRS. WINFREE

60.     Plaintiffs incorporate herein by reference all previous allegations of this Complaint as if the same were fully set forth in this paragraph.

61.     Mrs. Winfree has engaged in a concerted and intentional campaign to tortiously interfere with Plaintiffs' business relationships, including TN Dental's business relationships with specific Plaintiffs. Mrs. Winfree has used her knowledge gained during her employment with Marquee in order to specifically target those patients using improper means, and with the improper motive of harming Plaintiffs and destroying their business and reputation.

62.     Mrs. Winfree has already succeeded in that effort, interfering in dozens—if not hundreds—of business relationships between, among other things, TN Dental and its patients. Moreover, Mrs. Winfree has refused to admit what she has done, and has shown no remorse for having done so, even when sanctioned by this Court.

63.     In addition to this, Mrs. Winfree has and continues to lie to TN Dental's patients and the general public in an ill-advised and illegal smear campaign in an attempt to destroy the Practice and damage Plaintiffs.

64.     Mrs. Winfree's lies are a direct and immediate threat to Plaintiffs' reputations and

4811-9619-0102.2-9619-0102.2

business relationships—the most immediate of which is her efforts to spread her lies to a broader audience.

66. There is no doubt that, absent injunctive relief, Mrs. Winfree will continue to tortuously interfere with Plaintiffs' business relationships, disparage Plaintiffs and their employees and representatives, and otherwise do everything in her power to destroy Plaintiffs and their businesses.

66. For all of the reasons set forth in this Amended Complaint, unless Mrs. Winfree is restrained, temporarily enjoined and subsequently permanently enjoined from the foregoing conduct, Plaintiffs will be irreparably injured by its loss of confidential and proprietary information and trade secrets, the loss of patients, the loss of business reputation, other present economic losses which are currently unascertainable, and future economic losses which are presently incalculable.

67. Plaintiffs have no adequate remedy at law for the immediate and irreparable harm they are suffering.

## COUNT THREE
## BREACH OF CONTRACT (APA) AS TO DR. WINFREE

68. Plaintiffs incorporate herein by reference all previous allegations of this Amended Complaint as if the same were fully set forth in this paragraph.

69. The APA is a valid and enforceable contract supported by adequate consideration.

70. Thereunder, Dr. Winfree made a variety of promises, representations, and warranties, as detailed herein, including agreeing to certain restrictive covenants and the non-disparagement clause.

71. Despite so promising, as set forth *supra*, Dr. Winfree has breached and/or continues to breach these obligations.

4811-9619-0102.2-9619-0102.2

16

72.     For example, Dr. Winfree provided incomplete and/or doctored copies of financial information in connection with the APA which did not fairly present the assets, liabilities and financial condition of the Winfree P.C. and which were not consistent with the books and records of the Winfree P.C. and/or did not represent only actual, bona fide transactions.

73.     As a further example, Dr. Winfree also falsely represented and warranted that he had not established or maintained any fund or asset that had not been recorded in the books and records of the Winfree P.C. and that he was and had been in compliance in all material respects with all applicable laws, orders and decrees, including all "Healthcare Laws," as that term was defined in the APA.

74.     In general, Dr. Winfree withheld from Marquee multiple material facts and other information relating to the Winfree P.C., Dr. Winfree, and their assets, liabilities and operations and made multiple untrue statements of material fact and material omissions.

75.     Finally, as detailed herein, Dr. Winfree has breached the non-solicit, non-competition, and non-disparagement clauses contained in the APA. Dr. Winfree has been disparaging Plaintiffs in violation of the APA, soliciting or attempting to solicit patients in violation of the APA, and—by his own admission—is providing dental services within 75 miles of the Practice Location, also in violation of the APA.

76.     As a result of these breaches, Marquee has been damaged in an amount to be determined at trial.  Dr. Winfree is liable for these damages and is subject to injunctive relief to prevent additional damages to Marquee.

**COUNT FOUR**
**BREACH OF CONTRACT (EMPLOYMENT AGREEMENT)**
**AS TO DR. WINFREE**

77.     Plaintiffs incorporate herein by reference all previous allegations of this Amended Complaint as if the same were fully set forth in this paragraph.

78.     The Employment Agreement is a valid and enforceable contract supported by adequate consideration.

79.     Thereunder, Dr. Winfree made a variety of promises, representations, and warranties, as detailed herein, including agreeing to certain restrictive covenants and the non-disparagement clause.

80.     Despite so promising, as set forth *supra*, Dr. Winfree has breached and/or continues to breach these obligations.

81.     For example, Dr. Winfree failed to devote all of his professional time and effort to TN Dental and failed to use TN Dental personnel, space, equipment, supplies and other items solely for the purpose of providing professional dental services. Instead, Dr. Winfree treated patients off the books and took payments that were diverted away from TN Dental.

82.     Moreover, as detailed herein, Dr. Winfree has breached the non-solicit, non-competition, and other provisions of the Employment Agreement. At a minimum, Dr. Winfree has been disparaging Plaintiffs in violation of the Employment Agreement and soliciting or attempting to solicit patients in violation of the Employment Agreement.

83.     As a result of these breaches, TN Dental has been damaged in an amount to be determined at trial.  Dr. Winfree is liable for these damages and is subject to injunctive relief to prevent additional damages to TN Dental.

## COUNT FIVE
## <u>FRAUD AS TO DR. WINFREE</u>

84.     Plaintiffs incorporate herein by reference all previous allegations of this Amended Complaint as if the same were fully set forth in this paragraph.

85.     In conjunction with the negotiation of the APA, Dr. Winfree disclosed false information to Marquee about the financial circumstances of the Winfree P.C., as detailed above. When Dr. Winfree made these representations, he did so with knowledge of their falsity.

86.     Dr. Winfree's false statements concerned facts material to the negotiation of the APA.

87.     Dr. Winfree intended for his false statements to induce Marquee to sign the APA.

88.     Marquee had no reason to know that Dr. Winfree's statements and the financial information he disclosed were false, and it reasonably relied thereupon. As a result, Marquee signed the APA resulting in significant harm to it in an amount to be proven at trial. But for Dr. Winfree's false statements, Marquee would not have signed the APA. In addition, because Dr. Winfree acted intentionally and fraudulently, Marquee is entitled to an award of punitive damages.

## COUNT SIX
## <u>BREACH OF FIDUCIARY DUTY AS TO DR. WINFREE</u>

89.     Plaintiffs incorporate herein by reference all previous allegations of this Amended Complaint as if the same were fully set forth in this paragraph.

90.     Pursuant to Tennessee law, during his employment with TN Dental, Dr. Winfree owed a fiduciary duty of loyalty to TN Dental to act solely for the benefit of TN Dental in matters within the scope of his employment. Dr. Winfree was also required to refrain from conduct that was adverse to TN Dental's interests.

91.     Dr. Winfree breached this fiduciary duty by, among other things, diverting money from TN Dental into his and his wife's pockets and by various other actions as more fully described herein.

92.     As a result of these breaches, TN Dental has been damaged in an amount to be determined at trial.  In addition, because Dr. Winfree acted intentionally, fraudulently, and/or recklessly, TN Dental is entitled to an award of punitive damages.

**COUNT SEVEN**
**BREACH OF FIDUCIARY DUTY AS TO MRS. WINFREE**

93.     Plaintiffs incorporate herein by reference all previous allegations of this Amended Complaint as if the same were fully set forth in this paragraph.

94.     Pursuant to Tennessee law, during her employment with Marquee, Mrs. Winfree owed a fiduciary duty of loyalty to Marquee to act solely for the benefit of Marquee in matters within the scope of her employment. Mrs. Winfree was also required to refrain from conduct that was adverse to Marquee's interests.

95.     Mrs. Winfree breached this fiduciary duty by, among other things, helping divert money from Marquee into her and her husband's pockets and various other actions as more fully described herein.

96.     As a result of these breaches, Marquee has been damaged in an amount to be determined at trial. In addition, because Mrs. Winfree acted intentionally, fraudulently, and/or recklessly, Marquee is entitled to an award of punitive damages.

**COUNT EIGHT**
**CIVIL CONSPIRACY AS TO THE WINFREES**

97.     Plaintiffs incorporate herein by reference all previous allegations of this Amended Complaint as if the same were fully set forth in this paragraph.

4811-9619-0102.2-9619-0102.2

20

98.     The Winfrees have engaged in, and are engaging in, a civil conspiracy to (1) mislead Plaintiffs into purchasing the Practice for much more than it was actually worth; (2) divert funds from Plaintiffs by seeing patients off the books; (3) wrongfully induce TN Dental's patients to terminate their relationships with the TN Dental; (4) misappropriate TN Dental's confidential and proprietary information and trade secrets; and (5) utilize such misappropriated information to do TN Dental harm, take its patients, and destroy its reputation.

99.     The Winfrees were and are aware of each other's intent to engage in this civil conspiracy, and both have taken overt actions in furtherance of this conspiracy.

100.    The Winfrees are liable to TN Dental for all damages caused by any and all conduct in furtherance of this conspiracy.

**COUNT ELEVEN**
**INTENTIONAL INTERFERENCE WITH**
**BUSINESS RELATIONS AS TO MRS. WINFREE**

101.    Plaintiffs incorporate herein by reference all previous allegations of this Amended Complaint as if the same were fully set forth in this paragraph.

102.    TN Dental has business relationships with the Practice's patients of which Mrs. Winfree was aware.

103.    Without justification, Mrs. Winfree spread lies and misinformation intended to induce those patients to terminate their relationships with the TN Dental.

104.    Mrs. Winfree's intentional and malicious conduct proximately caused many of the TN Dental's patients to terminate their relationships with TN Dental.

105.    Tennessee Code Annotated Section 47-50-109 provides:

Procurement of breach of contracts unlawful -- Damages. -- It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of

such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract.  The party injured by such breach may bring suit for the breach and for such damages.

106.    Mrs. Winfree is liable for treble damages under the statute resulting from her actions.

107.    Mrs. Winfree is also liable for common law interference with business relationships and, because her actions were intentional and malicious, Plaintiffs are entitled not only to actual damages but also punitive damages.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1.      That a jury of six or, alternatively, the smallest permissible number of jurors be empaneled;

2.      That the Court issue a permanent injunction enjoining Dr. Winfree from further violating the terms of the APA and the Employment Agreement;

3.      That the Court issue a permanent injunction enjoining Mrs. Winfree from further interfering with TN Dental's relationships with its patients and disparaging the TN Dental's and Marquee's reputation;

4.      That the Court issue a permanent injunction requiring the Winfrees to preserve all records of any kind, specifically including any and all computer records or data, including but not limited to, information and records related to Plaintiffs and their business, their employees, or their patients, the Winfrees's contact and/or solicitation of those employees and patients, or other records in any way related to any actions or conduct by the Winfrees which are the subject of this Amended Complaint;

5.      That upon final hearing of this cause, the Winfrees be ordered permanently to

adhere to the above-described injunctions and other relief embodying the provisions prayed for, together with such further equitable relief as the Court finds just and proper;

6.      That the Winfrees be ordered to account for, disgorge and pay to Plaintiffs all of the monies they received or will receive as a result of their unlawful acts complained of in this Amended Complaint, including the solicitation or service of TN Dental's patients;

7.      That Dr. Winfree be ordered to pay Plaintiffs its actual damages for any breach of contract, as shown by the proof;

8.      That the Winfrees be ordered to pay Plaintiffs double damages for misappropriation of trade secrets;

9.      That the Winfrees be ordered to pay Plaintiffs treble damages for their interference with TN Dental's relationships with its patients;

10.     That the Winfrees be ordered to pay Plaintiffs punitive damages in an amount sufficient to deter such conduct in the future;

11.     That the Winfrees be ordered to pay Plaintiffs interest;

12.     That Dr. Winfree be ordered to pay Plaintiffs their attorneys' fees and expenses; and

13.     That Plaintiffs be awarded such other relief that this Court deems just and equitable.

WALLER LANSDEN DORTCH & DAVIS, LLP

By: s/ John E. Haubenreich
Aron Z. Karabel (BPR 031828)
John E. Haubenreich (BPR 29202)
Taylor J. Askew (BPR 33193)
511 Union Street, Suite 2700
Nashville, Tennessee 37219-8966
(615) 244-6380
aron.karabel@wallerlaw.com
john.haubenreich@wallerlaw.com
taylor.askew@wallerlaw.com

*Attorneys for Plaintiffs TN Dental Professionals, P.C. and CPF Dental, LLC d/b/a Marquee Dental Partners*

## CERTIFICATE OF SERVICE

I certify that the foregoing document has been served on the following on September 16, 2019, as follows:

Fred C. Statum III (BPR No. 14495)
J. Caralisa Connell (BPR No. 36298)
MANIER & HEROD P.C.
1201 Demonbreun Street, Suite 900
Nashville, TN 37203
(615) 244-0030
fstatum@manierherod.com
cconnell@manierherod.com

*Attorneys for Defendants Robert and Olivia Winfree*

s/ John E. Haubenreich

4811-9619-0102.2-9619-0102.2

24

# APPENDIX B

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

MIDDLE DISTRICT OF TENNESSEE

Case number *(if known)* _____

Chapter you are filing under:

☐ Chapter 7

■ Chapter 11

☐ Chapter 12

☐ Chapter 13

☐ Check if this is an amended filing

Official Form 101

# Voluntary Petition for Individuals Filing for Bankruptcy

02/20

The bankruptcy forms use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car," the answer would be *yes* if either debtor owns a car. When information is needed about the spouses separately, the form uses *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.

| Part 1: | Identify Yourself |
|---|---|

| | | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|---|
| 1. | **Your full name** | | |
| | Write the name that is on your government-issued picture identification (for example, your driver's license or passport).<br><br>Bring your picture identification to your meeting with the trustee. | Robert<br>First name<br><br>Terry<br>Middle name<br><br>Winfree<br>Last name and Suffix (Sr., Jr., II, III) | First name<br><br>Middle name<br><br>Last name and Suffix (Sr., Jr., II, III) |
| 2. | **All other names you have used in the last 8 years**<br>Include your married or maiden names. | | |
| 3. | **Only the last 4 digits of your Social Security number or federal Individual Taxpayer Identification number (ITIN)** | xxx-xx-9355 | |

106

Debtor 1   __Robert Terry Winfree__                                    Case number *(if known)* _____

| | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|
| **4.** **Any business names and Employer Identification Numbers (EIN) you have used in the last 8 years**<br><br>Include trade names and *doing business as* names | ☑ I have not used any business name or EINs.<br><br>Business name(s)<br>_____<br>EIN<br>_____ | ☐ I have not used any business name or EINs.<br><br>Business name(s)<br>_____<br>EIN<br>_____ |
| **5.** **Where you live** | **1014 Mystic Stream Drive**<br>**Mount Juliet, TN 37122**<br>Number, Street, City, State & ZIP Code<br><br>**Wilson**<br>County<br><br>**If your mailing address is different from the one above, fill it in here.** Note that the court will send any notices to you at this mailing address.<br><br>_____<br>Number, P.O. Box, Street, City, State & ZIP Code | **If Debtor 2 lives at a different address:**<br><br>_____<br>Number, Street, City, State & ZIP Code<br><br>_____<br>County<br><br>**If Debtor 2's mailing address is different from yours, fill it in here.** Note that the court will send any notices to this mailing address.<br><br>_____<br>Number, P.O. Box, Street, City, State & ZIP Code |
| **6.** **Why you are choosing *this district* to file for bankruptcy** | *Check one:*<br><br>☑ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>☐ I have another reason.<br>Explain. (See 28 U.S.C. § 1408.) | *Check one:*<br><br>☐ Over the last 180 days before filing this petition, I have lived in this district longer than in any other district.<br><br>☐ I have another reason.<br>Explain. (See 28 U.S.C. § 1408.) |

Debtor 1   **Robert Terry Winfree**                                  Case number *(if known)*

| Part 2: | Tell the Court About Your Bankruptcy Case |
|---|---|

**7. The chapter of the Bankruptcy Code you are choosing to file under**

*Check one.* (For a brief description of each, see *Notice Required by 11 U.S.C. § 342(b) for Individuals Filing for Bankruptcy (Form 2010)*). Also, go to the top of page 1 and check the appropriate box.

☐ Chapter 7

■ Chapter 11

☐ Chapter 12

☐ Chapter 13

**8. How you will pay the fee**

■ **I will pay the entire fee when I file my petition**. Please check with the clerk's office in your local court for more details about how you may pay. Typically, if you are paying the fee yourself, you may pay with cash, cashier's check, or money order. If your attorney is submitting your payment on your behalf, your attorney may pay with a credit card or check with a pre-printed address.

☐ **I need to pay the fee in installments.** If you choose this option, sign and attach the *Application for Individuals to Pay The Filing Fee in Installments* (Official Form 103A).

☐ **I request that my fee be waived** (You may request this option only if you are filing for Chapter 7. By law, a judge may, but is not required to, waive your fee, and may do so only if your income is less than 150% of the official poverty line that applies to your family size and you are unable to pay the fee in installments). If you choose this option, you must fill out the *Application to Have the Chapter 7 Filing Fee Waived* (Official Form 103B) and file it with your petition.

**9. Have you filed for bankruptcy within the last 8 years?**

■ No.

☐ Yes.

| | District | | When | | Case number | |
|---|---|---|---|---|---|---|
| | District | | When | | Case number | |
| | District | | When | | Case number | |

**10. Are any bankruptcy cases pending or being filed by a spouse who is not filing this case with you, or by a business partner, or by an affiliate?**

■ No

☐ Yes.

| | Debtor | | | Relationship to you | |
|---|---|---|---|---|---|
| | District | | When | Case number, if known | |
| | Debtor | | | Relationship to you | |
| | District | | When | Case number, if known | |

**11. Do you rent your residence?**

■ No.    Go to line 12.

☐ Yes.    Has your landlord obtained an eviction judgment against you?

   ☐ No. Go to line 12.

   ☐ Yes. Fill out *Initial Statement About an Eviction Judgment Against You* (Form 101A) and file it as part of this bankruptcy petition.

Debtor 1  **Robert Terry Winfree** _____  Case number *(if known)* _____

| **Part 3:** | **Report About Any Businesses You Own as a Sole Proprietor** |

**12. Are you a sole proprietor of any full- or part-time business?**

A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.

If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.

■ No.   Go to Part 4.

☐ Yes.  Name and location of business

_____
Name of business, if any

_____

_____
Number, Street, City, State & ZIP Code

*Check the appropriate box to describe your business:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
☐ None of the above

**13. Are you filing under Chapter 11 of the Bankruptcy Code and are you a *small business debtor*?**

For a definition of *small business debtor*, see 11 U.S.C. § 101(51D).

*If you are filing under Chapter 11, the court must know whether you are a small business debtor so that it can set appropriate deadlines.* If you indicate that you are a small business debtor, you must attach your most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. 1116(1)(B).

☐ No.   I am not filing under Chapter 11.

☐ No.   I am filing under Chapter 11, but I am NOT a small business debtor according to the definition in the Bankruptcy Code.

☐ Yes.  I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I do not choose to proceed under Subchapter V of Chapter 11.

■ Yes.  I am filing under Chapter 11, I am a small business debtor according to the definition in the Bankruptcy Code, and I choose to proceed under Subchapter V of Chapter 11.

| **Part 4:** | **Report if You Own or Have Any Hazardous Property or Any Property That Needs Immediate Attention** |

**14. Do you own or have any property that poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety? Or do you own any property that needs immediate attention?**

*For example, do you own perishable goods, or livestock that must be fed, or a building that needs urgent repairs?*

■ No.

☐ Yes.  What is the hazard?  _____

If immediate attention is needed, why is it needed?  _____

Where is the property?  _____

_____
Number, Street, City, State & Zip Code

Official Form 101   Voluntary Petition for Individuals Filing for Bankruptcy   page 4

Debtor 1    **Robert Terry Winfree**

Case number *(if known)* _____

| Part 5: | Explain Your Efforts to Receive a Briefing About Credit Counseling |
|---|---|

|  | About Debtor 1: | About Debtor 2 (Spouse Only in a Joint Case): |
|---|---|---|

**15. Tell the court whether you have received a briefing about credit counseling.**

The law requires that you receive a briefing about credit counseling before you file for bankruptcy. You must truthfully check one of the following choices. If you cannot do so, you are not eligible to file.

If you file anyway, the court can dismiss your case, you will lose whatever filing fee you paid, and your creditors can begin collection activities again.

*You must check one:*

■ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.
If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver credit counseling with the court.

*You must check one:*

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, and I received a certificate of completion.**

Attach a copy of the certificate and the payment plan, if any, that you developed with the agency.

☐ **I received a briefing from an approved credit counseling agency within the 180 days before I filed this bankruptcy petition, but I do not have a certificate of completion.**

Within 14 days after you file this bankruptcy petition, you MUST file a copy of the certificate and payment plan, if any.

☐ **I certify that I asked for credit counseling services from an approved agency, but was unable to obtain those services during the 7 days after I made my request, and exigent circumstances merit a 30-day temporary waiver of the requirement.**

To ask for a 30-day temporary waiver of the requirement, attach a separate sheet explaining what efforts you made to obtain the briefing, why you were unable to obtain it before you filed for bankruptcy, and what exigent circumstances required you to file this case.

Your case may be dismissed if the court is dissatisfied with your reasons for not receiving a briefing before you filed for bankruptcy.

If the court is satisfied with your reasons, you must still receive a briefing within 30 days after you file. You must file a certificate from the approved agency, along with a copy of the payment plan you developed, if any. If you do not do so, your case may be dismissed.

Any extension of the 30-day deadline is granted only for cause and is limited to a maximum of 15 days.

☐ **I am not required to receive a briefing about credit counseling because of:**

☐ **Incapacity.**
I have a mental illness or a mental deficiency that makes me incapable of realizing or making rational decisions about finances.

☐ **Disability.**
My physical disability causes me to be unable to participate in a briefing in person, by phone, or through the internet, even after I reasonably tried to do so.

☐ **Active duty.**
I am currently on active military duty in a military combat zone.

If you believe you are not required to receive a briefing about credit counseling, you must file a motion for waiver of credit counseling with the court.

Debtor 1   __Robert Terry Winfree_____   Case number *(if known)* _____

---

| Part 6: | Answer These Questions for Reporting Purposes |
|---|---|

**16.** What kind of debts do you have?

**16a.** **Are your debts primarily consumer debts?** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

■ No. Go to line 16b.

☐ Yes. Go to line 17.

**16b.** **Are your debts primarily business debts?** *Business debts* are debts that you incurred to obtain money for a business or investment or through the operation of the business or investment.

☐ No. Go to line 16c.

■ Yes. Go to line 17.

**16c.** State the type of debts you owe that are not consumer debts or business debts _____

---

**17.** Are you filing under Chapter 7?

■ No.   I am not filing under Chapter 7. Go to line 18.

Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available for distribution to unsecured creditors?

☐ Yes.   I am filing under Chapter 7. Do you estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors?

☐ No

☐ Yes

---

**18.** How many Creditors do you estimate that you owe?

■ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than100,000

---

**19.** How much do you estimate your assets to be worth?

☐ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
☐ $500,001 - $1 million

■ $1,000,001 - $10 million
☐ $10,000,001 - $50 million
☐ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

---

**20.** How much do you estimate your liabilities to be?

☐ $0 - $50,000
☐ $50,001 - $100,000
☐ $100,001 - $500,000
■ $500,001 - $1 million

☐ $1,000,001 - $10 million
☐ $10,000,001 - $50  million
☐ $50,000,001 - $100 million
☐ $100,000,001 - $500 million

☐ $500,000,001 - $1 billion
☐ $1,000,000,001 - $10 billion
☐ $10,000,000,001 - $50 billion
☐ More than $50 billion

---

| Part 7: | Sign Below |
|---|---|

**For you**

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**/s/ Robert Terry Winfree**
_____          _____
**Robert Terry Winfree**                        Signature of Debtor 2
Signature of Debtor 1

Executed on  __March  5, 2020__          Executed on  _____
MM / DD / YYYY                                          MM / DD / YYYY

Official Form 101     Voluntary Petition for Individuals Filing for Bankruptcy     page 6

111

Debtor 1   **Robert Terry Winfree**

Case number *(if known)*

---

**For your attorney, if you are represented by one**

**If you are not represented by an attorney, you do not need to file this page.**

I, the attorney for the debtor(s) named in this petition, declare that I have informed the debtor(s) about eligibility to proceed under Chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each chapter for which the person is eligible.  I also certify that I have delivered to the debtor(s) the notice required by 11 U.S.C. § 342(b) and, in a case in which § 707(b)(4)(D) applies, certify that I have no knowledge after an inquiry that the information in the schedules filed with the petition is incorrect.

| **/s/ Griffin S. Dunham** | Date | **March  5, 2020** |
|---|---|---|
| Signature of Attorney for Debtor | | MM / DD / YYYY |

**Griffin S. Dunham**
Printed name

**Dunham Hildebrand, PLLC**
Firm name

**2416 21st Avenue South**
**Suite 303**
**Nashville, TN 37212**
Number, Street, City, State & ZIP Code

Contact phone   **615.933.5850**            Email address   **griffin@dhnashville.com**

**27043 TN**
Bar number & State

---

```
                ROBERT TERRY WINFREE
                1014 MYSTIC STREAM DRIVE
                MOUNT JULIET TN 37122

                GRIFFIN S. DUNHAM
                DUNHAM HILDEBRAND, PLLC
                2416 21ST AVENUE SOUTH
                SUITE 303
                NASHVILLE, TN 37212

                AMERICAN EXPRESS
                ATTN: OFFICER
                P.O. BOX 650448
                DALLAS TX 75265-0448

                AUDI FINANCIAL SERVICES
                PO BOX 5215
                CAROL STREAM IL 60197

                BANK OF AMERICA
                ATTN: OFFICER
                P.O. BOX 15019
                WILMINGTON DE 19886-5019

                CHASE
                MAIL CODE LA4-6475
                700 KANSAS LANE
                MONROE LA 71203

                CITI CARDS
                ATTN: OFFICER
                PO BOX 9001037
                LOUISVILLE KY 40290

                CPF DENTAL LLC DBA MARQUEE DENTAL PART.
                C/O JOHN HAUBENREICH/WALLER
                511 UNION STREET, SUITE 2700
                NASHVILLE TN 37219

                FIFTH THIRD BANK
                ATTN: BANKRUPTCY DEPARTMENT
                38 FOUNTAIN SQUARE PLAZA
                CINCINNATI OH 45263

                JAGUAR LAND ROVER NORTH AMERICA, LLC
                100 JAGUAR LAND ROVER WAY
                MAHWAH NJ 07495

                LENDINGTREE, LLC
                11115 RUSHMORE DRIVE
                CHARLOTTE NC 28277
```

```
MANIER & HEROD, PC
ATTN: FRED C. STATUM, III
1201 DEMONBREUN STREET, SUITE 900
NASHVILLE TN 37203

SANTANDER CONSUMER USA
PO BOX 961245
FORT WORTH TX 76161

TN DENTAL PROFESSIONALS, PC
C/O JOHN HAUBENREICH/WALLER
511 UNION STREET, SUITE 2700
NASHVILLE TN 37219
```

# APPENDIX C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 3:20-bk-01417 |
| ROBERT T. WINFREE, D.D.S., | ) | Chapter 11 |
| | ) | Judge Mashburn |
| Debtor. | ) | |

| | | |
|---|---|---|
| TN DENTAL PROFESSIONALS, P.C., and | ) | |
| CPF DENTAL, LLC d/b/a MARQUEE | ) | |
| DENTAL PARTNERS, | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | Case No. 18-1384-III |
| | ) | Chancellor Lyle |
| vs. | ) | |
| | ) | |
| ROBERT T. WINFREE, D.D.S. and | ) | |
| OLIVIA WINFREE, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

## NOTICE OF REMOVAL

Robert T. Winfree, D.D.S. (the "Debtor"), as a defendant in Davidson County Chancery Court Case No. 18-1384-III (the "Removed Case"), hereby removes the claims and causes of action (the "Removed Claims") in the Removed Case to the United States Bankruptcy Court for the Middle District of Tennessee (the "Bankruptcy Court") pursuant to an administrative order of reference issued by the United States District Court for the Middle District of Tennessee.

The Removed Claims consist of (i) claims by the Debtor against Plaintiffs TN Dental Professionals, P.C. and CPF Dental, LLC (collectively, the "Plaintiffs") for breach of contract, promissory estoppel, intentional misrepresentation, and intentional interference with business relations, and (ii) claims by the Plaintiffs against the Debtor and his wife, Olivia Winfree, for injunctive relief, breach of contract, fraud, breach of fiduciary duty, civil conspiracy, and

intentional interference with business relations fraudulent inducement. A copy of the complaint and counterclaim are attached hereto as Exhibit A and Exhibit B, respectively.

In support of this Notice of Removal, the Debtor states as follows:

1.      The Removed Case was commenced in the Chancery Court for Davidson County, Tennessee on December 21, 2018.  On March 5, 2020 (the "Petition Date"), the Debtor filed his Chapter 11 in the Bankruptcy Court.

2.      The Removed Claims relate to the Bankruptcy Case.  As such, the United States District Court for the Middle District of Tennessee (the "District Court") has jurisdiction of the Removed Claims pursuant to 28 U.S.C. § 1334(b).  Therefore, pursuant to 28 U.S.C. § 1452(a), the Removed Claims may be removed to the District Court.

3.      Pursuant to 28 U.S.C. § 157, the District Court may refer the Removed Claims to the bankruptcy judges for the district.  The District Court has referred to the bankruptcy judges for this district all cases under Title 11 and all proceedings under Title 11 or arising in or related to a case under Title 11.  That includes the Removed Claims in the Removed Case.

4.      As permitted by Bankruptcy Rule 9027(a)(2), this Notice of Removal is being filed within 90 days after the Petition Date.

5.      Upon removal, the Removed Claims are a core proceeding within the meaning of 28 U.S.C. § 157(b)(A)-(C).  Pursuant to 28 U.S.C. § 157(c)(2), the Debtor consents to the District Court's referral of the Removed Claims to the Bankruptcy Court to hear and determine and to enter appropriate orders and judgments, subject to review under 28 U.S.C. § 158.  Pursuant to Bankruptcy Rule 9027(a)(1), the Debtor hereby consents to the entry of final orders of judgments by the Bankruptcy Court.

2

6.      The original pleadings in the Removed Case have been replaced by amended pleadings, and accordingly service of the amended pleadings were made pursuant to Tennessee Rule of Procedure 5.02.

7.      Pursuant to Federal Rule of Bankruptcy Procedure 9027(b), the undersigned will promptly file a copy of this Notice of Removal with the Clerk of the Chancery Court for Davidson County, Tennessee, as well as all other parties in the Removed Case.

8.      Prior to the filing of this notice, defendant Olivia Winfree in the Removed Case consented to the filing hereof and undersigned counsel anticipates that she will consent to (i) the District Court's referral of the Removed Claims to the Bankruptcy Court to hear and determine and to enter appropriate orders and judgments, subject to review under 28 U.S.C. § 158, and (ii) the entry of final orders of judgments by the Bankruptcy Court.

Respectfully Submitted,


/s/ Griffin S. Dunham
Griffin S. Dunham
Alex Koval
DUNHAM HILDEBRAND, PLLC
Nashville, Tennessee 37212
615.933.5850
griffin@dhnashville.com
*Counsel for the Debtor*

3

## <u>CERTIFICATE OF SERVICE</u>

On March 5, 2020, this notice has been served on all parties consenting to electronic service in this case and by electronic mail and regular mail to the following:

| | |
|---|---|
| Aron Z. Karabel | David M. Anthony |
| John E. Haubenreich | Bone McAllester Norton PLLC |
| Taylor J. Askew | 511 Union Street, Suite 1600 |
| Waller Lansden Dorth & Davis, LLP | Nashville, Tennessee 37219 |
| 511 Union Street, Suite 2700 | danthony@bonelaw.com |
| Nashville, Tennessee 37219 | |
| aron.karabel@wallerlaw.com | |
| john.haubenreich@wallerlaw.com | |
| taylor.askew@wallerlaw.com | |

/s/ Griffin S. Dunham
Griffin S. Dunham

4

EXHIBIT A

# IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| **TN DENTAL PROFESSIONALS, P.C. and** ) | |
| **CPF DENTAL, LLC d/b/a MARQUEE** ) | |
| **DENTAL PARTNERS,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 181384-I** |
| ) | **Chancellor Martin** |
| **ROBERT T. WINFREE, D.D.S. and** ) | **Jury Demand** |
| **OLIVIA WINFREE,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

## AMENDED COMPLAINT

Plaintiffs TN Dental Professionals, P.C. ("TN Dental") and CPF Dental, LLC d/b/a Marquee Dental Partners ("Marquee") bring this Amended Complaint for injunctive relief and damages against Defendants Robert T. Winfree, D.D.S. and Olivia Winfree and state:

## SUMMARY

1.      In December of 2015, Dr. Winfree sold his dental practice to Marquee for $1,675,000 and signed a three-year employment agreement with TN Dental for $250,000 per year, terminable with or without cause. Both the Asset Purchase Agreement and Employment Agreement he signed contained non-solicitation and non-competition provisions. In late 2018, TN Dental chose to terminate its employment relationship with Dr. Winfree.

2.      Within minutes of leaving the practice location, Dr. Winfree and Olivia Winfree launched a pernicious and broad-scale campaign to poach TN Dental's patients, disparage Plaintiffs, and attempt to destroy Plaintiffs' business.

3.      Plaintiffs seek permanent injunctions restraining and enjoining Defendants: (1) from further violating the non-solicitation, non-disparagement, and non-compete terms in the

APA and Employment Agreement; (2) from utilizing or disclosing the Plaintiffs' confidential and proprietary information and trade secrets; and (3) from interfering with the TN Dental's relationships with its patients and vendors. In addition to preventing further irreparable injury to it, Plaintiffs also seek to recover both compensatory and punitive damages related to the Winfrees' actions.

## PARTIES

4.     TN Dental Professionals, P.C. is a Tennessee professional corporation with its principal place of business located at 2505 21st Avenue South, Suite 204, Nashville, Tennessee 37212.

5.     CPF Dental, LLC is a Delaware limited liability company doing business as Marquee Dental Partners with its principal place of business located at 2505 21st Avenue South, Suite 204, Nashville, Tennessee 37212.

6.     The Winfrees are residents of Wilson County, Tennessee residing at 1014 Mystic Streams Dr., Mt. Juliet, TN 37122.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the parties and the subject matter of this action pursuant to Tenn. Code Ann. §§ 20-2-223, 20-2-225, and 16-11-101, *et seq.*

8.     Venue is proper in this Court pursuant to Tenn. Code Ann. §§ 16-11-115, and 20-4-101, *et seq.* and because of contractual agreements between Plaintiffs and Dr. Winfree with respect to venue.

## FACTUAL BACKGROUND

**I.     Dr. Winfree Sells His Dental Practice.**

9.      On December 16, 2015, Marquee[1] and Dr. Winfree entered into an Asset Purchase Agreement whereby Dr. Winfree and the professional corporation he formed to own his dental practice, Robert T. Winfree, D.D.S., P.C. (the "Winfree P.C."), located at 4243 Lebanon Pike, Hermitage, TN 37076 (the "Practice Location"), agreed to sell the non-clinical assets of Winfree PC to CPF Dental, LLC and the clinical assets of Winfree PC to TN Dental Professionals, P.C., for a combined purchase price of $1,675,000 (the "APA"). A true and exact copy of the APA and the Professional Assets Bill of Sale is attached hereto as Exhibit A. Prior to selling his dental practice, Dr. Winfree operated under the business name "Winfree & Denton Cosmetic and General Dentistry." Following this acquisition, TN Dental Professionals, P.C. operated the newly acquired Practice Location (the "Practice") under the name "Winfree & Craig Cosmetic and General Dentistry."

10.     Contemporaneous with the closing of the APA (and as a condition thereto), Dr. Winfree executed an employment agreement with TN Dental whereby he agreed to work as a dentist at the Practice Location (the "Employment Agreement"). Dr. Winfree practiced in the same building and serviced the same patients that he did prior to selling his practice. However, and critical to this dispute, Dr. Winfree was an employee of TN Dental as a result of his sale, and the Practice was thereafter owned by TN Dental Professionals, P.C.—not Dr. Winfree or Winfree PC. A true and exact copy of the Employment Agreement is attached hereto as Exhibit B.

---

[1] Marquee is affiliated with TN Dental through a business services agreement, whereby Marquee provides non-clinical administrative/business services to TN Dental. Though Marquee is the named party in the APA, pursuant to its terms, Dr. Winfree agreed to transfer the dental practice and all clinical assets to TN Dental (and did so pursuant to a Professional Assets Bill of Sale), and TN Dental is a third party beneficiary under the APA.

11.     As compensation for his services under the Employment Agreement, TN Dental paid Dr. Winfree an annual salary of $250,000. Marquee also provided Dr. Winfree with the opportunity to achieve performance incentives.

12.     Olivia Winfree was also hired as an employee of Marquee, earning an annual salary of $80,000.

## II.      The Restrictive Covenants in the APA and the Employment Agreement.

13.     Under the terms of the APA and his Employment Agreement, and in exchange for Marquee's purchase of his practice/customer goodwill and TN Dental's willingness to employ him and provide a lucrative salary, Dr. Winfree agreed to non-competition, non-solicitation, non-interference, and non-disparagement covenants. These are found in Section 8 of the APA (Exhibit A) and Section 12 of the Employment Agreement (Exhibit B). These covenants restrict the ability of Dr. Winfree—or anyone on his behalf—to, among other things, solicit or attempt to solicit former patients, disparage Plaintiffs or their employees, and otherwise harm Plaintiffs' businesses post-termination.

14.     The APA and the Employment Agreement also contain non-compete provisions. Pursuant to the APA, Dr. Winfree is prohibited from, among other things, providing dental services within 75 miles of the Practice Location. (Ex. A at ¶ 8.) Pursuant to the Employment Agreement, Dr. Winfree is prohibited from providing dental services within 10 miles of the Practice Location. (Ex. B at ¶ 12.)

