IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| In re:<br><br>Robert Terry Winfree,<br><br>     Debtor<br>_____<br><br>TN Dental Professionals, P.C., and<br>CPF Dental, LLC, d/b/a Marquee Dental<br>Partners,<br><br>     Plaintiffs/ Counter-Defendants,<br><br>vs.<br><br>Robert T. Winfree, D.D.S. and Olivia<br>Winfree,<br><br>     Defendants/ Counter-Plaintiffs. | Chapter 11<br><br>Case No. 3:20-01417<br>Judge Randal S. Mashburn<br><br><br><br><br><br><br><br><br><br>Adv. Proc. No. 3:20-90031 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: Subpoena Served On<br><br>J.T. Palmer & Associates, LLC | Civil Action No. 3:20-mc-00055-E-BN |

**Non-Party J.T. Palmer & Associates, LLC's
Reply to Plaintiffs' Response to Motion to Quash Subpoena**

**A.      Plaintiffs' claims about the "timing" of the Subpoena are false.**

Plaintiffs do not dispute that commanding JT Palmer to produce the requested documents within only two business days of being served with the Subpoena failed to "allow a reasonable time to comply." *See* Fed. R. Civ. P. 45(d)(3)(A)(i); Response, pp. 1, 5-6. Instead, Plaintiffs continue relying on their unsupported and false claims that JT Palmer was served with the Subpoena on June 11, 2020 and that the Subpoena gave JT Palmer 14 days (until June 25) to comply. *Id.* The Subpoena itself refutes Plaintiffs' claims.

Plaintiffs' counsel signed and "issued" the subpoena on **June 2**. *See* Appendix in Support of Motion to Quash, App. 01. For still-unexplained reasons, Plaintiffs delayed delivering the "issued" Subpoena to their process server until **June 11**. App. 02 (Subpoena's "Proof of Service," "declar[ing] under penalty of perjury," "I received this subpoena … on … **6-11-20**") (Emphasis added). The Subpoena's "Proof of Service" also avers the process server "served the subpoena by delivering a copy to" JT Palmer's agent for service "on … **6-12-20**." *Id.* (Emphasis added).

Plaintiffs' claim that "Exhibit A to the Subpoena clearly states that production is to be made in 14 days, making JT Palmer's deadline to comply no later than June 25, 2020" is meritless for three reasons. *See* Response, p. 6. First, Rule 45 requires the subpoena to "command" compliance "at a specified time." *See* Fed. R. Civ. P. 45(a)(1)(A)(iii). Here, the Subpoena specifically "commanded" compliance on Tuesday, **June 16**, only two business days after service. App. 01. Exhibit A "commanded" nothing; it only "requests." App. 05.

Second, Exhibit A "requests" production "within fourteen (14) days." App. 05. But nowhere does it specify the date from which the 14-day period was to commence—*e.g.*, from the day when the Subpoena was served or from June 2, when it issued. *Id.*

1

Finally, to read Exhibit A's "request" to constitute the required "command" would implicate another of Rule 45's grounds for quashing the Subpoena. Exhibit A "requests" production at Plaintiffs' counsel's office in Nashville Tennessee, App. 05, well beyond Rule 45(c)'s 100-mile geographical limit. *See* Fed. R. Civ. P. 45(d)(3)(A)(ii); App. 10 (¶¶ 3-4).

In sum, Plaintiffs cannot credibly dispute that the Subpoena "commanded" production on June 16—only two business days after JT Palmer was served on June 12. Yet Plaintiffs continue telling two different courts that JT Palmer was served on June 11 and was required to comply on June 25. Even after being served with the Motion to Quash pointing out the truth, Plaintiffs continue making these same false claims, including to the Tennessee bankruptcy court. *See* Plaintiffs' Appendix, p. 300 (¶ 2).

The Court should quash the Subpoena. Fed. R. Civ. P. 45(d)(3)(A).

**B.     JT Palmer did not "ignore the Subpoena."**

Plaintiffs do not allege untimeliness as a ground for denying the Motion to Quash. Response, pp. 7-13. Still, Plaintiffs season their Response with false claims that "JT Palmer ignored the subpoena until it was pressed" and "did not file its Motion to Quash until July 10, 2020 – 29 days after service of the Subpoena." Response, p. 6. But the truth is Plaintiffs' 29-day calculation is based on Plaintiffs' same false claim that they served JT Palmer with the Subpoena on June 11, instead of June 12. Also, the uncontroverted evidence shows JT Palmer and her counsel never "ignored the subpoena." *See* App. 10 (¶7 & ¶8), 30.