15.     In addition to these restrictive covenants, Dr. Winfree also agreed to various non-disclosure obligations related to confidential information and trade secrets of Marquee and TN Dental. These are found in Section 8 of the APA and Section 13 of the Employment Agreement.

16.     Dr. Winfree acknowledged that a breach or threatened breach of any of the restrictive covenants or the non-disclosure obligations entitled Plaintiffs to injunctive relief without any requirement to post a bond or prove actual damages. (Ex. A at ¶ 8(d); Ex. B at ¶ 15.) Dr. Winfree further acknowledged that these provisions were reasonable with respect to time, scope and geographic region. (*Id.*)

17.     Perhaps most importantly, Dr. Winfree acknowledged that the restrictive covenants and non-disclosure obligation in the Employment Agreement were a material inducement for TN Dental to enter into his Employment Agreement, and Dr. Winfree's breach of the same would rob TN Dental of its "benefit of the bargain."  (Ex. B at ¶ 15.)

**III.     Additional Promises, Representations, and Warranties.**

18.     In the APA, Dr. Winfree represented:

- That he had provided "true, correct and complete copies of the unaudited balance sheet, income statement and other financial statements of Seller as of and for the 12 months ended December 31, 2012, 2013 and 2014, and as and for the eight months ended August 30, 2015 (collectively, the 'Financial Statements'), each of which presents fairly the assets, liabilities and financial condition of Seller as of such dates and the results of operations and cash flows of Seller for such periods, in each case on a cash basis, and are consistent with the books and records of Seller and represent only actual, bona fide transactions." (Ex. A at ¶ 5(d).)

- That he was, and had been, "in compliance in all material respects with all applicable Laws, orders and decrees, including all Healthcare Laws . . . ." (*Id.* at ¶ 5(g)(i).)

- That neither he nor anyone acting on his behalf had "established or maintained any fund or asset that has not been recorded in the books and records of Seller." (*Id.* at ¶ 5(g)(ii).)

- That he had not "been subject to a disciplinary proceeding, corrective action plan, inquiry, monitoring or investigation by or involving any professional board, agency, society, association or Governmental Authority charged with regulating the professional activities of such Person or any other Law . . . ." (*Id.* at ¶5(h)(iv).); and

- That he had not "withheld from Buyer any material facts or information relating to Seller, Owner or the Practice, Business or their assets, liabilities and operations" and that "[n]o representation or warranty made by Owner or Seller in this Agreement or in any statement, certificate or instrument to be furnished to Buyer pursuant to this Agreement or other Contracts or documents delivered in connection herewith contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make these statements contained herein and therein not misleading." (*Id.* at ¶ 5(u).)

19.    In the Employment Agreement, Dr. Winfree agreed to:

- "Devote all of his . . . professional time and effort to" TN Dental (Ex. B at ¶ 2(a)); and

- "[U]se all personnel, space, equipment, supplies and other items provided or arranged for by Employer solely for the purpose of providing professional dental services" pursuant to the Employment Agreement (Ex. B at ¶ 2(f)).

**IV.     The Winfrees Breach Contractual, Fiduciary, and Ethical Obligations to Plaintiffs**

20.     Unbeknownst to Plaintiffs, Dr. Winfree was in breach of many of the above representations and warranties from the moment the APA and Employment Agreement were signed.

21.     As has come to light after Plaintiffs terminated their relationships with Dr. and Mrs. Winfree, Dr. Winfree intentionally made a number of serious and material misrepresentations about the financial worth of the Practice and provided records that were riddled with inaccuracies, errors, misinformation, and deliberate misrepresentations, all in violation of the APA.

22.     Moreover, while an employee with TN Dental, and with the help of Olivia Winfree, Dr. Winfree, among other things, saw patients at the Practice Location, failing to document treatment in the medical records and accepting cash payments in order to deprive TN Dental of revenue, in violation of the Employment Agreement and the APA.

23.     Plaintiffs are still uncovering evidence of the Winfrees' fraudulent and unethical conduct as this case progresses.

**V.     TN Dental Decides to Terminate the Employment Agreement.**

24.     Dr. Winfree's Employment Agreement ran for an initial three-year employment term, which expired on December 16, 2018. At the conclusion of this initial term, the Agreement was set to renew for successive one-year periods unless terminated pursuant to the provisions of the Agreement.

25.     The "Termination" provision of the Employment Agreement with respect to TN Dental's termination rights reads as follows: "Employer may terminate this Agreement and

Dentist's employment hereunder with or without cause at any time by providing at least 90 days prior written notice to Dentist." (Ex. B, ¶ 11.)

26.     On October 2, 2018, TN Dental provided Dr. Winfree with notice that it would be terminating his Employment Agreement without cause pursuant to the Termination provision in the Employment Agreement. A copy of this notice is attached hereto as Exhibit C.

27.     To ensure that Dr. Winfree would have the full benefit of the 90 days notice of the termination of the Employment Agreement, TN Dental arranged for him to be paid his salary through December 31, 2018 (i.e., 90 days from October 2, 2018).

**VI.     The December 13, 2018 Meeting at the Practice.**

28.     Believing that it was the plan for Dr. Winfree to close the office for the last two weeks of December (and knowing that the office was not open on Fridays), on the afternoon of Thursday December 13, 2018, select employees of TN Dental and Marquee went to the Practice to oversee the conclusion of Dr. Winfree's employment with TN Dental. The decision had also been made to terminate the other staff at the Practice along with the conclusion of Dr. Winfree's employment, based on TN Dental and Marquee's experience in the industry, with the opportunity for many of the staff to re-apply. To provide a cushion, however, TN Dental and Marquee also paid the staff through the end of the year as well. TN Dental and Marquee intended to use the downtime between December 14, 2018 and January 1, 2019 to transition a new dentist and non-clinician team into the Practice, convert to a new practice management software, and install new cabinetry.

29.     During this December 13, 2018 visit, select employees of Marquee and the President of TN Dental, Dr. Keith Van Benthuysen, informed the rest of the employees[2]—which

---

[2] The non-clinical staff members of the Practice were employed by Marquee (the "Practice Location Staff"), whereas Dr. Winfree was employed by TN Dental.

4811-9619-0102.2-9619-0102.2

8

included Dr. Winfree's wife and Practice Operations Leader, Defendant Olivia Winfree—that Plaintiffs had decided to reorganize (not close) the Practice Location and that the unfortunate but necessary result of that reorganization was that the current employees working at the Practice Location would be separated from their employment with Marquee and TN Dental.

30.     Each non-clinical staff member was told that she would (1) continue to be paid through the end of the year, (2) receive payment for all unused paid time off, (3) continue to receive health insurance through the end of the year, and (4) would be eligible for rehire at another practice location staffed by Marquee.

31.     At that time, Plaintiffs were unaware that Dr. Winfree had failed to inform the Practice Location Staff that he had been given notice of the termination of his Employment Agreement. In fact, Mrs. Winfree had told the other Practice employees that Dr. Winfree signed a new agreement for an additional three-year term. Dr. Winfree was present for this announcement and for the hours immediately thereafter.

32.     Immediately, the Practice employees began to yell and curse at the TN Dental and Marquee representatives present—threatening to harm TN Dental and Marquee and disparage them to TN Dental's patients and the public at-large. Some employees were observed frantically texting. Other employees were observed shredding documents and destroying property.

33.     Upon receiving the news, Mrs. Winfree inaccurately reiterated to Practice employees that TN Dental lied and had renewed Dr. Winfree's Employment Agreement—though she knew this was false because her husband had received his termination notice nearly three months prior. Mrs. Winfree then began to walk around the practice whispering to other Practice employees who would then walk to a different part of the Practice. No representative of either Plaintiff could hear what Mrs. Winfree was whispering, but upon information and belief,

Plaintiffs believe she was instructing Practice employees to destroy documents and gather patient information.

34.     Making matters worse, other Practice employees took advantage of the chaos and packed up and removed confidential information. Upon information and belief, these stolen items included patient identifying information, patient contact information, patient medical charts, and information related to the TN Dental's finances. However, Practice employees were specifically observed packing up a rolodex, a thick binder full of papers, and endodontics-related patient correspondence.

35.     Later in the afternoon, the Winfrees' sons arrived at the Practice Location to help gather personal items. In doing so, one of the Winfree sons began inquiring into the Plaintiffs' computer hard drives at the Practice Location and was heard stating, "Take the hard drives." Plaintiffs still have not determined whether any internal and/or external hard drives were stolen.

**VII.     The Winfrees Set Their Plan in Motion.**

36.     After approximately two and a half hours, Dr. Winfree and all of the Practice employees vacated the premises. The separation was short, however, because the Winfrees and a number of Practice employees had previously agreed to meet at a nearby Chili's restaurant. Dr. Winfree accompanied these employees, including his wife, to the restaurant. At the restaurant, Winfrees and the Practice employees formalized their plan to harm Plaintiffs by disparaging them on social media, in the news, and to the general public; poach TN Dental's patients; and open a competing dental practice only a handful of miles from the Practice Location.

37.     Immediately after leaving the restaurant, the Winfrees—and others acting on their behalf—began frantically contacting patients of the Practice, misrepresenting the events of the previous hours, telling them to retrieve their records from the Practice, and soliciting them away

from the Practice. As a result, numerous people (including Olivia Winfree and other former TN Dental and Marquee employees) took to social media to spread the Winfrees' false version of the events. This was a campaign orchestrated by Defendants, as contemporaneous text messages, Facebook posts, Facebook messages, phone records, and other witness accounts later revealed.

38.    This meeting was followed up in the ensuing weeks by two other meetings at which this plan was discussed, one being a lunch at Restoration Hardware on or about December 18, 2018 (which Dr. Winfree paid for) and another being a Christmas party hosted by the Winfrees at Cedar Creek Yacht Club on December 20, 2018.

39.    Just as importantly, these meetings were both preceded and followed by a slew of text messages, Facebook messages, and phone calls in and among the Winfrees and former employees of TN Dental and Marquee, all with the coordinated plan to undermine Plaintiffs and poach TN Dental's patients.

40.    Dr. Winfree's disparagement of Plaintiffs to patients of the Practice and others violated and continues to violate the Non-Disparagement provisions in the APA and his Employment Agreement, and Plaintiffs have suffered and will continue to suffer irreparable harm if Dr. Winfree's conduct is not enjoined.

41.    Mrs. Winfree's disparagement of Plaintiffs to patients of the Practice and others is without justification and violates the law. Plaintiffs have suffered and will continue to suffer irreparable harm if Mrs. Winfree's conduct is not enjoined.

42.    Dr. Winfree's solicitation of the TN Dental's patients violated and continues to violate the restrictive covenants in the APA and his Employment Agreement, and Plaintiffs have suffered and will continue to suffer irreparable harm if Dr. Winfree's conduct is not enjoined.

43.    Mrs. Winfree's interference with TN Dental's relationships with its patients

violates the law, and TN Dental has suffered and will continue to suffer irreparable harm if Mrs. Winfree's conduct is not enjoined.

### VIII.   <u>Dr. Winfree Commits Fraud</u>.

44.     The Winfrees' attack on Plaintiffs did not stop with spreading lies in person, on the phone, via text message, and both publicly and privately on Facebook. Dr. Winfree began contacting laboratories and the United States Post Office in an effort to divert TN Dental patients and confidential information to his home address.

45.     On Sunday December 16, 2018, Asa Blalock from Lloyd Dental Laboratory, Inc. emailed Fred Ward, CEO of Marquee ("Mr. Ward"), to let him know that Dr. Winfree had contacted Mr. Blalock and asked him to send TN Dental lab cases to Dr. Winfree's home address. These test cases contained highly confidential and protected patient information and were the sole property of the TN Dental (subject to rigorous safeguards, including receipt and storage of such information) and its patients. At the time he made his request, Dr. Winfree knew he had no right to receive or store them but told Lloyd Dental that he did.

46.     Upon information and belief, Plaintiffs believe that Dr. Winfree had likewise contacted Hodges Dental Lab, LLC and made a similar request for it to forward TN Dental lab results to his home address. These test results contained protected patient information and were the sole property of TN Dental and its patients. At the time he made his request, Dr. Winfree knew he had no right to receive or store them but told Hodges Dental that he did.

47.     Making matters worse, in actions that constitute felony mail fraud, Dr. Winfree, directly and/or indirectly, contacted the United States Post Office and lied to it saying that the Practice had shut down and all of the Practice's mail—necessarily including protected patient health information—needed to be forwarded to his home address, in violation of HIPAA and

other laws. Dr. Winfree was successful in his deception, and TN Dental is unaware of the amount of its mail that has been fraudulently diverted into the Winfrees's hands.

48.     Dr. Winfree's direct and/or indirect diversion of the TN Dental's patients and the Plaintiffs' confidential information violates the Restrictive Covenants in the APA and the Employment Agreement, and Plaintiffs have suffered and will continue to suffer irreparable harm if Dr. Winfree's conduct is not enjoined.

**IX.     The Winfrees's Scheme Succeeds in Crippling TN Dental and Robbing Plaintiffs of Any Benefit of Their Bargain with Dr. Winfree.**

49.     By Monday December 17, 2018, the ramifications of the Winfrees's actions were beginning to manifest. Patients began presenting at the Practice by the dozens and demanding their dental records and withdrawing as patients of the Practice in accordance with the Winfrees' scheme.

50.     As the week progressed, more and more patients appeared at the Practice and requested to withdraw as patients of the Practice and requested copies of their records. Since that Monday, TN Dental has lost several hundred patients to other competing dental practices—and likely to Dr. Winfree himself, as he has admitted.

51.     In the weeks and months following December 13, 2018, the Winfrees continued to solicit patients through a variety of means (e.g., Facebook messages, phone conversations, text messages, in-person conversations) and have continued to disparage Plaintiffs to virtually anyone who will listen. As a result, TN Dental continues to hemorrhage patients and its revenues have declined precipitously.

**X.     The Court Must Permanently Enjoin the Dr. Winfree's Conduct.**

52.     The Winfrees have repeatedly failed to desist in harming Plaintiffs, despite understanding and acknowledging that their behavior is wrong and in violation of Dr. Winfree's

4811-9619-0102.2-9619-0102.2

13

agreements with Plaintiffs and the law more generally. The only thing holding Defendants back from finishing the job they started in destroying TN Dental is the Court's action. Absent a permanent injunction, and the means to enforce it, TN Dental will for all intents and purposes be destroyed. In all likelihood, the remaining patients will leave, potential patients will seek treatment elsewhere, and Plaintiffs may be forced to shut the doors of a Practice Location purchased for $1,675,000.00 only three years ago. The Winfrees' conduct will not only affect the reputation of the Practice Location, but also the other dental practice locations which Marquee manages across Tennessee. Without injunctive relief, Plaintiffs' damages will be catastrophic—and most certainly irreparable.

## COUNT ONE
## <u>INJUNCTIVE RELIEF AS TO DR. WINFREE</u>

53.     Plaintiffs incorporate herein by reference all previous allegations of this Complaint as if the same were fully set forth in this paragraph.

54.     Dr. Winfree's Employment Agreement with TN Dental is a valid and enforceable contract supported by adequate consideration. The APA is also a valid and enforceable contract supported by adequate consideration.

55.     Pursuant to these agreements, Dr. Winfree promised to abide by the terms of the restrictive covenants and the non-disparagement clauses, as more fully detailed herein.

56.     Despite these promises, as set forth *supra*, Dr. Winfree has and is continuing to breach the restrictive covenants and non-disparagement clause.

57.     Dr. Winfree acknowledged and agreed that a breach or threatened breach of the same would entitle Plaintiffs to move for injunctive relief without posting bond. (<u>Ex. A</u> at ¶ 8(d); <u>Ex. B</u>, at ¶ 15.)

58.     For all of the reasons set forth in this Amended Complaint, unless Dr. Winfree is

restrained, temporarily enjoined, and subsequently permanently enjoined from the foregoing conduct, Plaintiffs will be irreparably injured by their loss of confidential and proprietary information and trade secrets, the loss of patients, the loss of business reputation, other present economic losses which are currently unascertainable, and future economic losses which are presently incalculable.

59.     Plaintiffs have no adequate remedy at law for the immediate and irreparable harm they are suffering.

**COUNT TWO**
**INJUNCTIVE RELIEF AS TO MRS. WINFREE**

60.     Plaintiffs incorporate herein by reference all previous allegations of this Complaint as if the same were fully set forth in this paragraph.

61.     Mrs. Winfree has engaged in a concerted and intentional campaign to tortiously interfere with Plaintiffs' business relationships, including TN Dental's business relationships with specific Plaintiffs. Mrs. Winfree has used her knowledge gained during her employment with Marquee in order to specifically target those patients using improper means, and with the improper motive of harming Plaintiffs and destroying their business and reputation.

62.     Mrs. Winfree has already succeeded in that effort, interfering in dozens—if not hundreds—of business relationships between, among other things, TN Dental and its patients. Moreover, Mrs. Winfree has refused to admit what she has done, and has shown no remorse for having done so, even when sanctioned by this Court.

63.     In addition to this, Mrs. Winfree has and continues to lie to TN Dental's patients and the general public in an ill-advised and illegal smear campaign in an attempt to destroy the Practice and damage Plaintiffs.

64.     Mrs. Winfree's lies are a direct and immediate threat to Plaintiffs' reputations and

business relationships—the most immediate of which is her efforts to spread her lies to a broader audience.

65.     There is no doubt that, absent injunctive relief, Mrs. Winfree will continue to tortuously interfere with Plaintiffs' business relationships, disparage Plaintiffs and their employees and representatives, and otherwise do everything in her power to destroy Plaintiffs and their businesses.

66.     For all of the reasons set forth in this Amended Complaint, unless Mrs. Winfree is restrained, temporarily enjoined and subsequently permanently enjoined from the foregoing conduct, Plaintiffs will be irreparably injured by its loss of confidential and proprietary information and trade secrets, the loss of patients, the loss of business reputation, other present economic losses which are currently unascertainable, and future economic losses which are presently incalculable.

67.     Plaintiffs have no adequate remedy at law for the immediate and irreparable harm they are suffering.

## COUNT THREE
## BREACH OF CONTRACT (APA) AS TO DR. WINFREE

68.     Plaintiffs incorporate herein by reference all previous allegations of this Amended Complaint as if the same were fully set forth in this paragraph.

69.     The APA is a valid and enforceable contract supported by adequate consideration.

70.     Thereunder, Dr. Winfree made a variety of promises, representations, and warranties, as detailed herein, including agreeing to certain restrictive covenants and the non-disparagement clause.

71.     Despite so promising, as set forth *supra*, Dr. Winfree has breached and/or continues to breach these obligations.

4811-9619-0102.2-9619-0102.2

16

72.     For example, Dr. Winfree provided incomplete and/or doctored copies of financial information in connection with the APA which did not fairly present the assets, liabilities and financial condition of the Winfree P.C. and which were not consistent with the books and records of the Winfree P.C. and/or did not represent only actual, bona fide transactions.

73.     As a further example, Dr. Winfree also falsely represented and warranted that he had not established or maintained any fund or asset that had not been recorded in the books and records of the Winfree P.C. and that he was and had been in compliance in all material respects with all applicable laws, orders and decrees, including all "Healthcare Laws," as that term was defined in the APA.

74.     In general, Dr. Winfree withheld from Marquee multiple material facts and other information relating to the Winfree P.C., Dr. Winfree, and their assets, liabilities and operations and made multiple untrue statements of material fact and material omissions.

75.     Finally, as detailed herein, Dr. Winfree has breached the non-solicit, non-competition, and non-disparagement clauses contained in the APA. Dr. Winfree has been disparaging Plaintiffs in violation of the APA, soliciting or attempting to solicit patients in violation of the APA, and—by his own admission—is providing dental services within 75 miles of the Practice Location, also in violation of the APA.

76.     As a result of these breaches, Marquee has been damaged in an amount to be determined at trial.  Dr. Winfree is liable for these damages and is subject to injunctive relief to prevent additional damages to Marquee.

## COUNT FOUR
## BREACH OF CONTRACT (EMPLOYMENT AGREEMENT)
## AS TO DR. WINFREE

77.     Plaintiffs incorporate herein by reference all previous allegations of this Amended Complaint as if the same were fully set forth in this paragraph.

78.     The Employment Agreement is a valid and enforceable contract supported by adequate consideration.

79.     Thereunder, Dr. Winfree made a variety of promises, representations, and warranties, as detailed herein, including agreeing to certain restrictive covenants and the non-disparagement clause.

80.     Despite so promising, as set forth *supra*, Dr. Winfree has breached and/or continues to breach these obligations.

81.     For example, Dr. Winfree failed to devote all of his professional time and effort to TN Dental and failed to use TN Dental personnel, space, equipment, supplies and other items solely for the purpose of providing professional dental services. Instead, Dr. Winfree treated patients off the books and took payments that were diverted away from TN Dental.

82.     Moreover, as detailed herein, Dr. Winfree has breached the non-solicit, non-competition, and other provisions of the Employment Agreement. At a minimum, Dr. Winfree has been disparaging Plaintiffs in violation of the Employment Agreement and soliciting or attempting to solicit patients in violation of the Employment Agreement.

83.     As a result of these breaches, TN Dental has been damaged in an amount to be determined at trial.  Dr. Winfree is liable for these damages and is subject to injunctive relief to prevent additional damages to TN Dental.

## COUNT FIVE
## FRAUD AS TO DR. WINFREE

84.     Plaintiffs incorporate herein by reference all previous allegations of this Amended

Complaint as if the same were fully set forth in this paragraph.

85.     In conjunction with the negotiation of the APA, Dr. Winfree disclosed false

information to Marquee about the financial circumstances of the Winfree P.C., as detailed above.

When Dr. Winfree made these representations, he did so with knowledge of their falsity.

86.     Dr. Winfree's false statements concerned facts material to the negotiation of the

APA.

87.     Dr. Winfree intended for his false statements to induce Marquee to sign the APA.

88.     Marquee had no reason to know that Dr. Winfree's statements and the financial

information he disclosed were false, and it reasonably relied thereupon. As a result, Marquee

signed the APA resulting in significant harm to it in an amount to be proven at trial. But for Dr.

Winfree's false statements, Marquee would not have signed the APA. In addition, because Dr.

Winfree acted intentionally and fraudulently, Marquee is entitled to an award of punitive

damages.

## COUNT SIX
## BREACH OF FIDUCIARY DUTY AS TO DR. WINFREE

89.     Plaintiffs incorporate herein by reference all previous allegations of this Amended

Complaint as if the same were fully set forth in this paragraph.

90.     Pursuant to Tennessee law, during his employment with TN Dental, Dr. Winfree

owed a fiduciary duty of loyalty to TN Dental to act solely for the benefit of TN Dental in

matters within the scope of his employment. Dr. Winfree was also required to refrain from

conduct that was adverse to TN Dental's interests.

91.     Dr. Winfree breached this fiduciary duty by, among other things, diverting money from TN Dental into his and his wife's pockets and by various other actions as more fully described herein.

92.     As a result of these breaches, TN Dental has been damaged in an amount to be determined at trial.  In addition, because Dr. Winfree acted intentionally, fraudulently, and/or recklessly, TN Dental is entitled to an award of punitive damages.

**COUNT SEVEN**
**BREACH OF FIDUCIARY DUTY AS TO MRS. WINFREE**

93.     Plaintiffs incorporate herein by reference all previous allegations of this Amended Complaint as if the same were fully set forth in this paragraph.

94.     Pursuant to Tennessee law, during her employment with Marquee, Mrs. Winfree owed a fiduciary duty of loyalty to Marquee to act solely for the benefit of Marquee in matters within the scope of her employment. Mrs. Winfree was also required to refrain from conduct that was adverse to Marquee's interests.

95.     Mrs. Winfree breached this fiduciary duty by, among other things, helping divert money from Marquee into her and her husband's pockets and various other actions as more fully described herein.

96.     As a result of these breaches, Marquee has been damaged in an amount to be determined at trial. In addition, because Mrs. Winfree acted intentionally, fraudulently, and/or recklessly, Marquee is entitled to an award of punitive damages.

**COUNT EIGHT**
**CIVIL CONSPIRACY AS TO THE WINFREES**

97.     Plaintiffs incorporate herein by reference all previous allegations of this Amended Complaint as if the same were fully set forth in this paragraph.

4811-9619-0102.2-9619-0102.2

20

98.     The Winfrees have engaged in, and are engaging in, a civil conspiracy to (1) mislead Plaintiffs into purchasing the Practice for much more than it was actually worth; (2) divert funds from Plaintiffs by seeing patients off the books; (3) wrongfully induce TN Dental's patients to terminate their relationships with the TN Dental; (4) misappropriate TN Dental's confidential and proprietary information and trade secrets; and (5) utilize such misappropriated information to do TN Dental harm, take its patients, and destroy its reputation.

99.     The Winfrees were and are aware of each other's intent to engage in this civil conspiracy, and both have taken overt actions in furtherance of this conspiracy.

100.    The Winfrees are liable to TN Dental for all damages caused by any and all conduct in furtherance of this conspiracy.

**COUNT ELEVEN**
**INTENTIONAL INTERFERENCE WITH**
**BUSINESS RELATIONS AS TO MRS. WINFREE**

101.    Plaintiffs incorporate herein by reference all previous allegations of this Amended Complaint as if the same were fully set forth in this paragraph.

102.    TN Dental has business relationships with the Practice's patients of which Mrs. Winfree was aware.

103.    Without justification, Mrs. Winfree spread lies and misinformation intended to induce those patients to terminate their relationships with the TN Dental.

104.    Mrs. Winfree's intentional and malicious conduct proximately caused many of the TN Dental's patients to terminate their relationships with TN Dental.

105.    Tennessee Code Annotated Section 47-50-109 provides:

Procurement of breach of contracts unlawful -- Damages. -- It is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of

4811-9619-0102.2-9619-0102.2

21

such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract.  The party injured by such breach may bring suit for the breach and for such damages.

106.    Mrs. Winfree is liable for treble damages under the statute resulting from her actions.

107.    Mrs. Winfree is also liable for common law interference with business relationships and, because her actions were intentional and malicious, Plaintiffs are entitled not only to actual damages but also punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

1.    That a jury of six or, alternatively, the smallest permissible number of jurors be empaneled;

2.    That the Court issue a permanent injunction enjoining Dr. Winfree from further violating the terms of the APA and the Employment Agreement;

3.    That the Court issue a permanent injunction enjoining Mrs. Winfree from further interfering with TN Dental's relationships with its patients and disparaging the TN Dental's and Marquee's reputation;

4.    That the Court issue a permanent injunction requiring the Winfrees to preserve all records of any kind, specifically including any and all computer records or data, including but not limited to, information and records related to Plaintiffs and their business, their employees, or their patients, the Winfrees's contact and/or solicitation of those employees and patients, or other records in any way related to any actions or conduct by the Winfrees which are the subject of this Amended Complaint;

5.    That upon final hearing of this cause, the Winfrees be ordered permanently to

4811-9619-0102.2-9619-0102.2

22

adhere to the above-described injunctions and other relief embodying the provisions prayed for, together with such further equitable relief as the Court finds just and proper;

6.     That the Winfrees be ordered to account for, disgorge and pay to Plaintiffs all of the monies they received or will receive as a result of their unlawful acts complained of in this Amended Complaint, including the solicitation or service of TN Dental's patients;

7.     That Dr. Winfree be ordered to pay Plaintiffs its actual damages for any breach of contract, as shown by the proof;

8.     That the Winfrees be ordered to pay Plaintiffs double damages for misappropriation of trade secrets;

9.     That the Winfrees be ordered to pay Plaintiffs treble damages for their interference with TN Dental's relationships with its patients;

10.     That the Winfrees be ordered to pay Plaintiffs punitive damages in an amount sufficient to deter such conduct in the future;

11.     That the Winfrees be ordered to pay Plaintiffs interest;

12.     That Dr. Winfree be ordered to pay Plaintiffs their attorneys' fees and expenses; and

13.     That Plaintiffs be awarded such other relief that this Court deems just and equitable.

4811-9619-0102.2-9619-0102.2

WALLER LANSDEN DORTCH & DAVIS, LLP

By: s/ John E. Haubenreich
Aron Z. Karabel (BPR 031828)
John E. Haubenreich (BPR 29202)
Taylor J. Askew (BPR 33193)
511 Union Street, Suite 2700
Nashville, Tennessee 37219-8966
(615) 244-6380
aron.karabel@wallerlaw.com
john.haubenreich@wallerlaw.com
taylor.askew@wallerlaw.com

*Attorneys for Plaintiffs TN Dental Professionals,*
*P.C. and CPF Dental, LLC d/b/a Marquee Dental*
*Partners*

## CERTIFICATE OF SERVICE

I certify that the foregoing document has been served on the following on September 16, 2019, as follows:

Fred C. Statum III (BPR No. 14495)
J. Caralisa Connell (BPR No. 36298)
MANIER & HEROD P.C.
1201 Demonbreun Street, Suite 900
Nashville, TN 37203
(615) 244-0030
fstatum@manierherod.com
cconnell@manierherod.com

*Attorneys for Defendants Robert*
*and Olivia Winfree*

s/ John E. Haubenreich

4811-9619-0102.2-9619-0102.2

E-FILED
3/16/2018 2:47 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("Agreement") is dated as of December 16, 2015, by and among CPF Dental, LLC, a Delaware limited liability company d/b/a Marquee Dental Partners ("Buyer"), Robert T. Winfree, D.D.S., P.C., a Tennessee professional corporation ("Seller"), and Robert T. Winfree, D.D.S., an individual residing in the State of Tennessee ("Owner").

### RECITALS:

A.       Seller owns and operates a dental practice (the "Practice") located at 4243 Lebanon Pike, Hermitage, Tennessee 37076 (the "Location"), and Owner owns and holds 100% of the issued and outstanding capital stock or other equity interests in Seller.

B.       Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the Purchased Assets (as defined below) on the terms and conditions set forth herein.

C.       Certain capitalized terms used in this Agreement without definition have the meaning ascribed to them in **Exhibit A** hereto (which is incorporated herein by reference).

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.       **Purchase and Sale of Purchased Assets**.   In reliance upon the representations and warranties, and upon the terms and subject to the conditions, set forth herein:

(a)       **Purchase of Purchased Assets**.   Seller agrees to sell, transfer, convey, assign and deliver to Buyer, and Buyer agrees to purchase from Seller, at the Closing all of Seller's assets, properties, rights and interests, whether real, personal or mixed, tangible or intangible, and all of Seller's and Owner's respective rights, title and interest therein and thereto, other than and excluding the Excluded Assets (as defined below), free and clear of all Liens and Encumbrances (collectively, the "Purchased Assets"). The Purchased Assets include but are not limited to all of the following assets of Seller (other than the Excluded Assets):

(i)       All tangible personal property, including all equipment, furnishings, computers, furniture, fixtures, leasehold improvements, devices, instruments, inventory, supplies, drugs (other than controlled substances and other pharmaceuticals that Seller is prohibited from transferring or conveying to Buyer under applicable Laws) and other disposables, consumables and similar materials, including those in transit as of the Closing;

(ii)       All intangible personal property, including all goodwill, trade secrets, proprietary or confidential information, domain names, websites, web pages, social network profiles and pages (including for Facebook® and Twitter®), e-mail addresses, telephone numbers, software, trademarks, tradenames and other Intellectual Property (including the name "Winfree & Denton" and all variations and derivations thereof and the domain name www.winfreeanddenton.com); and all documentary evidence thereof, rights under warranties, indemnities or similar rights against third parties relating to the Purchased Assets,

(iii)       All accounts receivable and all notes receivable, negotiable instruments, chattel paper and other rights to receive payments from any Person, and all prepaid amounts, expenses, credits and security and other deposits; and all books, records, files, lists, manuals, advertising and promotional materials, and, to the extent lawfully assignable to Buyer, all licenses, permits, franchises and similar items; and

4848-3594-1674.9
12162015

(iv)    All Contracts identified on **Exhibit B-1** hereto (the "Assigned Contracts"), the real property lease for the Location identified on the Office Lease Assignment Agreement (the "Assigned Office Lease") and the equipment lease identified on **Exhibit B-2** hereto (the "Assigned Equipment Lease" and, collectively with the Assigned Contracts and Assigned Office Lease, the "Assigned Contracts and Leases").

(b)    **Excluded Assets.**  The Purchased Assets will not include any of the following assets of the Seller (collectively, the "Excluded Assets"): (i) cash and cash equivalents as of immediately prior to the Closing; (ii) minute books and stock ledger; (iii) insurance policies and insurance premium refunds; (iv) retirement, pension and other employee benefit plans; (v) the Professional Assets; (vi) Seller's rights and benefits under this Agreement; (vii) Seller's automobiles; (viii) Seller's personal plaques; and (ix) the assets, if any, specifically identified on **Exhibit C** hereto.

(c)    **Bill of Sale.**  At the Closing, Seller shall convey to Buyer good and marketable title to the Purchased Assets, evidenced by delivery of a general bill of sale and assignment, executed by Seller, in substantially the form and substance of **Exhibit D** hereto (the "Bill of Sale"), and such other recordable instruments of assignment, transfer and conveyance as Buyer may request.

(d)    **Assumed Liabilities.**  At the Closing, Seller shall assign to Buyer, and Buyer shall only assume and become responsible for, the future payment and performance of obligations of Seller (i) arising after the Closing under the Assigned Contracts and Leases (excluding any uncured defaults for periods prior to the Closing and unpaid amounts that arose prior to the Closing) (the "Assumed Post-Closing Liabilities") and (ii) for certain trade payables and accrued but unpaid payroll obligations of the Company to the extent set forth in **Exhibit E-1** hereto and reflected as a current liability in the purchase price adjustment pursuant to Section 3 below (the "Assumed Pre-Closing Liabilities" and, collectively with the Assumed Post-Closing Liabilities, the "Assumed Liabilities"), which shall be evidenced by the execution and delivery by Seller and Buyer at the Closing of an assignment and assumption agreement, executed by such Parties, in substantially the form and substance of **Exhibit E-2** hereto (the "Assignment and Assumption Agreement"). Buyer does not and shall not assume or undertake to pay, satisfy, discharge or perform (and shall not be deemed to have assumed or so undertaken) any obligation, expense, Tax, Indebtedness or other Liability of Seller, including any defaults or breaches that occur or arise prior to the Closing and any unpaid or other amounts owed, accrued or owing thereunder that arose prior to the Closing, and for the avoidance of doubt excluding any Liability or obligation for payroll, wages, salaries, bonuses, paid-time-off, severance obligations or other compensation earned, incurred or accrued at or prior to the Closing or any related social security, unemployment, Medicare and other payroll taxes (whether or not pending, threatened, contingent, known or unknown) (collectively, the "Excluded Liabilities"), other than the Assumed Liabilities, and all of the Excluded Liabilities shall be retained by and be the responsibility of Seller.

(e)    **Transfer of Professional Assets to New PC.**  In addition, at the Closing, for an aggregate purchase price of One Thousand Dollars ($1,000.00) and other valuable consideration, Seller will transfer, assign, convey and deliver to TN Dental Professionals, P.C., a Tennessee professional corporation (the "New PC"), and the New PC will accept and assume, all of the Professional Assets and Seller's and Owner's rights, title and interest therein and thereto, and Seller shall convey to the New PC good and marketable title to the Professional Assets, free and clear of any Liens and Encumbrances, all pursuant to a Professional Assets Bill of Sale and Assignment  Agreement in substantially the form and substance of **Exhibit F** hereto (the "Professional Assets Bill of Sale and Assignment"), and such other recordable instruments of assignment, transfer and conveyance as New PC may request, between Seller and New PC to be entered into by the parties concurrently with the execution and delivery of this Agreement. At the Closing, the New PC will assume the future payment and performance of obligations of Seller arising after the Closing under the Professional Assets (excluding any defaults or breaches that occur or arise prior to the Closing and any unpaid or other amounts owed, accrued or owing thereunder that arose at or prior to the Closing).

4848-3594-1674.9

12162015

2

2.    **Purchase Price.**  The total consideration for the purchase and sale of all of the Purchased Assets, and the other covenants, agreements, conveyances and assignments set forth herein, shall be the aggregate sum of One Million, Six Hundred Seventy-Five Thousand Dollars ($1,675,000) (the "Purchase Price"), which shall be subject to the Working Capital Adjustment and the terms and conditions for payment of the Earn-out Payments as provided in Section 3 below, and payable as follows:

(a)    To Pinnacle National Bank, as escrow agent (the "Escrow Agent"), the sum of One Hundred Fifty Thousand, Seven Hundred Fifty Dollars ($150,750) (the "Escrow Amount") to be held in escrow and administered by the Escrow Agent in accordance with and subject to the terms and conditions of an escrow agreement among Buyer, Owner and the Escrow Agent, executed by such parties, in substantially the form and substance of **Exhibit G** hereto (the "Escrow Agreement");

(b)    To the applicable lender(s) or lessor(s), an aggregate amount equal to all outstanding Indebtedness of Seller as of immediately prior to the Closing (the "Closing Indebtedness");

(c)    To the appropriate Persons, an aggregate amount equal to the fees and expenses of any brokers, investment bankers, attorneys, accountants, financial advisors and other advisors incurred by Seller or Owner, and any bonuses payable by Seller or Owner, in connection with this Agreement or the Closing or transactions contemplated herein, in each case that are unpaid immediately prior to the Closing (collectively, the "Transaction Expenses");

(d)    To Owner, an aggregate amount (the "Closing Payment") equal to: (i) One Million, Five Hundred Seven Thousand, Five Hundred Dollars ($1,507,500.00); *minus* (iii) the Escrow Amount; *minus* (iv) the Closing Indebtedness; and *minus* (v) the Transaction Expenses; and

(e)    To Owner, at such times as provided in Section 3(b), with respect to each Earn-Out Calculation Period the sum of Eighty-Three Thousand, Seven Hundred Fifty Dollars ($83,750.00) (each, an "Earn-out Payment"), if and only if the Adjusted EBITDA for such Earn-Out Calculation Period exceeds Four Hundred Nine Thousand Dollars ($409,000.00).