**C.     Plaintiffs' trade secret arguments are meritless.**

**1.     JT Palmer established its right to protection.**

Plaintiffs cite the "six factors" listed in *Carbo Ceramics, Inc. v. Keefe*, 166 Fed. Appx. 714, 718 n.1 (5th Cir. 2006) as "determining whether information should be treated as a trade secret." *See* Response, p. 8. Plaintiffs thereafter claim "JT Palmer fails to address **any**

of the six factors ...." *Id.* at 9 (Emphasis added).

*Carbo Ceramics* was a 2006 misappropriation of trade secrets case, applying Texas common law. *See Carbo Ceramics*, 166 Fed. Appx. at 718 n.1. On September 1, 2013, the Texas Uniform Trade Secrets Act ("TUTSA") took effect. *See* Act of May 2, 2013, 83d Leg., R.S., ch. 10, 2013 Tex. Sess. Law Serv. 13 (West), eff. Sept. 1, 2013. With the passage of TUTSA, its definition of a trade secret now controls. *See Demond v. Infiniti HR LLC*, 2017 WL 3835951, at *5 n.12 (N.D. Tex. Aug. 11, 2017), *report and recommendation adopted*, 2017 WL 3835336 (N.D. Tex. Aug. 31, 2017) (citing TUTSA's definition of "trade secret" and refusing to consider "pre-TUTSA cases that considered the earlier common law factors," explaining, "In light of the TUTSA definition, these factors need not be considered"); Joseph F. Cleveland, Jr., *et al.*, The Texas Uniform Trade Secrets Act, Tex. J. Bus. L. 323 (2013) ("TUTSA provides an unambiguous and updated definition of trade secrets," "an expansive definition of protectable trade secrets," and a "new statutory definition of a trade secret [that] represents a significant change to Texas law.").

TUTSA's trade secret definition is "identical to [the one] in TUTSA's federal counterpart," the Defense of Trade Secrets Act ("DTSA"). *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 702 (W.D. Tex. 2019) (citing 18 U.S.C. § 1839). JT Palmer's Motion to Quash relies on the trade secret definition in TUTSA and the DTSA. *See* Motion to Quash, p. 8.

JT Palmer's motion and proof addressed each required element in TUTSA and the DTSA's trade secret definition. *Id.* at 9-12; App. 10-12, 21-24. Citing *Autotech Technologies Ltd. Parnership v. Automationdirect.com, Inc.*, 235 F.R.D. 435, 442 (N.D. Ill. 2006), Plaintiffs argue that JT Palmer "resorts repeatedly to generic, conclusory allegations" to prove its trade secrets. *See* Response, p. 9. The alleged trade secret in *Autotech* was a "customer list." *Autotech Techs.*, 235 F.R.D. at 442. The court in *Autotech* refused to grant

3

protection to the list for good reason:

> ADC's opening brief does not claim that its list is a trade secret. There is the unadorned conclusion that it is "highly confidential and proprietary," the type of confidential and proprietary information that is entitled to protection against disclosure, and that disclosure to Autotech "would result in serious adverse consequences" because Autotech is a direct competitor.

*Id.* ("The kind of perfunctory and undeveloped argument that is the opening brief, unsupported by pertinent authority, hardly merits consideration.") (citations omitted).

JT Palmer's Motion to Quash alleged and proved confidential trade secrets that TUTSA and the DTSA specifically protect and Plaintiffs specifically seek. *See* Motion to Quash, p. 8-13; App. 10-12, 21-24. JT Palmer's allegations and proof were not "unadorned," "perfunctory," "undeveloped," "generic," or "conclusory." *Id.* Instead, they explain the confidential nature of, *inter alia*, the processes, including vendors and sources, JT Palmer uses in its business as a confidential information research specialist specializing in performing confidential background research aimed at discovering assets, including foreign bank accounts, that may be hidden or secreted. *Id.* JT Palmer also explained the business-ending harm that would result if its trade secrets are disclosed. *Id.*