(f)    The Purchase Price shall be allocated among the Purchased Assets for income Tax purposes as set forth on **Exhibit H** hereto.  The Parties agree to report such allocation on IRS Form 8594 for federal income tax purposes in a manner consistent with such **Exhibit H**.  Such allocation shall serve no evidentiary purpose in connection with any claim relating to a breach or alleged breach of the restrictive covenants set forth in Section 8.

3.    **Purchase Price Adjustment.**

(a)    **Working Capital Adjustment.**

(i)    First Working Capital Calculation.  Within 120 days after the Closing Date, Buyer shall determine the amount of the First Working Capital Adjustment, and provide the Owner a written statement setting forth the determination of Buyer (the "First Closing Statement").  Owner may notify Buyer of any good faith objections to the First Closing Statement as set forth in Section 3(c) below. If Owner does not provide Buyer with a Notice of Objection to the First Closing Statement within the time period required under Section 3(c) below, then the First Closing Statement shall become the final, conclusive and binding calculation of the amount of the Working Capital Adjustment and Closing Payment reflected therein (the "Final First Closing Statement").  If Buyer does receive a Notice of Objection to the First Closing Statement from Owner within the time period required under Section 3(c) below, any items not specifically objected to in the Notice of Objection shall be deemed final, binding and conclusive upon the Parties.  Within five Business Days after final determination of the Final First Closing Statement (whether pursuant to Section 3(a)(i) or 3(d)), if the First Working Capital Adjustment is a positive number, then Buyer shall pay the amount of the First Working Capital Adjustment to the Owner by wire transfer of immediately available funds.  If the First Working Capital Adjustment is a

4848-3594-1674 9

3

12162015

negative number, then it shall be addressed in the Second Working Capital Calculation as provided below.

(ii)     Second Working Capital Calculation. Within 180 days after the Closing Date, Buyer shall determine the amount of the Second Working Capital Adjustment, and provide the Owner a written statement setting forth the determination of Buyer (the "Second Closing Statement"). Owner may notify Buyer of any good faith objections to the Second Closing Statement as set forth in Section 3(c) below. If Owner does not provide Buyer with a Notice of Objection to the Second Closing Statement within the time period required under Section 3(c) below, then the Second Closing Statement shall become the final, conclusive and binding calculation of the amount of the Working Capital Adjustment and Closing Payment reflected therein (the "Final Second Closing Statement"). If Buyer does receive a Notice of Objection to the Second Closing Statement from Owner within the time period required under Section 3(c) below, any items not specifically objected to in the Notice of Objection shall be deemed final, binding and conclusive upon the Parties. Within five Business Days after final determination of the Final Second Closing Statement (whether pursuant to Section 3(a)(ii) or 3(d)), if (i) the Second Working Capital Adjustment is a positive number, then Buyer shall pay the amount of the Second Working Capital Adjustment to the Owner by wire transfer of immediately available funds, or (ii) if the Second Working Capital Adjustment is a negative number, then the Owner shall pay the absolute value of the Second Working Capital Adjustment to Buyer by wire transfer of immediately available funds.

(b)     **Earn-out.**

(i)     Earn-out Calculation. Following each Earn-Out Calculation Period, on or before the date (each, an "Earn-out Calculation Delivery Date") which is the earlier of (i) five days after the completion of the audit of Buyer's annual financial statements for the immediately preceding year or (ii) ninety (90) days after the last day of such Earn-Out Calculation Period, Buyer shall prepare and deliver to Seller a written statement (in each case, an "Earn-out Calculation Statement") setting forth in reasonable detail its determination of Adjusted EBITDA for the applicable Earn-Out Calculation Period and its calculation of the resulting Earn-out Payment (in each case, an "Earn-out Calculation"). If Owner does not provide Buyer with a Notice of Objection to the Earn-out Calculation Statement within the time period required under Section 3(c) below, then such Earn-out Calculation Statement shall become the final, conclusive and binding calculation of the amount of the Earn-out Payment reflected therein. If Buyer does receive a Notice of Objection to the Earn-out Calculation Statement from Owner within the time period required under Section 3(c) below, any items not specifically objected to in the Notice of Objection shall be deemed final, binding and conclusive upon the Parties.

(ii)     Purchase Price Adjustment. Within five Business Days after final determination of any Earn-out Calculation Statement (whether pursuant to Section 3(b)(i) or 3(d)), Buyer shall pay the applicable Earn-out Payment, if any, to Owner by wire transfer of immediately available funds.

(iii)     Independence of Earn-out Payments. Buyer's obligation to pay each of the Earn-out Payments to Owner in accordance herewith is an independent obligation of Buyer and is not otherwise conditioned or contingent upon the satisfaction of any conditions precedent to any preceding or subsequent Earn-out Payment and the obligation to pay an Earn-out Payment to Owner shall not obligate Buyer to pay any preceding or subsequent Earn-out Payment. For the avoidance of doubt and by way of example, if the conditions precedent to the payment of the Earn-out Payment for the first Earn-Out Calculation Period are not satisfied, but the conditions precedent to the payment of the Earn-out Payment for the second Earn-Out Calculation Period are satisfied, then Buyer would be obligated to pay such Earn-out Payment for the second Earn-Out Calculation Period for which the corresponding conditions precedent have been satisfied, and not the Earn-out Payment for the first Earn-Out Calculation Period.

4848-3594-1674.9

4

12162015

(iv)     Post-closing Operations.  Subject to the terms of this Agreement and the Ancillary Agreements, Buyer shall have sole discretion with regard to all matters relating to the operation of its business; provided, that Buyer shall not, directly or indirectly, take any actions in bad faith that would have the purpose of avoiding or reducing any of the Earn-out Payments hereunder. Notwithstanding the foregoing, Buyer has no obligation to operate its Business in order to achieve any Earn-out Payment or to maximize the amount of any Earn-out Payment.

(v)     Right of Set-off. Buyer shall have the right to withhold and set off against any amount otherwise due as an Earn-out Payment the amount of any Losses to which any Buyer Indemnified Party may be entitled under Section 7 of this Agreement or any other Ancillary Agreement.

(vi)     No Security.  The parties hereto understand and agree that (A) the contingent rights to receive any Earn-out Payment shall not be represented by any form of certificate or other instrument, are not transferable, except by operation of Laws relating to descent and distribution, divorce and community property, and do not constitute an equity or ownership interest in Buyer or New PC, (B) neither Seller nor Owner shall have any rights as a securityholder of Buyer or New PC as a result of Owner's contingent right to receive any Earn-out Payment hereunder and (C) no interest is payable with respect to any Earn-out Payment.

(c)     **Objection Procedures**.  If Owner disagrees in good faith with Buyer's determination of any of the items on the Closing Statement or the Earn-out Calculation Statement, Owner shall notify Buyer in writing prior to 5:00 p.m. Central Time on the day that is 30 days immediately following the date on which the Owner is given the Closing Statement or the Earn-out Calculation Statement, as applicable, to which Owner objects, including in reasonable detail the Owner's basis for the disagreement and the Owner's determination of the amount or amounts in dispute ("Notice of Objection").

(d)     **Dispute Resolution**. Following Buyer's receipt of any Notice of Objection (if applicable), Buyer and Owner shall negotiate in good faith to attempt to resolve such dispute for a period of 60 days.  If Buyer and Owner fail to agree within 60 days after Owner's delivery, if any, to Buyer of a Notice of Objection, then Buyer and Owner shall jointly engage and submit such disputed determination to the Nashville, Tennessee area office of BKD, LLP or, if such firm is unable or unwilling to be so engaged, such other accounting firm as the parties shall mutually agree (such applicable firm, the "Accounting Firm") for computation or verification in accordance with the provisions of this Agreement. The Accounting Firm shall review the items in dispute and shall, within 60 days following their engagement (or within the shortest time frame as the Accounting Firm shall agree), decide the proper amounts of such disputed items (which decision shall also include a calculation of the amounts on the Final Closing Statement).  The scope of the Accounting Firm's review shall be limited solely to the resolution of the then unresolved objections raised by the Owner in the Notice of Objection.  Submission of the disputed matter to the Accounting Firm shall be the exclusive remedy for resolving disputes related to the determination of the Final Closing Statement or any Earn-out Calculation Statement. The Accounting Firm's determination shall be final and binding upon the Parties and the Owner. The fees and expenses of the Accounting Firm shall be allocated between and borne by Buyer, on the one hand, and the Owner, on the other, equal to the proportion of the dollar value of the disputed amounts determined in favor of the other Party by the Accounting Firm.

4.     Closing.

(a)     **Closing Date and Place**.  The closing of the transactions contemplated hereby (the "Closing") will take place remotely by electronic mail, facsimile or other electronic exchange of documents, among and between the Parties and their respective counsel, at the offices of Waller Lansden Dortch & Davis, LLP in Nashville, Tennessee, simultaneously with the execution and delivery of this Agreement by each of the Parties hereto or at such other time and place as the Parties may agree in writing (the "Closing Date").  The Parties agree that should the Closing occur, the effective time and date

4848-3594-1674.9

12162015

5

of the transactions shall be 12:00:01 a.m. Central Time on the Closing Date. All deliveries, payments and other transactions and documents relating to the Closing shall not be effective unless and until all are effective (or waived in writing by the applicable Party), and shall be deemed to be consummated simultaneously.

(b)      **Events to Occur at the Closing**. In addition to the actions to be taken pursuant to Sections 1 through 3, at or prior to the Closing:

(i)      Repayment of Debt and Payoff Letters. Seller shall repay and satisfy (or cause to be repaid and satisfied) in full all outstanding Indebtedness of or guaranteed by Seller, if any, or secured by or encumbering any of the Purchased Assets or Professional Assets, and Seller will cause all security interests and other Liens and Encumbrances encumbering any of the Purchased Assets or Professional Assets to be terminated and UCC-3 releases or termination statements or other lien discharging documents to be properly recorded or to be promptly recorded to the satisfaction of Buyer and its legal counsel. Prior to Closing Date, Seller shall deliver to Buyer payoff letters and payment instructions, in form and substance satisfactory to Buyer, from each of the applicable lenders or lessors in respect of such Indebtedness.

(ii)      Transaction Expenses. Seller shall repay and satisfy (or cause to be paid or satisfied) in full all Transaction Expenses. Prior to the Closing Date, Seller shall deliver to Buyer payment amounts and instructions in respect of the Transaction Expenses.

(iii)      Satisfaction of Pre-Closing Payroll. At or prior to the Closing, Seller shall satisfy and pay in full all of its payroll, wages, salaries, bonuses, paid-time-off, severance obligations and other compensation earned, incurred or accrued prior to the Closing, and all related social security, unemployment, Medicare and other payroll taxes.

(iv)      Deliveries by Seller. Seller and Owner shall deliver the following documents to Buyer (collectively, the "Seller Closing Deliverables"):

(A)      Seller Officer Certificate. A certificate or certificates dated as of the Closing Date and duly executed by Owner, substantially in the form and substance of **Exhibit I** hereto;

(B)      Non-Foreign Person Affidavit. A non-foreign person affidavit, substantially in the form and substance of **Exhibit J** hereto, duly executed by Owner and an authorized officer of Seller;

(C)·      Bill of Sale and Assignment and Assumption Agreement. Each of the Bill of Sale and Assignment and Assumption Agreement, in each case duly executed by Owner and an authorized officer of Seller;

(D)      Escrow Agreement. The Escrow Agreement, duly executed by Owner and an authorized officer of Seller and duly executed on behalf of the Escrow Agent;

(E)      Payoff Letters. Customary payoff letters or similar documentation with respect to all Closing Indebtedness;

(F)      Employment Agreements. An employment agreement between Owner and New PC, substantially in the form and substance of **Exhibit K** hereto (the "Winfree Employment Agreement"), duly executed by Owner, and an employment agreement between Gregory S. Denton, D.D.S. and New PC, substantially in the form and substance of **Exhibit L** hereto (the "Denton Employment Agreement");

4848-3594-1674.9

6

12162015

(G)     Consents to Assignment.  Written consent to assignment, in form and substance satisfactory to Buyer and duly executed by the applicable counterparty(ies), to the assignment to New PC of (1) each of the Dentist Employment Agreements, (2) the Assigned Office Lease, substantially in the form and substance of **Exhibit M** hereto (the "Office Lease Assignment Agreement"), and (3) to the extent required under the terms and conditions thereof in connection with the transactions contemplated by this Agreement, to the assignment to Buyer of each of the Assigned Contracts and the assignment to New PC of any other Contracts included in the Professional Assets;

(H)     Transition Services Agreement.  A transition services agreement among Seller, Buyer and New PC, pursuant to which New PC would provide certain personnel to Seller and Buyer would provide certain business services and other personnel to Seller during a credentialing and enrollment transition period following the Closing, substantially in the form and substance of **Exhibit N** hereto (the "Transition Services Agreement"), and a related business associate agreement among such Parties, duly executed by Owner and an authorized officer of Seller;

(I)     Other Documents.  Such other documents as may be reasonably necessary to consummate the transactions contemplated by this Agreement as reasonably requested by Buyer, its counsel or New PC.

(v)     Deliveries by Buyer.  At the Closing, Buyer shall have delivered the following documents to Owner (collectively, the "Buyer Closing Deliverables"):

(A)     Officer's Certificate.  Certificate dated as of the Closing Date and duly executed by an authorized officer of Buyer, substantially in the form and substance of **Exhibit O** hereto ("Buyer Certificate");

(B)     Assignment and Assumption Agreement.  The Assignment and Assumption Agreement, duly executed by an authorized officer of Buyer;

(C)     Escrow Agreement.  The Escrow Agreement, duly executed by an authorized officer of Buyer, and executed on behalf of the Escrow Agent;

(D)     Employment Agreements.  The Employment Agreements, duly executed on behalf of New PC; and

(E)     Transition Services Agreement.  The Transition Services Agreement, duly executed on behalf of Buyer and New PC.

(vi)     Employment Transition.  As of the Closing, the employment relationship between Seller and all of its employees (including Owner) and their active participation in any of Seller's benefit plans shall cease, and Seller and Owner shall use their reasonable best efforts to cause all of such employees to become employees of Purchaser or New PC as applicable. Seller shall retain and be responsible for paying all of such employees for all wages, bonuses, paid-time-off and other compensation and benefits accrued or earned through the Closing, and all related taxes, contributions and other Liabilities, except for the Assumed Pre-Closing Liabilities.  Purchaser or New PC, as applicable, agree to pay the amounts set forth in **Exhibit P** attached hereto (the "Buyer Portion of Christmas Bonuses") to such employees or independent contractors of Purchaser or New PC as set forth therein. For the avoidance of doubt, nothing in this Agreement shall be deemed to (A) limit the right of Buyer or New PC to terminate the employment of any Person at any time, or to withhold any offer of employment to any Person, in their respective sole discretion (other than as expressly set forth under the Employment Agreements), (B) create or grant any third-party beneficiary, employment or other rights to any Person or (C) constitute the establishment or adoption of, or amendment to, any employee benefit plan, or provide any third party any claim or cause of action in respect of any provision of this Agreement as it relates to any employee benefit plan or otherwise.

4848-3594-1674.9

7

12162015

(c)      **Bank Accounts.**  Upon request by Buyer, Seller shall execute and deliver all signature cards and other documentation, and cooperate with Buyer, to effectuate all changes in the bank accounts of Seller to allow Buyer to sweep the bank accounts of Seller, as reasonably requested by Buyer, during the term of the Transition Services Agreement.

(d)      **Use of Name.**  Seller shall not include the words or letter combinations "Winfree" or "Denton" or any variant thereof as a trade name, fictitious name or otherwise in the conduct of any trade or business for a period of five (5) years following the Closing (except as contemplated in the Transition Services Agreement, as defined below).  Notwithstanding the foregoing, except as expressly permitted by Buyer, Seller shall no longer use or include the words or letter combinations "Winfree & Denton" nor shall Seller or Owner use such name or combination thereof as a trade name, fictitious name or otherwise in the conduct of any trade or business following the Closing (except as contemplated in the Transition Services Agreement, as defined below).

(e)      **Prorations.**  The Parties shall prorate as of the Closing Date, including for purposes of the Working Capital Adjustment, the responsibility for payment of lease payments, property or ad valorem taxes on any of the Purchased Assets or Professional Assets, and the expense of any water, sewer, telephone, electricity, gas, Internet, cable or other utilities any other expenses which are normally prorated upon the sale of assets of a going concern with respect to the Business and the Practice.

(f)      **Misdirected Payments.**  If, following the Closing, any Payor, customer, patient, vendor, supplier or other third party misdirects goods or payments to Seller or Owner in respect of any Purchased Assets or Professional Assets, then Seller and Owner shall promptly notify Buyer and forward such misdirected goods or payments to Buyer.

(g)      **Further Acts and Assurances.**  Seller and Owner shall, upon request of Buyer from time to time upon and following the Closing, take any and all steps necessary to place Buyer and New PC in possession and operating control of the Purchased Assets and the Professional Assets, respectively, and will do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be required for transferring and confirming to Buyer or New PC or their respective successors or assigns, as applicable, or for reducing to possession, any or all of the Purchased Assets and Professional Assets, respectively.  Seller and Owner also shall cooperate with Buyer, New PC and their respective Affiliates and representatives after the Closing in furnishing information, evidence, testimony and other assistance in connection with any Action, proceeding, investigation or dispute of any nature with respect to matters or Taxes pertaining to periods prior to the Closing in respect of the Practice, the Business, the Purchased Assets or Professional Assets.

(h)      **Work In Progress.**  For any dental crown preparation services that have been rendered prior to the Closing Date for which only the seating of the dental crown shall be completed following the Closing Date, the following shall apply: Upon receipt of payment for the dental crown, eighty percent (80%) of the fee for the dental crown shall be attributed to Seller's Pre-Closing Accounts Receivable, and twenty percent (20%) of the fee for the dental crown shall be attributed to the Buyer's Post-Closing Accounts Receivable.

5.      **Representations and Warranties of Seller and Owner.**  As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller and Owner, jointly and severally, represent and warrant to Buyer as follows, except as described in reasonable detail in the corresponding section or subsection of the Disclosure Schedule attached hereto as **Exhibit Q** (the "Disclosure Schedule").

(a)      **Organization; Qualification.** Owner is a natural Person who resides in the State of Tennessee and is, and at all times during the period in which he has held any ownership interests in Seller has been, duly licensed to practice dentistry without restriction in the State of Tennessee.  Seller is

4848-3594-1674.9

8

12162015

a professional service corporation, duly organized, validly existing and in good standing under the laws of the State of Tennessee, and has full power and authority to carry on the Business as currently conducted and to own and lease the rights, properties and assets that it currently owns or leases, including the Purchased Assets and Professional Assets. Owner owns and holds, beneficially and of record, all of the issued and outstanding shares of capital stock or other equity or ownership interests in Seller, free and clear of any and all Liens, encumbrances, preemptive rights and other limitations or restrictions, and there are no outstanding, authorized or reserved options, warrants, convertible securities, agreements or rights to purchase any capital stock or other equity or ownership interests in Seller. Seller does not do business in any jurisdiction other than the State of Tennessee and is not required to do business as a foreign corporation or limited liability company in any jurisdiction. Seller has provided Buyer with true, correct and complete copies of Seller's formation, organizational and governing documents, and minutes of meetings of Seller's board of directors and shareholders or actions by written consent, and stock ledger. Seller does not own or hold any shares of capital stock, membership interests or other equity or ownership interests in any other Person, and the Practice is operated solely through Seller and no other Person.

(b)    **Authority and Validity**.  Each of Seller and Owner has full power, authority and legal capacity to execute, deliver and perform their obligations under this Agreement and under each of the other Contracts and documents to be executed and delivered by such Party.  This Agreement and the Ancillary Agreements and other documents to be executed and delivered by Seller or Owner in connection herewith have been duly authorized, executed and delivered by each of Seller and Owner and, to the extent required, its board of directors, managers, shareholders, members or trustees, as applicable, and do not require any further authorization or consent, and are the legal, valid and binding obligations of each of Seller and Owner, enforceable against such Party in accordance with their respective terms.

(c)    **No Conflicts or Required Consents**.  Section 5(c) of the Disclosure Schedules sets forth each consent, approval or waiver required under the terms and conditions of the Assigned Contracts and Leases, and any other Contracts or leases of Seller in connection with the transactions contemplated by this Agreement.  The execution, delivery and performance by Seller and Owner of this Agreement and the Ancillary Agreements and other documents to be executed and delivered by such Party in connection herewith, and the consummation by Seller and Owner of the transactions contemplated hereby and thereby, do not and will not: (i) require the consent of or notice to any Governmental Authority; (ii) conflict with or result in a violation of any Law, order or injunction of any court or Governmental Authority to which Seller or Owner is subject or bound; (iii) conflict with or result in a violation of any of the terms of the Seller's or Owner's respective articles of incorporation, bylaws or other formation, organizational or governing documents, or any amendments thereto; nor (iv) violate, conflict with, result in a breach of or default under (with or without notice or lapse of time or both), require notice, filing, consent or other action under, or accelerate or permit the termination or acceleration of any performance required by the terms of any Contract, lease, license or permit to which Seller or Owner is a party or by which Seller or Owner is bound, nor result in the creation of any Lien or Encumbrance upon any of the assets of Seller or Owner.

(d)    **Financial Statements; No Undisclosed Liabilities**.  Seller has provided Buyer with true, correct and complete copies of the unaudited balance sheet, income statement and other financial statements of Seller as of and for the 12 months ended December 31, 2012, 2013 and 2014, and as and for the eight months ended August 30, 2015 (collectively, the "Financial Statements"), each of which presents fairly the assets, liabilities and financial condition of Seller as of such dates and the results of operations and cash flows of Seller for such periods, in each case on a cash basis, and are consistent with the books and records of Seller and represent only actual, bona fide transactions. Attached as **Section 5(d)-1** of the Disclosure Schedules is a true, correct and complete copy of the Financial Statements.  The Financial Statements do not reflect the assets, liabilities or operations of any other Person other than Seller.  Seller has no Liabilities of any nature except as disclosed in **Section 5(d)-2** of the Disclosure Schedules or that were incurred since August 30, 2015 in the ordinary course of business consistent with past practice and that are not material individually or in the aggregate.

4848-3594-1674.9

9

12162015

(e)   **Absence of Recent Changes**.   Since December 31, 2014, Seller and the Practice have operated only in the ordinary course of business consistent with past practice, and, except as disclosed in **Section 5(e)** of the Disclosure Schedules, Seller has not:

(i)   Suffered any event or condition that has had, or is reasonably likely to have, a material adverse effect on Seller or the Practice or their financial condition, assets, Liabilities, business, operations or prospects, or the ability of Seller or Owner to perform any of their obligations under this Agreement or the Ancillary Agreements;

(ii)   Sold, disposed of or otherwise transferred any of its rights or assets, other than inventory in the ordinary course of business consistent with past practice, or suffered any material damage, loss, destruction or eminent domain taking of any assets, or made aggregate capital expenditures or commitments in excess of $2,500.00;

(iii)   Increased any salaries, wages or benefits or made any arrangement or entered into any Contract for the payment of any bonus, special compensation or severance to any employee, independent contractor or consultant, other than immaterial amounts in the ordinary course of business consistent with past practice, or hired, committed to hire or terminated any employee, independent contractor or consultant, or received notice that any employee, independent contractor or consultant has resigned or threatened to resign; or entered into or amended any employment, independent contractor, consulting, severance or similar agreement;

(iv)   Terminated or amended any material Contract, Permit or other instrument or business arrangement or suffered any loss or termination, or, to the Knowledge of Seller, threatened loss or termination, of any material Contract, Permit, instrument or business arrangement, entered into any commitments or transactions involving aggregate value in excess of $2,500.00, or opened, terminated or closed any office location or line of business;

(v)   Delayed or postponed the payment of trade payables, accounts payable, payroll, wages, benefits, Taxes and other obligations, or accelerated the collection or payment of accounts receivable, except in the ordinary course of business consistent with past practice; or

(vi)   Agreed to take any action described in this Section 5(e).

(f)   **Litigation and Claims**.   Except as disclosed in **Section 5(f)** of the Disclosure Schedules, there is, and has been, no Action pending or, to the Knowledge of Seller, threatened against Seller or any Affiliate, shareholder, director, officer, employee or independent contractor thereof in their capacities as such or relating to Seller, at law or in equity before any court, arbitration tribunal or Governmental Authority, and there is no reasonable basis therefor. There are no judgments against or orders or consent decrees binding on Seller or on any Affiliate, shareholder, director, officer, employee or independent contractor of Seller in their capacity as such or relating to Seller.

(g)   **Compliance with Laws; Permits**.

(i)   Seller is, and has been, in compliance in all material respects with all applicable Laws, orders and decrees, including all Healthcare Laws, and Seller and Owner have not received or been served with any search warrant, subpoena, civil investigative demand, contact letter or other notice alleging any violation of any Law by Seller or Owner. Seller and Owner are not subject to any fine, penalty, Liability or disability as a result of a failure to comply with any requirement of any applicable Law, order, injunction or decree, or any other requirement of any Governmental Authority or court, and Seller and Owner have not received any notice of such noncompliance.

4848-3594-1674.9

12162015

10

(ii)     Neither Owner or Seller nor any of its directors, officers, agents, employees, independent contractors, shareholders or Affiliates or any other Persons acting on its behalf have, in their capacity with or on behalf of Seller: (A) used or committed to use any corporate or other funds for unlawful contributions, payments, gifts or entertainment, or made or committed to make any unlawful expenditures relating to political activity to government officials or others or established or maintained any unlawful or unrecorded funds; (B) accepted or received any unlawful contributions, payments, expenditures or gifts; or (C) established or maintained any fund or asset that has not been recorded in the books and records of Seller.

(iii)     Seller has in effect all federal, state and local permits, certificates, licenses, registrations, accreditations, approvals and other authorizations ("Permits") necessary in the conduct and operation of their respective business and operations as currently conducted or the assets used therein, or to obtain payment for services provided by or on behalf of Seller. All of the Permits are in full force and effect, Seller is not in material breach or violation of, or default under, any such Permit. No basis exists which, with or without notice or lapse of time or both, would constitute any such breach, violation or default or grounds for a violation, order or deficiency, and no proceeding is pending or, to the Knowledge of Seller, threatened to revoke, refuse to renew, suspend or modify any such Permit or accreditation. **Section 5(g)** of the Disclosure Schedule hereto sets forth a true, correct and complete list of all of such Permits. Seller has not engaged in mobile dentistry or on-site dentistry, owned or operated any dental or other laboratory, sponsored or made available to patients any discount dental plan, nor engaged in the business of insurance.

(h)     **Healthcare Matters.**

(i)     Neither Seller nor Owner, nor any of Seller's independent contractors, employees or agents, is or has been (A) party to any contract, lease, joint venture or other arrangement with any health care provider or immediate family member thereof, or other Person who is in a position to make or influence referrals to or otherwise generate business for Seller, except in compliance in all material respects with applicable Laws; (B) excluded, suspended or debarred from participation in any Government Program, or any federal or state governmental procurement or non-procurement program, nor is any such debarment, disqualification, suspension or exclusion pending or, to the Knowledge of Seller, threatened; (C) party to a Corporate Integrity Agreement or similar agreement with any Governmental Authority, or has any ongoing reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; or (D) a defendant in any *qui tam*, False Claims Act or similar Action, nor made any voluntary disclosure to any Governmental Authority.

(ii)     Seller has not participated in, contracted with or received reimbursement or payments from Medicare, any state or federal Medicaid program, Children's Health Insurance Program or other Governmental Program. All claims and billings submitted by or on behalf of Seller have been true, correct and complete and are and have been in compliance in all material respects with all applicable Laws and Contracts, manuals, policies and billing guidelines, and (except for immaterial amounts billed and refunded in the ordinary course of business) Seller has not billed or received any payment in excess of amounts permitted thereby nor made or caused to be made a false statement, claim or representation of a fact in any application for any benefit or payment from any patient or Payor. Seller has paid or caused to be paid all known and undisputed refunds or overpayments which have become due to any patient or third party, and neither Seller nor Owner has received any notice of any material overpayment, false claim, improper billing or recoupment from any patient or payor. Seller has provided Buyer with true, correct and complete copies of all audit, corrective action plan or inspection reports or overpayment demands received by Seller from any Payor and all written responses thereto.

(iii)     Seller and its operations are and have been in compliance in all material respects with HIPAA and all other applicable federal and state laws and regulations governing the use, security or disclosure of patient, health or protected information. Seller has taken commercially reasonable steps, consistent with industry standards and applicable Laws, such that the information is

4848-3594-1674.9

11

12162015

protected against unauthorized access, use, modification, disclosure or other misuse. Neither Seller nor Owner has received any notice from the Office for Civil Rights for the U.S. Department of Health and Human Services or any other Governmental Authority or Person of any allegation regarding its failure to comply with HIPAA or any other state law or regulation applicable to the protection of patient, health or protected information, nor made any notification of such a breach or failure to any Person, the media or the Secretary of the U.S. Department of Health and Human Services pursuant to HIPAA or applicable state Laws. Seller has undertaken surveys, audits, inventories, reviews, analyses and/or assessments to the extent required by HIPAA and remediated any deficiencies identified thereby, and have provided training with respect to compliance with HIPAA to their "workforce" and entered into a business associate agreement in accordance with HIPAA with each third party acting as a "business associate" or "subcontractor" thereto (as such terms are defined in HIPAA).

        (iv)    Set forth in **Section 5(h)(iv)** of the Disclosure Schedule hereto is a true, complete and correct list of each dentist, orthodontist, endodontist, oral surgeon, pediatric dentist, dental hygienist, dental assistant and other licensed personnel (including Owner) employed or contracted by or otherwise providing dental or healthcare services on behalf of Seller (each, a "Provider"), including each such Person's position and, if applicable, specialty, period of service with Seller, and whether such Person is part-time or full-time, an employee or independent contractor, or on a leave of absence and the type of leave. Each Provider is and, throughout the period of such employment, engagement or contract has been: (A) duly licensed and/or duly registered or certificated to practice his or her profession (or provide the applicable services to or on behalf of Seller) in the State of Tennessee and each other state in which he or she practices such profession; (B) performed such services in accordance with the scope of practice and supervision requirements set forth in applicable Laws, rules, regulations and guidelines; and (C) validly registered (to the extent required) with the United States Drug Enforcement Administration under the federal Controlled Substances Act and any other applicable Laws. There is no Action pending or, to the Knowledge of Seller, threatened with respect to denial or revocation of licensure, registration or certification of Seller or Providers, and no event has occurred, and no fact, circumstance or condition exists, that has resulted or reasonably may result in the denial, loss, restriction, revocation, suspension or rescission of any such professional license, registration or certification. Neither Seller nor any Provider is or has been subject to a disciplinary proceeding, corrective action plan, inquiry, monitoring or investigation by or involving any professional board, agency, society, association or Governmental Authority charged with regulating the professional activities of such Person or any other Law, and no such Action or proceeding is pending or threatened. All disciplinary actions, imposition of restrictions or conditions, revocation or non-renewal of rights and privileges for reasons requiring reporting to local, state, federal or quasi-public authorities that are required of each of Seller and the Providers have been effected as required.

        (i)    **Contracts.** Section 5(i) of the Disclosure Schedule hereto sets forth a true, complete and correct list of each written or oral Material Contract to which Seller is a party or by which it is bound. Except as set forth in **Section 5(i)** of the Disclosure Schedule, Seller has delivered to Buyer a true, correct and complete copy of each of the Material Contracts and such others as have been requested by Buyer. Each of the Material Contracts are valid and in full force and effect and are enforceable by or against Seller in accordance with their terms except as may be limited by bankruptcy, insolvency, or other Laws affecting creditors' rights generally, or as may be modified by a court of equity, and there is not (i) any existing or claimed default or breach by Seller or event that, with the notice or lapse of time or both, would constitute a default or breach by Seller or (ii) to the Knowledge of Seller, any existing or claimed default or breach by any other party or event which, with notice or lapse of time or both, would constitute a default or breach by any such party. There is no actual or, to the Knowledge of Seller, threatened, termination, cancellation or limitation of the Material Contracts. To the Knowledge of Seller, there is no pending or threatened bankruptcy, insolvency or similar proceeding with respect to any other party to any of the Material Contracts. Except as set forth on **Section 5(i)** of the Disclosure Schedule hereto, none of the Material Contracts requires consents by any third party in connection with the transactions contemplated hereby.

4848-3594-1674 9

12

12162015

(j)    **Assets**.  Seller has sole and exclusive, good and marketable title to (or, in the case of property held under a lease or other contractual obligation, a sole and exclusive, enforceable leasehold interest in, or right to use) all of its assets, free and clear of all Liens and Encumbrances. All of Seller's rights and tangible assets, whether owned or leased, are in the possession and control of Seller and are located at the premises currently used for the operation of the Practice.  The Purchased Assets include all tangible and intangible property necessary for or used or useful in the operation of the Practice (other than the Excluded Assets).  **Section 5(j)** of the Disclosure Schedule hereto sets forth a true, correct and complete list of all items of tangible personal property of or used or held for use in Seller's operations.  All tangible Purchased Assets are in good repair and operating condition, reasonable wear and tear excepted.  The inventories of Seller are of a good and merchantable quality usable and saleable in the ordinary course of business, are in a quantity reasonable for the operations of the businesses of Seller as currently conducted and are not obsolete, damaged, defective or slow moving.  The accounts receivable of Seller, whether or not reflected in the Financial Statements, represent bona fide transactions made in the ordinary course of business, have not been assigned or pledged to any other Person, are not subject to any dispute, contest, refusal to pay or right of set-off, and are collectible in accordance with their terms.  **Section 5(j))** of the Disclosure Schedule hereto also sets forth a true, correct and complete aging schedule of the accounts receivable of Seller as of November 30, 2015.

(k)    **Real Property.**  Except as disclosed on **Section 5(k)** of the Disclosure Schedule hereto, Seller does not own and has not owned any real property.  The Assigned Office Lease represents all of the leases, subleases, licenses or other Contracts with respect to which real property is leased, subleased, licensed, occupied or used by Seller, and Seller has provided Buyer with a true, correct and complete copy thereof, including all amendments, exhibits and schedules thereto. The Location is the only location at which the Practice is being conducted or that is necessary for the conduct and operation of the Practice, and is the only real property being leased or occupied by Seller.  The Location is adequate for the purposes for which it is currently used by Seller, in good repair and operating condition (subject to normal wear and tear) and not in need of maintenance or repairs other than in the ordinary course of business.  Seller's occupancy and use of the Location is in accordance with all applicable certificates of occupancy, Permits and zoning and other Laws. All utility systems serving the Location are adequate for the operation of the Business and the Practice and the Location has adequate access for ingress from and egress to a public way.  There are no facts or conditions affecting the Location that could reasonably be expected to, individually or in the aggregate, interfere in any material respect with the use, occupancy or operation thereof as currently used, occupied or operated.  Seller has a good and valid leasehold interest in the Location, free of all Liens and Encumbrances.  The Assigned Office Lease is in full force and effect, and no event has occurred which (whether with or without notice, lapse of time or both) would constitute a default thereunder by Seller, and Seller has not received any notice of any default, termination, eviction or assessment thereunder by any parties thereto.  The Location is not subleased from another Person, and Seller has not subleased, licensed or otherwise granted to any Person the right to use or occupy the Location or any portion thereof and there is no Person (other than Seller) in possession of any of the Location.  During the past 12 months, Seller has not received any notice of any increase in the amount of rent payable under the Assigned Office Lease.

(l)    **Employees**.  **Section 5(l)** of the Disclosure Schedule hereto sets forth a true, complete and correct list of each employee, independent contractor and consultant of Seller, including any leased or co-employed individuals, and each such Person's job title, salary or wage rates, bonus and benefit information, accrued paid-time-off and period of service, and whether such Person is part-time or full-time, an employee or independent contractor or leased or co-employed employees, or on a leave of absence and the type of leave.  Except as disclosed in **Section 5(l)** of the Disclosure Schedule hereto, all of such persons are terminable at will.  Seller has not received any notice that any of such employees, independent contractors or consultants plans or intends to terminate such Person's employment or engagement with Seller.  Seller is and has been in compliance with all applicable Laws relating to employment and employment practices, terms and conditions of employment, wages and hours, occupational safety and health, discrimination, civil rights, whistleblower statutes, workers' compensation, collection and payment of withholding and/or social security taxes, payroll taxes and any

4848-3594-1674.9

13

12162015

similar Tax, and the Fair Labor Standards Act or any other applicable Laws dealing with minimum wages, maximum hours or overtime for such employees.  Seller has properly classified individuals providing services to Seller as independent contractors or employees, as the case may be. There are and have been no charges, audits, investigations, proceedings or complaints concerning any of Seller's employment practices pending or, to the Knowledge of Seller, threatened before any Governmental Authority.  There are no claims by any employee, leased employee or former employee (or their dependents or spouses) pending or, to the Knowledge of Seller, threatened against Seller for costs, expenses or other Liabilities under any workers' compensation Laws, requirements or programs and no claims, injuries, fact, event or condition exists that could give rise to such a claim.  No labor dispute, strike, stoppage or complaint exists or, to the Knowledge of Seller, is threatened against Seller, none of Seller's employees is represented by a labor union, Seller is not party to or negotiating any collective bargaining agreement and no union organizing activities are taking place.