Contrary to Plaintiffs' contention, JT Palmer does not contend the social security numbers of its subjects are trade secrets. *See* Response, pp. 10-11. Instead, it is JT Palmer's **processes**, or "range of **techniques**," including confidential vendors and sources, that JT Palmer employs when using such identifying information that are highly confidential and guarded. *See* Motion to Quash, p. 8-13; App. 10-12, 21-24; Response, p. 2-3 n.2. Both TUTSA and the DTSA define as trade secrets confidential processes and techniques like those JT Palmer uses in its business. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6) (defining "trade secret" to include "all forms and types of information, including business, …, technical, [or] economic … information, and any … **technique**, [or] **process** …,

4

whether tangible or intangible ....") (Emphasis added); 18 U.S.C. § 1839(3).

Plaintiffs' Response does now try to narrow the Subpoena's scope by mis-describing it. *See, e.g.*, Response, p. 9 ("CPF Dental simply seeks documents showing the underlying identifiers, if any, that JT Palmer used in concluding that the Winfrees are or were the lawful owners of the Foreign Accounts."). But Plaintiffs elsewhere reveal the true aim and scope of their requests. *See* Response, p. 5 ("It is imperative to learn the **processes** used by JT Palmer," explaining why Plaintiffs want to learn "[i]f JT Palmer's **process** was thorough" or "something simple"), p. 7 (arguing "JT Palmer has failed to meet its burden in proving that JT Palmer's '**process**' constitutes a trade secret") (Emphasis added).

In sum, JT Palmer has carried its "burden to establish that the information sought is a trade secret and that its disclosure might be harmful." *See Cmedia, LLC v. LifeKey Healthcare, LLC*, 216 F.R.D. 387, 390–91 (N.D. Tex. 2003); Rule 45(d)(3)(B)(i).

### 2. Plaintiffs did not carry their burden to established either relevance or necessity.

Given JT Palmer's trade secret showing, the burden shifted to Plaintiffs "to show that the requested information is relevant and necessary." *Id.* This they failed to do.

Plaintiffs' relevance and need arguments are based on the same false claim that permeates their Response. Plaintiffs claim "**JT Palmer identified six undisclosed foreign bank accounts** (the 'Foreign Accounts') **allegedly owned by the Winfrees** with a total balance of $1,483,209, **by** name of the bank, **name of the account holder**, and account balance," explaining Plaintiffs "subpoenaed JT Palmer for documents to assist CPF Dental in determining *how* **JT Palmer identified that the Foreign Accounts are or were, in fact, owned by the Winfrees**." *See* Response, p. 1 (Emphasis added).

5

Conspicuously absent from Plaintiffs' allegations is JT Palmer's undisputed evidence showing JT Palmer **never** identified that **any** of the accounts "are or were, in fact, owned by the Winfrees"—by account name or otherwise. *See* App. 12 (¶16); App. 26. In fact, in her January 2, 2020 email, JT Palmer's owner, Ms. Shea, reported to her client:

> No ssn [*i.e.*, social security numbers] on any accounts.
> Address information does not match addresses on accounts.
> We can obtain the details on accounts but can not [sic] guarantee that these are your subjects.

App. 26; *see* App. 12 (¶16).

The only "possible" link between the six subject accounts and the Winfrees was by account holder name. *Id.* Even then, Ms. Shea's January 2 email showed **only one** of the six accounts had the same first and last names as the debtor/defendants Robert T. Winfree and Olivia Winfree. *See* App. 26 (showing non-matching names on the other five accounts in Switzerland, South Africa, Luxembourg, Shanghai and Brazil and asking her client, "Would like for us to proceed or [*call it*] a **no hit**?") (Emphasis and brackets added).[1]

It is precisely because JT Palmer could **not** identify the Winfrees as owners of the foreign accounts (*i.e.*, the "**no hit**") that she never said they were. *See* App. *See* App. 12 (¶16); App. 26. Even after she was asked to continue trying, Ms. Shea twice more (on May 4 and May 11) reaffirmed that no additional information connected the Winfrees to the six foreign accounts. *See* Supplemental Appendix, App. 44-47.