(m)   **Employee Benefits**.  **Section 5(m)** of the Disclosure Schedule hereto sets forth a true, complete and correct list of all retirement plans, pension plans, health, disability and life insurance plans, and other employee benefit plans or welfare plans that are or during the past five years have been maintained or contributed to by Seller, or with respect to which Seller has any Liability or obligations to any current or former officer, employee or service provider of Seller (the "Benefit Plans").  Seller has delivered to Buyer true, correct and complete copies of all Benefit Plan documents and amendments thereto.  Each Benefit Plan has been operated in compliance in all material respects with all applicable Laws, and all contributions to, and payments from, each Benefit Plan have been timely made under the requirements of all applicable Laws and the terms of the Benefit Plan.  All required reports, tax returns, documents and plan descriptions of the Benefit Plans have been timely filed with the appropriate Governmental Authority and if required by applicable Law, provided to participants in the Benefit Plans. Each Benefit Plan intended to be qualified under Section 401(a) of the Code has a current favorable determination letter (or, in the case of a prototype plan, a favorable opinion or notification letter), and no event has occurred which would reasonably be expected to cause any Benefit Plan to become disqualified for purposes of Section 401(a) of the Code.  There are no pending or, to the Knowledge of Seller, threatened claims, lawsuits or Actions relating to any Benefit Plan.  The consummation of any of the transactions contemplated by this Agreement will not accelerate the time of vesting or payment, or increase the amount, of compensation to any employee or former employee of Seller, nor trigger any payments under any of the Benefit Plans.  No Benefit Plans provide for, and no written or oral Contracts have been entered into with any employee or former employee of Seller promising or guaranteeing, any employer payment or funding for the continuation of any insurance coverage following Closing.

(n)   **Taxes**.  Seller has filed all Tax Returns required to be filed by it within the time and in the manner required or provided by applicable Law, and each such Tax Return was true, correct and complete, prepared in compliance with all applicable Laws and accurately reflected the Tax Liabilities of Seller.  Seller has provided to Buyer true, correct and complete copies of all Tax Returns, examination reports and statements of deficiencies filed by, assessed against or agreed to by Seller since December 31, 2010.  Seller has timely paid in full all Taxes (whether or not shown on a Tax Return), penalties, interest and any other statutory additions that have become due or payable, and there are no Tax Liens and Encumbrances encumbering any of the assets or other properties of Seller.  There is no pending or, to the Knowledge of Seller, threatened audit, examination, investigation, deficiency assessment, refund litigation, appeal, claim or other administrative or judicial Action relating to any Tax Return filed by Seller or any Tax for which Seller is or may be expected to be liable.  There is no dispute, deficiency or claim concerning any Tax Liability of Seller asserted, claimed or raised by any Governmental Authority, and Seller is not contesting any Tax Liability alleged to be owed by it.  Seller has not received notice that any Governmental Authority has proposed, asserted or assessed any adjustment that would reasonably be expected to result in an additional Tax for which Seller is or would reasonably be expected to be liable that has not been settled and paid.  Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.  All Taxes required to be withheld by or on behalf of Seller in connection with amounts paid or owing to any

4848-3594-1674 9

12162015

14

158

employee, independent contractor, creditor or other Person have been withheld and duly and timely paid to the proper Governmental Authorities, in accordance with applicable Laws.

(o) **Insurance**. Seller maintains, and has maintained, in full force and effect general and professional liability insurance coverage and various policies and forms of insurance that are, in each case, of the type and in the amounts adequate, commercially reasonable and customary for the Practice. **Section 5(o)** of the Disclosure Schedule hereto sets forth a true, correct and complete list of all insurance policies currently maintained by Seller and a list of all claims made by Seller under any policy of insurance during the past three years. Seller has delivered to Buyer true, correct and complete copies of all such policies together with all riders and amendments thereto. Such policies are in full force and effect and all premiums due thereon have been paid, and Seller is not in default under any such insurance policy or failed to file any notice or present any claim thereunder in a due and timely fashion. Seller has not received any notice of cancellation, modification or termination of any such policy, or any notice denying or disputing any coverage or claim made under any policies.

(p) **Intellectual Property.** Seller owns the entire right, title and interest in and to, free and clear of Liens and Encumbrances, or have a valid license or right to use, all trade names, trademarks, service marks, logos, copyrights, patents, patent applications, domain names and other Intellectual Property used or held for use in the operation of their respective businesses as currently conducted. **Section 5(p)** of the Disclosure Schedule hereto sets forth a true, correct and complete list of all Intellectual Property registered, or for which application has been filed for registration, with the United States Copyright Office or Patent and Trademark Office or other Governmental Authority. **Section 5(p)** of the Disclosure Schedule hereto further sets forth a true, correct and complete list of all Intellectual Property: (i) owned or developed by Seller; or (ii) licensed to Seller or otherwise owned by any third party and used in the businesses of Seller. The operations of Seller's businesses are not and have not been infringing, misappropriating or otherwise violating the Intellectual Property of any other Person, and, to the Knowledge of Seller, no other Person is infringing, misappropriating or otherwise violating any intellectual property owned by or licensed to Seller. There are and have been no claims or Actions pending or, to the Knowledge of Seller, threatened against Seller or Owner contesting the validity, use, ownership or enforceability of any of the intellectual property owned by Seller or used in their businesses, and no notices have been received by Seller that the operations of Seller are infringing, misappropriating or otherwise violating the intellectual property of any other Person.

(q) **Environmental Matters**. The operations, assets and properties of Seller are, and have been, in compliance in all material respects with all Environmental Laws and Seller has not treated, stored, managed, disposed of, transported, handled, released or used any Hazardous Materials, except in the ordinary course of business and in compliance with all Environmental Laws. There are no Actions pending or, to the Knowledge of Seller, threatened against Seller relating to any Environmental Law. There are no underground storage tanks located at the Location, and there is no asbestos-containing material or polychlorinated biphenyls ("PCBs") or PCB-containing items contained in or forming part of the Location. Seller is and has been in compliance in all material respects with all Laws applicable to the generation, transportation, treatment, storage, disposal and other handling of medical waste.

(r) **Affiliate Transactions**. Except as disclosed on **Section 5(r)** of the Disclosure Schedule hereto, Seller is not party to any Contract, loan, account receivable, accounts payable or other business arrangement with Owner or any director, officer, manager, employee or independent contractor of Seller (nor any Affiliate or immediate family member of Owner or any of the foregoing).

(s) **Bank Accounts**. Set forth in **Section 5(s)** of the Disclosure Schedule hereto is a true, correct and complete list of each of the bank accounts of Seller and the authorized signatories thereon.

(t) **Brokers**. None of Owner, Seller, or any Affiliate, representative or agent thereof, has employed or engaged any broker, finder or investment banker or incurred any Liability for

4848-3594-1674.9

15

12162015

any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with this Agreement or the transactions contemplated hereby.

(u)   **Disclosure**.  Seller and Owner have not withheld from Buyer any material facts or information relating to Seller, Owner or the Practice, Business or their assets, liabilities and operations. No representation or warranty made by Owner or Seller in this Agreement or in any statement, certificate or instrument to be furnished to Buyer pursuant to this Agreement or other Contracts or documents delivered in connection herewith contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make these statements contained herein and therein not misleading.

6.   **Representations and Warranties of Buyer**.  As an inducement to Seller and Owner to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer represents and warrants to Seller and Owner as follows:

(a)   **Organization**.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)   **Authority and Validity**.  Buyer has full power, authority and legal capacity to execute, deliver and perform its obligations under this Agreement and under each of the other Ancillary Agreements and documents to be executed and delivered by Buyer.  This Agreement and the Ancillary Agreements and other documents to be executed and delivered by Buyer in connection herewith have been duly authorized, executed and delivered by Buyer and do not require any further authorization or consent, and are the legal, valid and binding obligations of Buyer, enforceable against it in accordance with their respective terms.

(c)   **No Conflicts or Required Consents**.  The execution, delivery and performance by Buyer of this Agreement and the Ancillary Agreements and other documents to be executed and delivered by Buyer in connection herewith, and the consummation by Buyer of the transactions contemplated hereby and thereby, do not and will not: (i)  require the consent of or notice to any Governmental Authority; (ii) conflict with or result in a violation of any Law, order or injunction of any court or Governmental Authority to which Buyer is subject or bound; (iii) conflict with or result in a violation of any of the terms of Buyer's certificate of formation, limited liability company agreement or other formation or governing documents, or any amendments thereto; nor (iv) violate, conflict with, result in a breach of or default under (with or without notice or lapse of time or both), require notice, filing, consent or other action under, or accelerate or permit the termination or acceleration of any performance required by the terms of any Contract, lease, license or permit to which Buyer is a party or by which Buyer is bound.

(d)   **Brokers**.  Buyer has not employed or engaged any broker, finder or investment banker or incurred any Liability for any investment banking fees, financial advisory fees, brokerage fees or finders' fees in connection with this Agreement or the transactions contemplated hereby.

(e)   **Claims**.  As of the Closing, there are no Actions pending against Buyer or New PC Seller, at law or in equity before any court, arbitration tribunal or Governmental Authority that seek to challenge, enjoin or otherwise restrain Buyer's consummation of the transactions contemplated in this Agreement.

(f)   **Representations**.  No representation or warranty made by Buyer in this Agreement, and no statement, certificate or instrument to be furnished to Buyer pursuant to this Agreement contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make these statements contained herein and therein not misleading.

4848-3594-1674.9

16

12162015

7.    **Indemnification.**

(a)    **Indemnification by Seller and Owner.**  Subject to the terms set forth in this Section 7, Seller and Owner, jointly and severally, shall indemnify, defend, hold harmless, reimburse and pay Buyer, New PC and their respective Affiliates, owners, directors, officers, successors and assigns (each, a "Buyer Indemnified Person"), from and against any and all Losses suffered or incurred by any such Buyer Indemnified Person by reason of, arising out of or relating to, or based upon any of the following:

(i)    Any breach of or inaccuracy in any representation or warranty of Seller or Owner contained in this Agreement or any Ancillary Agreement or other document delivered in connection herewith to which Seller or Owner is or was a party, or any certificate, document or instrument delivered by Seller or Owner in connection herewith;

(ii)    The breach of any covenant or agreement of Seller or Owner contained in and made in connection with this Agreement;

(iii)    Any Transaction Expenses or Indebtedness of Seller or Owner, any Taxes of or with respect to Seller or its assets arising out of or relating to any period or periods prior to the Closing Date or ending on the Closing Date, or the Excluded Liabilities, Excluded Assets or operations of Seller prior to the Closing; and/or

(iv)    The matters, if any, described on **Exhibit Q** hereto.

(b)    **Indemnification by Buyer.**  Subject to the terms set forth in this Section 7, Buyer shall indemnify, defend, hold harmless, reimburse and pay Seller and Owner from and against any and all Losses suffered or incurred by Seller and Owner by reason of, arising out of or relating to, or based upon any of the following:

(i)    Any breach of or inaccuracy in any representation or warranty of Buyer contained in this Agreement or any Ancillary Agreement or other document delivered in connection herewith to which Buyer is a party or any certificate, document or instrument delivered by Buyer in connection herewith; or

(ii)    The breach of any covenant or agreement of Buyer contained in and made in connection with this Agreement.

(c)    **Survival.**  Subject to the limitations and other provisions of this Agreement, the representations and warranties set forth in this Agreement shall survive the Closing and shall remain in full force and effect for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus a period of 60 days; provided, that (i) the representations and warranties in Sections 5(a) (Organization; Qualification), 5(b) (Authority and Validity), 5(c) (No Conflicts or Required Consents), 5(j) (Assets), 5(q) (Affiliate Transactions) and 5(t) (Brokers), and in Sections 6(a) (Organization), 6(b) (Authority and Validity), 6(c) (No Conflicts or Required Consents) and 6(d) (Brokers) and (ii) this Section 7 (Indemnification) shall survive indefinitely. All covenants and agreements of the Parties contained herein shall survive the Closing indefinitely or for the period explicitly specified therein.  Notwithstanding the foregoing, any claims asserted by notice from the Party to be indemnified to the indemnifying Party prior to the expiration of the applicable survival period shall not thereafter be barred by the expiration of the relevant representation or warranty and such claims shall survive until finally resolved.

(d)    **Determination of Indemnification Amount.**  All indemnification payments under this Agreement will be treated as adjustments to the Purchase Price.  The right of any Buyer Indemnified Person to indemnification pursuant to this Section 7 will not be affected or limited by any investigation conducted for or on behalf of any Party, or knowledge acquired (or capable of being

4848-3594-1674.9

12162015

17

acquired) at any time by any Party or any Party's representatives, whether before or after the execution and delivery of this Agreement or the Closing, with respect to the accuracy of any representation or warranty, or performance of or compliance with any covenant or agreement. If a Buyer Indemnified Person has a right to indemnification under this Section 8, then Buyer may recover such amounts, claimed amounts or Losses from the Escrow Amount and shall be entitled to offset the amount of such recovery against any amounts otherwise payable by Buyer or its Affiliates to Seller or Owner under this Agreement and Ancillary Agreement or other Contract then in effect between Buyer or its Affiliates and Seller or Owner. The Escrow Amount shall not be the sole or exclusive relief afforded under this Agreement or otherwise to a Buyer Indemnified Person for Losses.

(f)     **Third Party Claims**. If a third party asserts a claim or brings an Action (a "Third-Party Claim") against any Person entitled to indemnification under this Section 7 (an "Indemnified Party") that may give rise to a claim by the Indemnified Party for indemnification under this Section 7 by a Party or Parties hereto (each, the "Indemnifying Party"), then the Indemnified Party will give written notice of such Third Party Claim to each Indemnifying Party promptly upon obtaining knowledge thereof; provided, however, that no delay or failure in delivering such notice shall relieve any Indemnifying Party from any indemnification obligation under this Agreement unless, and then only to the extent that, such Indemnifying Party is actually and materially prejudiced thereby. The Indemnified Party may elect to contest, defend against, consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim in any manner that the Indemnified Party reasonably deems appropriate and the Indemnifying Party(ies) will reimburse the Indemnified Party promptly and periodically for all costs and expenses (including attorneys' fees and expenses) of such contest, defense or settlement and will remain responsible for any Losses that the Indemnified Party suffers resulting from or relating to the Third-Party Claim as provided in this Section 7; provided, however, that the Indemnifying Party will have the right to contest and defend against the Third-Party Claim at the Indemnifying Party's sole cost and expense and with legal counsel of its or his or her choice (and reasonably satisfactory to the Indemnified Party), if (i) the Indemnifying Party notifies the Indemnified Party, in writing within 10 days after receiving notice of the Third-Party Claim, that the Indemnifying Party will indemnify the Indemnified Party from and against all Losses that the Indemnified Party suffers or incurs by reason of, arising out of or relating to, or based upon the Third-Party Claim, (ii) the Third-Party Claim involves only money damages and does not seek an injunction or other equitable relief, and does not involve any criminal proceeding or claim by any Governmental Authority, Government Program or other Payor, (iii) no conflict of interest exists between the Indemnifying Party(ies) and the Indemnified Party, and (iv) the Indemnifying Party conducts the defense of the Third-Party Claim actively and diligently. If any such condition ceases to be satisfied, then the Indemnified Party may again elect to contest, defend against, consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim, and the Indemnifying Party(ies) will reimburse the Indemnified Party and be responsible as provided above. If the Indemnifying Party so elects to contest or defend against a Third-Party Claim in accordance with this Section 7(f), then the Indemnified Party may, at its cost and expense, retain separate co-counsel of its choice and otherwise participate in such contest or defense of the Third-Party Claim, and the Indemnifying Party will not consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim without the Indemnified Party's prior written consent (not to be unreasonably withheld or delayed).

(g)     **Exclusive Remedy**. After the Closing, indemnification pursuant to this Section 7 and the other remedies provided for in this Agreement shall be the exclusive remedies of the Parties with respect to any inaccuracy in or breach of any representations and warranties in this Agreement or breach of or failure to comply with any covenant or obligation under this Agreement, other than with respect to any claim of fraud, willful misconduct or intentional misrepresentation and except for the remedies of specific performance or injunctive or other equitable relief.

8.     **Restrictive Covenants.**

(a)     **Acknowledgements**.  Seller and Owner each acknowledges and agrees that: (i) the covenants and agreements contained in this Section 8 are reasonably necessary to protect Buyer's interests in light of the substantial harm that Buyer might suffer should Seller or Owner breach any of the covenants or agreements, (ii) the period and geographical area of restrictions, and the activities prohibited, under this Section, are fair, reasonable and necessary to protect Buyer and its legitimate business interests, including the goodwill, trade secrets and confidential information being acquired hereunder, and (iii) by reason of Seller's and Owner's abilities and experience, these covenants and agreements will not prevent them from obtaining suitable employment or earning a livelihood in Owner's profession.

(b)     **Non-Competition; Non-Solicitation; Non-Interference; Non-Disparagement**. In order that Buyer shall receive and be able to maintain the benefit of the goodwill, trade secrets and confidential information being acquired directly or indirectly by Buyer or New PC hereunder, and in order to protect the legitimate business interests of Buyer and New PC, each of Seller and Owner hereby covenants and agrees with Buyer and New PC that commencing upon the Closing and thereafter for a five year period immediately following the Closing (the "Restricted Period"), Seller and Owner shall not, directly or indirectly, for its or his or her own behalf, or for or through any other Person:

(i)     Own any shares or interest in, manage, operate, control, finance or participate in, contract with, or be employed or engaged by or associated with, serve as a director, officer, manager, consultant, trustee or partner of or provide services, advice or other aid or assistance to, nor lend or permit their name to be used in connection with, any company, business, enterprise, practice or other Person (other than Buyer or New PC) engaged or involved (or planning to become engaged or involved), or otherwise engage or participate in (A) the practice of dentistry or providing, performing or offering to provide or perform any type of dental, implant or orthodontic treatment, procedures and services, and related activities, anywhere within a radius of 75 miles extending in all directions from the Location, or (B) any dental support organization or providing, performing or offering to provide or perform any business, management, administrative or support services to or for any dental, implant or orthodontic practice, anywhere within the State of Tennessee or a radius of 75 miles extending in all directions from the Location (in each case other than such Seller's passive ownership of less than 2% of any class of securities of an entity whose securities are listed on a national or regional securities exchange or stock market), nor attempt to do or take, assist any other Person in doing or taking or permit any Affiliate to do or take any such action; nor

(ii)     Solicit, recruit, induce or endeavor to entice away any employee or independent contractor of Buyer, its Affiliates or New PC to terminate his or her employment or engagement with Buyer, its Affiliates or New PC or to become employed or engaged by any other Person (other than general classified or "help wanted" advertisements and/or general solicitations to the public at large that are not targeted at any employees or independent contractors of Buyer), nor hire, employ or engage any Person who is or was an employee or independent contractor of Buyer, its Affiliates or New PC at any time during the immediately preceding 24-month period, nor attempt to do or take, assist any other Person in doing or taking or permit any Affiliate to do or take any such action; nor

(iii)     Solicit business from or perform services for, or solicit, recruit, induce or endeavor to entice away or to cease or reduce doing business with Buyer, its Affiliates or New PC, any customer, supplier, vendor, patient or other Person having a business relationship with Buyer, its Affiliates or New PC, nor attempt to do or take, assist any other Person in doing or taking or permit any Affiliate to do or take any such action; nor

(iv)     Interfere with or disrupt in any way any business relationship or Contract between Buyer, its Affiliates or New PC and any customer, patient, potential customer or patient, supplier, vendor, Payor, consultant, employee, independent contractor or other Person having a business

4848-3594-1674.9

19

12162015

relationship with Buyer, its Affiliates or New PC, nor make or publish, orally or in writing or electronically, any derogatory or disparaging statements regarding Buyer, its Affiliates or New PC, nor attempt to do or take, assist any other Person in doing or taking or permit any Affiliate to do or take any such action; provided, however, that this clause is not intended to prevent Owner from testifying truthfully in response to a valid subpoena or other compulsory legal process.

(c)      **Non-Disclosure**.  From and after the Closing Date, Seller and Owner each shall not, directly or indirectly, on its or his or her own behalf or through any other Person, use, disclose or communicate to any other Person any trade secrets or confidential information of or regarding Buyer, its Affiliates or New PC (including those included within the Purchased Assets or Professional Assets), whether or not such was created or arose before or after the Closing, and whether or not such is in written or physical form or is retained in the memory of Seller or Owner, unless and to the extent that the confidential information is or becomes generally known to and available for use by the public other than due to or as a result of a breach by or other fault, directly or indirectly, of Seller or Owner or their representatives or agents or a breach by or other fault of any other Person bound by a duty of confidentiality to Buyer or New PC.  In addition, Seller and Owner shall not, directly or indirectly, for itself or his or her self or for, though or in association with any other Person (other than on behalf of Buyer, New PC or their respective Affiliates), use or practice or operate under the name "Winfree & Denton" or "Winfree" or "Denton" or any variations and derivations thereof.

(d)      **Remedies**.  In the event of an actual or threatened breach by Seller or Owner of any provision of this Agreement, each of Buyer and/or New PC shall be entitled to injunctive or other appropriate equitable relief, enjoining, restraining and prohibiting Seller and/or Owner, as applicable, from violating this Agreement; provided, however, that nothing stated herein shall be construed as prohibiting or limiting Buyer and/or New PC from pursuing such other remedies as may be available to it in law or at equity, including the recovery of damages.  Seller and Owner each hereby waives any requirement on the part of Buyer and/or New PC of proving actual damages or securing or posting any bond in connection with obtaining such injunctive or other equitable relief.  Seller and Owner each agrees that it or he shall not challenge the reasonableness of the time, scope and geographic coverage of any of the provisions of this Section 8 in any Action, regardless of who initiates such Action.  If Seller or Owner breaches any of the provisions contained in this Section 8, the Restricted Period shall be extended by a period of time equal to the period of time during which such Person breaches this Section.

(e)      **Severability**.  If any provisions of this Section 8 shall be held or determined to be invalid or unenforceable, either in whole or in part, then: (i) the validity and enforceability of all other provisions shall be unaffected, (ii) the provision(s) held or determined to be wholly or partly invalid or unenforceable shall be deemed amended to delete or modify, as necessary, the offending provisions and to alter the balance of such provisions in order to render the same valid and enforceable to the fullest extent permissible, and the provisions of this Section shall be deemed to be valid and enforceable to the extent of any lesser geographic area or for any lesser duration permitted by law if the area and duration set forth herein is deemed to be too broad by a court or other government body, (iii) the court or other government body is authorized to amend and to reform the provision(s) to the minimum extent necessary to render it valid and enforceable to the fullest extent permissible and a provision having a similar economic effect shall be substituted, and (iv) if the ruling and/or the controlling principle of law or equity leading to the ruling is subsequently overruled, modified or amended by legislative, judicial or administrative action, then the provision(s) in question as originally set forth in this Section shall be deemed valid and enforceable to the maximum extent permitted by the new controlling principle of law or equity.

9.      Miscellaneous.

(a)      **Notices**.  All notices and other communications under this Agreement shall be in writing and shall be delivered in person, by nationally recognized overnight delivery service (charges prepaid), or by registered or certified U.S. mail (return receipt requested, postage prepaid), in each case addressed as

4848-3594-1674.9

12162015

follows, and shall be deemed given when (i) delivered in person, (ii) on the earlier of receipt or one Business Day after dispatch by FedEx, UPS or other nationally recognized overnight delivery service, or (iii) on the earlier of receipt or three Business Days after dispatch by U.S. registered or certified mail: (x) if to Seller or Owner: Dr. Robert T. Winfree, D.D.S., 1014 Mystic Streams, Mt. Juliet, Tennessee 37122, with a copy to Oberman Law Firm, 147 Lee Byrd Road, Loganville, Georgia 30052, Attention: Stuart J. Oberman, Esq. and Lauren A. Mansour, Esq.; and (y) if to Buyer, CPF Dental, LLC, 2505 21st Avenue S., Suite 204, Nashville, TN 37212, Attention: James Usdan, with a copy to Chicago Pacific Founders, 400 N. Michigan Ave., Suite 560, Chicago, Illinois 60611, Attention: Jon Maschmeyer, and to Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, Tennessee 37219, Attention: Donald R. Moody, Esq.  Any party hereto may change its address specified for notices herein by designating a new address by notice in accordance with this Section 9(a).

(b)     **Expenses**.  Except as otherwise provided herein, each of the Parties shall bear and pay all costs and expenses incurred by it or him (or on such Party's behalf) in connection with the negotiation, preparation, execution and performance of this Agreement and the other agreements and documents contemplated herein and the consummation of the transactions contemplated herein and therein.

(c)     **Amendments and Waivers**.  No amendment or waiver of any provision of this Agreement will be valid and binding unless it is in writing and signed, in the case of an amendment, by each of the Parties, or in the case of a waiver, by the Party against whom the waiver is to be effective.  No waiver by any Party of any breach or violation of, default under or inaccuracy in any representation, warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation, default of, or inaccuracy in, any such representation, warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence. No delay or omission on the part of any Party in exercising any right, power or remedy under this Agreement will operate as a waiver thereof.

(d)     **Succession and Assignment; No Third-Party Beneficiaries**.  This Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, and each of which such successors and permitted assigns will be deemed to be a Party hereto for all purposes hereof.  No Party may assign, delegate or otherwise transfer either this Agreement or any of his or her or its rights, interests, or obligations hereunder without the prior written consent of the other Parties; provided, however, that each of Buyer and New PC may assign any or all of its rights and interests or obligations hereunder to one or more of its Affiliates, or any acquiror of all or substantially all of its assets or any successor entity resulting from a merger or consolidation of or with such Party; or collaterally assign its rights and benefits hereunder to any lender, for security purposes or as collateral. This Agreement is for the sole benefit of the Parties hereto and their successors and permitted assignees and nothing herein expressed or implied will give or be construed to give any Person, other than the Parties hereto and such successors and assignees and New PC, any legal or equitable rights hereunder, including any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment.

(e)     **Entire Agreement**.  This Agreement and the Exhibits, Schedules, certificates and other documents delivered pursuant hereto or incorporated herein by reference, contain and constitute the entire agreement among the Parties and supersede and cancel any prior agreements, representations, warranties, or communications, whether oral or written, among the Parties relating to the transactions contemplated by this Agreement.

(f)     **Severability**.  Any term or provision hereof that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  In the event that any provision hereof would, under applicable Law, be invalid or unenforceable in any respect, each Party hereto intends that such provision will be construed

4848-3594-1674.9

12162015

21

by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable Law and to otherwise give effect to the intent of the Parties.

(g)     **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The exchange by the Parties of copies of this Agreement and executed signature pages hereto by facsimile or other electronic transmission shall constitute effective execution and delivery of the Agreement and may be used in lieu of the original thereof for all purposes.  In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart executed by the Party against whom enforcement of this Agreement is sought.

(h)     **Schedules**.  Nothing in any schedule attached to this Agreement is to be adequate to modify, qualify or disclose an exception to a representation or warranty made in this Agreement unless such schedule identifies the modification, qualification or exception with particularity and describes the relevant facts in reasonable detail.  The mere listing (or inclusion of a copy) of a document or other item is not to be adequate to disclose an exception to a representation or warranty made in this Agreement, unless the representation or warranty has to do with the existence of the document or other item itself. No modifications, qualifications or exceptions to any representations or warranties disclosed on one schedule is to constitute a modification, qualification or exception to any other representations or warranties made in this Agreement unless the modification, qualification or exception is also disclosed on each other applicable schedule or a specific cross reference to a disclosure on another schedule is made.

(i)     **Governing Law; Venue; Legal Expenses; Waiver of Jury Trial**.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Tennessee, without giving effect to any choice or conflict of Laws provision or rule that would cause the application of the Laws of any other jurisdiction.  To the fullest extent permitted by applicable Law, each Party hereto agrees: (i) that any claim, action or proceeding by such Party seeking any relief arising out of, or in connection with, this Agreement or the transactions contemplated hereby shall be brought only in a state or Federal court located in Davidson County, Tennessee and not in any other State or Federal court; (ii) to submit to the exclusive jurisdiction of such courts and waives and agrees not to assert any objection that the laying of such venue has been brought in an inconvenient forum; and (iii) that a judgment in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.  If a Party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial or arbitral proceedings, the prevailing Party in such proceeding will be entitled to recover such legal expenses (including reasonable attorneys' fees, costs and disbursements at all court levels), in addition to any other relief to which such Party shall be entitled.  EACH OF THE PARTIES KNOWINGLY AND VOLUNTARILY WAIVES THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(j)     **Remedies; Specific Performance**.  The rights, remedies, powers and privileges of the Parties provided in this Agreement are cumulative and not exclusive and are in addition to any and all rights, remedies, powers and privileges granted by applicable Law to the Parties.  Seller and Owner acknowledge and agree that Buyer and New PC would be damaged irreparably in the event any of the provisions of this Agreement is not performed in accordance with its specific terms or otherwise is breached or violated, and, accordingly, Seller and Owner agree that, without having to post bond or other security or prove actual damages, Buyer and/or New PC are entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions of this Agreement in any claim or action in addition to any other remedy to which Buyer or New PC, respectively, are entitled, at law or in equity.  Seller and Owner further agree that, in the event of any action for an injunction or specific performance in respect of any such threatened or actual breach or violation, Seller and Owner shall not assert that a remedy at law would be adequate.

4848-3594-1674.9

12162015

22

166

(k)     **Headings; Interpretation**.  The sections and other headings in this Agreement are solely for reference, and will not affect the meaning or interpretation hereof.  References to "including" and words of similar import shall mean "including, without limitation," and any list of items that may follow such word shall not be deemed to represent a complete list of, or be limited to, the contents of the referent of the subject.  References to (i) this Agreement are references to this Agreement and the Schedules and Exhibits hereto, (ii) the words "herein," "hereof" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular Section or other subdivision, (iii) any Section are to a section of this Agreement unless otherwise provided, (iv) a Party shall include references to its respective successors and permitted assigns, and (v) any document are to that document as of the date hereof and as amended, consolidated, supplemented, novated or replaced by the parties thereto from time to time.  The singular shall include the plural, the plural shall include the singular, and all nouns, pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, as the identity of the Person or Persons may require, and the term "or" shall mean "and/or".  The Parties have participated jointly in the negotiation and drafting of this Agreement, and in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  The parties intend that each representation, warranty, covenant and agreement contained herein will have independent significance.  If any party hereto has breached or violated, or if there is an inaccuracy in, any representation, warranty, covenant or agreement contained herein in any respect, the fact that there exists another representation, warranty, covenant or agreement relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached or violated, or in respect of which there is not an inaccuracy, will not detract from or mitigate the fact that the party has breached or violated, or there is an inaccuracy in, the first representation, warranty, covenant or agreement.

(l)     **Risk of Loss.**  The risk of loss or damage to the Purchased Assets or Professional Assets by fire, other casualty or condemnation prior to the Closing is retained by Seller.

(m)     **No Requirement to Refer**.  Nothing in this Agreement is to be construed to induce, encourage, solicit or reimburse the referral of any patients or business, or to limit the freedom of any patient to choose the practice, dentist or other provider from whom such patient will receive dental or healthcare services.  The Parties acknowledge that there is no requirement under this Agreement that any Seller refer patients or business to any Person and no payment under this Agreement is in return for the referral of any patients or business.

*[Remainder of page intentionally left blank.  Signatures on following page]*

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed on its behalf as of the day and year first above written.

CPF DENTAL, LLC

By: _James M. Usdan_

    James Usdan
    Chief Executive Officer

ROBERT T. WINFREE, D.D.S., P.C.

By:_____

    Robert T. Winfree, D.D.S.
    President

OWNER

_____

Robert T. Winfree, D.D.S.

*Signature Page to Purchase Agreement*

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed on its behalf as of the day and year first above written.

CPF DENTAL, LLC

By:_____
    James Usdan
    Chief Executive Officer

ROBERT T. WINFREE, D.D.S., P.C.

By:_____
    Robert T. Winfree, D.D.S.
    President

OWNER

_____
Robert T. Winfree, D.D.S.

*Signature Page to Purchase Agreement*

## EXHIBIT F

### BILL OF SALE AND ASSIGNMENT
### (PROFESSIONAL ASSETS)

See attached.

4825-3305-3227.6

GENERAL BILL OF SALE AND ASSIGNMENT
(PROFESSIONAL ASSETS)

**THIS GENERAL BILL OF SALE AND ASSIGNMENT** ("Bill of Sale") is dated as of December 16, 2015, by and among TN Dental Professionals, P.C., a Tennessee professional service corporation ("New PC"), Robert T. Winfree, D.D.S., P.C., a Tennessee professional corporation ("Seller") and Robert T. Winfree, D.D.S., an individual residing in the State of Tennessee ("Owner").

RECITALS:

A.    Seller, Owner and CPF Dental, LLC are parties to that certain Asset Purchase Agreement, dated as of December 16, 2015 (the "Purchase Agreement"), pursuant to which Seller and Owner agreed to sell, transfer, convey and deliver to New PC or its designee all of Seller's and Owner's right, title and interest in and to the Professional Assets.

**NOW, THEREFORE**, for and in consideration of the premises, agreements and covenants hereinafter set forth, and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and confessed, the parties, intending to be legally bound, hereby agree as follows:

1.    **Definitions**.  Capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the Purchase Agreement.

2.    **Assignment**.  Each of Seller and Owner does hereby irrevocably and unconditionally sell, assign, transfer, convey and deliver to New PC, its successors and assigns forever, all of the Professional Assets and all of Seller's and Owner's right, title and interest in and to the Professional Assets, free and clear of any and all Liens and Encumbrances, to have and to hold the same and each and all thereof unto the New PC, its successors and assigns forever, to its and their own use and benefit forever.

3.    **Further Assurances**.  Each of Seller and Owner hereby agrees to take such additional actions and to execute, acknowledge and deliver any and all other acts, deeds, assignments, powers of attorney, instruments or other documents as may reasonably be required to effect the intent and purposes of this Bill of Sale and the transactions contemplated hereby and/or by the Purchase Agreement.

4.    **Power of Attorney**.  Each of Seller and Owner hereby constitutes and appoints New PC their true and lawful attorney, with full power of substitution, in the name of Seller and Owner or otherwise, and on behalf and for the benefit of New PC, to demand and receive from time to time any and all of the Professional Assets; to institute and prosecute, from time to time, in the name of Seller and Owner or otherwise, any and all actions, suits and proceedings which New PC deems proper to assert or enforce any claim, title, right, debt, note or actions, suits or proceedings in respect to the Professional Assets; and to execute such other documents and take such other action as may be necessary from time to time to carry out this Bill of Sale. Seller and Owner hereby declare that the foregoing powers are coupled with an interest and shall be irrevocable.

5.    **Amendment and Modification; Waiver**.  This Bill of Sale may be amended, modified and supplemented only by a written instrument authorized and executed by New PC, Seller and Owner. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and executed by the party so waiving. The waiver by either party hereto of a breach of any provision of this Bill of Sale shall not operate or be construed as a waiver of any other or subsequent breach.

6.    **No Third-Party Beneficiaries**.  This Bill of Sale is for the sole and exclusive benefit of the parties hereto and their respective successors and permitted assigns and nothing herein is intended or shall be construed to confer upon any person other than the parties hereto and their respective successors and

4825-3305-3227.6

permitted assigns any rights, remedies or claims under, or by any reason of, this Bill of Sale or any term, covenant or condition hereof.

7.    **Governing Law; Venue; Legal Expenses; Waiver of Jury Trial**.  This Bill of Sale shall be governed by and construed in accordance with the Laws of the State of Tennessee, without giving effect to any choice or conflict of Laws provision or rule that would cause the application of the Laws of any other jurisdiction.  To the fullest extent permitted by applicable Law, each Party hereto agrees: (i) that any claim, action or proceeding by such Party seeking any relief arising out of, or in connection with, this Agreement or the transactions contemplated hereby shall be brought only in a state or Federal court located in Davidson County, Tennessee and not in any other State or Federal court; (ii) to submit to the exclusive jurisdiction of such courts and waives and agrees not to assert any objection that the laying of such venue has been brought in an inconvenient forum; and (iii) that a judgment in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.  If a Party elects to incur legal expenses to enforce or interpret any provision of this Bill of Sale by judicial or arbitral proceedings, the prevailing Party in such proceeding will be entitled to recover such legal expenses (including reasonable attorneys' fees, costs and  disbursements at all court levels), in addition to any other relief to which such Party shall be entitled.  EACH OF THE PARTIES KNOWINGLY AND VOLUNTARILY WAIVES THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, OR RELATING TO THIS BILL OF SALE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

8.    **Severability**.  In the event any provision of this Bill of Sale is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Bill of Sale, which shall be and remain in full force and effect, enforceable in accordance with its terms.

9.    **Divisions and Headings**.  The division of this Bill of Sale into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Bill of Sale.  The parties have participated jointly in the negotiation and drafting of this Bill of Sale, and in the event an ambiguity or question of intent or interpretation arises, this Bill of Sale will be construed as if drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Bill of Sale.

10.    **Counterparts**.  This Bill of Sale may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Bill of Sale and all of which, when taken together, will be deemed to constitute one and the same agreement.  The exchange of copies of this Bill of Sale and of signature pages by facsimile transmission or Portable Document Format (PDF) shall constitute effective execution and delivery of this Bill of Sale as to the parties and may be used in lieu of the original Bill of Sale for all purposes.  Signatures of the parties transmitted by facsimile and PDF shall be deemed to be their original signatures for any purposes whatsoever.

[Remainder of Page Intentionally Left Blank.  Signature page follows.]

4825-3305-3227.6

2

**IN WITNESS WHEREOF,** the parties have caused this Bill of Sale to be executed by such party or its authorized officer, all as of the date and year first above written.

ROBERT T. WINFREE, D.D.S., P.C.

By: _Robert T. Winfree PRS_
    Robert T. Winfree, D.D.S.
    President

OWNER

_Robert T. Winfree PPS_
Robert T. Winfree, D.D.S.

*SIGNATURE PAGE TO BILL OF SALE AND ASSIGNMENT*
*(PROFESSIONAL ASSETS)*

E-FILED
8/16/2019 2:47 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

# EXHIBIT B

## EXHIBIT K

### FORM OF WINFREE EMPLOYMENT AGREEMENT

See attached.