Nonetheless, to try to prove relevance and need, Plaintiffs argue that they need to see what they falsely claim JT Palmer "used":

- "... in making its determination that the Winfrees are or were in fact the rightful owners of the alleged undisclosed Foreign Accounts," Response, p. 5;

- "... to reach the conclusion that the Winfrees possessed the Foreign Accounts," *id*;

---

[1] Plaintiffs' listing of the Foreign Accounts on page 3 of their Response leaves off "Robert Wenfree," the non-matching name associated with the South African account. *See* App. 26.

6

- "… so that [Plaintiffs] can determine the level of credibility to place on JT Palmer's findings," *id*;

- "… in concluding that the Winfrees are or were the lawful owners of the Foreign Accounts," *id.* at 9-10;

- "… in concluding that the Winfrees are the owners of the Foreign Accounts," *id.* at 10; and

- "… in determining that the Winfrees possess the Foreign Accounts," *id.* at 12.

As the uncontroverted evidence shows, JT Palmer never determined, concluded or alleged the Winfrees are or were the owners of any foreign account. *See* App. 12 (¶16); App. 26.

As such, JT Palmer's trade secrets are not relevant or necessary to Plaintiffs' effort to connect those accounts to the Winfrees. *See* Response, p. 1 ("CPF Dental subpoenaed JT Palmer for documents to assist CPF Dental in determining **how** JT Palmer identified that the Foreign Accounts are or were, in fact, owned by the Winfrees.") (Emphasis added). In other words, JT Palmer's trade secrets cannot assist Plaintiffs in determining **how** JT Palmer did or concluded something that JT Palmer never actually did or concluded.

Finally, Plaintiffs own records show there are other sources from which they can obtain information to try to connect the Winfrees to the foreign accounts. On January 30, 2020—some 28 days **after** JT Palmer's January 2 email reporting a "**no hit**" on the Winfree's ownership of the foreign accounts—Plaintiffs filed in their action against the Winfrees an affidavit of their investigator, Dan Hodges. *See* Appendix D to Response in Opposition to Motion to Quash, pp. 198-99 ("Affidavit of Dan Hodges"). Plaintiffs appear to have used Hodges' affidavit to obtain "injunctive relief" against the Winfrees, apparently claiming "the Debtor parked over a million dollars in multiple foreign bank accounts to hinder [Plaintiffs'] collection efforts …." *See* Response, p. 5 n.4. The affidavit had Hodges swear, "upon **my own personal knowledge**," that "**I** was retained to identify assets of"

7

the Winfrees and "**I was able to identify** the following accounts that appear to be owned by" the Winfrees, listing the same six foreign accounts Plaintiffs identify on page 3 of their Response as "the Foreign Accounts." Plaintiffs' Appendix, pp. 198-99 (Emphasis added).

If Plaintiffs' investigator was telling the truth, then **he** can provide Plaintiffs the proof JT Palmer was never able to obtain. But if he was not, then it would appear a fraud was perpetrated on the Tennessee court.

What's more, **after** Plaintiffs sent JT Palmer the Subpoena, Hodges sent Plaintiffs' counsel an email in which he discussed how Plaintiffs "mishandled" the "investigation" into the Winfrees' assets, including now by Plaintiffs' "non-disclosure"-breaching decision to subpoena JT Palmer:

> Our first searches were for domestic US banks which were done with addresses, names, dates of birth and SSN's. The results were unremarkable. We asked **our source** [*JT Palmer*] to then do international bank searches and found out that the international banks **did not accept** US SSN's DOB's or any other US indentifyers [sic]. **The information provided had clear caveats and non-disclosure language which I guess was ignored.**
> …
> In my opinion this matter was **mishandled from the very start**. … At a minimum the CPA or personal accountant should have been subpoenaed and deposed. Also better interviews of the former employees could possibly have revealed additional information. **Instead now the source that provided the off-shore information is issued a subpoena.** In one of our conference calls Attorney Mike Ralchelson from Chicago acknowledged that **our source should not be given up**. I guess that was just a suggestion.

*See* Supplemental Appendix, App. 48-49 (Emphasis and bracketed reference added).