4825-3305-3227.6

**EMPLOYMENT AGREEMENT**

**THIS EMPLOYMENT AGREEMENT** ("Agreement"), dated as of December 16, 2015 (the "Effective Date"), by and between TN Dental Professionals, P.C., a Tennessee professional corporation ("Employer"), and Robert T. Winfree, D.D.S., an individual residing in the State of Tennessee ("Dentist").

**RECITALS:**

A.    Employer owns and operates a dental practice providing dental services at one or more in locations in the State of Tennessee (the "Practice").

B.    Dentist is a dentist duly licensed to practice dentistry in the State of Tennessee.

C.    Employer desires to employ Dentist, and Dentist is willing to accept employment with Employer, each on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    **Employment.**    Employer agrees to employ Dentist, and Dentist hereby accepts employment with Employer, to provide professional dental services on a full-time basis, at the location(s) and during the times and days of the week identified in Exhibit A attached hereto and incorporated herein by reference, and at such other location(s) and during such other times as may be agreed upon in writing or an e-mail by the parties from time to time (such locations, collectively, the "Practice Sites"). Dentist shall perform his or her duties and responsibilities hereunder diligently, faithfully and in a high quality manner, using his or her best efforts and skill for the interest and benefit of Employer.

2.    **Covenants of Dentist.**    Dentist covenants and agrees as follows:

(a)    Dentist shall devote all of his or her professional time and effort to Employer except for such volunteer and charitable services rendered by Dentist for which no compensation is received and which does not interfere with Dentist's obligations hereunder, in each case subject to the terms of the Asset Purchase Agreement of even date herewith (the "Purchase Agreement") among Dentist, Robert T. Winfree, D.D.S., P.C. and CPF Dental, LLC (the "DSO"), to the extent they do not interfere with Dentist's obligations hereunder. Dentist shall not, during the Term, enter into any other arrangements to offer or provide professional dental or related services to patients nor acquire an ownership interest, directly or indirectly, in any entity providing such services.

(b)    Dentist shall procure and maintain at his or her own cost and expense professional claims made liability insurance covering Dentist and Employer with limits of coverage not less than $1,000,000.00 for each incident and no less than $3,000,000.00 for all incidents in the aggregate. The policy shall name Employer and any dental support organization engaged by Employer as additional insureds and Dentist shall provide Employer evidence of such designation upon the request of Employer. The terms and provisions of such professional liability insurance policy shall conform to reasonable requirements established and communicated in writing by Employer to Dentist.  Employer shall reimburse Dentist, up to $1,500.00 total, on an annual basis for premiums paid by Dentist with respect to the professional liability insurance procured and maintained by Dentist pursuant to this Section 2(b).

(c)    If Dentist's license to practice dentistry in the State of Tennessee, registration to prescribe certain drugs, medications or pharmaceuticals, and/or professional liability insurance coverage is cancelled, suspended, revoked, restricted or terminated, Dentist shall immediately notify Employer of such cancellation, suspension, revocation, restriction or termination. Dentist shall immediately

4829-2766-4170.11
12162015

discontinue treatment of patients until such license and/or malpractice insurance is reinstated or replaced and Employer consents to such treatment.

(d)     Dentist shall provide professional services to patients in a manner consistent the then current standards of care in the State of Tennessee. In addition, Dentist shall abide by all rules, regulations and policies of Employer, and comply with all federal, state and local laws, rules and regulations applicable to and governing professional dental services; all rules, regulations and policies of accrediting bodies or agencies having jurisdiction over the practice of dentistry; and all rules, procedures and policies of third party payors providing reimbursement to Employer for professional dental services. Dentist shall notify Employer, promptly upon obtaining knowledge thereof, of any violation by Dentist of any such laws, rules, regulations, procedures or policies and fully cooperate with Employer in its investigation thereof.

(e)     Dentist shall promptly provide any materials, documentation and information reasonably requested by Employer's credentialing personnel. Dentist grants Employer the power and authority to include Dentist as a provider in contracts with third party insurance, capitation, direct reimbursement plans, or any other third party payor plan or program.

(f)     Dentist shall use all personnel, space, equipment, supplies and other items provided or arranged for by Employer solely for the purpose of providing professional dental services hereunder.

(g)     In providing services under this Agreement, Dentist shall not discriminate on the basis of race, color, sex, age, religion, national origin, handicap, disability or payment source, or on any other basis prohibited by applicable law.

(h)     Dentist agrees that Employer may use Dentist's name, likeness and biographical information, including but not limited to print, photo or video footage of Dentist, for marketing of the Practice. Dentist agrees to engage in marketing and promotion of Employer's business as requested by Employer.

(i)     Dentist agrees, acknowledges and understands that Employer has the right to conduct a pre-employment and/or continued employment background or reference investigations of Dentist.

3.     **Representations and Warranties.** Dentist represents and warrants to Employer as follows:

(a)     Dentist possesses, and shall maintain throughout the Term, a valid and unrestricted license to practice dentistry in the State of Tennessee and registration to prescribe certain drugs, medications or pharmaceuticals, in accordance with all applicable state and federal laws, rules and regulations.

(b)     Except as expressly disclosed by Dentist in writing to Employer prior to the date hereof, (i) Dentist has never been disciplined, sanctioned or disciplined by any governmental authority, licensing board or state or local dental society or specialty board, professional, managed care or peer review organization, accrediting body or provider network in any jurisdiction; (ii) Dentist's license to practice dentistry or to prescribe controlled substances in any jurisdiction has never been restricted, limited, suspended or revoked; and (iii) Dentist has never been the subject of any investigation or proceeding relating to an allegation that Dentist filed or cause to be filed any false claims, violated any anti-kickback laws or committed any fraud, or suspended, excluded or debarred from participation in Medicare, Medicaid or any other governmental health care program. Dentist shall notify Employer,

4829-2766-4170.11
12162015

2

immediately after obtaining knowledge thereof, of any inquiry, investigation, action, suit, claim, sanction or other proceeding, threatened or pending, that relates to dental care provided by Dentist, and fully cooperate with Employer's efforts to investigate, respond and defend any such proceeding.

(c)      Except as expressly disclosed by Dentist in writing to Employer prior to the date hereof, (i) there has never been entered against Dentist a final judgment in a malpractice action; (ii) no action, based on an allegation of malpractice by Dentist, has ever been settled by payment to the plaintiff; and (iii) there have been no claims threatened or pending against Dentist for professional malpractice occurring within five years prior to the date hereof.

(d)      Dentist is not under any covenant, contract or other obligation of any nature to any person that would prevent, limit or impair in any way Dentist's performance of his or her duties and responsibilities under this Agreement, and hereby represents and warrants that (i) the execution, delivery and performance of this Agreement by Dentist does not and will not conflict with, breach, violate or cause a default under any agreement, contract or instrument to which Dentist is a party or any judgment, order or decree to which Dentist is subject; (ii) Dentist is not a party to or bound by any employment agreement, consulting agreement, non-compete agreement, confidentiality agreement or similar agreement with any other person or entity that is inconsistent with the provisions of this Agreement; and (iii) upon the execution and delivery of this Agreement by Employer and Dentist, this Agreement will be a valid and binding obligation of Dentist.

4.      **Term**.  The initial term of this Agreement shall begin on the Effective Date specified herein and, unless earlier terminated pursuant to Section 9 below, shall continue until the three year anniversary of the Effective Date ("Initial Term").  This Agreement shall thereafter be renewed for successive one year periods (each a "Renewal Term"), unless earlier terminated pursuant to Section 8 below.  As used herein, the "Term" means the period during which Dentist is employed by Employer under this Agreement.

5.      **Compensation**.  Dentist shall be paid the compensation specified in Exhibit B, attached hereto and incorporated herein by reference. The parties acknowledge and agree that such compensation reflects fair market value for the services to be rendered.  In addition, for each new dentist that Dentist identifies and introduces to Employer, with whom Employer has not previously engaged in substantive discussions regarding engagement or employment and whom Employer subsequently engages or employs to provide dental services during the Term, Dentist shall be paid (a) an initial fee of One Thousand, Five Hundred Dollars ($1,500.00) at the end of the first six months of such new dentist's engagement or employment with Employer and (b) an additional fee of One Thousand, Five Hundred Dollars ($1,500.00) at the end of the first twelve months of such new dentist's engagement or employment with Employer.  Subject to the terms and conditions as set forth in this Agreement, in the event of termination of this Agreement by either party and for any reason, the Dentist shall be entitled to all Compensation earned by Dentist up to the date of termination, which shall be paid at Employer's next scheduled pay period after termination.

6.      **Outside Activities and Income**.  Dentist may engage in teaching, lecturing or research at any school, university or other institution of learning as long as such activity has been first approved in writing by Employer (such approval not to be unreasonably withheld unless Employer determines in good faith that such activity may interfere with Dentist's obligations hereunder).  Notwithstanding the foregoing, Dentist shall cease any such engagement or activity as soon as reasonably practicable upon any good faith determination by Employer that such engagement or activity has interfered or may interfere with Dentist's obligations hereunder.  Personal income of Dentist earned in any of the foregoing pursuits set forth in this Section 6 shall belong to Dentist individually and will not be deemed compensation by the Employer.  All applicable federal, state and local taxes on any income earned by the Dentist from any school, university or other institution of learning shall be the sole responsibility of the Dentist.

4829-2766-4170.11
12162015

3

7.    **Employer's Obligations and Authority**

(a)    **Facility, Equipment and Supplies.**  Employer shall provide Dentist reasonable access to the Employer's facility, equipment, instruments and supplies that are reasonably necessary for the performance of Dentist's duties, as determined by Employer, provided that Employer shall not be required to provide any such items if they are not reasonably or normally used in the Employer's practice.

(b)    **Personnel.**    Employer    shall    provide    additional    personnel,    including administrative/clerical personnel, chair side assistant(s) and dental hygienists, as necessary and available that are reasonably necessary for the performance of Dentist's duties, as determined by Employer.

(c)    **Benefits.**  In addition to holidays on which the Practice Sites are closed, Dentist shall be entitled to time off for non-paid vacation, personal leave and/or continuing education, up to the following number of days each year: (i) three consecutive working days after the last Monday of May (Memorial Day), (ii) three consecutive working days during the week of that includes July 4 (Independence Day) and (iii) six consecutive working days in any two-week period that includes December 25 (Christmas) (provided that Dentist shall provide Employer with reasonable notice of the specific two-week period that Dentist desires to take off).  Dentist may request additional time off with at least four (4) weeks prior written notice to Employer (or, if such request is for emergency reasons, with reasonable notice), provided that any such additional time off shall be subject to Employer's sole determination of the needs of the Practice, and any such additional days that Employer permits Dentist to take off shall be made up by Dentist at additional working days and times to be mutually agreed upon. Any such additional permitted leave may not be carried over to any subsequent period.  Dentist shall be entitled to participate in Employer's benefit plans on the same basis as other dentist employees of Employer, subject to (i) the provisions of the relevant contracts, policies or plans providing such benefits, and (ii) the right of Employer to amend, modify or terminate any such benefit plans.

(d)    **Additional Employer Obligations.**  Employer agrees to provide, (a) scheduling of appointments; (b) processing of patient records and maintenance of patient financial records; (c) billing and collection of payment services; and (d) other reasonable and normal administrative duties related to patient care.

8.    **Fees and Power of Attorney.**    Employer shall have the exclusive authority to (a) determine the fees or charges, or a procedure for establishing the fees or charges, for services provided by Dentist hereunder; and (b) determine whether and upon what terms Dentist and Company shall participate in any managed care, third party payer or other plan, program or contract with respect to such services. All fees, charges, compensation and other sums billed to, received from, or due from patients or third parties with respect to Dentist's services under this Agreement belong exclusively to Employer. Dentist shall open all mail addressed to Dentist as soon as reasonably practicable following the delivery thereof to Dentist to determine if any such correspondence contains payments by third party payors or patients for services rendered by Dentist under this Agreement and shall deliver such payment to Employer on the same day received.  Dentist shall account to Employer for all such sums as Employer may reasonably request.  Employer and its designees shall have the sole right to bill and collect, or cause to be billed and collected, such fees, charges, compensation and other sums. This Agreement does not confer upon Dentist any interest in or claim upon any such fees, charges, compensation or sums.  Dentist hereby appoints Employer as his/her attorney-in-fact to: (i) execute, deliver and endorse, all checks, claim forms, payment applications and other documents which Employer regards as necessary or appropriate to collect all sums due for services rendered by Dentist; and (ii) execute and deliver any other documents, applications or forms required by Employer or its service providers, provider networks, managed care organizations or third party payors in relation to billing or payment for Dentist's services under this Agreement.

4829-2766-4170.11
12162015

4

9.    **Patient Re-Treatment**.  For the first twelve-months during the Term, Employer may permit Dentist to re-treat or re-do any services previously rendered by Dentist on patients at the Practice Site (including any corrective or replacement of services), at Buyer's option.  Any such services provided by Dentist shall be with no compensation due for such services from Employer.  At Dentist's request, an employee or independent contractor of Employer other than Dentist may provide such services on such patients, subject to Dentist's agreement to reimburse Employer for the cost of any such services (including the cost of compensating such other employee or independent contractor for providing such services).  For the avoidance of doubt, Employer is not assuming any blanket responsibility or liability for any such corrective or replacement of services.

10.    **Patient Records**.  Dentist shall prepare and maintain or cause to be maintained complete, accurate and appropriate records relating to all services rendered by Dentist under this Agreement, in accordance with applicable law and Employer policies and procedures.  Dentist shall submit timely and accurate information to Employer for billing purposes in a format prescribed by Employer. All charts, x-rays, molds, reports, billing records and other patient records pertaining to the services and the patients treated by Dentist, as well as all office, business, financial and appointment records and patient lists relating to the services provided pursuant to this Agreement are and shall remain at all times, the property of Employer. Dentist hereby agrees that Dentist shall not remove such records from any Practice Sites or from any other location where such records are kept.  While providing services at the Practice Sites during the Term, Dentist acknowledges and agrees to serve as a custodian of the patient records and protect the same as required under applicable law.  Upon the request of Employer following the termination of this Agreement for any reason, Dentist agrees to execute a letter approved by Employer that Employer may send, at Employer's sole cost and expense, to all of Dentist's patients of record at the Practice Site, announcing the end of Dentist's engagement with Employer and encouraging such patients to continue to seek their future dental treatment from the professionals employed or engaged by Employer. Employer shall provide Dentist with access to the patient records of patients treated by Dentist for the purpose of treatment of such patients and billing by the Employer for such services and directly in furtherance of Dentist's performance of his duties hereunder.  After termination of this Agreement, upon reasonable request and subject to compliance with HIPAA and other applicable laws and confidentiality requirements, Employer shall provide Dentist with limited access to patient records of patients treated by Dentist on behalf of Employer during the term of this Agreement, solely for the purpose of Dentist's defense of any malpractice claim or any formal grievance or complaint filed with or brought by the Tennessee Board of Dentistry, any patient lawsuits, discovery obligations to the extent required by law, court orders, and insurer requests in connection with insurance investigations or defenses of malpractice claims in connection with services provided by Dentist during the term of the Agreement, in each case during the normal business hours of the Employer, at the Practice Sites, in a manner that does not disturb the normal operation of the dental practice and upon reasonable advance notice.  The costs of any reproduction shall be paid for solely by Dentist.  Under no circumstances shall Dentist remove or copy any patient list, clinical or financial record without the express written consent of Employer.

11.    **Termination.**

(a)    Employer may terminate this Agreement and Dentist's employment hereunder with or without cause at any time by providing at least 90 days prior written notice to Dentist.

(b)    Dentist may terminate this Agreement and Dentist's employment hereunder with or without cause at any time by providing at least 90 days prior written notice to the Employer.  Employer may request Dentist not to perform any other service during all or any portion of such 90-day notice period, and if Employer so requests, Employer shall have no obligation to pay Dentist any compensation or provide any benefits (except to the extent required by applicable law) with respect to such notice period or portion thereof during which Dentist does not provide services hereunder.

4829-2766-4170.11
12162015

(c)     Employer may terminate this Agreement at any time upon the occurrence of any of the following events (each of which shall constitute "Cause"):

(i)     Dentist's breach or failure to comply with any of the covenants, agreements or requirements set forth in Sections 10 or 11 of this Agreement;

(ii)     Dentist's material breach by Dentist of any other provision of this Agreement that (if capable of being cured) is not cured within 15 days following written notice of the breach from Employer;

(iii)     The revocation, suspension, termination, cancellation, restriction, lapse, placement on probationary status or taking of other disciplinary action or sanction with regard to Dentist's license to practice dentistry in the State of Tennessee or state or federal controlled substances registration;

(iv)     The exclusion, debarment or suspension of Dentist's participation in the Medicare or Medicaid programs or any other governmental health care program;

(v)     Dentist's indictment for, conviction or commission of or plea of guilty or no contest to any crime punishable as a felony or involving moral turpitude or fraud;

(vi)     Loss, cancellation or non-renewal of Dentist's professional liability insurance coverage or Dentist's uninsurability thereunder at standard rates;

(vii)     Dentist's use of alcohol or a controlled substance, which materially impairs the ability of Dentist to effectively perform his or her duties and obligations under this Agreement or which violates any of Employer's policies with respect to the use of alcohol or controlled substances; or

(viii)     Dentist's neglect of duty, personal misconduct, disruptive behavior or failure to provide adequate patient care, or a determination by Employer in good faith that patient health, safety or welfare may be jeopardized by continued employment of Dentist.

(d)     This Agreement shall terminate immediately in the event of Dentist's death.

(e)     Following the termination of this Agreement, Dentist shall be entitled to and shall be promptly paid by Employer compensation owed pursuant to Section 5 above that has been earned or accrued but unpaid as of the termination date.

(f)     Dentist acknowledges that Dentist is responsible for all dental services performed by Dentist during the Term as defined herein, and shall complete or redo, as reasonably necessary, all dental services Dentist provides during the Term as defined herein (unless Employer determines that another dentist shall perform such services). Accordingly, Dentist agrees that, if notice of termination of this Agreement is given by Employer or Dentist, Dentist shall use Dentist's best efforts to complete any ongoing dental services prior to such termination. Following Dentist's termination, and for the twelve (12) month period following the date that the Dentist discontinues practicing on the Employer's premises, the Dentist shall assist the Employer with any re-treatment of services previously rendered by the Dentist on patients of the Employer. However, the Employer is not assuming any blanket responsibility or liability for such corrective or replacement of services. Should any of the Dentist's patients treated by Dentist during the Term on behalf of Employer require such corrective services or replacement with respect to such treatment provided by Dentist during the Term, and to the extent consented by the patient, the Employer may provide such corrective services or request Dentist to provide such services or replacements. Should the Employer request compensation or reimbursement from the Dentist for such

4829-2766-4170.11
12162015

6

corrective services or replacements (whether such services or replacements are provided by Employer or Dentist), then the following shall apply:

Dentist Provides Re-treatment: The Dentist shall first be given the option by notice of examining the patient needing re-treatment and providing the necessary service in the Employer's office, provided that the Dentist is licensed to practice dentistry in the State of Tennessee at that time, and has professional malpractice insurance coverage. The foregoing notice may be delivered in person, by email or by telephone and shall be deemed given on such date of delivery, or otherwise by any notice procedure permitted under Section 16(f). Dentist may elect to exercise such option by informing Employer of such within three (3) business days after Employer's delivery of such notice, the Dentist shall pay the Employer for all direct expenses associated with the service(s) at the time such service(s) are rendered, which shall be limited to all supply and lab costs, as well as any personnel costs. Should the patient have third party coverage for any needed re-treatment, then the fee received shall be divided equally between the Employer and Dentist and shall be in lieu of the Dentist paying the Employer for any direct costs as previously described. Dentist shall provide such services promptly and in accordance with applicable law and standard of care and, unless the patient requests a different time for performance of such services, by no later than twelve (12) business days after electing to exercise his option.

Employer Provides Re-treatment: Dentist shall be deemed to be unable or unwilling to provide the necessary service if he does not inform Employer within three (3) business days after Employer's delivery of notice in accordance with the immediately foregoing paragraph. Should the Dentist be unable or unwilling to provide the necessary service, then Employer may provide the re-treatment services for fifty percent (50%) of the Employer's normal fee at the time such service is rendered. This fee shall then be paid to the Employer by the Dentist within thirty (30) days of receiving written notice from the Employer that such services have been completed. Should the patient have third party coverage for any needed re-treatment, then the Employer shall accept the third party carrier's fee in lieu of payment from the Dentist.

On all patients of the Dentist being re-treated by the Employer (where compensation for such services is being requested by the Employer from the Dentist), upon reasonable request and subject to compliance with HIPAA and other applicable laws and confidentiality requirements, the Employer agrees to provide the Dentist with limited access to (a) applicable radiographs of the tooth or teeth, (b) progress notes of proposed treatment fees, and (c) copies of all applicable ledger cards or computerized billing statements, in each case during the normal business hours of the Employer, at the Practice Sites, in a manner that does not disturb the normal operation of the dental practice and upon reasonable advance notice. In each case, the costs of reproduction shall be paid for solely by Dentist. Under no circumstances shall Dentist remove or copy any patient list, clinical or financial record without the express written consent of Employer.

(g)      Upon termination of Dentist's employment hereunder for any reason, Dentist shall deliver promptly to Employer all computers, keys, telephones, other electronic devices, card keys, credit cards, files, correspondence, memoranda, notes, records, drawings, sketches, plans, lists or documents or property of Employer or any dental support organization engaged by Employer that are in Dentist's possession, custody or control.

(h)      Dentist shall, upon the termination of this Agreement for any reason, also procure and maintain at his/her own cost and expense an extended reporting endorsement (a/k/a "tail policy") covering Dentist and Employer for Dentist's professional acts and omissions during the Term in the same coverage amounts as set forth in Section 2(b) above. Dentist shall provide Employer evidence of such coverage within 15 days of the effective date of termination of this Agreement. If Dentist fails to do so, Employer shall have the right to procure such policy on Dentist's behalf and deduct the cost of the policy from any amounts that remain due and owing to Dentist from Employer. If the cost of the policy exceeds

4829-2766-4170.11
12162015

7

the amounts that Employer owes to Dentist following termination, Dentist shall pay Employer the difference immediately.

(i)  Notwithstanding any provision contained herein to the contrary, Employer's termination of this Agreement and Dentist's employment hereunder, with or without cause, shall not have any effect on the payment of any portion of the Purchase Price (including the Earn-out Payments) pursuant to that certain Asset Purchase Agreement by and among Robert T. Winfree, D.D.S., P.C., Dentist and CPF Dental, LLC.

12.  <u>Noncompetition; Non-Solicitation; Non-Interference; Non-Disparagement</u>. Dentist acknowledges that, in the course of his or her employment with Employer, Dentist has and will become familiar with the Trade Secrets and Confidential Information (each as defined Section 12) and that the restrictions in this Section 12 are necessary to protect the legitimate business interests of Employer, and that the covenants in this Section 12 and Section 13 are reasonable with respect to duration, geographical area and proscription and will not prevent Dentist from practicing his or her profession or earning a living. Therefore, Dentist agrees that during the Term and for a period of two years following expiration or termination of this Agreement for any reason (the "<u>Restricted Period</u>"), except pursuant to this Agreement on behalf and for the benefit of Employer, Dentist shall not, directly or indirectly, on his or her own behalf or on behalf of any other person, organization or entity, individually or collectively, in any fashion, form or manner, do or take any of the following actions, nor attempt to do or take, assist any other person in doing or taking or planning to do or take any such action:

(a)  (i) engage or participate or be involved in any capacity, or (ii) own any shares or interest in, or manage, operate or control or contract with, or be employed or engaged by or associated with, or serve as a director, officer, manager, consultant, advisor, trustee or partner of, or provide services, advice, financing or other aid or assistance to, or lend or permit its or his or her name to be used in connection with, any company, business, enterprise, practice or other Person (other than Employer) engaged or involved (or planning or taking steps to become engaged or involved), in (A) the practice of dentistry or the provision, performance or offer of any type of dental treatment, procedures or services, in each case anywhere within a radius of ten (10) miles extending in all directions from each Practice Site or other location at which Dentist provides services hereunder for or on behalf of Employer during the Term, or (B) any dental support organization or the provision, performance or offer of any business, management, administrative, marketing or support services to or for any dentist, dental practice or dental entity, in each case anywhere within the State of Tennessee (other than such Dentist's passive ownership of less than 2% of any class of securities of an entity whose securities are listed on a national or regional securities exchange or stock market); nor

(b)  Solicit, recruit, induce or endeavor to entice away any employee or independent contractor of Employer or any dental support organization engaged by Employer to terminate his or her or its employment or engagement with Employer or any dental support organization engaged by Employer or to become employed or engaged by any other Person (other than general classified or "help wanted" advertisements and/or general solicitations to the public at large that are not targeted at any employees or independent contractors of Employer or any dental support organization engaged by Employer), nor hire, employ or engage any Person who is or was an employee or independent contractor of Employer or any dental support organization engaged by Employer at any time during the immediately preceding 24-month period; nor

(c)  Solicit, recruit, induce or endeavor to entice away any Person who is or, at any time during the immediately preceding 24-month period was, a patient of Employer to terminate or otherwise interfere with their patient relationship with Employer or for the purpose of providing any dental services, treatment or consultation; nor

4829-2766-4170 11
12162015

8

(d)     Interfere with or disrupt in any way any business relationship or contract between Employer and any customer, patient, potential customer or patient, supplier, vendor, payor, consultant, employee, independent contractor or other person having a business relationship with Employer; nor

(e)     Make or publish, orally, in writing or electronically, any derogatory or disparaging statements or remarks regarding Employer, any dental support organization engaged by Employer or their officers, directors, employees, operations or services; provided, however, that this clause is not intended to prevent Dentist from testifying truthfully in response to a valid subpoena or other compulsory legal process.

13.     **Non-Disclosure**.  During the Term and at any time thereafter, Dentist shall not, unless authorized by Employer for Employer's benefit, directly or indirectly, on his or her own behalf or through any other person, misappropriate, use, divulge, reveal, disclose or communicate any trade secrets or other Confidential Information of Employer or any dental support organization engaged or contracted by Employer.  The term "Confidential Information" means any trade secret or other information disclosed to or learned by Dentist in connection with his/her employment by Employer, including, but not limited to, any information relating to Employer's patients, suppliers, business alliances, agreements, strategies, policies, procedures, pricing, software programs, contracts and financial records.  All documents and records containing any trade secret or other Confidential Information of Employer in the possession of Dentist are the exclusive property of Employer and shall be immediately returned to Employer when Dentist's employment with Employer ends.

14.     **Survival**.  The provisions of Sections 8, 10 11(f), 11(g), 11(h), 11(i) and 12 through 16 of this Agreement, and any right or obligation of the parties in this Agreement which, by its nature, should survive termination or expiration of this Agreement, shall survive the termination or expiration of this Agreement and Dentist's employment. Dentist agrees that he or she will cooperate with Employer and its affiliates and any dental support organization engaged by Employer in the defense of any claims that may be made against Employer or its affiliates or any dental support organization engaged by Employer to the extent that such claims may relate to services performed by Dentist on behalf of Employer or otherwise with respect to his or her employment by Employer.

15.     **Enforcement**.  In the event of a breach or threatened breach of any term, provision or condition of this Agreement by Dentist, Employer shall be accorded the broadest protection allowed by law to enforce this Agreement, including, but not limited to, injunctive relief without any requirement to post a bond or prove actual damages, and/or monetary damages and any other legal or equitable remedies or relief.  The Restricted Period shall be extended by a period of time equal to the period of time during which Dentist breaches Section 10.  Sections 10 and 11 of this Agreement are independent of the other provisions of this Agreement and the existence of any claim or cause of action of Dentist against Employer shall not be a defense to Employer's enforcement thereof.  To the extent that Sections 10 and 11 may be deemed unenforceable because of their scope in terms of geographical area or duration of time, a court of competent jurisdiction may modify or reduce their scope to the minimum extent necessary to enforce them. Dentist further acknowledges and agrees that (a) the covenants and agreements set forth in Sections 10 and 11 were a material inducement to Employer to enter into this Agreement and to perform its obligations hereunder and that Employer would not have the benefit of its bargain set forth in this Agreement if Dentist breached the provisions of Sections 10 or 11; and (b) all restrictions contained in Sections 10 and 11 are reasonable and valid and all defenses to the strict enforcement of Sections 10 or 11 are hereby waived.

16.     **Miscellaneous.**

(a)     **Governing Law; Venue; Legal Expenses; Waiver of Jury Trial**. This Agreement shall be governed by and construed in accordance with the laws of the State of

4829-2766-4170.11
12162015

9

184

Tennessee, without giving effect to any choice or conflict of laws provision or rule that would cause the application of the laws of any other jurisdiction. Subject to Section 16(b), to the fullest extent permitted by applicable law, each party hereto agrees: (i) that any claim, action or proceeding by such party seeking any relief arising out of, or in connection with, this Agreement or the transactions contemplated hereby shall be brought only in a state or Federal court located in Davidson County, Tennessee and not in any other State or Federal court; (ii) to submit to the exclusive jurisdiction of such courts and waives and agrees not to assert any objection that the laying of such venue has been brought in an inconvenient forum; and (iii) that a judgment in any such action or proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law. If a party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial or arbitral proceedings, the prevailing party in such proceeding will be entitled to recover such legal expenses (including reasonable attorneys' fees, costs and disbursements at all court levels), in addition to any other relief to which such party shall be entitled. EACH OF THE PARTIES KNOWINGLY AND VOLUNTARILY WAIVES THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(b)     **Dispute Resolution**. Any controversy, dispute or claim arising out of or relating to this Agreement or the breach hereof, including whether the controversy, dispute or claim is arbitrable (each, a "Dispute"), will be resolved in accordance with the following. Upon the written demand of either party hereto, the Dispute will be submitted to mediation administered by the American Arbitration Association ("AAA") or its successor under its employment mediation rules and procedures. The mediation will be conducted by a single mediator selected and appointed in accordance with such rules. If the Dispute is not resolved in the course of such mediation, then upon the written demand of either party, such Dispute will be submitted to and finally resolved by binding arbitration administered by the AAA or its successor in accordance with its employment arbitration rules and procedures. The arbitration will be conducted before a panel of three arbitrators selected and appointed in accordance with such rules. The same Person may not serve both as the mediator and an arbitrator. Each party may be represented by one or more attorneys or other selected representative(s). Each party will bear and pay equally the fees and expenses of AAA and the mediator associated with the mediation, and each party will bear its own attorneys' fees, costs and other expenses in connection with the mediation. Subject to Section 16(a), each party will bear and pay equally the fees and expenses of AAA and the arbitrators associated with the arbitration, and each party will bear its own attorneys' fees, costs and other expenses in connection with the arbitration. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The mediation and arbitration will be conducted in Nashville, Tennessee. This subsection will not restrict the Company's right to institute any proceeding to obtain injunctive relief without resorting to mediation or arbitration, including the remedies referenced in Section 15. The arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.) and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(c)     **Severability**. The invalidity or partial invalidity of any portion of this Agreement will not affect the validity of any other provision. In the event that any provision of this Agreement is held to be invalid, the remaining provisions shall be deemed to be in full force and effect as if they had been executed by both parties subsequent to the expungement or judicial modification of the invalid provision.

(d)     **Entire Agreement; Amendment**. This Agreement and the Exhibits hereto set forth and establishes the entire understanding between Employer and Dentist relating to the employment of Dentist by Employer. Any prior discussions or representations by or between the parties are merged into and rendered null and void by this Agreement. No amendment or modification of this Agreement shall be valid or effective unless it is in writing and properly executed by all parties hereto.

4829-2766-4170.11
12162015

10

(e)   **Waiver**.  Any waiver of any term and condition hereof must be in writing and signed by the party against whom it is sought to be asserted.  No consent or waiver, expressed or implied, by any party to any breach or default by the other in the performance by the other of their obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default of this Agreement.  Failure of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver of that party's rights hereunder.

(f)   **Notices**.  All notices and other communications under this Agreement shall be in writing and shall be delivered in person, by nationally recognized overnight delivery service (charges prepaid), or by registered or certified U.S. mail (return receipt requested, postage prepaid), in each case addressed as follows, and shall be deemed given when (i) delivered in person, (ii) on the earlier of receipt or one business day after dispatch by FedEx, UPS or other nationally recognized overnight delivery service, or (iii) on the earlier of receipt or three business days after dispatch by U.S. registered or certified mail: (x) if to Dentist: Robert T. Winfree, D.D.S., 1014 Mystic Streams, Mt. Juliet, Tennessee 37122; and (y) if to Employer, TN Dental Professionals, P.C., c/o 2505 21st Avenue S., Suite 204, Nashville, TN 37212, with a copy to CPF Dental, LLC, 2505 21st Avenue S., Suite 204, Nashville, TN 37212, Attention: James Usdan.  Any party hereto may change its address specified for notices herein by designating a new address by notice in accordance with this Section 14(e).

(g)   **Counterparts; Construction**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  The parties may deliver executed signature pages to this Agreement by facsimile, e-mail or other electronic transmission, The headings of sections herein are inserted for convenience of reference only and shall be ignored in the construction or interpretation hereof.  The parties have participated jointly in the negotiation and drafting of this Agreement and this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions of this Agreement.

(h)   **Dentist's Understanding**. Dentist acknowledges that he or she has reviewed this Agreement to his or her satisfaction and has had an opportunity to consult with an attorney before signing it.

(i)   **Assignment and Binding Effect**.  Employer shall have the right to assign its rights and obligations under this Agreement, provided that such assignment shall be made to an entity authorized to employ dentists under applicable law. The rights and benefits of Dentist under this Agreement are personal to Dentist and no such right or benefit shall be subject to voluntary or involuntary alienation, assignment or transfer without the prior written consent of Employer. This Agreement shall be binding on Employer and Dentist as well as their heirs, permitted assigns, executors, personal representatives and successors in interest.

(j)   **Patient Referrals**.  The parties agree that no part of this Agreement shall be construed to induce or encourage, directly or indirectly, the referral of patients or the purchase of health care services or supplies.  The parties acknowledge that there is no requirement under this Agreement or any other agreement between the parties that either party refer any patients to any health care provider or purchase any health care goods or services from any source.  No payment made under this Agreement shall be in return for such referral or purchase.

[Remainder of page intentionally blank. Signatures appear on following page.]

4829-2766-4170.11
12162015

11

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

EMPLOYER:

TN DENTAL PROFESSIONALS, P.C.

By: _____

Name:  Steven Hecklin, D.M.D.

Title:  President

DENTIST:

_____

Robert T. Winfree, D.D.S.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

EMPLOYER:

TN DENTAL PROFESSIONALS, P.C.

By:_____
Name:  Steven Hecklin, D.M.D.
Title:  President

DENTIST:

Robert T. Winfree, D.D.S.

## EXHIBIT A

### PRACTICE SITES AND TIMES

Practice Site(s):

- 4243 Lebanon Pike, Hermitage, Tennessee 37076

Times and Days of Week:

- 8:30 a.m.- 5:00 p.m. (Central Time) each Monday and Tuesday

- 8:30 a.m. - 12:00 p.m. (Central Time) each Wednesday

4829-2766-4170.11
12162015

## EXHIBIT B

### COMPENSATION

1.    **Compensation**.  As compensation for all services rendered by Dentist, Employer shall pay Dentist an annual salary of Two Hundred Fifty Thousand Dollars ($250,000.00).

2.    **Payment**.  The Compensation shall be paid to Dentist pursuant to Employer's normal payroll practices as the same may be modified from time to time by Employer.

3.    **Withholding**.  Employer may withhold and deduct any amounts required or permitted to be withheld or deducted by applicable law or benefit plan, such as payroll taxes, FICA, garnishments, amounts owed to Employer, from Dentist's compensation and/or final pay in accordance with Employer's normal payroll practices and internal books and records.

4829-2766-4170.11
12162015

E-FILED
8/16/2019 2:47 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

# EXHIBIT C

**TN DENTAL PROFESSIONALS, P.C.**

October 2, 2018

**VIA HAND DELIVERY**

Robert T. Winfree, D.D.S.
1014 Mystic Streams
Mt. Juliet, Tennessee 37122

      Re:    Termination of Provider Agreement

Dr. Winfree,

      This letter constitutes notice by TN Dental Professionals, P.C. ("Employer") to you of its decision to terminate, without cause, your Employment Agreement, dated December 16, 2015 (as it may have been amended, the "Agreement"), and your employment by Employer.  A copy of the Agreement is attached hereto as Attachment 1.  In the alternative, should you agree with Employer's determination that it would be best for the parties to part ways, Employer would be amendable to your voluntary resignation.

      The effective date of your separation will be December 31, 2018, which is ninety (90) days after the date of this written notice of termination, pursuant to Section 11 of the Agreement.

      We want to remind you of your existing and continuing obligations under the Agreement, including the restrictive covenants in Section 12 of the Agreement.

      Thank you for your service.  We wish you the best in your future endeavors.

            Sincerely,

            TN Dental Professionals, P.C.

            Dr. Keith Van Benthuysen, President

4827-9039-6277.2

EXHIBIT B
Case 3:20-mc-00055-E-BN   Document 6-1   Filed 07/27/20   Page 193 of 304   PageID 294
E-FILED
10/03/2019 2:21 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

## IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

| | | |
|---|---|---|
| TN DENTAL PROFESSIONALS, P.C. and | ) | |
| CPF DENTAL, LLC d/b/a MARQUEE | ) | |
| DENTAL PARTNERS, | ) | |
| | ) | **Case No. 181384-II** |
| **Plaintiffs,** | ) | **Chancellor Martin** |
| | ) | **Jury Demand** |
| v. | ) | |
| | ) | |
| ROBERT T. WINFREE, D.D.S. and | ) | |
| OLIVIA WINFREE , | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIM

Defendants, Robert T. Winfree, D.D.S. ("Dr. Winfree") and Olivia Winfree ("Ms. Winfree") (sometimes collectively referred to herein as the "Winfrees"), by and through undersigned counsel, and for their Answer to Plaintiffs' Amended Complaint (the "Amended Complaint") state as follows:

1.    Dr. Winfree admits that he executed the Asset Purchase Agreement and Employment Agreement in December of 2015. The Asset Purchase Agreement and the Employment Agreement speak for themselves and the Winfrees deny any allegations contained in Paragraph 1 inconsistent therewith. Dr. Winfree further admits that TN Dental terminated its employment relationship with Dr. Winfree in December of 2018.