Hodges' email is important for at least four reasons. First, it shows Plaintiffs have other available avenues to try to obtain the proof they seek besides subpoenaing JT Palmer's confidential trade secrets. Second, it shows Hodges and Plaintiffs' counsel well know JT Palmer never was able to identify the Winfrees as owners of the foreign accounts. Third, it shows when Plaintiffs tell the Court—"This is exactly what CPF Dental is asking

8

JT Palmer to confirm: that JT Palmer discovered the Foreign Accounts by associating the Subjects names–Dr. Winfree and Mrs. Winfree–to the subject's respective social security numbers," Response, p. 10—they well know JT Palmer did no such thing. Finally, it shows Plaintiffs likely also have mislead the Tennessee Debtor—who appears to be looking to blame someone for the injunctive relief Plaintiffs obtained on the strength of Hodges' affidavit. *See* Response, p. 5 n.4 (showing Debtor now claims: "'**It appears** JT Palmer originated the false statements that caused [Plaintiffs] to file a motion for injunctive relief and allege that the Debtor parked over a million dollars in multiple foreign bank accounts to hinder [Plaintiffs'] collection efforts in the event of a judgment.'") (Emphasis added).[2]

At a minimum, the evidence before the Court shows Plaintiffs failed to carry their burden to establish relevance and need. *See Cmedia*, 216 F.R.D. at 390–91.

### 3. The potential harm outweighs the benefit.

Plaintiffs' counsel is a large law firm, "[w]ith more than 270 attorneys in three states." *See* https://www.wallerlaw.com/what-we-do. Its services include "[w]orking with both secured and unsecured creditors in the collection of debts and judgments, both in federal bankruptcy and state court proceedings" and "[l]everaging our deep experience in … collections, receiverships, turnover actions, injunctions to prevent dissipation of assets." *See* https://www.wallerlaw.com/services/1/bankruptcy-restructuring. In this case, as part of its efforts to prevent dissipation of assets and to enable future collection efforts, "Waller" hired an investigator to help its clients try to find hidden bank accounts of the Winfrees.

Many of JT Palmer's clients are law firms. App. 12. If law firms, including "Waller," could discover the confidential techniques and processes JT Palmer uses to locate secreted

---

[2] Even after receiving Hodges' email, Plaintiffs still submitted Hodges' **same** affidavit as evidence to support their Motion to Compel in the Tennessee court and their opposition to JT Palmer's Motion to Quash in this court. *See* Response, p. 3.; Plaintiffs' Appendix, App. 198, 225; JT Palmer's Supp. Appendix, App. 48.

9

bank accounts, there would be no reason for any law firm to hire JT Palmer—the law firm could simply provide JT Palmer's same service directly to clients. *Id.* If law firms could learn how to do what JT Palmer does, that would destroy JT Palmer's business. *Id.*[3]

At minimum, JT Palmer has shown that "the potential harm caused by production outweighs [any alleged] benefit." *Cmedia*, 216 F.R.D. at 391 (even if relevant "discovery will not be permitted … if the potential harm caused by production outweighs the benefit.").

**D. Conclusion: The Court should quash the Subpoena.**

JT Palmer recognizes that typically, under Rule 45(d)(3), the Court has discretion either to quash or to modify a subpoena. But given the record in this case and the totality of Plaintiffs' conduct, JT Palmer requests the Court to quash, not modify the Subpoena. Respectfully submitted,

By: */s/ Charles W. Fillmore*  */s/ J. Michael McBride*
H. Dustin Fillmore III  J. Michael McBride
State Bar No. 06996010  Texas Bar No. 13332100
Charles W. Fillmore  J. MICHAEL MCBRIDE, P.C.
State Bar No. 00785861  6420 Southwest Blvd., Suite 112
THE FILLMORE LAW FIRM, LLC  Fort Worth, Texas 76109
1200 Summit Avenue, Suite 860  (817) 877-1824 (office)
Fort Worth, Texas 76102  (817) 877-1797 (fax)
(817) 332-2351 (office)  jmm@mcbridelegal.com
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

ATTORNEYS FOR NON-PARTY J.T. PALMER & ASSOCIATES, LLC

**CERTIFICATE OF SERVICE**

On August 3, 2020, this Reply Brief was served on all counsel of record via the court's electronic filing system.

*/s/ Charles W. Fillmore*

---

[3] Plaintiffs' suggestion of "a protective order restricting disclosure to counsel and the parties" would not eliminate the harm. *See* Response, p. 13. Moreover, on this record, no one can have any confidence that either Plaintiffs or "Waller" would respect and abide by such an order.

10