2.    Denied.

3.    The Complaint speaks for itself and the Winfrees deny that the Plaintiffs are entitled to any relief sought in the Complaint.

4.    Upon information and belief, admitted.

5.      Upon information and belief, admitted.

6.      Admitted.

7.      The allegations contained in Paragraph 7 of the Amended Complaint call for a legal conclusion to which no response is required. To the extent a response is required, the Winfrees are not contesting this Court's jurisdiction.

8.      The allegations contained in Paragraph 8 of the Amended Complaint call for a legal conclusion to which no response is required. To the extent a response is required, the Winfrees are not contesting venue.

9.      The Winfrees admits that Exihibit A appears on its face to be a true and exact copy of the Asset Purchase Agreement (the "APA") and the Professional Assets Bill of Sale (the "Bill of Sale"), though the Winfrees have not performed a line by line examination of Exhibit A. The APA and the Bill of Sale speak for themselves and the Winfrees deny any allegations contained in Paragraph 9 of the Amended Complaint inconsistent therewith. The Winfrees admit that Dr. Winfree previously operated under the business name "Winfree & Dental Cosmetic General Dentistry" in conjunction with Dr. Gregory S. Denton, D.D.S. The Winfrees further admit that most recently, Dr. Winfree practice under the name "Winfree & Craig Cosmetic and General Denistry."

10.     The Winfrees admit that Exhibit B appears on its face to be a true and exact copy of an employment agreement between TN Dental and Dr. Winfree (the "Employment Agreement"), though the Winfrees have not performed a line by line examination of Exhibit B. The Employment Agreement speaks for itself and the Winfrees deny any allegations contained in Paragraph 10 of the Amended Complaint inconsistent therewith. The Winfrees admit that Dr. Winfree practiced dentistry in the same building following the execution of the APA and the

Employment Agreement and that he treated some of the patients he had treated prior to the execution of the APA and Employment Agreement.

11.     The Winfrees admit that TN Dental paid Dr. Winfree an annual salary of $250,000, but deny that Paragraph 11 of the Amended Complaint contains an exhaustive recitation of the terms of the Employment Agreement. The Employment Agreements speaks for itself and the Winfrees deny any of the remaining allegations contained in Paragraph 11 of the Amended Complaint that are inconsistent therewith.

12.     Admitted.

13.     The Employment Agreement speaks for itself and the Winfrees deny any allegations contained in Paragraph 13 of the Amended Complaint inconsistent therewith, and further deny that Paragraph 13 contains an exhaustive recitation of the terms of the Employment Agreement. The Winfrees affirmatively assert that these terms of the Employment Agreement are unenforceable as to Dr. Winfree as a result of the Plaintiffs' wrongful conduct. The Winfrees deny the remaining allegations contained in Paragraph 13 of the Amended Complaint.

14.     The APA and the Employment Agreement speak for themselves and the Winfrees deny any allegations contained in Paragraph 14 of the Amended Complaint inconsistent therewith, and further deny that Paragraph 14 contains an exhaustive recitation of the terms of the APA or the Employment Agreement. The Winfrees affirmatively assert that these terms of the APA and the Employment Agreement are unenforceable as to Dr. Winfree as a result of the Plaintiffs' wrongful conduct and representations.

15.     The APA and the Employment Agreement speak for themselves and the Winfrees deny any allegations contained in Paragraph 15 of the Amended Complaint inconsistent therewith, and further deny that Paragraph 15 contains an exhaustive recitation of the terms of the APA or

the Employment Agreement. The Winfrees deny the remaining allegations contained in Paragraph 15 of the Amended Complaint.

16.     The APA and the Employment Agreement speak for themselves and the Winfrees deny any allegations contained in Paragraph 16 of the Amended Complaint inconsistent therewith, and further deny that Paragraph 16 contains an exhaustive recitation of the terms of the APA or the Employment Agreement. The Winfrees affirmatively assert that these terms of the APA and the Employment Agreement are unenforceable as to Dr. Winfree as a result of the Plaintiffs' wrongful conduct and representations. The Winfrees deny the remaining allegations contained in Paragraph 16 of the Amended Complaint.

17.     The APA and the Employment Agreement speak for themselves and the Winfrees deny any allegations contained in Paragraph 17 of the Amended Complaint inconsistent therewith, and further deny that Paragraph 17 contains an exhaustive recitation of the terms of the APA or the Employment Agreement. The Winfrees affirmatively assert that these terms of the Employment Agreement are unenforceable as to Dr. Winfree as a result of the Plaintiffs' wrongful conduct. The Winfrees deny the remaining allegations contained in Paragraph 17 of the Amended Complaint.

18.     The APA speaks for itself and the Winfrees deny any allegations contained in Paragraph 18 of the Amended Complaint inconsistent therewith, and further deny that Paragraph 18 contains an exhaustive recitation of the terms of the APA.

19.     The Employment Agreement speaks for itself and the Winfrees deny any allegations contained in Paragraph 19 of the Amended Complaint inconsistent therewith, and further deny that Paragraph 19 contains an exhaustive recitation of the terms of the Employment Agreement.

# APPENDIX D

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| TN DENTAL PROFESSIONALS, P.C. and CPF DENTAL, LLC d/b/a MARQUEE DENTAL PARTNERS, | ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) Case No. 181384-I ) Chancellor Lyle |
| ROBERT T. WINFREE, D.D.S. and OLIVIA WINFREE, | ) Jury Demand ) ) ) |
| Defendants. | ) |

## AFFIDAVIT OF DAN HODGES

STATE OF TENNESSEE  )
                         )
COUNTY OF DAVIDSON  )

I, Dan Hodges, having been duly sworn, state as follows:

- I am over eighteen years of age, and I make this Affidavit based upon my own personal knowledge.

- I am a partner with Hodges and Associates, LLC, a private investigative company that conducts criminal and civil investigations to include asset searches and permissible bank account searches.

- I was retained to identify assets of Dr. Robert T. Winfree, D.D.S. and Olivia Winfree.

I was able to identify the following accounts that appear to be owned by Robert T. Winfree, DDS:

- **Rothschild & Co Bank (Zürich, Switzerland) - $397,500.00**

# EXHIBIT D

198

- **Danske Bank Internations (Luexembourg) - $736,500.00**

- **Investec Asset Management (Port Elizabeth, South Africa) - $77,000.00**

I was able to identify the following accounts that appear to be owned by Olivia Winfree.

- **HSBC Bank (Shanghai, China) - $215,320.00**

- **Bradesco Financiamentos (St. Oeste, Goiânia Brazil) - $45,000.00**

- **Bank of Greenland (Nuuk, Greenland) - $16,000.00**


AFFIANT FURTHER SAYETH NOT.


Dated: January 2̶9̶ 30 DH, 2020

_Dan Hodges_
Dan Hodges

Sworn to and subscribed before me, the undersigned notary public, on the 9̶t̶h̶ 30th DH day of January, 2020.

STEVE JARRETT
State of Tennessee Notary Public
Williamson County
My Comm. Exp 12-12-2020

Notary Public

My Commission Expires: _12-12-2020_

# APPENDIX E

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| TN DENTAL PROFESSIONALS, P.C. and CPF DENTAL, LLC d/b/a MARQUEE DENTAL PARTNERS, | ) ) ) ) |
|     Plaintiffs, | ) ) |
| v. | )     No. 18-1384-I ) |
| ROBERT T. WINFREE, D.D.S. and OLIVIA WINFREE, | ) ) ) |
|     Defendants. | ) ) |

## AFFIDAVIT OF RORBERT T. WINFREE, D.D.S IN SUPPORT OF RESPONSE TO PLAINTIFFS' EX PARTE MOTION AND SUPPORTING MEMORANDUM FOR TEMPORARY RESTRAINING ORDER

I, Robert T. Winfree, D.D.S., after first being duly sworn, hereby state and affirm as follows:

1.    I am of majority age and have personal knowledge of the facts set forth herein.

2.    I am an individual and a resident of the State of Tennessee, residing at 1014 Mystic Streams Drive, Mount Juliet, Tennessee 37122.

3.    I am one of the Defendants in the above-referenced matter, and my co-defendant Olivia Winfree is my wife ("Olivia").

4.    I am familiar with all bank accounts in my individual name, as well as any bank accounts held jointly by me and Olivia. Further, I believe I am familiar with all bank accounts that are held in Olivia's sole name.

5.    I have reviewed the *Affidavit of Dan Hodges* dated January 30, 2020 that was filed in this matter.

4820-2740-9587, v. 1                    1

6.    Page 1-2 of the Hodges Affidavit lists three bank accounts that Hodges alleges that his research and investigation shows are owned by me.

7.    Page two of the Hodges Affidavit lists three bank accounts that Hodges alleges that his research and investigation shows are owned by me.

8.    The Hodges Affidavit is incorrect, as I do not own any of the accounts listed in the Affidavit or have any interest in those accounts in any other beneficial capacity. To be clear, I have nothing to do with the banks, financial institutions or accounts listed, I have none of the funds listed in the Affidavit.

9.    The Hodges Affidavit is similarly incorrect in its allegations regarding Olivia's alleged accounts, and I have no reason to believe that Olivia owns any of the accounts listed in the Affidavit or have any interest in those accounts in any other beneficial capacity, based on my knowledge of her finances.

10.    Neither Olivia or I have opened any off-shore, foreign bank accounts as alleged in the Affidavit and/or the Motion.

11.    I do not have own or have any interest in any bank accounts, foreign or domestic, that has not been disclosed in this matter previously.

FURTHER, the Affiant saith not.

Robert T. Winfree, D.D.S.

Sworn to and subscribed before me this 31st day of January, 2020.

STATE
OF
TENNESSEE
NOTARY
PUBLIC

2

Notary Public

My Commission Expires:

10-2-23

3

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

|  |  |  |
|---|---|---|
| TN DENTAL PROFESSIONALS, P.C. and<br>CPF DENTAL, LLC d/b/a MARQUEE<br>DENTAL PARTNERS, | ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | No. 18-1384-I |
| ROBERT T. WINFREE, D.D.S. and<br>OLIVIA WINFREE, | ) ) ) |  |
| Defendants. | ) ) |  |

### AFFIDAVIT OF OLIVIA WINFREE
### IN SUPPORT OF RESPONSE

I, Olivia Winfree, after first being duly sworn, hereby state and affirm as follows:

1.      I am of majority age and have personal knowledge of the facts set forth herein.

2.      I am an individual and a resident of the State of Tennessee, residing at 1014 Mystic Streams Drive, Mount Juliet, Tennessee 37122.

3.      I am one of the Defendants in the above referenced matter, and my co-defendant, Robert T. Winfree, D.D.S., is my husband ("Terry").

4.      I am familiar with all bank accounts in my individual name, as well as any bank accounts held jointly by me and Terry. Further, I believe that I am familiar with all bank accounts that are held in Terry's sole name.

5.      I have reviewed the *Affidavit of Dan Hodges* dated January 30, 2020 that was filed in this matter.

6.      Page two of the Hodges Affidavit lists three bank accounts that Hodges alleges that his research and investigation shows are owned by me.

7.      Pages one and two of the Hodges Affidavit lists three bank accounts that Hodges alleges that his research and investigation shows are owned by Terry.

{02007414.} }

1

8.   The Hodges Affidavit is incorrect, as I do not own any of the accounts listed in the Affidavit or have any interest in those accounts in any other beneficial capacity. To be clear, I have nothing to do with the banks, financial institutions or accounts listed, I have none of the funds listed in the Affidavit.

9.   The Hodges Affidavit is similarly incorrect in its allegations regarding Terry's alleged accounts, and I have no reason to believe that Terry owns any of the accounts listed in the Affidavit or have any interest in those accounts in any other beneficial capacity, based on my knowledge of his finances.

10.   Neither Terry nor I have opened any off-shore, foreign bank accounts as alleged in the Affidavit and/or the Motion.

FURTHER, the Affiant saith not.

_____
Olivia Winfree

Sworn to and subscribed before me this 31st day of January, 2020.

_____
Notary Public

My Commission Expires:

___10-2-23___

{02007414.1 }                    {02007414.1 }

205

# APPENDIX F

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 3:20-bk-01417 |
| | ) | Adversary Pro. No. 3:20-ap-90031 |
| ROBERT T. WINFREE, D.D.S., | ) | Chapter 11 |
| | ) | Judge Mashburn |
| Debtor. | ) | |

| | | |
|---|---|---|
| TN DENTAL PROFESSIONALS, P.C., and | ) | |
| CPF DENTAL, LLC d/b/a MARQUEE | ) | |
| DENTAL PARTNERS, | ) | |
| | ) | |
| Plaintiffs/Counter-Defendants, | ) | Case No. 18-1384-III |
| | ) | Chancellor Lyle |
| vs. | ) | |
| | ) | |
| ROBERT T. WINFREE, D.D.S. and | ) | |
| OLIVIA WINFREE, | ) | |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

## DEBTOR'S RESPONSE IN SUPPORT OF MOTION TO COMPEL

On July 2, 2020, plaintiffs TN Dental Professionals, P.C. and CPF Dental, LLC (collectively, "Plaintiffs") filed their *Motion to Compel JT Palmer and Associates, LLC to Produce Documents in Accordance with Subpoena* (Docket No. 31). CPF Dental, LLC issued a subpoena to JT Palmer and Associates, LLC ("JT Palmer") on June 11, 2020 and reasonably requested the production of a limited amount of documents. The requested documents relate to JT Palmer's production of documents to Hodges and Associates, LLC in connection with the prepetition state court lawsuit between Plaintiffs, the Debtor, and the Debtor's spouse. Plaintiffs are entitled to the requested documents and counsel for Plaintiffs has been diligent and patient in attempting to procure such documentation.

In addition, the Debtor may have an actionable claim against JT Palmer. It appears that JT

Palmer originated the false statements that caused Plaintiffs to file a motion for injunctive relief and allege that the Debtor parked over a million dollars in multiple foreign bank accounts to hinder Plaintiffs' collection efforts in the event of a judgment. Debtor submitted affidavits in the state court action vehemently denying the existence of any international bank accounts and thereafter swore under oath when he filed his bankruptcy petition that such accounts do not exist.

Nevertheless, the accusations of deception, violation of a court order, and hiding assets in the state court action caused the Debtor reputation damage, personal humiliation, and mental anguish. The Debtor should be able to review the information JT Palmer conveyed to Hodges and Associates, LLC in order to assess a potential defamation claim for the benefit of the Debtor's creditors. To establish a prima facie case of defamation, a plaintiff must establish that (i) a party published a statement; (ii) with knowledge that the statement is false and defaming to the other; or (iii) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571-72 (Tenn. 1999). On information and belief, JT Palmer published a statement to Hodges and Associates, LLC about the existence of international bank accounts. *See Brown v. Christian Bros. Unive*rsity, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) ("Publication is a term of art meaning the communication of defamatory matter to a third person."). Depending upon the content, the statements were made with reckless disregard for the truth of the statement or with negligence inf ailing to ascertain the truth of the statement. As a result, the Debtor suffered actual damages. *See Murray v. Lineberry*, 69 S.W.3d 560, 564 (Tenn. Ct. App. 2001) ("When looking at damages for a defamation suit this court has stated that, the issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and

2

suffering.") (quotations omitted). The Debtor should therefore be entitled to the documents in order to assess a defamation claim against JT Palmer for the benefit of his creditors.

WHEREFORE, for the foregoing reasons, the Debtor respectfully requests the Court to grant Plaintiffs' motion to compel.

Respectfully Submitted:


/s/ Griffin S. Dunham
Griffin S. Dunham
DUNHAM HILDEBRAND, PLLC
2416 21st Avenue South, Suite 303
Nashville, Tennessee 37212
615.933.5850
griffin@dhnashville.com
*Counsel for the Debtor*


## CERTIFICATE OF SERVICE

On July 2, 2020, this response has been served on all parties consenting to electronic service in this adversary proceeding.


/s/ Griffin S. Dunham
Griffin S. Dunham

3

# APPENDIX G

Case 3:20-mc-00055-E-BN Document 6-1 Filed 07/27/20 Page 211 of 304 PageID 302

# UNITED STATES BANKRUPTCY COURT

Middle _____ District of Tennessee _____

In re Robert T. Winfree, D.D.S. _____
_____
Debtor

Case No. 3:20-bk-01417 _____

*(Complete if issued in an adversary proceeding)*

TN Dental Professionals, P.C. and
CPF Dental, LLC d/b/a Marquee Dental Partners
_____
Plaintiff

Chapter 11 _____

v.

Robert T. Winfree, D.D.S. and Olivia Winfree
_____
Defendant

Adv. Proc. No. 3:20-90031 _____

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: JT Palmer and Associates, LLC, c/o Judy Shea, President, P.O. Box 1783, Granbury, Texas 76048
_____
*(Name of person to whom the subpoena is directed)*

■ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See attached Exhibit A.

| PLACE Lexitas Legal, Attn: Raven Grandberry, 325 North St. Paul Street, #1900, Dallas, TX 75201 | DATE AND TIME June 16, 2020 5:00 p.m. CST |
|---|---|

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 06/04/2020

CLERK OF COURT

OR

_____
*Signature of Clerk or Deputy Clerk*

_____
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
Plaintiffs _____ , who issues or requests this subpoena, are: Melissa W. Jones, Waller Lansden
Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN 37219; melissa.jones@wallerlaw.com; 615-244-6380

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

**PROOF OF SERVICE**
(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

J.T. Palmer & Associates, LLC Registered Agen'

I received this subpoena for (*name of individual and title, if any*): Martina's TAX Service

on (*date*) 6-11-20

[X] served the subpoena by delivering a copy to the named person as follows: J.T. Palmer & Associates, LLC by
serving registered Agent Martina's TAX Service, Martina Grannath
_____ on (*date*) 6-12-20 ; or

[ ] returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

Gary B Cooper
*Server's signature*

Gary B Cooper
*Printed name and title*

1502 Star light Ct.
Granbury, TX 76048
*Server's address*

Additional information concerning attempted service, etc.:

Case 3:20-mc-00055-E-BN   Document 6-1   Filed 07/27/20   Page 213 of 304   PageID 304

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

<u>EXHIBIT A</u>
<u>ATTACHMENT TO SUBPOENA TO</u>
<u>JT PALMER AND ASSOCIATES, LLC</u>

TN Dental Professionals, P.C. and CPF Dental, LLC d/b/a Marquee Dental Partners (collectively, "***CPF Dental***"), requests that JT Palmer and Associates, LLC ("***JT Palmer***") produce the requested documents (the "***Requests***") within fourteen (14) days to CPF Dental's counsel, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN 37219, Attention: Melissa Jones.

## <u>DEFINITIONS</u>

1.     "**Debtor**" refers to Robert T. Winfree, D.D.S., and all partners, agents, employees, officers, directors, attorneys, and other representatives of Debtor acting on Debtor's behalf or purporting to act on Debtor's behalf.

2.     "**Document**" and "**documentation**" mean each copy, version, or draft (including every copy bearing handwritten or other marks, notations, stamps, or variations), whether sent or received or neither, that embodies or records any thoughts, ideas, concepts, expressions, or communications. The term "document" includes but is not limited to the following:

  a.   all writings (including but not limited to emails, text messages, internet postings, letters, faxes, books, correspondence, telegraphs, telex messages, cables, contracts, mortgages, agreements, notes, drafts, records, minutes of meetings, reports, appraisals, checks, cancelled checks, accounts, statements of accounts, ledgers, ledger entries, book entries, and notices);

  b.   all audio or visual records (including but not limited to photographs, drawings, sketches, paintings, sculptures, castings, replicas, models, exemplars, samples, video tapes, video discs, video files, audio tapes, audio discs, audio files, and animations);

  c.   all items that combine, incorporate, or associate two or more of the types of documents described above; and

  d.   any other items properly included within the definition of "document" pursuant to applicable rules and law.

The terms "document" and "documents" shall specifically include electronically stored information ("***ESI***") such as, but not limited to, email, text messages, instant messages, any documents created on a computer or other electronic device, any data residing on a storage

medium, including but not limited to, hard drives (desktop, laptop or external), servers, jump drives, hand held drives, iPhones, iPads, iPods, Blackberries, mobile phones or smart phones, CDs and DVDs, and any sound or tape recording.  The requesting party reserves the right to require the producing party to produce any ESI or documents in native format.

The meaning of the words "document" and "documents" also includes voice recordings and reproductions and film impressions of any of the aforementioned writings as well as copies of documents, which are not identical duplicates of the originals and copies of documents of which the originals are not in your possession, custody, or control.  In case originals or original non-identical copies are not available, "document" or "documents" includes copies of originals or copies of non-identical copies, as the case may be.

3.      "**Foreign Account**" means, collectively (a) any right to payment of a monetary obligation, whether or not earned by performance, (b) without duplication, any "account" (as defined in the UCC), any accounts receivable (whether in the form of payments for services rendered or goods sold, rents, license fees or otherwise), any "health-care-insurance receivables" (as that term is defined in the UCC), any "payment intangibles" (as that term is defined in the UCC) and all other rights to payment and/or reimbursement of every kind and description, whether or not earned by performance, (c) all accounts, "general intangibles" (as that term is defined in the UCC), intellectual property, rights, remedies, guarantees, "supporting obligations" (as that term is defined in the UCC), "letter-of-credit rights" (as that term is defined in the UCC) and security interests in respect of the foregoing, all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights in respect of the foregoing, (d) all information and data compiled or derived by Debtor or Mrs. Winfree or to which Debtor or Mrs. Winfree is entitled in respect of or related to the foregoing, and (e) all proceeds of any of the foregoing, located outside of the United States of America, including, without limitation, accounts held or previously held at the following financial institutions:

a.  Rothchild & Co Bank
    Zollikerstrasse 181
    8034 Zurich, Switzerland

b.  Investec Bank
    6th Floor Fairview Ofce Park
    Ring Rd Port Elizabeth 6045

c.  Danske Bank International SA
    13 Rue Edward Steichen
    2540 Luxembourg

d.  HSBC Bank
    1391 Guber Road
    Shanghai, China

e.  Bradesco Financiamentos
    R 3 880 St.
    St. Oeste, Goiania, Brazil

4829-4275-3725.2

   f. Bank of Greenland
    Imaneq 33
    Postboks 1033
    3900 Nuuk

  4.  "**Hermitage Investment Group**" means, collectively, 11689284 Ltd., a foreign corporation having a registered address at Kemp House 152-160 City Road, London, United Kingdom EC1V 2NX, formerly known as Hermitage Investment Group Ltd. and Hermitage Investment Group, Inc., a for-profit corporation located at 105 Bonnabrook Drive, Suite 105, Hermitage, Tennessee 37076.

  5.  "**Mrs. Winfree**" refers to Olivia McMurray Winfree, wife of Debtor.

  6.  "**Ms. Shea**" refers to Judy Shea, President of JT Palmer.

  7.  "**UCC**" means the Uniform Commercial Code of the State of Tennessee or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Foreign Account.

## INSTRUCTIONS

  1.  Except as otherwise specified, the Definitions and Instructions incorporate by reference the requirements set forth in Fed. R. Civ. P. 45, together with all other applicable rules of procedure and local rules.

  2.  In construing the Requests, the singular shall include the plural and vice versa.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

  1.  Any and all Documents evidencing or relating to JT Palmer's or Ms. Shea's search for foreign accounts owned by Debtor or Mrs. Winfree;

  2.  Any and all Documents evidencing or relating to the identity of Hermitage Investment Group used in identifying any Foreign Account;

  3.  Any and all Documents evidencing that the funds in any Foreign Account originated in the United States of America; and

4829-4275-3725.2

3

4.      Any and all Documents evidencing that any Foreign Account belongs to Debtor

and/or Mrs. Winfree.

# APPENDIX H

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Robert Terry Winfree, | ) | Case No. 3:20-01417 |
|  | ) | Judge Randal S. Mashburn |
| Debtor. | ) |  |
|  | ) |  |
| TN Dental Professionals, P.C., and | ) |  |
| CPF Dental, LLC, d/b/a Marquee Dental | ) |  |
| Partners, | ) |  |
|  | ) |  |
| Plaintiffs/ Counter-Defendants, | ) |  |
|  | ) |  |
| vs. | ) | Adv. Proc. No. 3:20-90031 |
|  | ) |  |
| Robert T. Winfree, D.D.S. and Olivia | ) |  |
| Winfree, | ) |  |
|  | ) |  |
| Defendants/ Counter-Plaintiffs. | ) |  |

## PLAINTIFFS' MOTION TO COMPEL JT PALMER AND ASSOCIATES, LLC TO PRODUCE DOCUMENTS IN ACCORDANCE WITH SUBPOENA

Plaintiff TN Dental Professionals, P.C., and CPF Dental, LLC, d/b/a Marquee Dental Partners (collectively, "***CPF Dental***") moves the Court for an Order to Compel JT Palmer and Associates, LLC ("***JT Palmer***"), to provide full and complete responses to CPF Dental's Subpoena to Produce Documents served on JT Palmer on June 11, 2020 (Dkt. No. 23) (the "***Subpoena***"), pursuant to Rule 45(c)(2) of the Federal Rules of Civil Procedure.  As demonstrated below, JT Palmer has failed to produce any and all documents as required in accordance with the Subpoena.

## BACKGROUND

Prior to Defendant Robert Terry Winfree filing for bankruptcy relief under Chapter 11 of Title 11 of the United States Bankruptcy Code, CPF Dental hired Hodges & Associates, LLC

("**_Hodges_**"), a firm specializing in asset and bank account searches, to (i) confirm that Defendants were providing a complete picture of their finances, and (ii) determine if Defendants possessed additional accounts that had not been disclosed despite repeated Court Orders to do so and representations from Defendants and their counsel that no such accounts existed.  Hodges thereafter discovered, through the help of JT Palmer, that Defendants possess at least six (6) undisclosed accounts at various foreign banks in Defendants' names with nearly $1.5 million contained within them.  (_See_, Affidavit of Dan Hodges, attached hereto as **Exhibit A**, attesting to Defendants' foreign bank accounts).

After repeated attempts to gain confirmation that the above-mentioned foreign bank accounts in fact relate to Defendants, CPF Dental served the Subpoena on JT Palmer on June 11, 2020, requesting, among other things, production of any and all documentation proving the identity of the account holders in which the alleged foreign bank accounts belong.  The pertinent requests to JT Palmer, found in paragraphs 1 through 4 of the Subpoena, state as follows:

> 1.     _Any and all Documents evidencing or relating to JT Palmer's or Ms. Shea's search for foreign accounts owned by Debtor or Mrs. Winfree;_
>
> 2.     _Any and all Documents evidencing or relating to the identity of Hermitage Investment Group used in identifying any Foreign Account;_
>
> 3.     _Any and all Documents evidencing that the funds in any Foreign Account originated in the United States of America; and_
>
> 4.     _Any and all Documents evidencing that any Foreign Account belongs to Debtor and/or Mrs. Winfree._

JT Palmer's documentation evidencing the process used in order to reveal the existence of the foreign bank accounts will ultimately guide settlement negotiations among CPF Dental and Defendants, and thus is absolutely necessary in order for the parties to move forward.

2

## ARGUMENT

**JT Palmer Should be Compelled to Provide Documents Requested by the Subpoena**

Rule 34(c) of the Federal Rules of Civil Procedure provides that, in accordance with Rule 45, "a nonparty may be compelled to produce documents." Rule 45(d)(2)(B) provides that if "a person commanded to produce documents" wishes to object to the production, such "objection must be served before the earlier of time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B). If a party fails to respond to such document request, a party "may move for an order compelling discovery." Fed. R. Civ. P. 37(a)(1); *See also* Fed. R. Civ. P. 37(a)(3)(B)(iv) (a motion to compel may be made if a party fails to produce documents as requested under Rule 34).

The Subpoena was properly served on JT Palmer on June 11, 2020 in accordance with Rule 45(d) of the Federal Rules of Civil Procedure. As stated in the subpoena, JT Palmer was required to produce any and all documents related to the requests set forth in the Subpoena no later than fourteen (14) days of service. As of the date of this Motion, JT Palmer has failed to produce any documentation as requested by the Subpoena, and further has failed to file any affidavit or other documentation with this Court attesting, under oath, that it has no documentation to produce.

CPF Dental also certifies that, as required by Rule 37(a)(1) of the Federal Rules of Civil Procedure, it has "in good faith conferred or attempted to confer with [JT Palmer] in an effort to obtain [the discovery] without court action." Numerous phone calls with JT Palmer's counsel were exchanged over the course of the past week, and although JT Palmer, through its counsel, requested CPF Dental to grant it an extension to object to the Subpoena, it was unable to confirm that any grant of an extension would result in JT Palmer producing the documentation requested by the Subpoena. JT Palmer's production pursuant to the Subpoena was due on June 25, 2020.

In order for this case to move forward, whether it is through settlement negotiations or

3

through a trial on the merits, confirmation of whether the alleged foreign bank accounts uncovered by JT Palmer in fact relate to the Defendants is critical.

## <u>CONCLUSION</u>

For the reasons addressed above, Plaintiffs respectfully request the Court grant this Motion to Compel, and enter the Order attached hereto as **Exhibit B**, ordering JT Palmer to fully produce all documents related to Plaintiffs' requests at set forth in the Subpoena.

Dated: July 2, 2020                    WALLER LANSDEN DORTCH & DAVIS, LLP

/s/ *Ryan K. Cochran*
Ryan K. Cochran (TN 025851)
Melissa W. Jones ( TN 036559)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
ryan.cochran@wallerlaw.com
melissa.jones@wallerlaw.com

*Attorneys for CPF Dental, LLC d/b/a Marquee Dental*
*Partners and TN Dental Professionals, P.C.*

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Motion was served via the Court's electronic filing system, this 2nd day of July, 2020, and via first class mail on the following business day, as follows:

JT Palmer and Associates, LLC
PO Box 1783
Granbury, TX 76048

-and-

J. Michael McBride
6420 Southwest Blvd., Suite 112
Fort Worth, TX 76109

*Attorney for JT Palmer and Associates,*
*LLC*

/s/ *Ryan K. Cochran*
Ryan K. Cochran

5

## EXHIBIT A

**Affidavit of Dan Hodges**

See attached.

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

TN DENTAL PROFESSIONALS, P.C. and )
CPF DENTAL, LLC d/b/a MARQUEE )
DENTAL PARTNERS, )
                     )
      Plaintiffs, )
                     )    Case No. 181384-I
v.                    )    Chancellor Lyle
                     )    Jury Demand
ROBERT T. WINFREE, D.D.S. and )
OLIVIA WINFREE, )
                     )
      Defendants. )

## AFFIDAVIT OF DAN HODGES

STATE OF TENNESSEE  )
                       )
COUNTY OF DAVIDSON  )

I, Dan Hodges, having been duly sworn, state as follows:

-    I am over eighteen years of age, and I make this Affidavit based upon my own personal knowledge.

-    I am a partner with Hodges and Associates, LLC, a private investigative company that conducts criminal and civil investigations to include asset searches and permissible bank account searches.

-    I was retained to identify assets of Dr. Robert T. Winfree, D.D.S. and Olivia Winfree.

I was able to identify the following accounts that appear to be owned by Robert T. Winfree, DDS:

-    **Rothschild & Co Bank (Zürich, Switzerland) - $397,500.00**

**EXHIBIT D**

- **Danske Bank Internations (Luexembourg) - $736,500.00**

- **Investec Asset Management (Port Elizabeth, South Africa) - $77,000.00**

I was able to identify the following accounts that appear to be owned by Olivia Winfree.

- **HSBC Bank (Shanghai, China) - $215,320.00**

- **Bradesco Financiamentos (St. Oeste, Goiânia Brazil) - $45,000.00**

- **Bank of Greenland (Nuuk, Greenland) - $16,000.00**

AFFIANT FURTHER SAYETH NOT.

Dated: January 29, 2020        30 DH

_Dan Hodges_
Dan Hodges

Sworn to and subscribed before me, the undersigned notary public, on the 9ᵗʰ day of January, 2020.        30ᵗʰ DH

STEVE JARRETT
State of Tennessee Notary Public
Williamson County
My Comm. Exp 12-12-2020

Notary Public

My Commission Expires: _12-12-2020_

**<u>EXHIBIT B</u>**

**Proposed Order**

4813-7618-1953

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| In re: | Chapter 11 |
| Robert Terry Winfree, | Case No. 3:20-01417 |
| Debtor. | Judge Randal S. Mashburn |
| | |
| TN Dental Professionals, P.C., and CPF Dental, LLC, d/b/a Marquee Dental Partners, | |
| Plaintiffs/ Counter-Defendants, | |
| vs. | Adv. Proc. No. 3:20-90031 |
| Robert T. Winfree, D.D.S. and Olivia Winfree, | |
| Defendants/ Counter-Plaintiffs. | |

## ORDER GRANTING PLAINTIFFS' MOTION TO COMPEL
## JT PALMER AND ASSOCIATES, LLC TO PRODUCE
## DOCUMENTS IN ACCORDANCE WITH SUBPOENA

After consideration of *Plaintiffs' Motion to Compel JT Palmer and Associates, LLC to Produce Documents in Accordance with the Subpoena*, the Court finds that Plaintiffs' Motion is well-taken and should be granted as follows:

1.      JT Palmer shall produce any and all documentation related to the requests set forth in Plaintiffs' Subpoena to JT Palmer to Produce Documents within ten (10) days of entry of this Order.

Therefore, it is **ORDERED, ADJUDGED and DECREED**, that the Plaintiffs' Motion is **GRANTED**, as described more fully above.

**This Order was Signed and Entered Electronically as Indicated at the Top of the First Page**

4813-7618-1953

APPROVED FOR ENTRY:


/s/ *Ryan K. Cochran*
Ryan K. Cochran (TN 025851)
Melissa W. Jones ( TN 036559)
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
ryan.cochran@wallerlaw.com
melissa.jones@wallerlaw.com

*Attorneys for CPF Dental, LLC d/b/a*
*Marquee Dental Partners and TN Dental Professionals, P.C.*

4813-7618-1953
Case 3:20-ap-90031   Doc 31-2   Filed 07/02/20   Entered 07/02/20 20:40:55   Desc
Exhibit B - Proposed Order   Page 3 of 3

229

# APPENDIX I

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

In re:                                            Chapter 11

Robert Terry Winfree,                             Case No. 3:20-01417
                                                  Judge Randal S. Mashburn
          Debtor
_____

TN Dental Professionals, P.C., and
CPF Dental, LLC, d/b/a Marquee Dental
Partners,

          Plaintiffs/ Counter-Defendants,

vs.

Robert T. Winfree, D.D.S. and Olivia
Winfree,                                          Adv. Proc. No. 3:20-90031

          Defendants/ Counter-Plaintiffs.
_____

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In Re: Subpoena Served On                         Civil Action No. _____

J.T. Palmer & Associates, LLC
_____

**Non-Party J.T. Palmer & Associates, LLC's
Motion to Quash Subpoena Served by
Plaintiffs TN Dental Professionals, P.C. and
CPF Dental, LLC and Brief in Support Thereof**

Motion to Quash and Brief in Support - Page 1

## I. Relevant Background.

1.  Non-Party J.T. Palmer & Associates, LLC ("JT Palmer") files this Motion to Quash, requesting the Court to quash a subpoena that Tennessee counsel for Tennessee Plaintiffs TN Dental Professionals, P.C. and CPF Dental, LLC ("Plaintiffs") issued and served on JT Palmer from the Bankruptcy Court for the Middle District of Tennessee. *See* Appendix to Motion to Quash, App. 02-08.[1]

2.  The Subpoena purported to command production of "the following documents," directing JT Palmer to "See attached Exhibit A." App. 02 In the blank identifying the "place" for production, the Subpoena commanded, "Lexitas Legal, Attn: Raven Grandberry, 325 North St. Paul Street, # 1900, **Dallas, TX** 75201." *Id.* In the blank identifying the "Date and Time" for production, the Subpoena commanded "**June 16, 2020** 5:0o p.m. CST." *Id.*

3.  Attached to the Subpoena was an "Exhibit A," entitled "Attachment to Subpoena to JT Palmer and Associates, LLC." App. 05. Unlike the Subpoena, "Exhibit A" "requests" JT Palmer to produce the requested documents "within fourteen (14) days to [Plaintiffs'] counsel Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN, 37219, Attention: Melissa Jones." *Id.*

4.  Curiously, the Subpoena was actually issued by Plaintiffs' counsel **two weeks earlier**, on Tuesday, June 2, 2020. App. 02. And for reasons unknown to JT Palmer, the Subpoena did not make its way into the hands of Plaintiffs' process server until Thursday, June 11. App. 03.

---

[1] Cites to the Appendix will be by bates number page, as follows: "App. 02."

Motion to Quash and Brief in Support - Page 2

5.   JT Palmer was not served with the Subpoena until Friday, June 12. *Id*. Thus, by the time the Subpoena made it to JT Palmer, JT Palmer had only **two business days** to comply with the Tuesday, June 16 deadline.

6.   Aside from denying JT Palmer "a reasonable time to comply," Fed. R. Civ. P. 45(d)(3)(A)(i), the Subpoena also demanded production of documents that would require disclosure of confidential, trade secret materials, the production of which would threaten to destroy JT Palmer's business. *See* Motion to Quash *infra*, pp. 7-14; App. 11-12.

7.   Accordingly, once JT Palmer was able to engage counsel to respond, *see* App. 10, JT Palmer's counsel (J. Michael McBride) contacted Plaintiffs' counsel to discuss the Subpoena and to try to obtain an extension. App. 30. From his several conversations with Ms. Melissa Jones (Plaintiffs' counsel who signed the Subpoena), Mr. McBride was led to believe that an extension would be forthcoming pending the approval of the "partner in charge." *Id*.

8.   After several follow-up calls to Ms. Jones between June 30 and July 2, Mr. McBride was eventually contacted on July 3 by the "partner in charge," Mr. Ryan K. Cochran. *Id*. For the first time, Mr. McBride learned that an extension would not be forthcoming; it was Plaintiffs' position that JT Palmer had already missed its compliance deadline and had to respond regardless. *Id*.

9.   Moreover, what Mr. Cockran did not tell Mr. McBride was that on July 2, Plaintiffs had already filed a motion to compel in Tennessee, seeking an order from the Tennessee court compelling JT Palmer "to produce documents in accordance with subpoena." App. 30. In their motion to compel, Plaintiffs tell the Tennessee court:

Numerous phone calls with JT Palmer's counsel were exchanged over the course of the past week, and although JT Palmer, through its counsel, requested CPF Dental to grant it an extension to object to the Subpoena, it was unable to confirm that any grant

Motion to Quash and Brief in Support - Page 3

of an extension would result in JT Palmer producing the documentation requested by the Subpoena. JT Palmer's production pursuant to the Subpoena was due on June 25, 2020.

App. 35.

10. Notably, Plaintiffs' motion to compel does not include the Subpoena as an exhibit for the Tennessee court's review. App. 33-43. Nor does the motion give any information identifying where JT Palmer resides or where the Subpoena commanded compliance. *Id*. What Plaintiffs' motion does tell the court is "[t]he Subpoena was properly served on JT Palmer on June 11, 2020 in accordance with Rule 45(d)," that "[a]s stated in the subpoena, JT Palmer was required to produce any and all documents related to the requests set forth in the Subpoena no later than fourteen (14) days of service," and that "JT Palmer's production pursuant to the Subpoena was due on June 25, 2020." App. 35.

11. In truth, the Subpoena's "Proof of Service" shows that it was served on JT Palmer on Friday, June 12, 2020. App. 02. And what the Subpoena actually commands is for JT Palmer to produce all of the requested documents on "June 16, 2020 5:00 p.m. CST"— only two business days after JT Palmer was served. *Id*. And as previously stated, the Subpoena requires compliance in the Northern District of Texas. *Id*.

## II. Brief: Argument & Authorities.

**A.    This is the only court with jurisdiction to rule on the Subpoena.**

"Rule 45 requires that disputes related to non-party subpoenas be resolved locally to avoid imposing undue travel or expense burdens on non-parties who are challenging a subpoena." *Kilmon v. Saulsbury Indus., Inc.*, MO:17-CV-99, 2018 WL 5800759, at *3 (W.D. Tex. Feb. 13, 2018). A motion to quash a subpoena or to compel compliance is properly filed only in a court for the district where compliance with the subpoena is required. *See* Fed. R. Civ. P. 45(d)(2)(B), 45(d)(3)(A); *see also MetroPCS v. Thomas*, 327

Motion to Quash and Brief in Support - Page 4

F.R.D. 600, 606 (N.D. Tex. 2018) ("Because the Subpoena requires compliance in Dallas, the Motion to Quash and Motion to Compel are properly filed in this Court, which, as required by Rule 45(d), is the court in the district where compliance with the Subpoenas is required."); *accord CSS, Inc. v. Herrington*, 354 F. Supp. 3d 702, 710 (N.D. Tex. 2017) (recognizing "Rule 45's 'purpose of protecting nonparties is defeated if a party could demand compliance [in one location] and still require the nonparty to adjudicate a dispute over that subpoena in a distant forum") (bracketed language added) (quoting *Raap v. Brier & Thorn, Inc.*, 17-MC-3001, 2017 WL 2462823, at *2 (C.D. Ill. July 7, 2017) ("The court with jurisdiction to modify or quash a subpoena is the court for the district 'where compliance is required.'")).

Where, as in this case, the court issuing the subpoena (a Tennessee bankruptcy court) is not also the court in the district where compliance is required, the issuing court lacks jurisdiction either to compel enforcement or to quash the subpoena. *See Kilmon*, 2018 WL 5800759, at *3 ("A plain reading of the Federal Rules of Civil Procedure indicates that this Court, although the 'issuing court,' is not the 'compliance court' for purposes of the SCANA Corp. Subpoena and thus does not have jurisdiction to rule on Plaintiff's Motion to Compel Third Party."); *Diamond Consortium, Inc. v. Manookian*, 4:16-CV-00094-ALM, 2016 WL 9275972, at *3 (E.D. Tex. Oct. 25, 2016) ("Here, the subpoenas directed at Sunwest, Andrew Stern, and Frederick Stern issued (appropriately) from this Court. Nevertheless, these subpoenas require compliance in Dallas, Texas—in the Northern District of Texas. As a result, this Court lacks authority to quash or modify these subpoenas in the first instance.") (parenthetical in original).

Moreover, Rule 45's limitations on which court is authorized to enforce or to quash a subpoena involve important concerns beyond "protecting nonparties" from the burden

Motion to Quash and Brief in Support - Page 5

and expense of having "to adjudicate a dispute over that subpoena in a distant forum."

*See Herrington*, 354 F. Supp. 3d 702, 710; *Kilmon*, 2018 WL 5800759, at *3. "A district

court [] must have personal jurisdiction over a nonparty in order to compel it to comply

with a valid discovery request under Federal Rule of Civil Procedure 45." *Gucci Am., Inc.*

*v. Weixing Li*, 768 F.3d 122, 141 (2d Cir. 2014); *see In re Sealed Case*, 141 F.3d 337, 341

(D.C.Cir.1998) (recognizing that in Rule 45 discovery transfer motions "a transferee court

... would often lack personal jurisdiction over the nonparty" and that "[t]he principle that

courts lacking jurisdiction over litigants cannot adjudicate their rights is elementary, and

cases have noted the problem this creates for the prospect of transferring nonparty

discovery disputes").

      Accordingly, because the court in the Northern District of Texas is the only court

with jurisdiction over JT Palmer and the Subpoena, JT Palmer has moved in this Court

for an order quashing the Subpoena. Additionally, JT Palmer does not consent to the

Tennessee court's exercising jurisdiction over this matter or JT Palmer.

**B.**      **The Subpoena failed to allow a reasonable time to comply.**

      Rule 45 provides that a subpoena "must" be quashed if it "fails to allow a

reasonable time to comply." Fed. R. Civ. P. 45(d)(3)(A)(i). Rule 45 does not state what

constitutes "a reasonable time." Nonetheless, JT Palmer submits that Plaintiffs'

subpoena—commanding compliance within only two business days of service—does not

constitute a reasonable time to comply. *See, e.g.*, *United States v. Cabelka*, 7:16-CV-

00126-O-BP, 2017 WL 11477131, at *1 (N.D. Tex. Oct. 23, 2017) (denying motion to

compel production of documents pursuant to subpoena where non-party "was only given

fifteen days' notice to produce the requested documents," explaining "[a]lthough Ms.

Slate did not file an objection or a motion to quash/modify the subpoena as indicated

Motion to Quash and Brief in Support - Page 6

under Rule 45, Ms. Slate was not given 'reasonable time' to comply with the subpoena duces tecum" and "[b]ecause Ms. Slate was untimely served, the Court finds that Ms. Slate had no obligation to produce the documents requested"); *Hall v. Louisiana*, CIV.A. 12-657-BAJ, 2014 WL 1652791, at *13 (M.D. La. Apr. 23, 2014) (time periods of 9 and 12 days to comply with subpoenas "are clearly unreasonable, particularly when the 14 day period for serving objections under Rule 45(c)(2)(B) is generally considered a reasonable time"); *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 1:07-CV-956, 2009 WL 724001, at *1 (W.D. Mich. Mar. 10, 2009) ("Two business days, more or less, even with the intervening weekend, is not an adequate period of time to comply with a subpoena."); *Paul v. Stewart Enterprises, Inc.*, CIV. A. 99-3441, 2000 WL 1171120, at *1 (E.D. La. Aug. 16, 2000) ("One business day's notice is clearly unreasonable in light of the requirement in Fed.R.Civ.P. 45(c)(2)(B) that a subpoenaed person be permitted 14 days to object.").

Accordingly, JT Palmer requests the Court to enter an order quashing the Subpoena.[2]

## C.    The Subpoena requires production of confidential, trade secret information.

Rule 45 provides that "the district where compliance is required may, on motion, quash or modify the subpoena if it requires: (i) disclosing a trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B)(i). Similarly, both Texas law and federal law provide for protections against

---

[2] Moreover, the fact that the Subpoena's "Exhibit A" "requests" production in 14 days in Tennessee is of no moment. App. 05. The actual Subpoena **commanded** production in the Northern District of Texas on June 1. Any argument that the Subpoena somehow commanded JT Palmer to produce documents in Tennessee 14 days after service would render the Subpoena fatally defective on an additional ground too. *See* Fed. R. Civ. P. 45(d)(3)(A)(ii) ("the court for the district where compliance is required must quash or modify a subpoena that ... requires a person to comply beyond the geographical limits specified in Rule 45(c)"), 45(c) (limiting the place of production to "a place within 100 miles of where the person resides, is employed, or regularly transacts business in person").

Motion to Quash and Brief in Support - Page 7

those who would misappropriate a trade secret. *See* Texas Uniform Trade Secrets Act,

Tex. Civ. Prac. & Rem. Code § 134A.002(1), (3), (6), 134A.004(a); The Federal Defend

Trade Secrets Act, 18 U.S.C. 1836; P.L. 114-153, § 2, 130 Stat, 376 (2016).

A "trade secret" is broadly defined to mean:

"(3) … all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

    (A)    the owner thereof has taken reasonable measures to keep such information secret; and

    (B)    the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."

*See* 18 U.S.C. § 1839(3). Moreover, "the term 'owner,' with respect to a trade secret, means

the person or entity in whom or in which rightful legal or equitable title to, or license in,

the trade secret is reposed." *Id.* at (4).

**1.    Plaintiffs' production requests.**

The Subpoena purports to command production pursuant to the following

requests set forth in Exhibit A.

1.    Any and all Documents evidencing or relating to JT Palmer's or Ms. Shea's search for foreign accounts owned by Debtor or Mrs. Winfree;

2.    Any and all Documents evidencing or relating to the identity of Hermitage Investment Group used in identifying any Foreign Account;

3.    Any and all Documents evidencing that the funds in any Foreign Account originated in the United States of America; and

4.    Any and all Documents evidencing that any Foreign Account belongs to Debtor and/or Mrs. Winfree.

Motion to Quash and Brief in Support - Page 8

App. 07.

**2. Facts relevant to Plaintiffs' requests.[3]**

Plaintiffs are apparently creditors of two individuals who filed for bankruptcy protection in Tennessee, Robert Terry Winfree and Oliva Winfree (Winfrees). In an effort to determine if the Winfrees were hiding money in undisclosed bank accounts, Plaintiffs hired a private investigation firm named, Hodges & Associates, LLC ("Hodges"). Hodges hired private detective Paul Pankiewicz, with ROS Consulting, Inc., who, in turn, hired JT Palmer. App. 10.

JT Palmer is an information research specialist. *Id.* JT Palmer was formed as a Texas Limited Liability company, with Ms. Judy Shea being the sole member and 100% owner. *Id.* JT Palmer's office is in Granbury Texas, which is also where Ms. Shea resides and conducts the business of JT Palmer. *Id.*

JT Palmer is in the business of performing confidential background research for clients who, like Pankiewicz, employ JT Palmer to conduct confidential research to discover assets, including foreign bank accounts, that individuals, like the Winfrees, may have hidden or secreted. *Id.*

**a. The Trade Secret Information.**

Over the years of performing this service, JT Palmer has developed private patterns, methods, techniques, processes, procedures and programs by which JT Palmer conducts data, or information searches and obtains this information—information that is itself hidden and not readily ascertainable, or discoverable. App. 11. The private patterns,

---

[3] The evidentiary support for the facts set forth in the paragraphs that follow are contained in the Affidavit of Judith Ann Shea, App. 10-12, and the attached exhibits.

Motion to Quash and Brief in Support - Page 9

methods, techniques, processes, procedures and programs that JT Palmer has developed to discover this hidden information are themselves not generally known or readily ascertainable. *Id.* Moreover, the private methods, techniques, processes, and procedures JT Palmer has developed also makes use of sources and vendors whose identities are themselves highly confidential. *Id.* Their identities and information sources are information that JT Palmer carefully guards and does not disclose. *Id.*

**b.  JT Palmer is the owner of the Trade Secret Information.**

JT Palmer is the owner of these private patterns, methods, techniques, processes, procedures and programs. *Id.* As stated above, Ms. Judy Shea is 100% owner of JT Palmer, and she developed these private patterns, methods, techniques, processes, procedures and programs personally for use in the business of JT Palmer. *Id.*

**c.  JT Palmer has taken reasonable measures to keep the Trade Secret Information secret.**

JT Palmer does not share or disclose to third parties, including its clients, the private patterns, methods, techniques, processes, procedures and programs it has developed and uses to discover information. *Id.* In fact, JT Palmer has a process by which it seeks to ensure the information which is discovered through the use of its private patterns, methods, techniques, processes, procedures and programs is kept secret. *Id.* Specifically, JT Palmer utilizes a "Customer Agreement," which clients sign and which clearly states:

> JT Palmer and Associates, LLC's reports contain confidential information and is not to be distributed to anyone other than the intended recipient. Distribution to any other entity in whole or in part is strictly prohibited. This information is for fact finding only and is not admissible in court.

App. 11, 22. The "Customer Agreement" that Pankiewicz signed in this matter is included at App. 22.

Motion to Quash and Brief in Support - Page 10

Similarly, the report JT Palmer prepares and provides to clients is entitled "CONFIDENTIAL" and clearly states:

> This report contains confidential information and is not to be distributed to anyone other than the intended recipient named above. Distribution to any other entity in whole or in part is strictly prohibited. This information is for fact finding only and is not admissible in court.

App. 11, 24. These documents are part of JT Palmer's efforts to ensure that the private patterns, methods, techniques, processes, procedures and programs themselves are kept secret and confidential. App. 11-12.

> **d.     The Trade Secret Information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.**

The heart of JT Palmer's business as a confidential information research specialist is its private patterns, methods, techniques, processes, procedures and programs by which it obtains information that is itself hidden and not readily ascertainable, or discoverable. App. 11-12. The methods by which JT Palmer finds secreted bank accounts is the very essence of its business. *Id.*

Disclosure of the private patterns, methods, techniques, processes, procedures and programs for obtaining that information is vital to JT Palmer's economic existence. *Id.* If anyone, including JT Palmer's clients (many of which are law firms) could obtain the information sought, there would be no reason to hire JT Palmer to obtain the information. *Id.* Disclosure of either the information or the private patterns, methods, techniques, processes, procedures and programs by which JT Palmer obtained the information, including JT Palmer's confidential sources and vendors, would enable anyone receiving the information to perform similar data searches, to discovery and utilize JT Palmer's

Motion to Quash and Brief in Support - Page 11

confidential sources and vendors, and thus to destroy JT Palmer's business as a confidential information research specialist. *Id.*

### 3. Plaintiffs' requests are broadly worded to require production of Trade Secret Information.

There is no question that Plaintiffs seek JT Palmer's Trade Secret Information. As Plaintiffs have said in their motion to compel, "JT Palmer's documentation evidencing ***the process used*** in order to reveal the existence of the foreign bank accounts will ultimately guide settlement negotiations among [Plaintiffs] and Defendants, and thus is absolutely necessary in order for the parties to move forward." App. 34 (emphasis added). At base, this is what each of Plaintiffs' requests seek.

With respect to Request No. 1, the breadth of the terms "any and all" and "evidencing or relating to" in the specific context of the "search" JT Palmer and Ms. Shea performed in looking for foreign accounts owned by the Winfrees seek and would require production of JT Palmer's Trade Secret Information. App. 07 The request is worded to include not only the confidential information JT Palmer may have discovered but also the private patterns, methods, techniques, processes, procedures and programs by which JT Palmer obtained the information.

Similarly, Request No. 2 includes the same, broad "any and all" and "evidencing and relating to" terms, this time tied to "the identity of Hermitage Investment Group" as that entity may relate to JT Palmer's "use [] in identifying any Foreign Account." App. 07. Whether and how JT Palmer may have used or obtained information from the Hermitage Investment Group to identify a foreign bank account or the actual information JT Palmer may have obtained fall squarely within JT Palmer's Trade Secret Information.

Motion to Quash and Brief in Support - Page 12

Similarly, Request No. 3 includes the same, broad "any and all" and "evidencing" terms, this time tied to "the funds in any Foreign Account originated in the United States." App. 07 Here again, Plaintiffs' request would require JT Palmer to disclose its confidential, Trade Secret patterns, methods, techniques, processes, procedures and programs by which JT Palmer could discover where "funds" "originated" and trace how they may have wound up in "any Foreign Account." This, again, strikes at the heart of JT Palmer's business.

Finally, Request No. 4 also included the same, broad "any and all" and "evidencing" terms, this time tied to "any Foreign Account belong[ing] to" the Winfrees. App. 08. Notably, the request is not limited to identifying "any Foreign Account belong[ing] to" the Winfrees. Instead, it seeks "any and all Documents evidencing *that* any Foreign Account belongs to" the Winfrees. The request again seeks the Trade Secret Information that JT Palmer used to discover the foreign bank accounts that JT Palmer identified and disclosed to Pankiewicz.

In sum, each request seeks "trade secret or other confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B)(i). Accordingly, JT Palmer requests the Court to quash the Subpoena on this ground as well. *Id.*

**D.    The Court should deny Plaintiffs' intrusive short-cut through JT Palmer's Trade Secret Information.**

JT Palmer has already provided and Plaintiffs already have information identifying the foreign bank accounts that JT Palmer discovered. App. 12. As JT Palmer has already told Pankiewicz, JT Palmer has no information from which it can confirm that the foreign

Motion to Quash and Brief in Support - Page 13

accounts previously identified belong to the Winfrees other than accountholder names. App. 12, 26.

How JT Palmer found those accounts is not probative; it's their existence that is probative. And there is a multitude of less intrusive methods by which Plaintiffs can go about trying to connect dollars that may have come out of the Winfrees' other known bank accounts in the United States and may have gone into those accounts overseas. Subpoenas to the banks themselves would yield the information Plaintiffs' seek, verify the existence and ownership of those account, and do so without intruding on JT Palmer's Trade Secret Information or jeopardizing JT Palmer's livelihood.

In short, if there is a money trial, it starts with the Winfrees' known bank accounts. And Plaintiffs already know specific foreign banks where they (but not JT Palmer) believes the trail may end. JT Palmer could not and did not confirm that the trail ends in any of those accounts. Requiring JT Palmer to disclose "the process used in order to reveal the existence of the foreign bank accounts," App. 34, does not nothing but disclose JT Palmer's Trade Secret Information and jeopardize its entire business.

### III. Conclusion and Prayer.

For all of the reasons stated above, Non-Party JT Palmer & Associates requests the Court to grant this Motion to Quash. JT Palmer requests such other and further relief to which it may be entitled, including all relief afforded pursuant to Rule 45(d)(1), Fed. R. Civ. P.

Motion to Quash and Brief in Support - Page 14

Respectfully submitted,

By:  */s/ Charles W. Fillmore*          */s/ J. Michael McBride*
H. Dustin Fillmore III                J. Michael McBride
State Bar No. 06996010                Texas Bar No. 13332100
Charles W. Fillmore
State Bar No. 00785861                J. MICHAEL MCBRIDE, P.C.
                                      6420 Southwest Blvd., Suite 112
THE FILLMORE LAW FIRM, LLC            Fort Worth, Texas 76109
1200 Summit Avenue, Suite 860         (817) 877-1824 (office)
Fort Worth, Texas 76102               (817) 877-1797 (fax)
(817) 332-2351 (office)               jmm@mcbridelegal.com
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

ATTORNEYS FOR NON-PARTY J.T. PALMER & ASSOCIATES, LLC

## CERTIFICATE OF SERVICE

On July 10, 2020, this Motion was served on the following counsel for Plaintiffs TN Dental Professionals, P.C. and CPF Dental, LLC via U.S. Post Office Mail, return receipt requested, 7001 2510 0002 0581 0972:

Ryan K. Cochran
Melissa W. Jones
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
ryan.cochran@wallerlaw.com
melissa.jones@wallerlaw.com.

*/s/ Charles W. Fillmore*

Motion to Quash and Brief in Support - Page 15

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| In re: | Chapter 11 |
| Robert Terry Winfree, | Case No. 3:20-01417 |
| Debtor | |
| _____ | |
| TN Dental Professionals, P.C., and CPF Dental, LLC, d/b/a Marquee Dental Partners, | |
| Plaintiffs/ Counter-Defendants, | |
| vs. | |
| Robert T. Winfree, D.D.S. and Olivia Winfree, | Adv. Proc. No. 3:20-90031 |
| Defendants/ Counter-Plaintiffs. | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: Subpoena Served On | Civil Action No. _____ |
| JT Palmer & Associates, LLC | |

**Appendix in Support of
Non-Party J.T. Palmer & Associates, LLC's
Motion to Quash Subpoena Served by
Plaintiffs TN Dental Professionals, P.C. and
CPF Dental, LLC and Brief in Support Thereof**

Appendix in Support of Motion to Quash and Brief in Support - Page 1

Non-Party J.T. Palmer & Associates, LLC files this Appendix in Support of its

Motion to Quash Subpoena Served by Plaintiffs TN Dental Professionals, P.C. and CPF

Dental, LLC and Brief in Support Thereof:

| | |
|---|---|
| **Appendix Item 1:** | The Subpoena, with executed return of service, on file in the Bankruptcy Court in the Middle District of Tennessee |
| **Appendix Item 2:** | Affidavit of Judith Ann Shea |
| Exhibit A: | The Subpoena served on JT Palmer |
| Exhibit B: | "Customer Agreement" |
| Exhibit C: | Blank "Confidential Report" |
| Exhibit D: | Emails between Judith Ann Shea and Paul Pankiewicz |
| **Appendix Item 3:** | Affidavit of J. Michael McBride. |
| Exhibit A: | "Plaintiffs' Motion to Compel JT Palmer and Associates, LLC to Produce Documents in Accordance with Subpoena," on file in the Bankruptcy Court in the Middle District of Tennessee. |

Respectfully submitted,


By:  */s/ Charles W. Fillmore*  */s/ J. Michael McBride*
H. Dustin Fillmore III  J. Michael McBride
State Bar No. 06996010  Texas Bar No. 13332100
Charles W. Fillmore
State Bar No. 00785861  J. MICHAEL MCBRIDE, P.C.
6420 Southwest Blvd., Suite 112
THE FILLMORE LAW FIRM, LLC  Fort Worth, Texas 76109
1200 Summit Avenue, Suite 860  (817) 877-1824 (office)
Fort Worth, Texas 76102  (817) 877-1797 (fax)
(817) 332-2351 (office)  jmm@mcbridelegal.com
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

ATTORNEYS FOR NON-PARTY J.T. PALMER & ASSOCIATES, LLC


Appendix in Support of Motion to Quash and Brief in Support - Page 2

## CERTIFICATE OF SERVICE

On July 10, 2020, this Motion was served on the following counsel for Plaintiffs TN Dental Professionals, P.C. and CPF Dental, LLC via U.S. Post Office Mail, return receipt requested, 7001 2510 0002 0581 0972:

Ryan K. Cochran
Melissa W. Jones
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
ryan.cochran@wallerlaw.com
melissa.jones@wallerlaw.com.

*/s/ Charles W. Fillmore*

Appendix in Support of Motion to Quash and Brief in Support - Page 3

# Appendix
# Item 1

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Middle _____ District of Tennessee _____

In re Robert T. Winfree, D.D.S. _____
Debtor

Case No. 3:20-bk-01417 _____

*(Complete if issued in an adversary proceeding)*

TN Dental Professionals, P.C. and
CPF Dental, LLC d/b/a Marquee Dental Partners
_____
Plaintiff
v.
Robert T. Winfree, D.D.S. and Olivia Winfree
_____
Defendant

Chapter 11 _____

Adv. Proc. No. 3:20-90031 _____

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: JT Palmer and Associates, LLC, c/o Judy Shea, President, P.O. Box 1783, Granbury, Texas 76048 ____

*(Name of person to whom the subpoena is directed)*

☒ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See attached Exhibit A.

| PLACE Lexitas Legal, Attn: Raven Grandberry, 325 North St. Paul Street, #1900, Dallas, TX 75201 | DATE AND TIME June 16, 2020 5:00 p.m. CST |
|---|---|

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 06/02/2020

CLERK OF COURT

_____          OR          _____
Signature of Clerk or Deputy Clerk                                 *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
Plaintiffs _____, who issues or requests this subpoena, are: Melissa W. Jones, Waller Lansden
Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN 37219; melissa.jones@wallerlaw.com; 615-244-6380

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

10570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for (name of individual and title, if any): J.T. Palmer & Associates, LLC  Registered Agen'
Martinas TAX Service
on (date) 6-11-20

[X] I served the subpoena by delivering a copy to the named person as follows: JT. Palmer & Associates, LLC by
serving registered Agent Martina's TAX Service, Martina Grannath
on (date) 6-12-20 ; or

[ ] returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
Gary B Cooper
Server's signature

Gary B Cooper
Printed name and title
1502 Starlight Ct.
Granbury, TX 76048
Server's address

Additional information concerning attempted service, etc.:

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

---

**EXHIBIT A**
**ATTACHMENT TO SUBPOENA TO**
**JT PALMER AND ASSOCIATES, LLC**

TN Dental Professionals, P.C. and CPF Dental, LLC d/b/a Marquee Dental Partners (collectively, "*CPF Dental*"), requests that JT Palmer and Associates, LLC ("*JT Palmer*") produce the requested documents (the "*Requests*") within fourteen (14) days to CPF Dental's counsel, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN 37219, Attention: Melissa Jones.

## DEFINITIONS

1. "**Debtor**" refers to Robert T. Winfree, D.D.S., and all partners, agents, employees, officers, directors, attorneys, and other representatives of Debtor acting on Debtor's behalf or purporting to act on Debtor's behalf.

2. "**Document**" and "**documentation**" mean each copy, version, or draft (including every copy bearing handwritten or other marks, notations, stamps, or variations), whether sent or received or neither, that embodies or records any thoughts, ideas, concepts, expressions, or communications. The term "document" includes but is not limited to the following:

  a.  all writings (including but not limited to emails, text messages, internet postings, letters, faxes, books, correspondence, telegraphs, telex messages, cables, contracts, mortgages, agreements, notes, drafts, records, minutes of meetings, reports, appraisals, checks, cancelled checks, accounts, statements of accounts, ledgers, ledger entries, book entries, and notices);

  b.  all audio or visual records (including but not limited to photographs, drawings, sketches, paintings, sculptures, castings, replicas, models, exemplars, samples, video tapes, video discs, video files, audio tapes, audio discs, audio files, and animations);

  c.  all items that combine, incorporate, or associate two or more of the types of documents described above; and

  d.  any other items properly included within the definition of "document" pursuant to applicable rules and law.

The terms "document" and "documents" shall specifically include electronically stored information ("*ESI*") such as, but not limited to, email, text messages, instant messages, any documents created on a computer or other electronic device, any data residing on a storage

4829-4275-3725.2
Case 3:20-ap-90031   Doc 23   Filed 06/16/20   Entered 06/16/20 10:39:07   Desc Main
Document   Page 4 of 7
App. 05

253

medium, including but not limited to, hard drives (desktop, laptop or external), servers, jump drives, hand held drives, iPhones, iPads, iPods, Blackberries, mobile phones or smart phones, CDs and DVDs, and any sound or tape recording. The requesting party reserves the right to require the producing party to produce any ESI or documents in native format.

The meaning of the words "document" and "documents" also includes voice recordings and reproductions and film impressions of any of the aforementioned writings as well as copies of documents, which are not identical duplicates of the originals and copies of documents of which the originals are not in your possession, custody, or control. In case originals or original non-identical copies are not available, "document" or "documents" includes copies of originals or copies of non-identical copies, as the case may be.

3.      "**Foreign Account**" means, collectively (a) any right to payment of a monetary obligation, whether or not earned by performance, (b) without duplication, any "account" (as defined in the UCC), any accounts receivable (whether in the form of payments for services rendered or goods sold, rents, license fees or otherwise), any "health-care-insurance receivables" (as that term is defined in the UCC), any "payment intangibles" (as that term is defined in the UCC) and all other rights to payment and/or reimbursement of every kind and description, whether or not earned by performance, (c) all accounts, "general intangibles" (as that term is defined in the UCC), intellectual property, rights, remedies, guarantees, "supporting obligations" (as that term is defined in the UCC), "letter-of-credit rights" (as that term is defined in the UCC) and security interests in respect of the foregoing, all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights in respect of the foregoing, (d) all information and data compiled or derived by Debtor or Mrs. Winfree or to which Debtor or Mrs. Winfree is entitled in respect of or related to the foregoing, and (e) all proceeds of any of the foregoing, located outside of the United States of America, including, without limitation, accounts held or previously held at the following financial institutions:

a.   Rothchild & Co Bank
Zollikerstrasse 181
8034 Zurich, Switzerland

b.   Investec Bank
6th Floor Fairview Ofce Park
Ring Rd Port Elizabeth 6045

c.   Danske Bank International SA
13 Rue Edward Steichen
2540 Luxembourg

d.   HSBC Bank
1391 Guber Road
Shanghai, China

e.   Bradesco Financiamentos
R 3 880 St.
St. Oeste, Goiania, Brazil

4829-4275-3725.2

2

f. Bank of Greenland
Imaneq 33
Postboks 1033
3900 Nuuk

4.      "**Hermitage Investment Group**" means, collectively, 11689284 Ltd., a foreign corporation having a registered address at Kemp House 152-160 City Road, London, United Kingdom EC1V 2NX, formerly known as Hermitage Investment Group Ltd. and Hermitage Investment Group, Inc., a for-profit corporation located at 105 Bonnabrook Drive, Suite 105, Hermitage, Tennessee 37076.

5.      "**Mrs. Winfree**" refers to Olivia McMurray Winfree, wife of Debtor.

6.      "**Ms. Shea**" refers to Judy Shea, President of JT Palmer.

7.      "**UCC**" means the Uniform Commercial Code of the State of Tennessee or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Foreign Account.

## INSTRUCTIONS

1.      Except as otherwise specified, the Definitions and Instructions incorporate by reference the requirements set forth in Fed. R. Civ. P. 45, together with all other applicable rules of procedure and local rules.

2.      In construing the Requests, the singular shall include the plural and vice versa.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.      Any and all Documents evidencing or relating to JT Palmer's or Ms. Shea's search for foreign accounts owned by Debtor or Mrs. Winfree;

2.      Any and all Documents evidencing or relating to the identity of Hermitage Investment Group used in identifying any Foreign Account;

3.      Any and all Documents evidencing that the funds in any Foreign Account originated in the United States of America; and

4829-4275-3725.2

3

4.   ==Any and all Documents evidencing that any Foreign Account belongs to Debtor and/or Mrs. Winfree.==

# Appendix Item 2

## AFFIDAVIT OF JUDITH ANN SHEA

**STATE OF TEXAS**          §
                                          §
**COUNTY OF HOOD**       §

Before me, the undersigned notary, on this day personally appeared Judith Ann Shea, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified as follow:

1.        "My name is Judith Ann (Judy) Shea. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.        I reside in Granbury Texas.

3.        I formed J.T. Palmer and Associates, LLC (JT Palmer) as a Texas Limited Liability Company, and I am the sole member and 100% owner of JT Palmer. JT Palmer's office is in Granbury Texas, which is also where I reside and conduct the business of JT Palmer.

4.        Neither I nor JT Palmer resides in, is employed in, or regularly transacts business in Tennessee.

5.        JT Palmer is an information research specialist. JT Palmer is in the business of performing confidential background research for clients who employ JT Palmer to conduct confidential research to discover assets, including foreign bank accounts, that individuals may have hidden or secreted.

6.        In this case, JT Palmer was hired by private detective Paul Pankiewicz with ROS Consulting, Inc.

7.        On Friday, June 12, 2020, I received from JT Palmer's registered agent a copy of the Subpoena that is attached hereto as Exhibit A. On Monday June 15, 2020 I reached out to LegalShield, a business with which I had contracted to provide legal services for help. I was informed that my LegalShield Representative was the law office of Ross & Matthews. I contacted this law firm and was asked to email *via* their website the Subpoena. I did so. When I did not receive any return correspondence from them, I reached out to them again on Wednesday June 17, 2020. They informed me they did not receive the subpoena. I resent the Subpoena on same day. I received a call from Jack Cameron with Ross & Matthews on Monday, June 22, 2020 telling me that he read the subpoena and I needed to obtain an attorney and that they will send me *via* email a recommendation for an attorney through LegalShield. On Thursday, June 25, 2020 I was sent an email with the contact information for Mr. J. Michael McBride. I immediately tried to contact Mr. McBride and was able to speak to him on Friday, June 26, 2020.

8.        During this time, including from time I received the Subpoena, I was also dealing with a cancer diagnosis, that ultimately resulted in a surgery to remove the cancer, which took place on July 8, 2020.

9.      Over the years of performing confidential background and information research, I, on behalf of JT Palmer, have developed private patterns, methods, techniques, processes, procedures and programs by which JT Palmer conducts data, or information searches and obtains this information—information that is itself hidden and not readily ascertainable, or discoverable. The private patterns, methods, techniques, processes, procedures and programs that I developed to discover this hidden information are themselves not generally known or readily ascertainable. Moreover, the private methods, techniques, processes, and procedures I have developed also makes use of sources and vendors whose identities are themselves highly confidential. Their identities and information sources are information that JT Palmer carefully guards and does not disclose.

10.     JT Palmer is the owner of these private patterns, methods, techniques, processes, procedures and programs. As stated above, Ms. Judy Shea is 100% owner of JT Palmer, and she developed these private patterns, methods, techniques, processes, procedures and programs personally for use in the business of JT Palmer.

11.     JT Palmer does not share or disclose to third parties, including its clients, the private patterns, methods, techniques, processes, procedures and programs it has developed and uses to discover information. In fact, JT Palmer has a process by which it seeks to ensure the information which is discovered through the use of its private patterns, methods, techniques, processes, procedures and programs is kept secret. Specifically, JT Palmer utilizes a "Customer Agreement," which clients sign and which clearly states:

> JT Palmer and Associates, LLC's reports contain confidential information and is not to be distributed to anyone other than the intended recipient. Distribution to any other entity in whole or in part is strictly prohibited. This information is for fact finding only and is not admissible in court.

Attached to my affidavit as Exhibit B is a true and correct copy of the "Customer Agreement" that Mr. Pankiewicz signed in this matter.

12.     Similarly, the report JT Palmer prepares and provides to clients is entitled "CONFIDENTIAL" and clearly states:

> This report contains confidential information and is not to be distributed to anyone other than the intended recipient named above. Distribution to any other entity in whole or in part is strictly prohibited. This information is for fact finding only and is not admissible in court.

Attached to my affidavit as Exhibit C is a true and correct copy of a blank confidential report containing this language. The report that JT Palmer prepared and provided to Mr. Pankiewicz is on this same form and contains the same quoted language.

13.     Exhibits B and C are part of JT Palmer's efforts to ensure that the private patterns, methods, techniques, processes, procedures and programs themselves are kept secret and confidential.

**AFFIDAVIT OF JUDY SHEA**                                          **Page 2 of 3**

14.     The heart of JT Palmer's business as a confidential information research specialist is its private patterns, methods, techniques, processes, procedures and programs by which it obtains information that is itself hidden and not readily ascertainable, or discoverable. The methods by which JT Palmer finds secreted bank accounts is the very essence of its business.

15.     Disclosure of the private patterns, methods, techniques, processes, procedures and programs for obtaining that information is vital to JT Palmer's economic existence. If anyone, including JT Palmer's clients (many of which are law firms) could obtain the information sought, there would be no reason to hire JT Palmer to obtain the information. Disclosure of either the information or the private patterns, methods, techniques, processes, procedures and programs by which JT Palmer obtained the information, including JT Palmer's confidential sources and vendors, would enable anyone receiving the information to perform similar data searches, to discovery and utilize JT Palmer's confidential sources and vendors, and thus to destroy JT Palmer's business as a confidential information research specialist.

16.     JT Palmer has already provided information to Mr. Pankiewicz identifying the foreign bank accounts that JT Palmer discovered in relation to this matter. They are the accounts identified by Plaintiffs in their motion to compel. JT Palmer has no information from which it can confirm that the foreign accounts previously identified belong to the Winfrees other than by accountholder names. JT Palmer communicated this to Mr. Pankiewicz. Attached hereto as Exhibit D is a true and correct copy of the email that I sent on behalf of JT Palmer to Mr. Pankiewicz identifying "possible accounts," based solely on accountholder names, and explaining JT Palmer located no social security numbers on any accounts, the address information for the Winfrees does not match addresses on the accounts, and that JT Palmer could not guarantee that the subject accounts belonged to the Winfrees who were the subject of Mr. Pankiewicz's efforts and hiring of JT Palmer. Also included under Exhibit D is a true and correct copy of Mr. Pankiewicz's response email"

FURTHER AFFIANT SAYETH NOT.

By: _Judith Ann Shea_____
    Judith Ann Shea

Sworn to and subscribed before me by Judy Shea on this __10__ day of __July__, 2020, 2020.



JENNIFER LEBLANC
Notary Public
STATE OF TEXAS
ID#12958331-5
My Comm. Exp. Oct. 4, 2021

_____
Notary Public in and for the State of Texas

**AFFIDAVIT OF JUDY SHEA**                                      **Page 3 of 3**

# Exhibit A

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Middle _____ District of Tennessee _____

In re Robert T. Winfree, D.D.S. _____

                    Debtor

Case No. 3:20-bk-01417

_(Complete if issued in an adversary proceeding)_

TN Dental Professionals, P.C. and
CPF Dental, LLC d/b/a Marquee Dental Partners

                    Plaintiff

Chapter 11

                    v.

Robert T. Winfree, D.D.S. and Olivia Winfree

                    Defendant

Adv. Proc. No. 3:20-90031

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: JT Palmer and Associates, LLC, c/o Judy Shea, President, P.O. Box 1783, Granbury, Texas 76048

_(Name of person to whom the subpoena is directed)_

■ _Production_: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: **See attached Exhibit A.**

| PLACE Lexitas Legal, Attn: Raven Grandberry, 325 North St. Paul Street, #1900, Dallas, TX 75201 | DATE AND TIME June 16, 2020 5:00 p.m. CST |
|---|---|

☐ _Inspection of Premises_: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 06/04/2020

CLERK OF COURT

                                        OR

_____                 _____
_Signature of Clerk or Deputy Clerk_          _Attorney's signature_

The name, address, email address, and telephone number of the attorney representing _(name of party)_ Plaintiffs _____ , who issues or requests this subpoena, are: Melissa W. Jones, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN 37219; melissa.jones@wallerlaw.com; 615-244-6380

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

App. 14

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
### (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the
witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 3)

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
  (i) is a party or a party's officer; or
  (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
 (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
 *(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 *(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
 *(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  (i) fails to allow a reasonable time to comply;
  (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
  (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  (iv) subjects a person to undue burden.
 *(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  (i) disclosing a trade secret or other confidential research, development, or commercial information; or

 (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 *(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 *(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 *(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 *(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 *(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
 *(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  (i) expressly make the claim; and
  (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 *(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

...
**(g) Contempt.** The court for the district where compliance is required — and also, after a motion is transferred, the issuing court — may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

App. 16

## EXHIBIT A
## ATTACHMENT TO SUBPOENA TO
## JT PALMER AND ASSOCIATES, LLC

TN Dental Professionals, P.C. and CPF Dental, LLC d/b/a Marquee Dental Partners

(collectively, "*CPF Dental*"), requests that JT Palmer and Associates, LLC ("*JT Palmer*")

produce the requested documents (the "*Requests*") within fourteen (14) days to CPF Dental's

counsel, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN

37219, Attention: Melissa Jones.

### DEFINITIONS

1.      "**Debtor**" refers to Robert T. Winfree, D.D.S., and all partners, agents, employees, officers, directors, attorneys, and other representatives of Debtor acting on Debtor's behalf or purporting to act on Debtor's behalf.

2.      "**Document**" and "**documentation**" mean each copy, version, or draft (including every copy bearing handwritten or other marks, notations, stamps, or variations), whether sent or received or neither, that embodies or records any thoughts, ideas, concepts, expressions, or communications. The term "document" includes but is not limited to the following:

   a.  all writings (including but not limited to emails, text messages, internet postings, letters, faxes, books, correspondence, telegraphs, telex messages, cables, contracts, mortgages, agreements, notes, drafts, records, minutes of meetings, reports, appraisals, checks, cancelled checks, accounts, statements of accounts, ledgers, ledger entries, book entries, and notices);

   b.  all audio or visual records (including but not limited to photographs, drawings, sketches, paintings, sculptures, castings, replicas, models, exemplars, samples, video tapes, video discs, video files, audio tapes, audio discs, audio files, and animations);

   c.  all items that combine, incorporate, or associate two or more of the types of documents described above; and

   d.  any other items properly included within the definition of "document" pursuant to applicable rules and law.

The terms "document" and "documents" shall specifically include electronically stored information ("*ESI*") such as, but not limited to, email, text messages, instant messages, any documents created on a computer or other electronic device, any data residing on a storage

4829-4275-3725.2

medium, including but not limited to, hard drives (desktop, laptop or external), servers, jump drives, hand held drives, iPhones, iPads, iPods, Blackberries, mobile phones or smart phones, CDs and DVDs, and any sound or tape recording. The requesting party reserves the right to require the producing party to produce any ESI or documents in native format.

The meaning of the words "document" and "documents" also includes voice recordings and reproductions and film impressions of any of the aforementioned writings as well as copies of documents, which are not identical duplicates of the originals and copies of documents of which the originals are not in your possession, custody, or control. In case originals or original non-identical copies are not available, "document" or "documents" includes copies of originals or copies of non-identical copies, as the case may be.

3. "**Foreign Account**" means, collectively (a) any right to payment of a monetary obligation, whether or not earned by performance, (b) without duplication, any "account" (as defined in the UCC), any accounts receivable (whether in the form of payments for services rendered or goods sold, rents, license fees or otherwise), any "health-care-insurance receivables" (as that term is defined in the UCC), any "payment intangibles" (as that term is defined in the UCC) and all other rights to payment and/or reimbursement of every kind and description, whether or not earned by performance, (c) all accounts, "general intangibles" (as that term is defined in the UCC), intellectual property, rights, remedies, guarantees, "supporting obligations" (as that term is defined in the UCC), "letter-of-credit rights" (as that term is defined in the UCC) and security interests in respect of the foregoing, all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights in respect of the foregoing, (d) all information and data compiled or derived by Debtor or Mrs. Winfree or to which Debtor or Mrs. Winfree is entitled in respect of or related to the foregoing, and (e) all proceeds of any of the foregoing, located outside of the United States of America, including, without limitation, accounts held or previously held at the following financial institutions:

      a. Rothchild & Co Bank
         Zollikerstrasse 181
         8034 Zurich, Switzerland

      b. Investec Bank
         6th Floor Fairview Ofce Park
         Ring Rd Port Elizabeth 6045

      c. Danske Bank International SA
         13 Rue Edward Steichen
         2540 Luxembourg

      d. HSBC Bank
         1391 Guber Road
         Shanghai, China

      e. Bradesco Financiamentos
         R 3 880 St.
         St. Oeste, Goiania, Brazil

4829-4275-3725.2

2

f.  Bank of Greenland
Imaneq 33
Postboks 1033
3900 Nuuk

4.    "**Hermitage Investment Group**" means, collectively, 11689284 Ltd., a foreign corporation having a registered address at Kemp House 152-160 City Road, London, United Kingdom EC1V 2NX, formerly known as Hermitage Investment Group Ltd. and Hermitage Investment Group, Inc., a for-profit corporation located at 105 Bonnabrook Drive, Suite 105, Hermitage, Tennessee 37076.

5.    "**Mrs. Winfree**" refers to Olivia McMurray Winfree, wife of Debtor.

6.    "**Ms. Shea**" refers to Judy Shea, President of JT Palmer.

7.    "**UCC**" means the Uniform Commercial Code of the State of Tennessee or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Foreign Account.

## INSTRUCTIONS

1.    Except as otherwise specified, the Definitions and Instructions incorporate by reference the requirements set forth in Fed. R. Civ. P. 45, together with all other applicable rules of procedure and local rules.

2.    In construing the Requests, the singular shall include the plural and vice versa.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    Any and all Documents evidencing or relating to JT Palmer's or Ms. Shea's search for foreign accounts owned by Debtor or Mrs. Winfree;

2.    Any and all Documents evidencing or relating to the identity of Hermitage Investment Group used in identifying any Foreign Account;

3.    Any and all Documents evidencing that the funds in any Foreign Account originated in the United States of America; and

4829-4275-3725.2

3

4.      Any and all Documents evidencing that any Foreign Account belongs to Debtor and/or Mrs. Winfree.

4829-4275-3725.2

4

268

# Exhibit B

## Customer Agreement

By placing this order, and any future orders with JT Palmer and Associates, LLC, I ___PAUL PANKIEWICZ___, hereby certify that I have permissible Purpose, (as defined by the Fair Credit Reporting Act), for requesting any and all search results, reports, information, service or product.

JT PALMER & ASSOCIATES, LLC is not a consumer reporting agency, and no report, search result, information, service or product purchased from or provided by JT PALMER & ASSOCIATES, LLC constitutes a "consumer report," as defined by the federal Fair Credit Reporting Act, 15 U.S.C. Section 1681 et seq. ("FCRA"). Reports, search results, services, information or products purchased from or provided by JT PALMER & ASSOCIATES, LLC may not be used to determine eligibility for credit, employment, insurance or used for any other purpose governed by the FCRA.

JT Palmer and Associates, LLC's reports contain confidential information and is not to be distributed to anyone other than the intended recipient. Distribution to any other entity in whole or in part is strictly prohibited. This information is for fact finding only and is not admissible in court.

In the event of an omission or other error by JT Palmer and Associates, LLC, I understand that JT Palmer and Associates, LLC and/or its agents shall not be liable and that I agree that I shall not be entitled to any punitive or any other damages as a result of any errors in JT Palmer and Associates, LLC search. I further agree to defend, indemnify and hold harmless JT Palmer and Associates, LLC and/or its agents from any actions, which may arise from the providing of any search information.

___ROS CONSULTING, INC.___
**Company Name**

___PAUL PANKIEWICZ___          ___PRESIDENT___
**Authorized Name Printed**          **Position**


___(signature)___          ___22 APRIL 2019___
**Authorized Signature**          **Date**

# Exhibit C

# CONFIDENTIAL REPORT
## PREPARED FOR

**DATE:**

**TYPE OF SEARCH:**

**TARGET:**

**RESULTS:**

*This report contains confidential information and is not to be distributed to anyone other than the intended recipient named above. Distribution to any other entity in whole or in part is strictly prohibited. This information is for fact finding only and is not admissible in court.*

# Exhibit D

7/10/2020                              J.T. Palmer & Associates Mail - Re: Work



                                              Judy Shea <judy@jtpalmerassociates.com>

---

## Re: Work

**Judy Shea** <Judy@jtpalmerassociates.com>                    Thu, Jan 2, 2020 at 2:20 PM
To: paul pankiewicz <ppankiewicz@earthlink.net>

We have located possible accounts:
Switzerland(Rob Winfree)
South Africa(Robert Wenfree)
Luxembourg (R Winfree)

Possible accounts:
Shanghai (O. Winfree)
Brazil (Olivia McMurry)
Greenland (Olivia Winfree)

No ssn on any accounts.
Address information provided does not match addresses on accounts.

We can obtain the details on accounts but can not guarantee that these are your
subjects.
Would you like for us to proceed or no hit?

London(Judy's assistant)


Sincerely,

Judy Shea
*J.T. Palmer & Associates, LLC*
800-808-0078
817-894-3539
Judy@jtpalmerassociates.com
www.jtpalmerassociates.com
NM PI #3295

Member
CALI, FALI, NCISS, TALI, WAD

This message and any attachments contain information that is confidential. This message and the information contained
herein have been sent for fact-finding purposes only. By retaining this message for any length of time without immediately
returning it to sender, the recipient agrees that the information contained herein is not admissible for any purposes in any
court of law and may not be made part of any public record whatsoever. The information is intended only for the use of
the individual or entity to whom it is directed, regardless of the e-mail address, physical address, fax number, or any other
means by which you have received this message. If you are not the intended recipient, you are notified that any
examination, disclosure, copying, distribution or the taking of any action in reliance on, or with the respect to, the contents
of this information is strictly prohibited. If you have received this message in error, please immediately notify the person
identified as the sending person by reply e-mail or call the telephone number set forth above. By receiving this message,
the recipient acknowledges that it is a privilege to receive the information contained herein and that a violation of any of
the above provisions will cause irreparable harm to the sender as well as lasting and continuing damages

[Quoted text hidden]

https://mail.google.com/mail/u/0?ik=7d12aef2dc&view=pt&search=all&permmsgid=msg-a%3Ar-7989649886088754637&simpl=msg-a%3Ar-79896498…   1/2

J.T. Palmer & Associates Mail - Re: Work

 Gmail

**Judy Shea <judy@jtpalmerassociates.com>**

---

## Re: Work

**Paul Pankiewicz** <ppankiewicz@earthlink.net>                                      Thu, Jan 2, 2020 at 2:17 PM
To: Judy Shea <Judy@jtpalmerassociates.com>

Please proceed. Great work.

*Sent from my Verizon Wireless 4G LTE DROID*
[Quoted text hidden]

# Appendix
# Item 3

## AFFIDAVIT OF J. MICHAEL MCBRIDE

**STATE OF TEXAS** §
§
**COUNTY OF TARRANT** §

Before me, the undersigned notary, on this day personally appeared J. Michael McBride, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified as follow:

1.     "My name is J. Michael McBride. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

2.     I currently reside in Fort Worth Texas.

3.     I formed J. Michael McBride, P.C., a Texas Professional Corporation, and I am the sole member and 100% owner of J. Michael McBride, P.C. The office is located in Fort Worth, Texas, which is where business is conducted.

4.     My firm was engaged by J.T. Palmer & Associates, LLC ("JT Palmer") and Judith Shea on June 29, 2020.

5.     I contacted the counsel who issued the Subpoena, Melissa Jones of Waller Lansden Dortch & Davis, LLP. I had several conversations with Melissa Jones on June 30th, July 1st and July 2nd seeking an extension of time to reply to the Subpoena or to work out a settlement and to explain why there were much better and easier ways to get the same bank information. From my conversations with Ms. Melissa Jones I was led to believe that an extension would be forthcoming pending the approval of the "partner in charge."

6.     I was left with the impression that an extension, while not yet allowed by the partner in charge, was imminent.

7.     After several follow-up calls to Ms. Melissa Jones between June 30 and July 2, I was eventually contacted on the afternoon of July 3 by the "partner in charge," Mr. Ryan K. Cochran. For the first time, I learned that an extension would not be forthcoming and it was Plaintiffs' position that JT Palmer had already missed its compliance deadline and had to respond.

8.     In my conversation with Mr. Cockran on July 3, he did not mention that on July 2, Plaintiffs had already filed a Motion to Compel in Tennessee, seeking an order from the Tennessee court compelling JT Palmer "to produce documents in accordance with subpoena."

9.     Attached hereto as Exhibit A is a true and correct copy of "Plaintiffs' Motion to Compel JT Palmer and Associates, LLC to Produce Documents in Accordance with Subpoena," on file in the bankruptcy court in the Middle District of Tennessee.

---

**AFFIDAVIT OF J. MICHAEL MCBRIDE**                                      **Page 1 OF 2**

App. 30

278

10.     I first heard of/received Plaintiffs' Motion to Compel JT Palmer and Associates, LLC to Produce Documents in Accordance with Subpoena on July 7, 2020 when it arrived via registered mail."

FURTHER AFFIANT SAYETH NOT.

By: _____

     J. Michael McBride

Sworn to and subscribed before me by J. Michael McBride on this _10th_ day of _July_ 2020.

MICHELLE WILSON
Notary Public, State of Texas
Comm. Expires 07-10-2023
Notary ID 5614114

_Michelle Wilson_
Notary Public in and for the State of Texas

---

**AFFIDAVIT OF J. MICHAEL MCBRIDE**                                    Page 2 OF 2

# Exhibit A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| In re: | Chapter 11 |
| Robert Terry Winfree, | Case No. 3:20-01417 |
| Debtor. | Judge Randal S. Mashburn |
| TN Dental Professionals, P.C., and CPF Dental, LLC, d/b/a Marquee Dental Partners, | |
| Plaintiffs/ Counter-Defendants, | |
| vs. | Adv. Proc. No. 3:20-90031 |
| Robert T. Winfree, D.D.S. and Olivia Winfree, | |
| Defendants/ Counter-Plaintiffs. | |

## PLAINTIFFS' MOTION TO COMPEL JT PALMER AND ASSOCIATES, LLC TO PRODUCE DOCUMENTS IN ACCORDANCE WITH SUBPOENA

Plaintiff TN Dental Professionals, P.C., and CPF Dental, LLC, d/b/a Marquee Dental Partners (collectively, "*CPF Dental*") moves the Court for an Order to Compel JT Palmer and Associates, LLC ("*JT Palmer*"), to provide full and complete responses to CPF Dental's Subpoena to Produce Documents served on JT Palmer on June 11, 2020 (Dkt. No. 23) (the "*Subpoena*"), pursuant to Rule 45(c)(2) of the Federal Rules of Civil Procedure. As demonstrated below, JT Palmer has failed to produce any and all documents as required in accordance with the Subpoena.

### BACKGROUND

Prior to Defendant Robert Terry Winfree filing for bankruptcy relief under Chapter 11 of Title 11 of the United States Bankruptcy Code, CPF Dental hired Hodges & Associates, LLC

("*Hodges*"), a firm specializing in asset and bank account searches, to (i) confirm that Defendants were providing a complete picture of their finances, and (ii) determine if Defendants possessed additional accounts that had not been disclosed despite repeated Court Orders to do so and representations from Defendants and their counsel that no such accounts existed. Hodges thereafter discovered, through the help of JT Palmer, that Defendants possess at least six (6) undisclosed accounts at various foreign banks in Defendants' names with nearly $1.5 million contained within them. (*See*, Affidavit of Dan Hodges, attached hereto as **Exhibit A**, attesting to Defendants' foreign bank accounts).

After repeated attempts to gain confirmation that the above-mentioned foreign bank accounts in fact relate to Defendants, CPF Dental served the Subpoena on JT Palmer on June 11, 2020, requesting, among other things, production of any and all documentation proving the identity of the account holders in which the alleged foreign bank accounts belong. The pertinent requests to JT Palmer, found in paragraphs 1 through 4 of the Subpoena, state as follows:

> 1.     *Any and all Documents evidencing or relating to JT Palmer's or Ms. Shea's search for foreign accounts owned by Debtor or Mrs. Winfree;*
>
> 2.     *Any and all Documents evidencing or relating to the identity of Hermitage Investment Group used in identifying any Foreign Account;*
>
> 3.     *Any and all Documents evidencing that the funds in any Foreign Account originated in the United States of America; and*
>
> 4.     *Any and all Documents evidencing that any Foreign Account belongs to Debtor and/or Mrs. Winfree.*

JT Palmer's documentation evidencing the process used in order to reveal the existence of the foreign bank accounts will ultimately guide settlement negotiations among CPF Dental and Defendants, and thus is absolutely necessary in order for the parties to move forward.

2

## ARGUMENT

**JT Palmer Should be Compelled to Provide Documents Requested by the Subpoena**

Rule 34(c) of the Federal Rules of Civil Procedure provides that, in accordance with Rule 45, "a nonparty may be compelled to produce documents." Rule 45(d)(2)(B) provides that if "a person commanded to produce documents" wishes to object to the production, such "objection must be served before the earlier of time specified for compliance or 14 days after the subpoena is served." Fed. R. Civ. P. 45(d)(2)(B). If a party fails to respond to such document request, a party "may move for an order compelling discovery." Fed. R. Civ. P. 37(a)(1); *See also* Fed. R. Civ. P. 37(a)(3)(B)(iv) (a motion to compel may be made if a party fails to produce documents as requested under Rule 34).

The Subpoena was properly served on JT Palmer on June 11, 2020 in accordance with Rule 45(d) of the Federal Rules of Civil Procedure. As stated in the subpoena, JT Palmer was required to produce any and all documents related to the requests set forth in the Subpoena no later than fourteen (14) days of service. As of the date of this Motion, JT Palmer has failed to produce any documentation as requested by the Subpoena, and further has failed to file any affidavit or other documentation with this Court attesting, under oath, that it has no documentation to produce.

CPF Dental also certifies that, as required by Rule 37(a)(1) of the Federal Rules of Civil Procedure, it has "in good faith conferred or attempted to confer with [JT Palmer] in an effort to obtain [the discovery] without court action." Numerous phone calls with JT Palmer's counsel were exchanged over the course of the past week, and although JT Palmer, through its counsel, requested CPF Dental to grant it an extension to object to the Subpoena, it was unable to confirm that any grant of an extension would result in JT Palmer producing the documentation requested by the Subpoena. JT Palmer's production pursuant to the Subpoena was due on June 25, 2020.

In order for this case to move forward, whether it is through settlement negotiations or

3

through a trial on the merits, confirmation of whether the alleged foreign bank accounts uncovered by JT Palmer in fact relate to the Defendants is critical.

**CONCLUSION**

For the reasons addressed above, Plaintiffs respectfully request the Court grant this Motion to Compel, and enter the Order attached hereto as **Exhibit B**, ordering JT Palmer to fully produce all documents related to Plaintiffs' requests at set forth in the Subpoena.

Dated: July 2, 2020         WALLER LANSDEN DORTCH & DAVIS, LLP

                    */s/ Ryan K. Cochran*
                    Ryan K. Cochran (TN 025851)
                    Melissa W. Jones ( TN 036559)
                    511 Union Street, Suite 2700
                    Nashville, TN 37219
                    Telephone: (615) 244-6380
                    Facsimile: (615) 244-6804
                    ryan.cochran@wallerlaw.com
                    melissa.jones@wallerlaw.com

                    *Attorneys for CPF Dental, LLC d/b/a Marquee Dental Partners and TN Dental Professionals, P.C.*

4

4813-7618-1953

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion was served via the Court's electronic filing system, this 2nd day of July, 2020, and via first class mail on the following business day, as follows:

JT Palmer and Associates, LLC
PO Box 1783
Granbury, TX 76048

-and-

J. Michael McBride
6420 Southwest Blvd., Suite 112
Fort Worth, TX 76109

*Attorney for JT Palmer and Associates, LLC*

/s/ *Ryan K. Cochran*
Ryan K. Cochran

4813-7618-1953

**EXHIBIT A**

**Affidavit of Dan Hodges**

See attached.

4813-7618-1953

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE

| | |
|---|---|
| TN DENTAL PROFESSIONALS, P.C. and CPF DENTAL, LLC d/b/a MARQUEE DENTAL PARTNERS, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 181384-I ) Chancellor Lyle |
| ROBERT T. WINFREE, D.D.S. and OLIVIA WINFREE, | ) Jury Demand ) ) ) |
| Defendants. | ) ) |

**2020 JAN 30 PM 2:26**
FILED
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.
D.C.&M.

## AFFIDAVIT OF DAN HODGES

STATE OF TENNESSEE )
                  )
COUNTY OF DAVIDSON )

I, Dan Hodges, having been duly sworn, state as follows:

- I am over eighteen years of age, and I make this Affidavit based upon my own personal knowledge.

- I am a partner with Hodges and Associates, LLC, a private investigative company that conducts criminal and civil investigations to include asset searches and permissible bank account searches.

- I was retained to identify assets of Dr. Robert T. Winfree, D.D.S. and Olivia Winfree.

I was able to identify the following accounts that appear to be owned by Robert T. Winfree, DDS:

- **Rothschild & Co Bank (Zürich, Switzerland) - $397,500.00**

**EXHIBIT D**

- **Danske Bank Internations (Luexembourg) - $736,500.00**

- **Investec Asset Management (Port Elizabeth, South Africa) - $77,000.00**

I was able to identify the following accounts that appear to be owned by Olivia Winfree.

- **HSBC Bank (Shanghai, China) - $215,320.00**

- **Bradesco Financiamentos (St. Oeste, Goiânia Brazil) - $45,000.00**

- **Bank of Greenland (Nuuk, Greenland) - $16,000.00**


AFFIANT FURTHER SAYETH NOT.


Dated: January 30 DH, 2020


Dan Hodges


Sworn to and subscribed before me, the undersigned notary public, on the 30th DH day of January, 2020.

STEVE JARRETT
State of Tennessee Notary Public
Williamson County
My Comm. Exp 12-12-2020

Notary Public

My Commission Expires: 12-12-2020

**EXHIBIT B**

**Proposed Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Robert Terry Winfree, | Case No. 3:20-01417 |
| Debtor. | Judge Randal S. Mashburn |
| TN Dental Professionals, P.C., and CPF Dental, LLC, d/b/a Marquee Dental Partners, | |
| Plaintiffs/ Counter-Defendants, | |
| vs. | Adv. Proc. No. 3:20-90031 |
| Robert T. Winfree, D.D.S. and Olivia Winfree, | |
| Defendants/ Counter-Plaintiffs. | |

ORDER GRANTING PLAINTIFFS' MOTION TO COMPEL
JT PALMER AND ASSOCIATES, LLC TO PRODUCE
DOCUMENTS IN ACCORDANCE WITH SUBPOENA

After consideration of *Plaintiffs' Motion to Compel JT Palmer and Associates, LLC to Produce Documents in Accordance with the Subpoena*, the Court finds that Plaintiffs' Motion is well-taken and should be granted as follows:

1.     JT Palmer shall produce any and all documentation related to the requests set forth in Plaintiffs' Subpoena to JT Palmer to Produce Documents within ten (10) days of entry of this Order.

Therefore, it is **ORDERED, ADJUDGED and DECREED**, that the Plaintiffs' Motion is **GRANTED**, as described more fully above.

**This Order was Signed and Entered Electronically as Indicated at the Top of the First Page**

4813-7618-1953

APPROVED FOR ENTRY:

/s/ *Ryan K. Cochran*
Ryan K. Cochran (TN 025851)
Melissa W. Jones ( TN 036559)
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
ryan.cochran@wallerlaw.com
melissa.jones@wallerlaw.com

*Attorneys for CPF Dental, LLC d/b/a*
*Marquee Dental Partners and TN Dental Professionals, P.C.*

4813-7618-1953
Case 3:20-ap-90031    Doc 31-2    Filed 07/02/20    Entered 07/02/20 20:40:55    Desc
Exhibit B - Proposed Order    Page 3 of 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| In re: | Chapter 11 |
| Robert Terry Winfree, | Case No. 3:20-01417 |
| Debtor | |
| _____ | |
| TN Dental Professionals, P.C., and CPF Dental, LLC, d/b/a Marquee Dental Partners, | |
| Plaintiffs/ Counter-Defendants, | |
| vs. | |
| Robert T. Winfree, D.D.S. and Olivia Winfree, | Adv. Proc. No. 3:20-90031 |
| Defendants/ Counter-Plaintiffs. | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: Subpoena Served On | |
| JT Palmer & Associates, LLC | Civil Action No. 3:20-mc-00055-E-BN |

## **CERTIFICATE OF SERVICE**

Attached hereto as Exhibit "A" is a true and correct copy the Electronic Order (Doc. # 3) entered by the Court in the above-referenced matter pending in the Northern District of Texas.  The undersigned certifies that he has served Exhibit "A" on all counsel of record in the underlying litigation in the United States Bankruptcy Court for the Middle District

Certificate of Service - Page 1

of Tennessee, *via* both electronic mail and U.S. Post Office Mail, return receipt requested

on this day, July 16, 2019, as follows:

Ryan K. Cochran                                    Certified Mail/Return Receipt Requested
John E. Haubenreich                                7001 2510 0002 0581 0965
Melissa W. Jones
WALLER LANSDEN DORTCH & DAVIS LLP
511 Union Street, Suite 2700
Nashville, TN 37219
ryan.cochran@wallerlaw.com
john.haubenreich@wallerlaw.com
melissa.jones@wallerlaw.com

ATTORNEYS FOR TN DENTAL PROFESSIONALS, P.C.

Griffin S. Dunham                                  Certified Mail/Return Receipt Requested
Alexander S. Koval                                 7001 2510 0002 0581 0958
DUNHAM HILDEBRAND, PLLC
2416 21st Avenue South, Suite 303
Nashville, TN 37212
griffin@dhnashville.com

ATTORNEYS FOR ROBERT T. AND OLIVIA WINFREE

Timothy G. Niarhos Trustee                         Certified Mail/Return Receipt Requested
NIARHOS LAW GROUP PLC                              7001 2510 0002 0581 0941
1106 18TH AVE S
NASHVILLE, TN 37212
615-320-1101
tim@niarhos.com

TRUSTEE

Jeffrey S. Grasl                                   Certified Mail/Return Receipt Requested
Megan Reed Seliber                                 7001 2510 0002 0581 0934
DEPT OF JUSTICE OFFICE OF US TRUSTEE
701 BROADWAY SUITE 318
NASHVILLE, TN 37203
jeffrey.s.grasl@usdoj.gov
megan.seliber@usdoj.gov

REPRESENTATIVE OF TRUSTEE

Certificate of Service - Page 2

Paul A. Randolph, US Trustee
Kimberly C. Swafford, Assistant US Trustee
OFFICE OF THE UNITED STATES TRUSTEE
200 Jefferson Avenue, Suite 400
Memphis, TX 38103
c/o
Jeffrey S. Grasl                                     Certified Mail/Return Receipt Requested
Megan Reed Seliber                                   7001 2510 0002 0581 0934
DEPT OF JUSTICE OFFICE OF US TRUSTEE
701 BROADWAY SUITE 318
NASHVILLE, TN 37203
jeffrey.s.grasl@usdoj.gov
megan.seliber@usdoj.gov

REPRESENTATIVE OF TRUSTEE

*/s/ Charles W. Fillmore*

Certificate of Service - Page 3

# Exhibit A

| | |
|---|---|
| **From:** | ecf_txnd@txnd.uscourts.gov |
| **Sent:** | Thursday, July 16, 2020 11:29 AM |
| **To:** | Courtmail@txnd.uscourts.gov |
| **Subject:** | Activity in Case 3:20-mc-00055-E-BN TN Dental Professionals PC et al v. Winfree et al Order Setting Deadline/Hearing |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

If you need to know whether you must send the presiding judge a paper copy of a document that you have docketed in this case, click here: Judges' Copy Requirements. Click here to see Judge Specific Requirements. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge.

**U.S. District Court**

**Northern District of Texas**

## Notice of Electronic Filing

The following transaction was entered on 7/16/2020 at 11:29 AM CDT and filed on 7/16/2020

| | |
|---|---|
| **Case Name:** | TN Dental Professionals PC et al v. Winfree et al |
| **Case Number:** | 3:20-mc-00055-E-BN |
| **Filer:** | |
| **Document Number:** | 3(No document attached) |

**Docket Text:**
**ELECTRONIC ORDER: Any response to Non-Party J.T. Palmer & Associates, LLC's Motion to Quash Subpoena Served by Plaintiffs TN Dental Professionals, P.C. and CPF Dental, LLC [1] must be filed by July 27, 2020, and any reply must be filed by August 3, 2020. Non-Party J.T. Palmer & Associates, LLC's counsel is further ordered to, by July 17, 2020, serve a copy of this Electronic Order on all counsel of record in the underlying litigation in the United States Bankruptcy Court for the Middle District of Tennessee and to then file a certificate of service in this matter. The Court further notes that Plaintiffs' Motion to Compel JT Palmer and Associates, LLC to Produce Documents in Accordance with Subpoena is set for hearing in the Bankruptcy Court on July 21, 2020. (Ordered by Magistrate Judge David L. Horan on 7/16/2020.)**

**3:20-mc-00055-E-BN Notice has been electronically mailed to:**

John Michael McBride    enotices@mcbridelegal.com

H Dustin Fillmore, III    dusty@fillmorefirm.com, chad@fillmorefirm.com, marvin@fillmorefirm.com, sprovost@fillmorefirm.com

Charles W Fillmore    chad@fillmorefirm.com, dusty@fillmorefirm.com, marvin@fillmorefirm.com, sprovost@fillmorefirm.com

**3:20-mc-00055-E-BN The CM/ECF system has NOT delivered notice electronically to the names listed below. The clerk's office will only serve notice of court Orders and Judgments by mail as required by the federal rules.**

# APPENDIX J

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| In re: | Chapter 11 |
| Robert Terry Winfree, | Case No. 3:20-01417 |
| Debtor. | Judge Randal S. Mashburn |
| TN Dental Professionals, P.C., and CPF Dental, LLC, d/b/a Marquee Dental Partners, | |
| Plaintiffs/ Counter-Defendants, | |
| vs. | Adv. Proc. No. 3:20-90031 |
| Robert T. Winfree, D.D.S. and Olivia Winfree, | |
| Defendants/ Counter-Plaintiffs. | |

**PLAINTIFFS' NOTICE OF WITHDRAWAL OF MOTION TO COMPEL JT PALMER**
**AND ASSOCIATES, LLC TO PRODUCE DOCUMENTS**
**IN ACCORDANCE WITH SUBPOENA**

Plaintiff TN Dental Professionals, P.C., and CPF Dental, LLC, d/b/a Marquee Dental

Partners (collectively, "*CPF Dental*") hereby files this *Notice of Withdrawal of Motion to Compel*

*JT Palmer and Associates, LLC to Produce Documents in Accordance with Subpoena*, filed July

2, 2020 (Dkt. No. 31) (the "*Motion*"), in support CPF Dental states as follows:

**BACKGROUND**

1.     On June 2, 2020, CPF Dental issued a *Subpoena to Produce Documents,*

*Information, or Objects or to Permit Inspection of Premises in a Bankruptcy Case (or Adversary*

*Proceeding)* (the "*Subpoena*") to JT Palmer and Associates, LLC, c/o Judy Shea, President ("*JT*

*Palmer*").

2.      The subpoena was served on JT Palmer on June 11, 2020 (Dkt. No. 23), requesting within fourteen (14) days, among other things, production, of any and all documentation proving the identity of the account holders to which certain alleged foreign bank accounts belong.  The Subpoena was properly served on JT Palmer in accordance with Rule 45(d) of the Federal Rules of Civil Procedure, and JT Palmer's production pursuant to the Subpoena was due on June 25, 2020.

3.      On July 2, 2020, CPF Dental filed the Motion seeking to compel JT Palmer to produce the documentation requested by the Subpoena, and the Court set the Motion for hearing on July 21, 2020, at 11:00 AM at Courtroom 1, 2nd Floor Customs House, 701 Broadway, Nashville, TN 37203.

4.      On July 16, 2020, CPF Dental's counsel was served with JT Palmer's Motion to Quash Subpoena filed July 10, 2020 (the "***Motion to Quash***"), in the United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:20-mc-00055-E (the "***Texas Court***").  The Texas Court ordered any responses to the Motion to Quash be filed by July 27, 2020, with replies to same due by August 3, 2020.

5.      CPF Dental will proceed to enforce the Subpoena in the Texas Court.

Therefore, in light of the above, CPF Dental hereby notifies the Court that the Motion (Dkt. No. 31) is hereby withdrawn.

Dated: July 20, 2020             WALLER LANSDEN DORTCH & DAVIS, LLP

                                 /s/ *Ryan K. Cochran*
                                 Ryan K. Cochran (TN 025851)
                                 Melissa W. Jones ( TN 036559)
                                 511 Union Street, Suite 2700
                                 Nashville, TN 37219
                                 Telephone: (615) 244-6380
                                 Facsimile: (615) 244-6804
                                 ryan.cochran@wallerlaw.com
                                 melissa.jones@wallerlaw.com

                                 *Attorneys for CPF Dental, LLC d/b/a Marquee Dental*
                                 *Partners and TN Dental Professionals, P.C.*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Notice was served via electronic email and the Court's electronic filing system, this 20th day of July, 2020, and via first class mail on the following business day, as follows:

J. MICHAEL MCBRIDE, P.C.
6420 Southwest Blvd., Suite 112
Fort Worth, Texas 76109
(817) 877-1824 (office)
(817) 877-1797 (fax)
jmm@mcbridelegal.com

-and-

THE FILLMORE LAW FIRM, LLC
1200 Summit Avenue, Suite 860
Fort Worth, Texas 76102
(817) 332-2351 (office)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

*Attorneys for JT Palmer and Associates, LLC*

/s/ *Ryan K. Cochran*
Ryan K. Cochran

# APPENDIX K

**From:** griffin@dhnashville.com <griffin@dhnashville.com>
**Sent:** Tuesday, June 2, 2020 4:46 PM
**To:** Chris Cronk <Chris.Cronk@wallerlaw.com>
**Cc:** Ryan Cochran <Ryan.Cochran@wallerlaw.com>; Melissa Jones <Melissa.Jones@wallerlaw.com>; Ann Marie Jezisek <AnnMarie.Jezisek@wallerlaw.com>
**Subject:** RE: In re: Robert Terry Winfree - Case No. 20-01417 Adv. Proc. No. 20-90031 - Notice of Issuance of Subpoenas Requiring Production of Documents

> **External Message**

Melissa/Ryan, I noticed the subpoena for Hermitage Investment Group, Inc. is addressed to 105 Bonnabrook Drive. Just FYI, I believe that building might be vacant. The corporation was dissolved in 1993 after a failed attempt to invest in some Dumplins restaurant franchises. The corporation has no records and Winfree never received any distributions (other than a $25,000 return on his investment). Winfree is the registered agent, so I can accept service of the subpoena via email if you want. But as a heads up, there just won't be any documents to produce.

Griffin



**Griffin S. Dunham** / Member
griffin@dhnashville.com /
615.933.5850

**Dunham Hildebrand, PLLC**
http://www.dhnashville.com



**From:** Chris Cronk <Chris.Cronk@wallerlaw.com>
**Sent:** Tuesday, June 2, 2020 12:36 PM
**To:** griffin@dhnashville.com
**Cc:** Ryan Cochran <Ryan.Cochran@wallerlaw.com>; Melissa Jones <Melissa.Jones@wallerlaw.com>; Ann Marie Jezisek <AnnMarie.Jezisek@wallerlaw.com>
**Subject:** In re: Robert Terry Winfree - Case No. 20-01417 Adv. Proc. No. 20-90031 - Notice of Issuance of Subpoenas Requiring Production of Documents

Mr. Dunham,

Attached please find three (3) Notices of Issuance of Subpoena on behalf of TN Dental Professionals, P.C. and CPF Dental, LLC, d/b/a Marquee Dental Partners, in the subject case, which we intend to serve today.  Copies of these will be delivered to your office today as well.  If you have any questions, please let us know.  Thank you.

Christine T. Cronk
Paralegal

waller

Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN 37219
615.850.8761 (offc)
615.594.9657 (cell)
chris.cronk@wallerlaw.com